```
 1                  UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF DELAWARE

 3

 4    VIA VADIS LLC                :    CA NO. 11-507-RGA

 5                                 :    JULY 6, 2012

 6              Plaintiff,         :

 7                                 :    10:00 O'clock a.m.

 8    v.                           :

 9                                 :

10    SKYPE INC., ET AL            :

11                                 :

12              Defendants,        :

13    ...........................:

14

15

16            TRANSCRIPT OF DISCOVERY DISPUTE

17         BEFORE THE HONORABLE RICHARD G. ANDREWS

18              UNITED STATES DISTRICT JUDGE

19

20

21    APPEARANCES:

22

23    For Plaintiff:    WHITEFORD, TAYLOR & PRESTON

24                      BY:  DANIEL A. GRIFFITH, ESQ

25                      BY:  STEVEN E. TILLER, ESQ
```

```
For Defendants:      MORRIS, NICHOLS, ARSHT & TUNNELL
                     BY:  RODGER D. SMITH, ESQ
                     BY:  JACK B. BLUMENFELD, ESQ
                          -and-
                     KASOWITZ, BENSON, TORRES & FRIEDMAN
                     BY:  MICHAEL B. EISENBERG, ESQ




Court Reporter:      LEONARD A. DIBBS
                     Official Court Reporter
```

1
2                    P R O C E E D I N G S
3
4           THE COURT: Everyone be seated.
5           Good morning. This is Richard Andrews.
6           We've got Dan Griffith on one side, Rodger Smith. I
7    assume you're Mr. Eisenberg? I think I've seen you before.
8           Michael Eisenberg on the other side. So now we have
9    Mr. Blumenfeld and Mr. Tiller on the phone.
10          So this is a discovery matter in Via Vadis LLC versus
11   Skype Inc, Civil Action No. 11-507.
12          I've gotten a letter from the plaintiff. I've gotten a
13   letter from the defendants. And I got an Affidavit from Dr.
14   Nielson. And I got some e-mails. And I have read them all.
15          So I think I have a pretty good understanding of what's
16   going on.
17          But, Mr. Tiller, if you want to say something, go
18   ahead.
19          MR. TILLER: Yes, your Honor. Thank you. I'm sorry
20   for the delay.
21          THE COURT: Don't worry about it.
22          MR. TILLER: Okay. Thanks. Just a couple of quick
23   points. Again, as we said in our letter, the code that we have
24   asked for represents far less than two percent of the total code
25   that was produced, seven files.

1     And that code is specifically requested because it
2  falls, we believe, directly into our theory of infringement in
3  this case. Most noticeably, too, I should mention, your Honor,
4  that we did not ask for large, obviously, over 98 percent of the
5  code. And we haven't asked for code with regard to, for
6  example, video encryption or any other issues that aren't
7  related to our code.
8     What we've asked for, and the inference in the letter
9  from defendants' counsel, Dr. Nielson did not do a review and
10 simply -- I'm sorry for that, your Honor.
11        THE COURT: I'm not sure whether it's your phone or our
12 phone or what.
13        MR. TILLER: I'm not sure either.
14    I would say, your Honor, the inference in defendants'
15 letter that Dr. Nielson kind of went in and identified some
16 files and is going to do a review later is absolutely,
17 completely wrong.
18    He was there for eight straight hours looking at code,
19 reviewed the code, identified code that is narrowly crafted and
20 narrowly tailored to what we believe are the infringement
21 theories.
22    And I would note, your Honor, that a lot of what this
23 code represents and deals with regard to Skype's applications
24 are already in the public domain in the fact that Skype filed a
25 patent application in Germany which touches on some of these

1    issues and touches on some of the code that we are requesting.

2            Also, your Honor, the inference in the letter that Dr.
3    Nielson and my law firm and the other law firms representing the
4    plaintiff will disclose this information is somewhat offensive
5    and, obviously, we understand our burdens and obligations under
6    the Protective Order.

7            But finally, your Honor, in closing, the Protective
8    Order makes very clear that we are permitted to print or
9    designate code to be printed and produced, and that the
10   defendants can only object to that in a very narrow
11   circumstance, and that is, they believe that the printed
12   portions are excessive and not reasonably necessary to any case
13   preparation activity.

14           Now, in this dispute, defendants are essentially trying
15   to rewrite the Protective Order.

16           By the way, the Protective Order took over a year to
17   negotiate.  This was certainly, in my career, the most heavily
18   negotiated Protective Order that I've ever been part of.

19           Now, they are trying to say the fact that you are
20   asking for the entire subfiles, or entire files, isn't what we
21   intended.

22           But the fact of the matter is, your Honor, the
23   Protective Order is very clear, unless the code that is being
24   requested is excessive and not reasonably necessary to any case
25   preparation activity, it shall be produced.

1                   Dr. Nielson had said this is necessary to a case
2       preparation activity.  We have to produce infringement claim
3       charts.  We have to produce an expert report.
4                   Dr. Nielson needs this very limited code to engage in
5       those activities.
6                   Again, this code represents less than two percent of
7       the entire code.  And this is not the time to try to renegotiate
8       the Protective Order to come up with other bases for objecting
9       to the preparation of the code.
10                  I would also note, your Honor, that the defendants say
11      that because the -- because entire files, and I use that term.
12      These are really subfiles of the entire file.  But because they
13      are they argue that printing the full files exacerbates the harm
14      that could result from unintentional disclosure.  The fact is
15      they really haven't said what that harm could be.
16                  Again, much of this code is the subject of a disclosed
17      patent application in Germany that we've had transcribed.  And
18      it represents a very small aspect of the Skype system,
19      essentially, how computers talk to each other, or how they
20      initiate that conversation.
21                  And the mere fact that it's an entire subfile doesn't
22      just because Skype's says so.  And so for all of those reasons,
23      your Honor --
24                  THE COURT:  Hold on a second, Mr. Tiller.
25                  Is it possible we could get them to call back in?  I

```
 1    would imagine if they did that, it won't happen again.
 2              Mr. Tiller, if I hang up, can you call back in?
 3              MR. TILLER:  Yes, we will do that.
 4              THE COURT:  All right.  So, I'm going to hang up.
 5              Mr. Tiller, Mr. Blumenfeld, are you there again?
 6              MR. TILLER:  Mr. Blumenfeld has dropped off somehow.
 7              THE COURT:  All right.
 8              MR. TILLER:  That was part of the issue that was going
 9    on.
10              THE COURT:  Mr. Smith says he's not necessary.
11              Let's just advance.  I got what you had to say, Mr.
12    Tiller.  Mr. Eisenberg, I guess?
13              MR. EISENBERG:  Yes, your Honor.
14              I am there are a few points that I would like to
15    address.
16              First of all, there is a presumption that source code
17    is subject to a different kind of confidentiality.  That's the
18    provisions in lots of, you know, agreements between parties and
19    in fact, the default agreement in Delaware.
20              This isn't just any other piece of paper that could be
21    out there in the world.
22              I did not mean to suggest in any letter that they would
23    intentionally disclose it.  I believe that attorneys act
24    honorably, generally.  But the issue is inadvertent disclosure,
25    that once something is out of our control --
```

1                THE COURT: Right. I think I got the disclosure issue.
2           I didn't take your letter to be saying anything other
3     than accidents can happen. And that's the reason why it's
4     exactly what you're saying, why it's the highest category of
5     protection and there all these safeguards. Accidents can happen
6     to anyone. So, go ahead.
7           MR. EISENBERG: I have never heard mention of Skype's
8     source code being in the public domain before. I don't think it
9     was attached to any application. I haven't seen this German
10    application. I would assume that it's generally not done that
11    code would be attached to that.
12          MR. TILLER: I didn't mean to infer that the code was
13    attached. It was the concepts that are conveyed by the code are
14    discussed in the German application. That's how we knew what to
15    look for, your Honor.
16          MR. EISENBERG: The difference between concepts and
17    actual source code is very different.
18          I can figure out how Microsoft Word works, but
19    Microsoft is still not giving me the source code if I ask for
20    it. It's highly confidential, highly prejudicial.
21          This is not little snippets. Internally, they asked
22    for 2000 pages, four reams of paper to be printed out of
23    confidential source code.
24          I noticed in our letter, we referred to 49 files. I
25    counted on the way down on the train, it was actually a 105.

1   There are 15 different versions of the source code, seven files
2   from each of those different 15 different versions.
3           THE COURT: Your letter said nine versions.
4           Now it's 15 versions?
5           MR. EISENBERG: Now, it's 15 versions, I have version
6   numbers sitting here. That was a mistake. I believe also the
7   Protective Order says excessive and/or not pertinent to the
8   litigation. There is and or.
9           THE COURT: I think the actual language is and/or not
10  reasonably necessary to any case preparation activity. That's
11  for the objection, which doesn't exactly a hundred percent track
12  that you should only print those limited portions of the source
13  code specifically necessary for a specific case preparation
14  activity, but presumably, the reasonably necessary kind of
15  matches up with the first things since it makes little sense
16  that it would be anything other than you can object if they
17  don't -- if they want something that is beyond a limited portion
18  of the source code is specifically necessary for a specific case
19  preparation activity.
20          MR. EISENBERG: Again, when someone says necessary to a
21  specific case preparation activity, is the expert going to sit
22  down and visibly compare 2000 pages of printouts?
23          He's not going to show that to the jury. He's not
24  going to present that to your Honor. It's not going to be part
25  of any actual filing to this Court.

1             It's clear that what he wants to do is sit at home at
2    his leisure and read through it at a place that is convenient
3    for him.
4             That's not what a Protective Order is about. That's
5    not what I thought we were agreeing to when we signed this.
6    That was not the intent.
7             If he had asked for a few pages here and there, we
8    would not be here today. But it was not.
9             It was a 105 files, 2000 plus pages. And that is
10   excessive.
11            I don't think this is dispositive here. When they talk
12   about the burden on their expert, their expert lives in
13   Baltimore. It's not a particularly difficult trip to go from
14   Baltimore to Delaware to review coe.
15            I came down here for today's hearing from New York.
16   It's a reasonable accommodation. They have now asked for a two
17   week extension of time to submit their claim charts in this
18   case, to give us notice of where this case is going.
19            That room has been open. They could have been there
20   any day.
21            THE COURT: That room has been open since when?
22            MR. EISENBERG: Since the day for our core document
23   production.
24            THE COURT: I thought it was then, but I wasn't sure.
25   Okay. Go ahead.

1               MR. EISENBERG:  Basically, in our view, they have
2      caused this problem.  Even when we said we wouldn't give them
3      the printouts, they could have been there the next day, or with
4      the notice provision, within a window to go ahead and look at
5      the code and they chose not to.
6               THE COURT:  I forget.  June 21st is the day they
7      actually went.  You actually went?
8               MR. GRIFFITH:  Right.
9               MR. EISENBERG:  They originally asked for June 22nd as
10     well.  And they did not come on the 22nd.  They just requested
11     the printouts.
12              As soon as I got that file, I asked somebody to write a
13     letter and say, Hey, this is excessive.  That is and remains our
14     position.  There was no change of issues.
15              THE COURT:  All right.  Thanks.
16              I thought the letters that were submitted, which is
17     consistent with arguments that I just heard were pretty
18     excellent at framing the issues.
19              I started with the Default Standard, which does say in
20     paragraph five, source code may not be printed or copied without
21     the agreement of the producing party or further order of the
22     Court.
23              So then you all modified that as your encouraged to do
24     in Docket Item 57, which is the Protective Order.  And paragraph
25     9(c)(3) -- no, actually on -- it's talking about the computer

1 work station. And it says, outside counsel and the experts are
2 or consultants shall have access to the computer work station
3 throughout the duration of the case subject to the notice
4 provision.
5 And paragraph 9(c)(4) says -- talks about the printing
6 of paper copies, material, printing of paper copies. It talks
7 about a reasonable amount of paper. And says the receiving
8 party, which issuing in this case is Via Vadis quote, shall only
9 print those limited portions of the source code specifically
10 necessary to a specific case preparation activity unquote.
11 So Via Vadis submitted an Affidavit from Dr. Nielson
12 which, you know, was pretty conclusory at the key point.
13 Quote, paragraph 6, each of the files I requested to be
14 printed and produced are necessary to a specific case
15 preparation activity.
16 In this regard, these files are necessary to my
17 preparation of an expert report and to assisting counsel in
18 preparing charts regarding defendants' infringement.
19 So then I also have in the record what defendants have
20 said today a bit. There is what I would call a whiff of
21 convenience to Dr. Nielson that's at issue here.
22 And besides whatever e-mails there were back and forth,
23 there seems to have been to some extent, if I understand things
24 correctly, the stand-alone computer has this utility where you
25 can compare the 15 versions of the source code with each other

1   and see what you actually need.

2   Whether there is any difference in them, I have no
3   idea. I don't have the background to know whether it's likely
4   they are all different or whether many of them are exactly the
5   same.

6   But it doesn't seem from what's been provided that Dr.
7   Nielson chose to do that when he was asking for the 2000 pages
8   or so.

9   And it seems to me that any sort of reasonable -- any
10  sort of an attempt to comply with the Protective Order about
11  specifically necessary -- to a specific case preparation
12  activity would at least involve some activity by Dr. Nielson to
13  narrow down what he needs, the correspondence saying, you know,
14  you all represent -- I don't think it's your job to represent.
15  And I think it's the plaintiff's job to analyze what is in the
16  stand-alone-computer.

17  And I also have to say on the one hand, we do have an
18  Affidavit from the plaintiff. We've got argument from the
19  defendants.

20  On the other hand, the Affidavit from Dr. Nielson
21  really is pretty conclusory. And I find it hard to believe
22  that, in fact, to produce the expert report he needs -- that
23  essentially all 2000 pages are essential, which I would take
24  necessary to mean -- that again, they are essential in terms of
25  preparing the defendants' infringement chart -- sorry.

1    Preparing the plaintiff's infringement charts.

2           You know, there is the provision in the Protective
3    Order about taking some notes.  It seems to me that's what for
4    the most part should be used to prepare the plaintiff's
5    infringement charts.

6           So, I'm not sure that I would say the 2000 pages is
7    excessive just because it's 2000 pages.  But I do think I'm not
8    convinced at all that they are reasonably necessary to a
9    specific case preparation activity and so, therefore, I'm not
10   going to enter some order for plaintiff saying for you to print
11   the 2000 pages.

12          And in terms of the request for the extra two weeks to
13   do the infringement contentions, I'm taking note of the fact
14   that July 11th, five days from today, and while I don't think
15   the plaintiffs -- although, I don't agree with the merits of
16   their position, I also -- I think realistically, they are going
17   to need some more time.

18          So, my inclination is to give them one extra week so
19   that if the infringement contentions are due right now on July
20   11th, to make it July 18th.

21          Mr. Tiller, can you and Dr. Nielson and whoever else
22   you need, do what's necessary to meet the July 18th deadline?

23          MR. TILLER:  Your Honor, just because I know from some
24   slight travel plans -- some travel plans on the part of a couple
25   of attorneys, would it be possible to make it the 20th?

1         THE COURT: Which attorneys?

2         MR. TILLER: Myself and Mr. Zoltick.

3         THE COURT: I saw he was the one that actually came

4    last time around.

5         MR. TILLER: We both came last time around, to be

6    honest. We were both there.

7         THE COURT: Hold on one minute.

8         MR. TILLER: Yes.

9         THE COURT: The letter from July 3rd where I thought it

10   was saying Mr. Griffith, that's actually Mr. Tiller who went?

11        MR. TILLER: Myself and Mr. Zoltick.

12        THE COURT: The team was Zoltick, Nielson and Tiller?

13        MR. TILLER: Correct.

14        THE COURT: I guess when the letter was written they

15   forgot to change the I.

16        MR. TILLER: Oh, that's right.

17        MR. GRIFFITH: Sorry about that, your Honor.

18        THE COURT: That's all right. I understand how these

19   things happen. Just don't hold it against me when I do it.

20        I'm sorry, Mr. Tiller. You have travel plans, Zoltick?

21        MR. TILLER: I have a hearing in San Francisco next

22   week. Mr. Zoltick is in Japan right now, which is why he's not

23   on this call.

24        I would ask for two more days until the 20th.

25        THE COURT: The 20th, all right.

1           MR. TILLER: Your Honor, can I ask a question?

2           I'm not trying to ask for some type of an advisory

3    opinion or to tip off anything one way or the other.

4           If Dr. Nielson goes up there, runs the utilities,

5    determines how much of this code is identical, how many of the

6    versions are identical and then asks for those non-identical

7    files, you're not saying that that per se is not permitted

8    either, that we'll deal with it when it happens?

9           THE COURT: You're not asking for an advisory opinion.

10   And I am not giving an advisory opinion.

11          I don't think that I'm likely to be very receptive to

12   giving a complete file. I think the idea is portion.

13          I don't have enough experience to know what 20 pages of

14   source code looks like, really.

15          But, you know, I could imagine that there is a page or

16   two where even for experts in the field, it's very tricky and,

17   you know, a colon here, or a word there makes some difference.

18          You know, that's what I'm kind of imagining. It's kind

19   of they think that might be requested and then might be

20   necessary because that's exactly where the claim limitation is.

21   I don't know what.

22          MR. TILLER: Okay.

23          THE COURT: I'm not likely to be real receptive to

24   wanting an entire subfile.

25          MR. TILLER: Okay.

1        THE COURT:  All right.
2        MR. EISENBERG:  Your Honor, may I ask one quick
3 question.
4        THE COURT:  Yes.
5        MR. EISENBERG:  The extension to July 20th, I assume
6 all the other dates can be extended based on that?
7        THE COURT:  Yes.  You have 30 days from then for your
8 invalidity, et cetera.  I was trying to look before we had this,
9 but I assume that extending these deadlines isn't going to cause
10 any other associated problems?
11        MR. EISENBERG:  I don't believe so.
12        MR. TILLER:  I don't think so, your Honor.
13        THE COURT:  All right.
14        I couldn't actually run that down.  I didn't think it
15 was.  Okay.  Thank you for calling in, Mr. Tiller.
16        MR. TILLER:  Thank you, your Honor.
17        THE COURT:  Have a good weekend.
18        MR. TILLER:  Thank you.
19        THE COURT:  Thank you all for coming by.
20        (At this time, the conference concluded)
21
22
23
24
25