IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


VIA VADIS, LLC.,            )
                           )
          Plaintiff,       )
                           ) C.A. No. 11-507-RGA
v.                         )
                           )
SKYPE, INC., et al.,       )
                           )
          Defendants.  )



                  Monday, September 24, 2012
                   2:00 p.m.
                  Conference in Chambers

                  844 King Street
                  Wilmington, Delaware


BEFORE:  THE HONORABLE RICHARD G. ANDREWS
         United States District Court Judge

APPEARANCES:


          WHITEFORD TAYLOR & PRESTON, LLP
           BY:  STEVEN E. TILLER, ESQ.

                   Counsel for the Plaintiff

          MORRIS NICHOLS ARSHT & TUNNELL, LLP
          BY:  RODGER D. SMITH, II, ESQ.

                   -and-

          KASOWITZ BENSON TORRES & FRIEDMAN, LLP
          BY:  MICHAEL EISENBERG, ESQ.

                   Counsel for the Defendants

1                    THE COURT:   Please be seated.  Good

2       afternoon.

3                    So we're here on a discovery matter

4       involving Via Vadis LLC versus Skype, Inc., which

5       is Civil Action Number 11-507.  I assume you are

6       Mr. Tiller?

7                    MR. TILLER: I am, Your Honor.

8                    THE COURT:   And I know

9       Mr. Griffith, I excused.

10                   MR. TILLER: Yes, Your Honor.

11                   THE COURT:   Mr. Smith.  And,

12      Mr. Eisenberg, I've seen you before.

13                   All right.  So, I am correct that I

14      got one submission from each of you, which was

15      approximately three pages long?

16                   MR. TILLER: Yes, Your Honor.

17                   THE COURT:   All right.  And you're

18      Via Vadis and you're Skype; right?  Okay.

19                   And so Skype is now doing electronic

20      searching using 37 terms that you got from Via

21      Vadis as well as your own terms?

22                   MR. EISENBERG: Yes, Your Honor.

23                   THE COURT:   So what's your beef?

24                   MR. TILLER: Well, Your Honor, the

```
1    beef maybe has changed a little bit since seeing

2    their letter.  The primary beef was that there

3    was no terms that would have logically identified

4    any documents relating to damages.

5              And we said that multiple, multiple

6    times.

7              THE COURT:  Well, so just as far as

8    damages go, I mean, they offered to produce

9    financials.  I'm not sure -- I forget exactly

10   what they offered to produce, but they offered to

11   produce --

12             MR. TILLER: Summary financial.

13             THE COURT:   -- information that,

14   you know, in my limited experience, I have seen,

15   just as represented, people produce it.

16             And it seems like a good starting

17   place.

18             MR. TILLER: Your Honor, I would

19   agree.  It's a good starting place.  This is the

20   first time we heard about this was in this

21   letter.

22             I mean, if you look at all the

23   emails back and forth, I say multiple times in

24   there, We need financial information.
```

1                    THE COURT:  All right.  But so

2        better late than never.  Here we are.

3                    So they've offered to do that and I

4        assume that they will; right?

5                    MR. EISENBERG: Yes, Your Honor.  And

6        I would mention that they've always had the right

7        to propound interrogatories which --

8                    THE COURT:  All right.  We're not

9        questioning who shot who here, but, you know, are

10       we moving forward?

11                   So what else?

12                   MR. TILLER: There was a complete

13       refusal to look at -- to identify any terms or

14       use any terms regarding the witnesses or the

15       people with knowledge --

16                   THE COURT:  Right.  And they said

17       that --

18                   MR. TILLER: -- for the first time.

19                   THE COURT:   -- something --

20                   MR. TILLER: And, again, for the

21       first time.  And I guess that's what I'm trying

22       to get to, the frustrating part here.

23                   But for the first time they're

24       saying, We are searching those individuals'

```
 1    records.  So, therefore, you're going to get

 2    documents from them.  I'm not sure that that is a

 3    complete and accurate statement.

 4              Just because you're searching

 5    somebody's computer or their personal network on

 6    the company's drive doesn't mean you're going to

 7    get all the documents. But, again, that's the

 8    first time we've heard about this, so...

 9              THE COURT:   So maybe we could

10    approach this different.  What's left?

11              I mean, if you're saying now that

12    you've heard all this stuff, there's no real

13    reason to be having a conference today, I'm good

14    with that.

15              MR. TILLER: Well, here's what I

16    would like to see happen, Your Honor.  We also

17    proposed some other sort of technical terms that

18    we pulled directly out of their users' manuals

19    and administrators' manuals.

20              THE COURT:   I thought there was a

21    reference that they were doing some technical

22    terms.

23              MR. TILLER: They adopted a couple of

24    those.  What I'd like to see happen, and here
```

1    what we've been saying from the beginning is, Run

2    a hit report.  That's very -- that's done all the

3    time.

4                    THE COURT:   In these cases -- well,

5    you know, here's the thing about that, which is

6    because my initial inclination upon reading this

7    was, yes, I don't know if it's done all the time,

8    but it's done frequently.  You know, same thing.

9                    And it's not -- you know, in the

10   overall cost of the litigation here, $10,000 is

11   not a break the bank kind of thing.

12                   On the other hand, I gather they're

13   running 37 terms requested by you when they could

14   be saying it is ten and not a term more.

15                   MR. TILLER: Well, I would say two

16   things to that, Your Honor.  First of all, the

17   $10,000, I am 99 percent sure is not a statement

18   with regards to the additional costs of running a

19   hit report.  And I've got an affidavit from

20   somebody here who does this all the time as well.

21                   To run a hit report on one term, 50

22   terms or a thousand terms, you cut and paste the

23   terms into the software and it spits out a search

24   report.  And I know that the $10,000 isn't

```
1    involved in that because the gentleman who

2    executed the affidavit, whose name I've

3    forgotten, --

4             THE COURT: It doesn't matter.

5             MR. TILLER: -- talks about

6    processing and --

7             THE COURT:  I thought he said before

8    processing.

9             MR. TILLER: He says it's part of the

10   processing.

11            MR. EISENBERG: Your Honor, I'll

12   represent to you --

13            THE COURT:   Let Mr. Eisenberg,

14   because he probably knows more about it than

15   either one of us.

16            MR. EISENBERG: There's a huge amount

17   of information that is stored on a pair of

18   repositories that we didn't just collect and

19   bring over somewhere.  We did an initial search

20   hit using the terms that we ran against that.

21            He's suggesting, Well, if you

22   already just pulled everything, then adding

23   additional terms only means a little bit of work.

24            Our system doesn't work that way.
```

```
 1    He has to -- there's a special script that is run

 2    against these data repositories, which include

 3    gigabytes of information to select which to pull

 4    and then do the more detailed hit searches

 5    against.

 6             So, you know, he has no basis to say

 7    what it costs Skype to run search terms, and he's

 8    guaranteed that he knows for a fact how we do

 9    things.  And that's just ridiculous.

10             MR. TILLER: That's not --

11             THE COURT:   Let me ask:  If he paid

12    the, whatever your costs were, would you object?

13             MR. EISENBERG: Shirking of costs, I

14    mean...

15             THE COURT:   I mean, if he would

16    like a hit report and he's willing to pay $11,000

17    for it, are you good with that?

18             MR. EISENBERG: Sure.

19             THE COURT:   Are you willing to pay

20    $11,000 for it?

21             MR. TILLER: I just want a hit report

22    on whatever they're running their -- on whatever

23    they've already processed.  I just want a hit

24    report on that.
```

1              I'm not asking for anymore

2    processing to happen, anymore extracting of data

3    to happen.  I'm simply asking -- Mr. Eisenberg

4    just said they ran a hit report.  They do some

5    coding.  They pull documents or they pull servers

6    in, and then they do their search.

7              I just want a hit report on whatever

8    they've already processed, whatever they've

9    pulled and whatever they've pulled from whatever

10   else, whatever the universe of Skype

11   documentation is and do a hit report on that.

12   That won't cost anymore money.

13             THE COURT:   Well, maybe it will and

14   maybe it won't.  Okay.

15             So, I'm on the thin edge of

16   understanding what you said.  Did you understand

17   what he said?

18             MR. EISENBERG: I'm not entirely sure

19   because we used the terms that we already

20   ourselves put in, 32.  We used their 37 to pull

21   in a certain amount of information.  All of those

22   have already hit some of those search terms;

23   otherwise, they wouldn't have been in there.

24             If they're asking us to run

1    additional terms within what we've already

2    collected, which we know has effectively hit a

3    search term, I don't understand what they're

4    trying to achieve by that.

5             THE COURT:  Well, I'm not entirely

6    sure, either. What are you trying to achieve,

7    Mr. Tiller?

8             MR. TILLER: Because I'm not sure

9    what's being produced.  If it is commentary or if

10   the statement is every single document that's

11   been pulled in from that initial search is going

12   to be produced, then you're right.  I don't need

13   anything more than that.

14           THE COURT:  I'm guessing that's not

15   what it is.  I'm guessing that's not the case.

16           Is that what it is?

17           MR. EISENBERG: My understanding of

18   what this is, without using the proximity search

19   terms that further limit in the original list --

20           THE COURT:  Oh, you mean the

21   modifiers?

22           MR. EISENBERG: Well, we use certain

23   modifiers.  If there was an and, it had to hit

24   both terms.  So A and B would collect together

1    everything that had A and B.  Sometimes we used

2    proximity search.

3              THE COURT:   You mean within ten?

4              MR. EISENBERG: Yeah, within ten.

5              THE COURT:   Right.  Right.

6              MR. EISENBERG: So our initial pull

7    was A and B.  We would then later run A within

8    ten of B to get the final set.

9              THE COURT:   I hate to interrupt you

10   only because I'm not -- do I understand

11   correctly, and I'm simplifying by a long shot

12   here, but you know, the universe of

13   electronically stored information that's

14   available to Skype, you have gotten some subset

15   of that by running the terms you've already run?

16             MR. EISENBERG: Yes, Your Honor.

17             THE COURT:   And so now, what is

18   your plan with this universe of information, this

19   subset?  What are you going to do with that now?

20             MR. EISENBERG: So we're now going to

21   run the proximity terms that we told them we'd

22   run within a certain amount of words of A and B.

23   And we're going to run privileged terms and

24   figure out what sort -- you know, what portion of

```
 1      that will be listed as privileged and -- well,

 2      we're not going to use that as the sole basis.

 3      People will then review it and put it on a

 4      privilege log.

 5                THE COURT:  But running the

 6      proximity term is, to the subset that you have

 7      right now, to a smaller subset?

 8                MR. EISENBERG: Yes, Your Honor.

 9                THE COURT:  And the stuff that's

10      not covered by the proximity terms will then be

11      set aside and not looked at again or what?

12                MR. EISENBERG: That is my

13      understanding, Your Honor.

14                THE COURT:  All right.  So --

15                MR. TILLER: I'd like at least the

16      proximity search of this first subset that you

17      talked about run, so we can get an idea of the

18      universe of documents --

19                THE COURT:  Well, it sounds like

20      he's going to do that.

21                MR. TILLER: -- on the terms we've

22      asked for.

23                MR. EISENBERG: Not on their terms.

24      We're not planning on those terms.
```

```
 1                    THE COURT:   All right.  Thank you.

 2                    All right.  So, again, and so is it

 3     your belief -- I mean, I did not study the

 4     declaration or affidavit from your computer guy,

 5     and even if I had, I probably wouldn't have

 6     gotten everything out of it that I should have.

 7                    The figure of 10,000 odd dollars, to

 8     do what?

 9                    MR. EISENBERG: That was to do the

10     initial search against the original repository.

11                    THE COURT:   So Mr. Diller is now

12     asking for a search using his terms against your

13     subset.

14                    MR. EISENBERG: Your Honor, that's

15     not something I asked about, but again, if

16     they're willing to pay the fees associated with

17     that, I don't see a problem.

18                    THE COURT:   All right.

19                    MR. EISENBERG: And I'll just have

20     my --

21                    THE COURT:   Let me ask, because

22     it's not clear to me:  Is Via Vadis -- you know,

23     I know Skype is now owned by Microsoft, has

24     unlimited pockets.
```

1              Do you all have unlimited pockets?

2              MR. TILLER: We would have the

3     opposite of that.  We would essentially have no

4     pockets.

5              THE COURT:   Okay.

6              MR. EISENBERG: I would point out

7     they just filed another lawsuit against Skype as

8     well.  They've got litigations pending in

9     Germany, Luxenberg.  Two in Delaware.

10             THE COURT:   Yeah.  Well, you know,

11    no matter what, they're not Microsoft, which I

12    assume now is bank rolling Skype.  So there is

13    some discrepancy here.

14             But I do appreciate that you have to

15    have some resources to litigate on multiple

16    continents.

17             MR. TILLER:  Not a lot.

18             THE COURT:   All right.  But, in any

19    event, the document that's in the record from

20    your expert about what it would cost to run their

21    search terms is based on the whole repository,

22    not on the smaller subset that has been, to some

23    degree, pulled and processed already?

24             MR. EISENBERG: Correct, Your Honor.

```
 1    And I don't know how much information now that

 2    would have to be searched and how much additional

 3    time would be put into those extra search terms

 4    to run them.  I don't have an estimate of that.

 5               THE COURT:   Do you have any

 6    estimate in terms of time as to how long it would

 7    take to -- you know, assuming you're not working

 8    around the -- assuming there's no overtime

 9    involved, I think your expert said he had some

10    hour figure.

11               MR. TILLER: He said 58 hours.

12               THE COURT:   Fifty-eight hours.  I

13    guess there's just -- what you're saying is

14    really, as you sit here, there's ways you can

15    make a reasonable proffer as to what's actually

16    involved against a smaller universe?

17               MR. EISENBERG: I'm not sure.  I

18    mean, I would hazard a guess.  It would be less

19    than 58 hours.

20               THE COURT:   Well --

21               MR. EISENBERG: I would also say

22    that.

23               THE COURT:   Yeah.  I would guess

24    that, too, but --
```

1                    MR. EISENBERG: But this also is not

2      the endpoint.

3                    THE COURT:   No.  No.

4                    I was just thinking about that.

5      Okay.

6                    So you run the search and you get

7      all these hits.  Then what?

8                    MR. EISENBERG: Then we're in front

9      of you again, Your Honor.

10                    THE COURT:   Maybe.  Maybe not.

11                    MR. TILLER: Listen, Your Honor, with

12     all due respect, I don't want a lot of documents.

13     That's the last thing that I want.

14                    I want the technical documents to

15     figure out exactly what Skype is doing, so we can

16     figure out our infringement theories.

17                    Yes, I've been given the source code

18     already.  And, yes, we have some technical

19     documents that have been produced already.

20                    But we've asked very precise terms

21     that are pulled out directly from language that

22     we've seen used.  And I want documents.

23                    THE COURT:   I thought the core

24     technical documents should have already been

```
 1    produced.

 2              MR. TILLER: I agree with that and I

 3    presume, I have no reason to doubt that they

 4    haven't been produced.  But that doesn't mean

 5    that there's emails discussing what a hash

 6    function is, or memos discussing what a super

 7    node is or any of these other technical

 8    information that may be included in documentation

 9    and other files that are not the core technical

10    documents. And I want to see exactly what kind of

11    documents that we're talking about.

12              Now, we have already dealt with the

13    damages issue.  I hope.

14              We have obviously reserved the right

15    to --

16              THE COURT:   Well, I mean -- so,

17    okay.

18              MR. TILLER: I mean, I guess what my

19    point is, Your Honor, if a term comes back, if

20    they run -- I don't even remember all the

21    different terms that are at issue here.  If they

22    run hash function, and it comes back with a

23    hundred thousand hits --

24              THE COURT:   As I would imagine it
```

1    would.

2              MR. TILLER: Well, it may not.  It

3    depends whether they use hash functions as to --

4    but I'm not -- I don't want a hundred thousand.

5    You know, I'm going to discuss a modification to

6    narrow that.

7              And, in fact, I think we have

8    offered modifiers to these terms.  And, in fact,

9    they're the modifying terms that Skype has

10   presented.

11             THE COURT:   But, no, the theory

12   that I get from the default standard and from

13   Judge Rader and other people is that the kind

14   of -- what you're supposed to do in the first

15   place is, you know, offer those search terms that

16   zero in on whatever it is that's important.  So

17   that not only do you not get a document, but they

18   don't have to go through a zillion documents.

19             MR. TILLER: And, again, we think we

20   have -- we think we've identified terms, very,

21   very specific terms and terminology with very

22   specific modifiers to try to further reduce and

23   limit the scope of the searches.

24             THE COURT:   All right.  And so

```
 1    leaving aside the question of damages, is there

 2    something else, you know, what the 32 or 37 terms

 3    that you've already submitted that they're using

 4    are; right?

 5              MR. TILLER: Yeah, I'm sure I do.  I

 6    can't remember them right now, to be honest.

 7              THE COURT:  No.  No, not a quiz.

 8              Other than the fact that they're not

 9    using all the terms that you're interested in,

10    and maybe you said this a minute ago, where are

11    they not searching -- what topic are they not

12    searching that's important to you?

13              MR. TILLER: Well, again, I think

14    their use of only a very, very small subset of

15    technical terms is very likely to miss certain

16    very important issues.

17              Two, again, damages.

18              Three, the specific witnesses.

19              And I presume they've given us

20    everything else about their invalidity or

21    unenforceability contentions, but --

22              THE COURT:  Well, right.

23              MR. TILLER: -- I don't see

24    terminology in that.
```

1              THE COURT:   But, I mean, part of

2    it, I mean, you're talking as though you don't

3    have to show anything.  All you have to do is

4    come up with terms, say they're relevant to

5    something and I'm sure they are.

6              And there does seem to be a general

7    approach being gotten here that E discovery,

8    electronically stored information discovery is

9    expensive.  You know, maybe Microsoft can afford

10   it, but it's still dollars out of somebody's

11   pocket.

12             And, you know, they've met you, it

13   seems to me, quite a bit over the line where they

14   had to meet you.  So I'm not real inclined to do

15   anything other than think that you haven't shown

16   good cause for them to do anything more than

17   they're already doing.

18             MR. TILLER: For example, Your Honor,

19   the concept of redundantly stored information is

20   a critical component to the patent claims.  We

21   asked that the term redundant be added to the

22   list with modifiers.  We identified certain

23   modifiers.

24             THE COURT:   Right, because

```
 1      redundant by itself would be a grossly --

 2                    MR. TILLER: Exactly.

 3                    THE COURT:   But what you've done,

 4      then, is because I do tend to think that, you

 5      know, redundantly stored, redundantly made,

 6      redundantly received, you know, that's three

 7      searches, not one.

 8                    MR. TILLER: Well, I would disagree

 9      with that, Your Honor, and for the following

10      reason:  We all agree that redundantly within

11      whatever or redundantly and stored redundantly

12      and received is more narrow than just

13      redundantly.  If you took off the modifiers,

14      you'd be left with one term.

15                    THE COURT:   Right.  Right.

16                    But, in other words, if you want

17      redundantly stored, you said redundantly within

18      intent of stored and that's your narrow targeted

19      search.

20                    MR. TILLER: Yeah.  And that's

21      exactly what we've asked for.

22                    THE COURT:   Well, right.  But

23      that's one search.  Isn't redundantly received

24      with intent of received a second search?
```

 1                    MR. TILLER: It is and it isn't.  And

 2       here's why.  I mean, yes, it is a second search.

 3                    And, again, the searching, I don't

 4       think once they've processed the documents, the

 5       searching is not the issue.  It's the extraction

 6       of the documents that's the cost.

 7                    But --

 8                    THE COURT:   Well --

 9                    MR. TILLER: But redundantly stored

10       and redundant, here's the terms that we've done,

11       redundantly with intent to store.  Redundant with

12       intent of access.  Redundant with intent of

13       manage, because those are the terms that we

14       believe are relevant.

15                    If you do all three of those

16       searches, it's going to be less documentation.

17       It's going to identify less documentation than

18       the term redundantly or redundant all by itself,

19       because each one is a limiting factor.

20                    So if they want to just run

21       redundantly and get everything --

22                    THE COURT:   Well, no.  See, that's

23       the thing is, yes, if you said run redundantly,

24       they could say that's ridiculous.  That will

```
1      cover zillions of documents that have nothing to

2      do with anything.

3               But when it says give them a

4      narrowed search, which those other three are, the

5      fact is that the three narrowed searches would

6      produce less documents than the grossly overbroad

7      search.  Doesn't mean 93 counts as one.

8               MR. TILLER: It may or may not count

9      as one other than it's certainly far more narrow

10     and ends up being less burdensome than the one

11     term that you said.  And, Your Honor, and again,

12     there's other -- there's some better -- like

13     Skype ID, that's a term that --

14               THE COURT:  Well, right.  But, I

15     mean, part of it is, too, you have to use, as I'm

16     sure you have, but perhaps more than you have

17     some judgment in rank order in what's actually

18     important to you, the fact that you can come up

19     with a theory as to why all 187 are important to

20     you doesn't mean, oh, okay, you get 187.

21               MR. TILLER: No.  I agree with you.

22               I absolutely agree with you and they

23     have adopted, I think, of the terms we suggested

24     hash, pre-specified, and redundant are terms that
```

```
1    are the three terms that they've added from

2    our -- you know, excuse me.  The term independent

3    is a pretty critical term to the patent.

4               The term Skype ID is pretty

5    important to our infringement theory.  It's kind

6    of critical to our infringement theory.

7               So, you know, we'd like to see those

8    terms run.  Interfacing node is terminology that

9    we pulled from their core technical documents.

10   That is a critical term that may not be covered

11   by super node or storage node.

12               And, again, those are some of the

13   terms.

14               THE COURT:   All right.

15   Mr. Eisenberg, do you have anything to add here?

16               MR. EISENBERG: They have our source

17   code here.  I'm not sure what it is that

18   Mr. Tiller thinks is magically going to appear

19   that is in email or other electronically stored

20   documents explaining how we supposedly infringe

21   the patent that they don't already have access

22   to.

23               We spent the time, effort and money

24   going and getting our source code, setting that
```

```
1      computer up.  We looked and -- went and looked

2      for core mechanical documents.

3                  THE COURT:   Right.  You have had no

4      choices in that.

5                  MR. EISENBERG: We did have no choice

6      in that, but that's how these rules are set up

7      that we give them the core technical documents.

8      And if they have narrow requests in addition to

9      that that are supposed to fill in gaps that

10     somehow went unmet, you know, then they can give

11     us a list of a few search terms.

12                 Default is ten. I'm not going to say

13     whether that's too much, too little, whatever.

14                 That's how this is all set up and

15     this is not a unique proposition here.  This case

16     is no different from a lot of other cases that

17     have already come in front of Your Honor or will

18     come in front of Your Honor in the future.

19                 That's the reason, as I understand

20     it, those rules are there.  And if there's

21     something that Mr. Tiller can tell me he can't

22     figure out from the source code, they've already

23     given us their infringement contentions.

24                 Now, I think they're baseless.  I
```

1    don't think there's anything.

2                    THE COURT:   Right.  Right.

3                    That's not really a time right now.

4                    MR. EISENBERG: But they seem to

5    think that they have enough information from our

6    source code and public information, whatever else

7    they have.

8                    THE COURT:   Well, they also didn't

9    have any choice.  They had a deadline.  They had

10   to give you what they had.

11                   MR. EISENBERG: Yes, Your Honor.  But

12   what is it about hash code that is not available

13   from the source code?  They can figure out the

14   exact formula down to the line of the code

15   necessary that is used for the hash codes.

16                   So what is it in an email that's

17   going to be relevant to whether or not that hash

18   code proves infringement?

19                   THE COURT:   Let me ask:  You've

20   said in your letter that somebody, some

21   organization, I don't know what, but somebody is

22   busy now searching these 30 odd terms that you --

23   wait.  I've lost track here.

24                   That --

1                    MR. EISENBERG: That they asked for

2      and we --

3                    THE COURT:   The 37 that they asked

4      for and the 32 that you had or whatever the terms

5      are, I know it's roughly in the ball park --

6      that's what you're now searching the subset

7      against.

8                     MR. EISENBERG: No.  No.

9                    That is what we do our original pull

10     on.

11                   THE COURT: That is how you generated

12     the subset?

13                   MR. EISENBERG: That is how we

14     generated it.  I don't have an estimate of time

15     and effort involved in that.

16                   THE COURT:  Okay.  But they're happy

17     with the subset.

18                   So let's assume I tell him he gets

19     nothing.  In terms of the subset, what is your

20     next step with the subset of material?

21                   MR. EISENBERG: So, my understanding

22     is the next thing we're going to do is we have a

23     list of privileged terms that we're going to run

24     against the full set because --

```
 1                    THE COURT:  All right.  So, let's

 2      just assume you get rid of the privilege

 3      documents, however you do it.  I don't care.

 4                    Okay.  But you narrow the universe

 5      down some more by carving some out as privileged.

 6      Then what are you going to do?

 7                    MR. EISENBERG: I'm sorry.  I missed

 8      that.

 9                    The proximity terms that are going

10      to be run to narrow it down and then the

11      privilege terms.

12                    THE COURT:  But these proximity

13      terms that are carving it down, which terms

14      are -- what terms are those?

15                    MR. EISENBERG: Those are -- so what

16      we did against the original repository is if we

17      had a search term that said hash function with

18      intent of index, --

19                    THE COURT:  Right.

20                    MR. EISENBERG: -- it was easier at

21      that point to run hash function and index.  So

22      only documents that hit both would be pulled.

23                    THE COURT:  But they don't

24      necessarily with intent.
```

1              MR. EISENBERG: Exactly.  So then we

2    would use the proximity terms to narrow that set

3    down, then do the privilege review and then we

4    would do a review of the documents.  I'm not sure

5    whether it would look at every document or a

6    subset of the documents to see.

7              You know, obviously, we want to see

8    that these terms have been run properly and

9    everything.  There will be significant amounts of

10   quality checking to make sure everything is

11   correct.

12             THE COURT:   How many proximity

13   terms are you running against this database?

14             MR. EISENBERG: So --

15             THE COURT:   Give me a ball park.

16             MR. EISENBERG: Sixty.  There's 30,

17   approximately 30 from our side.  And we added

18   their 37.  I think all 37 of those were

19   proximity.

20             THE COURT:   And you haven't done

21   this running yet?

22             MR. EISENBERG: I don't believe the

23   proximity terms have been run yet, but I'm not

24   positive, as I sit here.

1                    THE COURT:  And what you want is

2       additional proximity terms over what he's

3       currently doing?

4                    MR. TILLER: A few, not -- and,

5       honestly, Your Honor, this is the first time I've

6       heard all of this despite sort of the two months

7       of back and forth.

8                    Had we known all of this, I think we

9       could have avoided all of this situation.

10                   THE COURT:  Yeah, but that's all

11      right.  We're here. Let's try to resolve it.

12                   MR. TILLER: And I'm trying to go

13      through the terms right now and figure out.

14      There's probably another.

15                   THE COURT:  Here, this is, I guess,

16      what I'm thinking:  It seems like we're in a

17      stage where -- Well, I'll tell you what I'm

18      thinking.  It may not make anybody happy.  It may

19      not even be -- but what I'm thinking is I think

20      you've been excessive in what you've asked for.

21                   I see nothing but reasonable

22      attempts on the Skype side to deal with this

23      issue.

24                   On the other hand, I'm thinking that

```
1    if I let him ask for five targeted terms or

2    something to add to the 70 or so that you're

3    already running, I can give him the opportunity

4    to figure out what's actually the most important

5    thing left to him of all the things that you're

6    not doing that he originally wanted you to do.

7    And it doesn't seem to me like a great imposition

8    on you, on Skype, to add another five terms.

9              Am I --

10             MR. EISENBERG:  And this would be

11   against --

12             THE COURT:   The subset.

13             MR. EISENBERG:  -- the subset, not

14   the initial?

15             THE COURT:   I mean, something that

16   you're already about to start doing.  And so I'm

17   imagining, whatever marginal cost there is to

18   adding in five more terms, is not great.  And it

19   will presumably help narrow; right?

20             Or, no, I guess it probably won't.

21   But, in any event, that's kind of what I'm

22   thinking you've gotten.  I don't think he's been

23   terribly reasonable in what he's asked of you.

24             But I'm thinking that -- you know,
```

```
1    I'm thinking that even though probably I should

2    just give him nothing, that it might be working

3    towards a certain amount of learning the truth

4    here to give him his top five and let him add

5    them in to what you've already got.  I mean, his

6    top five that you don't already have, and so I'm

7    just wondering from the point of view of what

8    you're planning on doing, other than having to

9    run five more terms, that doesn't seem like it

10   would upset anything.

11              MR. EISENBERG: I don't believe that

12   those next steps have begun yet.  As I said, I'm

13   not sure if they have.

14              Then it could cause some problems,

15   but I just don't know the answer to that today.

16              THE COURT:   All right.  Well, it's

17   not -- Mr. Tiller, I know that's not what you

18   came here to get.

19              MR. TILLER: Five terms is fine, Your

20   Honor.

21              THE COURT:   All right.

22              MR. EISENBERG: And, Your Honor,

23   sorry.  As to those five terms, will they be sort

24   of proximity narrowed terms or --
```

1                    THE COURT:   Well, I will let him

2     pick them.

3                    MR. TILLER: They'll be from the list

4     that we've already given you.

5                    THE COURT:   Well, I mean, I kind of

6     assumed that.  But, and, I mean, it would strike

7     me that he's interested in -- well, in any event,

8     I can't pick between terms right now.

9                    I think that if he gets five more

10    terms, if you have a big problem with them and

11    you can't resolve it between the two of you,

12    well, you know, you can call me back.

13                   But, I guess, the only thing I would

14    ask is since they seem to be getting underway --

15                   MR. TILLER: We'll have it to them

16    tomorrow.

17                   THE COURT:   All right.  So --

18                   MR. TILLER: Close of business

19    tomorrow.

20                   THE COURT:   So, all right.  So,

21    okay.

22                   MR. EISENBERG: Yes, Your Honor.

23                   THE COURT:   Okay.  Well, listen.

24    Thank you.

```
 1                    If there continues to be a problem,

 2       let me know.  But I would think this is something

 3       that, based on what I've said, that the two of

 4       you can take it from here.  And whatever the next

 5       problem will be will be something different, not

 6       this.

 7                    MR. TILLER: Yes, Your Honor.

 8                    THE COURT:   Okay.  All right.

 9       Thank you.

10                    MR. TILLER: Thank you.

11                    MR. EISENBERG: Thank you.

12                    MR. SMITH:  Thank you.

13                    (Conference in chambers concluded at

14       2:34 p.m.)

15

16

17

18

19

20

21

22

23

24
```

```
1     State of Delaware)
                       )
2     New Castle County)

3
                     CERTIFICATE OF REPORTER
4
                  I, Heather M. Triozzi, Certified
5     Professional Reporter and Notary Public in the
      State of Delaware, do hereby certify that the
6     foregoing Pages 1 to 35 inclusive, is a true and
      accurate transcript of my stenographic notes
7     taken on September 24, 2012, in the
      above-captioned matter.

8
                  In witness whereof, I have hereunto
9     set my hand and seal this 17th day of October,
      2012, at Wilmington.

10

11
                             Heather M. Triozzi, CSR, RPR
12                           Cert. No: 184-PS
                             Exp: Permanent
13

14

15

16    DATED:  October 17, 2012

17

18

19

20

21

22

23

24
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24