# EXHIBIT A

## TO

## DEFENDANTS' MOTION TO STRIKE
## VIA VADIS'S UNTIMELEY DISCLOSED
## PROPOSED CLAIM CONSTRUCTIONS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VIA VADIS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11-507 (RGA) |
| | ) | |
| SKYPE, INC., SKYPE COMMUNICATIONS | ) | |
| SARL; SKYPE GLOBAL SARL; SKYPE | ) | |
| SOFTWARE SARL; and SKYPE | ) | |
| TECHNOLOGIES, SA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS SKYPE, INC., SKYPE COMMUNICATIONS SARL,
SKYPE GLOBAL SARL, SKYPE SOFTWARE SARL
AND SKYPE TECHNOLOGIES, SA'S IDENTIFICATION OF
PROPOSED CLAIM TERMS AND PROPOSED CLAIM CONSTRUCTIONS**

Pursuant to the Scheduling Order (D.I. 48), Defendants Skype, Inc., Skype Communications SARL, Skype Global SARL, Skype Software SARL, and Skype Technologies, SA (collectively "Skype") provide the following list of proposed claim terms that may require construction by the Court, including proposed constructions for those terms. In its July 20, 2012 Infringement Contentions, Plaintiff asserts claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, and 44 of U.S. Patent No. RE40, 521 (the "'521 Patent"), and claims 1, 3, 5, 7, and 8 of U.S. Patent No. 7,904,680 (the "'680 patent") (collectively "patents-in-suit").

The citations to patent claims that appear below are provided for convenience only, and should not be construed to be limiting in any way. Skype further proposes that the construction of each term be applicable to terms in the patents-in-suit which bear insignificant differences from the terms as set forth below. Skype reserves the right to amend or modify this

disclosure based on Plaintiff's disclosure, fact or expert discovery, positions taken by Plaintiff in the litigation, and other developments in this action.

## TERMS FOR CONTRUCTION AND PROPOSED CONSTRUCTIONS

| '521 Patent Claim Terms to be Construed | Proposed Construction | '521 Patent Asserted Claims |
|---|---|---|
| storage means | Subject to 112, 6<br><br>function:  storing<br><br>structure:  7:26-35(describing clusters, cells and fields) and 10:29-34 (describing non-volatile memories and random access memories) | Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44 |
| data transmission means | Subject to 112, 6<br><br>function:  transmitting data<br><br>structure:  3:48-55 (describing conductive connections, bus systems, network) | Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44 |
| detecting | discovering or measuring | Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44 |
| parameters of the data transmission | at least two performance characteristics describing the transmission | Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44 |
| detecting prespecified parameters of the [for] data transmission | discovering or measuring at least two performance characteristics of the data transmission between the at least two data storage means and the computer unit | Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44 |
| means for detecting prespecified parameters of the data transmission between the data storage means and the computer unit | Subject to 112, 6.<br><br>function:  "detecting prespecified parameters of the data transmission between the data storage means and the computer unit"<br><br>structure:  26:30-39 (describing a counter or timer). | Claims 1, 2, 4, 11, 16, 17 |
| with data being preferably stored in a redundant manner in the data storage means as a function of said detected prespecified parameters | Indefinite | Claims 1, 2, 4, 11, 16, 17 |
| accessing one of the data storage means as a | accessing an optimal data storage means as a function of the detected prespecified | Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44 |

| '521 Patent Claim Terms to be Construed | Proposed Construction | '521 Patent Asserted Claims |
|---|---|---|
| function of said detected prespecified parameters<br><br>/the access to the data being effected as a function of the determined prespecified parameters of the data transmission | parameters | |
| detecting prespecified parameters for data transmissions between said [the] data storage means | discovering or measuring at least two performance characteristics of the data transmission between the at least two data storage means | Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44 |
| second means for detecting prespecified parameters of the data transmission between said data storage means | Subject to 112, 6.<br><br>function:  "detecting prespecified parameters of the data transmission between said data storage means"<br><br>structure:  indefinite for lack of structure | Claims 1, 2, 4, 11, 16, 17 |
| wherein [t]he data storage means copies data which is redundantly stored in the system independent of an access of the computer unit as a function of the detected prespecified parameters of data transmission between the data storage means<br><br>/shifting redundantly stored data independent of an access of the computer unit to the data as a function of the determined prespecified parameters of data transmissions between the data storage means | Indefinite | Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44 |

| '521 Patent Claim Terms to be Construed | Proposed Construction | '521 Patent Asserted Claims |
|---|---|---|
| process[ing] / process[ed] | to modify using computer instructions | Claims 4, 11, 33, 40 |
| with prespecified parameters of the data transmission between the data storage means and the computer unit being determined | discovering or measuring at least two performance characteristics of the data transmission between the at least two data storage means and the computer unit | Claims 30, 31, 33, 40, 44 |
| shifting | copying data to a new location and deleting it from the prior location | Claims 30, 31, 33, 40, 44 |

| '680 Patent Claim Terms to be Construed | Proposed Construction | '680 Patent Asserted Claims |
|---|---|---|
| at least one computer unit that stores at least one complete file, each file including a plurality of individual pieces, the pieces containing parts of the files / store at least one complete file of data, each file including a plurality of individual pieces of data, the pieces containing parts of the file | Indefinite | Claims 1, 3, 5, 7, 8 |
| the data storage units copy pieces that are redundantly stored in the system from one of the data storage units to another of the data storage units independently of an access of the computer unit based on the data transmission performance measured between the data storage units / the second data storage | Indefinite | Claims 1, 3, 5, 7, 8 |

4

| '680 Patent Claim Terms to be Construed | Proposed Construction | '680 Patent Asserted Claims |
|---|---|---|
| means copy pieces that are redundantly stored in the system from one of the second data storage means to another of the second data storage means independently of an access of the first data storage means based on the measured data transmission performance between the second data storage means / sending from the at least one data storage device to the another data storage device a copy of the received piece of data for redundant storage independently of an access of the computer unit as a function of the measured data transmission performance between the data storage devices / sending from the at least one data storage device to the another data storage device a copy of the received second piece of data for redundant storage independently of an access of the computer unit as a function of the measured data transmission performance between the data storage devices | | |
| at least two data storage units that need not store | Indefinite | Claims 3 and 5 |

| '680 Patent Claim Terms to be Construed | Proposed Construction | '680 Patent Asserted Claims |
|---|---|---|
| the complete file stored in the at least one computer unit at a given point in time | | |
| first means for storing | Subject to 112, 6<br><br>function:  storing<br><br>structure:  7:26-35(describing clusters, cells and fields) and 10:29-34 (describing non-volatile memories and random access memories) | Claim 5 |
| second data storage means for storing data | Subject to 112, 6<br><br>function:  storing<br><br>structure:  7:26-35(describing clusters, cells and fields) and 10:29-34 (describing non-volatile memories and random access memories) | Claim 5 |
| control means for enabling data transmission between the second data storage means and the first means | Subject to 112, 6<br><br>function:  enabling data transmission<br><br>structure:  indefinite for lack of structure | Claim 5 |

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

_____

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

OF COUNSEL:

Douglas E. Lumish
Parker C. Ankrum
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
333 Twin Dolphin Drive
Suite 200
Redwood Shores, CA 94065

Michael B. Eisenberg
Stefan R. Stoyanov
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, NY 10019

August 28, 2012

*Attorneys for Defendants Skype, Inc., Skype
Communications SARL, Skype Global SARL,
Skype Software SARL, and Skype
Technologies, S.A.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 28, 2012, copies of the foregoing were caused to be

served upon the following in the manner indicated:

Daniel A. Griffith, Esquire                                   *VIA ELECTRONIC MAIL*
WHITEFORD TAYLOR PRESTON LLP
The Renaissance Centre, Suite 500
405 N. King Street
Wilmington, DC 19801
dgriffith@wtplaw.com
*Attorneys for Plaintiff*

Martin M. Zoltick, Esquire                                   *VIA ELECTRONIC MAIL*
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
607 14th Street, NW, Suite 800
Washington, DC 20005
mzoltick@rothwellfigg.com
*Attorneys for Plaintiff*

Steven E. Tiller, Esquire                                    *VIA ELECTRONIC MAIL*
Edward M. Buxbaum, Esquire
WHITEFORD, TAYLOR & PRESTON, LLP
Seven Saint Paul Street Suite 1500
Baltimore, MD 21202-1636
stiller@wtplaw.com
ebuxbaum@wtplaw.com
*Attorneys for Plaintiff*

Robert J. Weltchek, Esquire                                  *VIA ELECTRONIC MAIL*
WELTCHEK, MALLAHMA & WELTCHEK, LLC
2330 West Joppa Road
Suite 203
Lutherville, MD 21093
rweltchek@wmwlawfirm.com
*Attorneys for Plaintiff*

*/s/ Rodger D. Smith II*

_____
Rodger D. Smith II (#3778)

# EXHIBIT B

## TO

## DEFENDANTS' MOTION TO STRIKE
## VIA VADIS'S UNTIMELEY DISCLOSED
## PROPOSED CLAIM CONSTRUCTIONS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____

VIA VADIS, LLC,                            )
                                           )
      Plaintiff,                        )
                                           )   Civil Action No.11-507-RGA
v.                                         )
                                           )
SKYPE, INC.; SKYPE                         )   **JURY TRIAL DEMANDED**
COMMUNICATIONS SARL;                       )
SKYPE GLOBAL SARL; SKYPE                   )
SOFTWARE SARL;                             )
AND SKYPE TECHNOLOGIES, SA.,               )
                                           )
                                           )
      Defendants.                       )
_____)

### *PLAINTIFF'S IDENTIFICATION OF*
### *TERMS/PHRASES REQUIRING CONSTRUCTION BY THE COURT*

Plaintiff, Via Vadis, LLC ("Via Vadis"), by its undersigned counsel, pursuant to the Court's Scheduling Order entered April 12, 2012, hereby submits its identification of claim terms/phrases requiring construction by the Court. In this regard, Via Vadis does not believe that any of the claim terms/phrases of either of the patents at issue in this matter require construction by the Court. Via Vadis nonetheless reserves the right to propose constructions for any claim terms/phrases in response to Defendants' proposed constructions and for any claim terms/phrases that the Court finds require construction.

Respectfully submitted,


/s/ Daniel A. Griffith

Daniel A. Griffith (DE# 4209)
Whiteford, Taylor & Preston LLC
1220 North Market Street
Suite 608
Wilmington, Delaware 19801
(302) 353-4144
dgriffith@wtplaw.com


Edward M. Buxbaum (*admitted pro hac*)
Steven E. Tiller (*admitted pro hac*)
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1636
(410) 347-8700
ebuxbaum@wtplaw.com
stiller@wtplaw.com

Martin M. Zoltick (*admitted pro hac*)
ROTHWELL, FIGG, ERNST &
MANBECK, P.C.
607 14th Street, NW
Suite 800
Washington, DC 20005
(202) 783-6040
mzoltick@rothwellfigg.com

Robert J. Weltchek (*admitted pro hac*)
WELTCHEK MALLAHAN & WELTCHEK
2330 West Joppa Road, Suite 203
Lutherville, Maryland 21093
410-825-5287
rweltcheck@wmwlawfirm.com

***Attorneys for Plaintiff,***
***VIA VADIS, LLC***

2

## CERTIFICATE OF SERVICE

I, Daniel A. Griffith, Esquire, hereby certify that on August 28, 2012, a true and correct

copy of Plaintiff's Identification of Terms/Phrases to be Construed were served via electronic

and U.S. First Class Mail, postage prepaid, on the following counsel of record:

| | |
|---|---|
| Jack B. Blumenfeld | Douglas E. Lumish |
| Rodger Dallery Smith, II | Michael B. Eisenberg |
| Morris, Nichols, Arsht & Tunnell | Parker C. Ankrum |
| 1201 North Market Street | Stefan R. Stoyanov |
| PO Box 1347 | Kasowitz, Benson, Torres & Friedman LLP |
| Wilmington, DE  19899 | 333 Twin Dolphin Drive, Suite 200 |
| | Redwood Shores, CA 94065 |

/s/ Daniel A. Griffith

*2017270*

# EXHIBIT C

## TO

## DEFENDANTS' MOTION TO STRIKE VIA VADIS'S UNTIMELEY DISCLOSED PROPOSED CLAIM CONSTRUCTIONS

**From:**        Parker C. Ankrum
**Sent:**        Tuesday, September 04, 2012 1:35 PM
**To:**          Steven Tiller (stiller@wtplaw.com)
**Cc:**          Martin M. Zoltick (mzoltick@rfem.com); Skype-Via Vadis
**Subject:**     Via Vadis, LLC v. Skype, Inc.

Steven,

Pursuant to Paragraph 7 of the April 12, 2012 Scheduling Order, the Court mandated that the parties exchange "a list of those claim term(s)/phrase(s) that they believe need construction and their proposed claim constructions of those term(s)/phrase(s)" by last Tuesday, August 28.  As part of an agreement between the parties, Skype served a list of terms/phrases and proposed constructions on August 28, 2012 at 6:00 pm Eastern.  At the same time, Via Vadis served a pleading that <u>did not identify any terms or phrases for construction</u>.  In pertinent part, Via Vadis's pleading stated only that "Via Vadis does not believe that any of the claim terms/phrases of either of the patents at issue in this matter require construction by the Court."  Tellingly, Via Vadis failed to propose claim constructions for the means-plus-function terms recited in its asserted claims, where no reasonable argument can be made that a claim construction would be unnecessary.  Via Vadis's failure to address these or any other phrases or terms in the asserted claims violates both the letter and spirit of the Court's Scheduling Order.

To the extent that Via Vadis asserts that its disclosure accurately reflects its position that all terms and phrases in the asserted claims should be accorded their plain and ordinary meaning, then the parties should proceed through claim construction briefing on that basis.  If, however, Via Vadis seeks to adopt claim constructions other than plain and ordinary meaning, Skype hereby gives notice that it will object to any such change in position and will seek to strike any briefing submitted by Via Vadis that proposes alternative constructions.

Regards,
Parker

Parker C. Ankrum
Kasowitz, Benson, Torres & Friedman LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA 94065
Tel. (650) 453-5413
Fax (650) 362-2403
pankrum@kasowitz.com

# EXHIBIT D

## TO

## DEFENDANTS' MOTION TO STRIKE VIA VADIS'S UNTIMELEY DISCLOSED PROPOSED CLAIM CONSTRUCTIONS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

———————————————————————

VIA VADIS, LLC,            )
                         )

      Plaintiff,        )

                         )      Civil Action No.11-507-RGA

v.                       )

                         )

SKYPE, INC.; SKYPE        )      **JURY TRIAL DEMANDED**

COMMUNICATIONS SARL;    )

SKYPE GLOBAL SARL; SKYPE   )

SOFTWARE SARL;         )

AND SKYPE TECHNOLOGIES, SA., )

                         )

                         )

      Defendants.     )

———————————————————————)

## **<u>PLAINTIFF VIA VADIS, LLC'S OPENING BRIEF ON CLAIM CONSTRUCTION</u>**

Daniel A. Griffith (DE# 4209)
Whiteford, Taylor & Preston LLC
1220 North Market Street
Suite 608
Wilmington, Delaware 19801
(302) 353-4144
dgriffith@wtplaw.com

Edward M. Buxbaum (admitted pro hac)
Steven E. Tiller (admitted pro hac)
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1636
(410) 347-8700
ebuxbaum@wtplaw.com
stiller@wtplaw.com

Martin M. Zoltick (admitted pro hac)
ROTHWELL, FIGG, ERNST &
MANBECK, P.C.
607 14th Street, NW
Suite 800
Washington, DC 20005
(202) 783-6040
mzoltick@rothwellfigg.com

Robert J. Weltchek (admitted pro hac)
WELTCHEK MALLAHAN & WELTCHEK
2330 West Joppa Road, Suite 203
Lutherville, Maryland 21093
410-825-5287
rweltcheck@wmwlawfirm.com

*Attorneys for Plaintiff*
*Via Vadis, LLC*

**TABLE OF CONTENTS**

**PAGE**

I.    Nature of Case.................................................................................................. 1

II.   Specific Principles for Claim Construction ......................................................... 1

      A.    Plain and Ordinary Meaning.................................................................... 1

      B.    Construction of 35 U.S.C. § 112, ¶ 6 Means Plus Function Claim
            Language.................................................................................................. 3

III.  Plaintiff's Opening Position............................................................................... 3

      A.    Storage means (Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44) ............... 3

      B.    Data transmission means (Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44)............... 4

      C.    Detecting (Claims 1, 24, 30) .................................................................. 5

      D.    Parameters of the data transmission (Claims 1, 2, 4, 11, 16, 17, 30, 31, 33,
            40, 44) ..................................................................................................... 6

      E.    Detecting prespecified parameters of the [for] data transmission (Claims 1,
            2, 4, 11, 16, 17, 30, 31, 33, 40, 44) ........................................................ 8

      F.    Means for detecting prespecified parameters of the data transmission
            between the data storage means and the computer unit (Claims 1, 2, 4, 11,
            16, 17) ...................................................................................................... 9

      G.    With data preferably stored in a redundant manner in the data storage
            means as a function of said detected prespecified parameters (Claims 1, 2,
            4, 11, 16, 17) .......................................................................................... 11

      H.    Accessing one of the data storage means as a function of said detected
            prespecified parameters / the access to the data being effected as a
            function of the determined prespecified parameters of the data
            transmission (Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44) ................. 12

      I.    Detecting prespecified parameters for data transmissions between said
            [the] data storage means (Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44)............. 13

      J.    Second means for detecting prespecified parameters of the data
            transmission between said data storage means (Claims 1, 2, 4, 11, 16, 17) ......... 13

      K.    Wherein [t]he data storage means copies data which is redundantly stored
            in the system independent of an access of the computer unit as a function
            of the detected prespecified parameters of data transmission between the
            data storage means (Claims 1, 2, 4, 11, 16, 17).................................... 15

L.      Shifting redundantly stored data independent of an access of the computer unit to the data as a function of the determined prespecified parameters of data transmissions between the data storage means (Claims 30, 31, 33, 40, 44) .................................................................................................................... 16

M.      Process[ing]/process[ed] (Claims 4, 11, 33, 40) ................................................... 17

N.      With prespecified parameters of the data transmission between the data storage means and the computer unit being determined (Claims 30, 31, 33, 40, 44) ........................................................................................................................ 18

O.      Shifting (Claims 30, 31, 33, 40, 44)...................................................................... 19

IV.        Conclusion ......................................................................................................... 20

## TABLE OF AUTHORITIES

### CASES

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
   37 F.3d 1324 (Fed. Cir. 2011) ................................................................. 1

*Aristocrat Techs. Australia Pty Ltd. V. Int'l Game Tech.*,
   521 F.3d 1328 (Fed. Cir. 2008) ........................................................ 3, 10

*Blackboard, Inc. v. Desire2Learn, Inc.*,
   574 F.3d 1371 (Fed. Cir. 2009) ............................................................ 3

*Comark Communications, Inc. v. Harris Corp.*,
   156 F.3d 1182, 48 USPQ2d 1001 (Fed. Cir. 1998) ............................... 2

*Conoco, Inc. v. Energy & Environmental Int'l, L.C.*,
   460 F.3d 1349 (Fed. Cir. 2006) ............................................................ 3

*In re Alappat*,
   33 F.3d 1526 (Fed. Cir. 1994) ............................................................ 10

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004) ............................................................ 2

*ITT Manf. Enterprises, LLC v. Cellco Partnership, et. al.*,
   C.A. No. 1:09-cv-190-LPS,
   2011 WL 7121453 (D. Del. Dec. 29, 2011) ......................................... 3

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) ................................................................ 3

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
   545 F.3d 1359 (Fed. Cir. 2007) ............................................................ 3

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)
   *cert. denied*, 546 U.S. 1170 (2006) ............................................. 1, 2, 8

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) .............................................................. 2

### STATUTES

35 U.S.C. § 112, ¶ 6 ................................................................. passim

## **EXHIBITS**

Exhibit A    -    Joint Claim Construction Statement

Exhibit B    -    U.S. Reissue Patent No. RE40,521

Plaintiff Via Vadis, LLC ("Via Vadis"), through its counsel, hereby submits this brief setting forth Plaintiff's opening position on claim construction. As indicated in the parties' Joint Claim Construction Statement (Exhibit A), there are 15 terms identified for construction.

## I.      Nature of Case

This is a patent infringement action. Plaintiff Via Vadis asserts that Defendants, Skype, Inc., Skype Communications S.à r.l., Skype Global S.à r.l., Skype Software S.à r.l. and Skype Technologies, SA (collectively, "Defendants" or "Skype"), infringe at least claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40 and 44 of U.S. Reissue Patent No. RE40,521 ("the '521 patent").

## II.     Specific Principles for Claim Construction

In accordance with Paragraph 8 of the Scheduling Order, Via Vadis is providing only a brief discussion of specific principles applicable to the terms identified for construction.

### A.      Plain and Ordinary Meaning

The words of a claim will generally be accorded their "ordinary and customary meaning," which is "the meaning that the term would have *to a person of ordinary skill in the art* in question at the time of invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (emphasis added), *cert. denied*, 546 U.S. 1170 (2006). *See also Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1333 (Fed. Cir. 2011) (noting that courts may use sources available to the public to determine ordinary and customary meaning of a claim term).

As recognized by the Federal Circuit in *Phillips*, "determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art. Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art

would have understood disputed claim language to mean.' *Innova/Pure Water, Inc.*, 381 F.3d at 1116.   Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Phillips*, 415 F.3d. at 1313 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

After the claims themselves, the specification is the next most important piece of evidence used to interpret patent claims.   "The specification 'is always highly relevant to the claim construction analysis.   Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d. at 1315 (internal citations omitted) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).   The specification is of particular importance because "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.   The specification need not present every embodiment or permutation of the invention, and the claims are not limited to the preferred embodiment of the invention. *See Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186, 48 USPQ2d 1001, 1005 (Fed. Cir. 1998).

In addition to consulting the patent specification, the court may also consider the patent's prosecution history, if in evidence.   The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it otherwise would be." *Phillips*, 415 F.3d at 1317.   Other evidence excluding the claims, the specification and prosecution history ("extrinsic evidence") may be admissible to explain

scientific principles, the meaning of technical terms and terms of art, and demonstrate the state of prior art. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995); *Phillips*, 415 F.3d at 1317. If relevant and helpful, the court may receive testimony of experts in the field of the invention. *Conoco, Inc. v. Energy & Environmental Int'l, L.C.*, 460 F.3d 1349, 1362 (Fed. Cir. 2006).

### B.    Construction of 35 U.S.C. § 112, ¶ 6 Means Plus Function Claim Language

In considering means-plus function claims within the purview of 35 U.S.C. § 112, both the function and corresponding structure must be construed. *See ITT Manf. Enterprises, LLC v. Cellco Partnership, et. al.*, C.A. No. 1:09-cv-190-LPS, 2011 WL 7121453 at *15 (D. Del. Dec. 29, 2011). For computer-implemented inventions, the corresponding structure may be a general purpose computer or microprocessor, and a corresponding algorithm disclosed in the specification. See *id*. at *17; *see also Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371 (Fed. Cir. 2009); *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1359 (Fed. Cir. 2007); *Aristocrat Techs. Australia Pty Ltd. V. Int'l Game Tech.*, 521 F.3d 1328, 1332 (Fed. Cir. 2008).

## III.   Plaintiff's Opening Position[1]

### A.    Storage means (Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Plain and Ordinary Meaning to be construed in accordance with 35 U.S.C. §112, ¶ 6<br><br>Function: storage<br><br>Structure: cells; control units; individual memory areas; clusters; cluster pools/compounds; memory units; conventional storage means; non-volatile | Subject to 112, 6<br><br>function: storing<br><br>structure: 7:26-35(describing clusters, cells and fields) and 10:29-34 (describing non-volatile memories and random access memories) |

---

[1] Plaintiff does not believe that expert testimony or other extrinsic evidence is necessary to understand the language of the '521 patent claims. Plaintiff, however, reserves the right to submit expert testimony in support of its position on claim construction in response to Defendants' position and to the extent that the Court determines such testimony would be helpful in resolving any claim construction issues.

| | |
|---|---|
| memories; random access memories<br><br>Intrinsic evidence: *See* Exh. A, p. 2 | |

The parties agree that this claim term should be construed "to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. §112, ¶6. Defendants' proposed construction is contrary to 35 U.S.C. §112, ¶6 and inconsistent with the claim language and specification since it fails to include structure in the specification of the '521 patent that performs the function of storage.

Plaintiff's proposed construction is consistent with the ordinary meaning of the term, in accordance with 35 U.S.C. §112, ¶ 6, in the context of the claim language and specification. The structure disclosed in the specification of the '521 patent (Exh. B) that performs the storage function includes: cells (2:50-65, 2:66-67, 7:26-42, Figs. 1, 2, and 4); control units (2:35-38); individual memory areas (6:33-35); clusters (7:26-42, 10:8-10, Figs. 1, 2, 4); cluster pools/compounds (7:26-42, Figs. 1, 2, 4); memory units (10:8-10); conventional storage means (10:29-34); and non-volatile memories or random access memories (10:29-34, Fig. 3).

**B.      Data transmission means (Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Plain and Ordinary Meaning to be construed in accordance with 35 U.S.C. §112, para. 6<br><br>Function: data transmission<br><br>Structure: electrically conductive connections; bus systems; networks; wired or wireless (mobile) telephone networks; the Internet<br><br>Intrinsic evidence: *See* Exh. A, pp. 2-3 | Subject to 112, 6<br><br>function: transmitting data<br><br>structure: 3:48-55 (describing conductive connections, bus systems, network) |

The parties agree that this claim term should be construed "to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. §112, ¶6. Defendants' proposed construction is contrary to 35 U.S.C. §112, ¶6 and inconsistent

with the claim language and specification since it fails to include structure in the specification of the '521 patent that performs the function of data transmission.

Plaintiff's proposed construction is consistent with the ordinary meaning of the term, in accordance with 35 U.S.C. §112, ¶ 6, in the context of the claim language and specification.  The structure disclosed in the specification of the '521 patent (Exh. B) that performs the data transmission function includes: electrically conductive connections (3:48-56); bus systems (3:48-56, 8:5-13); networks (3:48-56, 8:5-13, Figs. 1, 3, and 4); wired or wireless (mobile) telephone networks (3:48-56); and the Internet (3:48-56, 8:5-13, 10:4-8).

### C.   Detecting (Claims 1, 24, 30)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No construction necessary<br><br>Alternative construction: Plain and Ordinary Meaning -- "determining, finding, identifying, discovering, measuring or other acts of detecting"<br><br>Intrinsic evidence: *See* Exh. A, p. 3 | discovering or measuring |

The claim term "detecting" is used in the context of the detection of parameters of data transmission between devices, such as data storage devices and computer units.  *See, e.g.,* Exh. B, claims 1, 24, 30; col. 4, ll. 15-20, 25-30, 42-56; col. 5, l. 58 – col. 6, l. 3.  In this context, the term is unambiguous and needs no construction.[2]

To the extent that the Court determines that this term should be construed, it should be accorded its plain, ordinary meaning consistent with the intrinsic evidence and how the term is used.  Defendants' proposed construction is inconsistent with the claim language and how the term is used in the specification.  By their proposed construction, Defendants attempt to

---

[2] Plaintiff's position is also supported by the file history.  Notably, the Examiner never questioned or raised any issue with respect to the meaning or interpretation of any of the terms Defendants contend require construction.  *See* Exh. A., pp. 3-11, citations to '084 and '521 patent file histories in Plaintiff's Proposed Constructions.

impermissibly limit the interpretation of detecting to "discovering or measuring."

Defendants' limited construction is not supported by the intrinsic evidence. The claims themselves refer to the "detecting prespecified parameters for data transmissions" as the "determined prespecified parameters of data transmissions." *See, e.g.* Exh. B, claims 30, 32, 51. The specification uses this same language. *Id.,* col. 25-30, 42-56; col. 5, l. 58 - col. 6, l. 3. Moreover, there is no evidence that supports any intent to limit the term to "discovering or measuring."

Accordingly, to the extent that the Court deems construction to be necessary, "detecting" should be construed to mean "determining, finding, identifying, discovering, measuring or other acts of detecting," which is consistent with the ordinary meaning of the claim language and the intrinsic record.

**D.** **Parameters of the data transmission (Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44)**

| Plaintiff's Construction | Defendants' Construction |
| --- | --- |
| No construction necessary<br><br>Alternative construction: Plain and Ordinary Meaning – "values, variables, characteristics or other parameters relating to the transmission"<br><br>Intrinsic evidence: *See* Exh. A, pp. 3-4 | at least two performance characteristics describing the transmission |

The claim phrase "parameters of the data transmission" is used in the context of data transmission between devices, such as data storage devices and computer units, data transmission between such devices and connected users, redundant storage in such devices and access, and copying and shifting by such devices,. *See, e.g.,* Exh. B, claims 1, 3, 7, 9, 15, 24-26, 30, 32, 38, 43, 49-51; col. 3, ll. 3-9, 39-47; col. 4, ll. 15-24; col. 5, ll. 28-33, 57-65; col. 9, ll. 6-11; col. 20, ll. 37-64; col. 23, l. 51 – col. 25, l. 31; col 26, ll. 15-19, 30-67. These data transmission

parameters are described in the specification, for instance, as follows:

> Moreover, the inventive system for a computer game can comprise additional means for the detection of prespecified <u>parameters of the data transmission</u> between the computer units and the respectively connected users in order to additionally optimise the data access and the data management. <u>Preferably</u>, these prespecified <u>parameters comprise</u> the duration of the transmission, and/or the fault rate, and/or the duration of data processing operations of the individual computer units and/or the individual users prior to the transmission of the data. [Exh. B, col. 4, ll. 15-24; emphasis added.]

> Further it is <u>to be preferred</u> that the determination of the prespecified <u>parameters of data transmissions</u> between the individual data storage means and the computer unit <u>comprises</u> the determination of the duration of the transmission, and/or the fault rate, and/or the duration of data processing operations of the individual data storage means prior to the transmission of the data in order to access data more rapidly and/or reliably. [Exh. B, col. 5, ll. 28-35; emphasis added.]

> It is further <u>to be preferred</u>, that the determination of the prespecified <u>parameters of data transmission</u> between the computer units and the users which are connected therewith <u>comprises</u> the determination of the duration of the transmission, and/or the fault rate, and/or the duration of data processing operations of the individual computer units and/or the individual users prior to the transmission of the data. [Exh. B, col. 5, ll. 57-65; emphasis added.]

In this context, the phrase "parameters of the data transmission" is unambiguous and needs no construction.

To the extent that the Court determines that this term should be construed, it should be accorded its plain, ordinary meaning consistent with the intrinsic evidence and how the term is used. Defendants' proposed construction attempts to impermissibly limit the interpretation of parameters of the data transmission to "at least two performance characteristics describing the transmission."

Defendants' limited construction is not supported by the intrinsic evidence. The recitation in the claims of the "parameters of data transmission" is in no way limited to "performance characteristics" as Defendants propose. In fact, to the extent that some of the data transmission parameters recited in the dependent claims are performance characteristics (*e.g.*,

fault rate) that further limit the "parameters of the data transmission," under the doctrine of claim differentiation, "parameters of the data transmission" would not be properly interpreted as so limited.  *See, e.g.,* Exh. B, claims 15, 25, 43, 50; *see also Phillips*, 415 F.3d at 1314-315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim").  Further, as indicated above, the specification simply refers to the parameters of data transmission disclosed as "preferable" and uses open-ended language by indicating that these parameters may "comprise" the parameters listed.  *Id.,* col. 4, ll. 15-24; col. 5, ll. 28-35, 57-65.  Moreover, there is no evidence that supports any intent to limit the parameters to "performance characteristics."

Accordingly, to the extent that the Court deems construction to be necessary, "parameters of the data transmission" should be construed to mean "values, variables, characteristics or other parameters relating to the transmission."

### E. Detecting prespecified parameters of the [for] data transmission (Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No construction necessary<br><br>Alternative construction: Plain and Ordinary Meaning – "determining, finding, identifying, discovering, measuring, or other acts of detecting prespecified values, variables, characteristics or other parameters relating to the transmission"<br><br>Intrinsic evidence: *See* Exh. A, p. 4 | discovering or measuring at least two performance characteristics of the data transmission between the at least two data storage means and the computer unit |

The claim language should be interpreted consistently throughout the claims of the '521 patent.  The meaning of "detecting" and "parameters of the [for] data transmission" in the phrase "detecting prespecified parameters of the [for] data transmission" should be the same as set forth above in Sections III.C and III.D. addressing that claim language.  For the reasons explained in

those sections, Plaintiff's proposal, in contrast with the Defendants, is consistent with the ordinary meaning of the claim language and the intrinsic record.

**F.**     **Means for detecting prespecified parameters of the data transmission between the data storage means and the computer unit (Claims 1, 2, 4, 11, 16, 17)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Plain and Ordinary Meaning to be construed in accordance with 35 U.S.C. §112, para. 6<br><br>Function: detecting prespecified parameters of the data transmission between the data storage means and the computer unit<br><br>Structure: cells comprising additional data which relates to parameters of data transmission between the individual data storage means and the computer unit; clients, clusters, cells using data transmission protocol; algorithm - pseudoreliable messages; find operation and algorithm; read operation and algorithm; write operation and algorithm; mirror operation and algorithm; shift operation based on transmission performance<br><br>Intrinsic evidence: *See* Exh. A, p. 5 | Subject to 112, 6.<br><br>function: "detecting prespecified parameters of the data transmission between the data storage means and the computer unit"<br><br>structure: 26:30-39 (describing a counter or timer)<br><br>26:30-39 |

The parties agree that this claim term should be construed "to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  35 U.S.C. §112, ¶6.  Defendants' proposed construction is contrary to 35 U.S.C. §112, ¶6 and inconsistent with the claim language and specification since it fails to include structure in the specification of the '521 patent that performs the claimed detecting function.

Plaintiff's proposed construction is consistent with the ordinary meaning of the term, in accordance with 35 U.S.C. §112, ¶ 6, in the context of the claim language and specification.  The structure disclosed in the specification of the '521 patent (Exh. B) that performs the claimed detecting function includes: cells comprising additional data which relates to parameters of data

transmission between the individual data storage means and the computer unit (col. 3 ll. 3-9, col. 9 ll. 6-11); clients, clusters, cells using data transmission protocol (col. 3 ll. 39-47, col. 4 ll. 15-24, col. 5 ll. 28-35, 57-65, col. 9 ll. 6-38, col. 9 l. 63 – col. 10 l.4, col. 18 ll. 32-27, 55-65); algorithm - pseudoreliable messages (col. 12, col. 13 ll. 6-20); find operation and algorithm (col. 9 ll. 11-22, col. 21 ll. 37-64); read operation and algorithm (col. 19 ll. 11-22, col. 21 l. 24 – col. 22 l. 59); write operation and algorithm (col. 19 ll. 11-22, col. 21 l. 24 – col. 22 l. 59); mirror operation and algorithm (col. 23 l. 51- col. 25 l. 31); and shift operation based on transmission performance (col. 26 ll. 11-51).

With respect to the algorithms and pseudocode, the specification discloses that "a number of algorithms will be described in more detail which are utilized by the functional operations described further below which serve for the execution of the invention.  This explanation is supplemented by corresponding pseudocodes which are used in the currently preferred embodiment of the invention."  Exh. B, col. 10, l. 64-col. 11, l. 2.  The specification describes that these algorithms for performing the various operations are executed by the various devices (*e.g.*, computer units, data storage devices, clients).  *See, e.g.,* Exh. B, col.13, ll. 22-24; col. 20, ll. 11-13, 25-28; col. 20, l. 66 – col. 21, l. 2; col. 21, ll. 37-42; col. 22, ll. 2-8, 39-37.

The '521 specification thus discloses sufficient structure, including in the form of algorithms for carrying out the function of "detecting prespecified parameters of the data transmission between the data storage means and the computer unit," described as executed on the various disclosed devices.  *See Aristocrat Techs. Australia*, 521 F.3d at 1333 (*quoting In re Alappat*, 33 F.3d 1526, 1545 (Fed. Cir. 1994)).

G.      **With data preferably stored in a redundant manner in the data storage means as a function of said detected prespecified parameters (Claims 1, 2, 4, 11, 16, 17)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No construction necessary<br><br>Alternative construction: Plain and Ordinary Meaning – "data preferably stored more than once in the data storage means with the storing function being affected by the determined, found, identified, discovered, measured or otherwise detected prespecified values, variables, characteristics or other parameters relating to data transmission"<br><br>Intrinsic evidence: *See* Exh. A, pp. 5-6 | Indefinite |

The Defendants have not offered any proposed construction.  The claim language is not indefinite.  To the extent that the Court determines that this term should be construed, it should be accorded its plain, ordinary meaning consistent with the intrinsic evidence and how the term is used.

The claim language should be interpreted consistently throughout the claims of the '521 patent.  The meaning of "data storage means," "detected," and "parameters of the [for] data transmission" in the phrase "detected prespecified parameters" should be the same as set forth above in Sections III.A., III.C., and III.D. addressing that claim language.

With regard to the claim language "data preferably stored in a redundant manner in the data storage means as a function of said detected prespecified parameters," the specification discloses copying redundantly stored data (col. 2 ll. 42-44) and dividing data in data subsets to be stored in a redundant manner (col. 4 ll. 61-64).  Furthermore, the specification discloses that each cell in the cluster compound may be available in a redundant manner, i.e. nm times in nm

clusters, thus each field is nm times stored in these cells (col. 8, l. 65-col. 9, l. 2). This redundant storage in cells is carried out as a function of the data transmission parameters. (col. 4, ll. 61-67).

The plain, ordinary meaning of "data preferably stored in a redundant manner in the data storage means as a function of said detected prespecified parameters," consistent with the intrinsic evidence and how the phrase is used, is that data is preferably stored more than once in the data storage means with the storing function being affected by the detected prespecified parameters.

Accordingly, to the extent that the Court deems construction to be necessary, the Court should adopt Plaintiff's proposal, which is consistent with the ordinary meaning of the claim language and the intrinsic record.

**H.** **Accessing one of the data storage means as a function of said detected prespecified parameters / the access to the data being effected as a function of the determined prespecified parameters of the data transmission (Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No construction necessary<br><br>Alternative construction: Plain and Ordinary Meaning – "accessing one of the data storage means with the accessing being affected by the determined, found, identified, discovered, measured or otherwise detected prespecified values, variables, characteristics or other parameters relating to data transmission"<br><br>Intrinsic evidence: *See* Exh. A, p. 6 | accessing an optimal data storage means as a function of the detected prespecified parameters |

The claim language should be interpreted consistently throughout the claims of the '521 patent. The meaning of "data storage means" and "detected/determined prespecified parameters" should be the same as set forth above in Sections III.A, III.C, III.D, and III.E addressing that claim language. Defendants' construction is improper because there is nothing in the claims that limits the data storage means to an "optimal" data storage means. Furthermore, "optimal" does

not appear anywhere in the specification.  For this reason, and for the reasons explained in the

above listed sections, Plaintiff's proposal, in contrast with the Defendants', is consistent with the

ordinary meaning of the claim language and the intrinsic record.

**I.      Detecting prespecified parameters for data transmissions between said [the] data storage means (Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No construction necessary<br><br>Alternative construction: Plain and Ordinary Meaning – "determining, finding, identifying, discovering, measuring, or other acts of detecting prespecified values, variables, characteristics or other parameters relating to the transmission between the data storage means"<br><br>Intrinsic evidence: *See* Exh. A, pp. 6-7 | discovering or measuring at least two performance characteristics of the data transmission between the at least two data storage means |

The claim language should be interpreted consistently throughout the claims of the '521

patent.  The meaning of "data storage means" and "detecting prespecified parameters for data

transmissions" should be the same as set forth above in Sections III.A, III.D, and III.E addressing

that claim language.  For the reasons explained in those sections, Plaintiff's proposal, in contrast

with the Defendants', is consistent with the ordinary meaning of the claim language and the

intrinsic record.

**J.      Second means for detecting prespecified parameters of the data transmission between said data storage means (Claims 1, 2, 4, 11, 16, 17)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Plain and Ordinary Meaning to be construed in accordance with 35 U.S.C. §112, para. 6<br><br>Function: detecting prespecified parameters of the data transmission between said data storage means<br><br>Structure: cells comprising additional data which relates to parameters of data | Subject to 112, 6.<br><br>function:  "detecting prespecified parameters of the data transmission between said data storage means"<br><br>structure:  indefinite for lack of structure |

| | |
|---|---|
| transmission between the individual data storage means and neighbouring cells and/or cells which comprise data; data transmission protocol; data transmission protocol that detects and uses data transmission parameters to access data more rapidly; algorithm - pseudoreliable messages; find operation and algorithm; read operation and algorithm; write operation and algorithm; mirror operation and algorithm; shift operation based on transmission performance<br><br>Intrinsic evidence: *See* Exh. A, pp. 7-8 | |

The parties agree that this claim term should be construed "to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. §112, ¶6. Defendants' proposed construction is contrary to 35 U.S.C. §112, ¶6 and inconsistent with the claim language and specification since it fails to include structure in the specification of the '521 patent that performs the claimed detecting function.

Plaintiff's proposed construction is consistent with the ordinary meaning of the term, in accordance with 35 U.S.C. §112, ¶ 6, in the context of the claim language and specification. The structure disclosed in the specification of the '521 patent that performs the claimed detecting function includes: cells comprising additional data which relates to parameters of data transmission between the individual data storage means and neighbouring cells and/or cells which comprise data (col. 3 ll. 3-9, 6-11); data transmission protocol (col. 9 l.63 - col. 10 l. 4); data transmission protocol that detects and uses data transmission parameters to access data more rapidly (col. 3 ll. 39-47, col. 4 ll. 15-24, col. 5 ll. 28-35, 57-65, col. 9 ll. 6-38, col. 9 l. 63 - col. 10 l. 4, col. 18 ll. 32-27, 55-65); algorithm - pseudoreliable messages (col. 12, col. 13 ll. 6-20); find operation and algorithm (col. 9 ll. 11-22, col. 21 ll. 37-64); read operation and algorithm (col. 19 ll. 11-22, col. 21 l. 24 - col. 22 l. 59); write operation and algorithm (col. 19 ll. 11-22, col. 21 l. 24 - col. 22 l. 59); mirror operation and algorithm (col. 23 l. 51 – col. 25 l. 31); and shift

operation based on transmission performance (col. 26 ll. 11-51).

As explained above in section III.F, the '521 specification thus discloses sufficient structure, including in the form of algorithms for carrying out the function of "second means for detecting prespecified parameters of the data transmission between said data storage means," described as executed on the various disclosed devices.

**K.** **Wherein [t]he data storage means copies data which is redundantly stored in the system independent of an access of the computer unit as a function of the detected prespecified parameters of data transmission between the data storage means (Claims 1, 2, 4, 11, 16, 17)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No construction necessary<br><br>Alternative construction: Plain and Ordinary Meaning – "the data storage means copies data which is stored more than once in the system without considering access by the computer unit and with the copy function being affected by the determined, found, identified, discovered, measured, or otherwise detected prespecified values, variables, characteristics or other parameters relating to data transmission between the data storage means"<br><br>Intrinsic evidence: *See* Exh. A, p. 8 | Indefinite |

The Defendants have not offered any proposed construction.  The claim language is not indefinite.  To the extent that the Court determines that this term should be construed, it should be accorded its plain, ordinary meaning consistent with the intrinsic evidence and how the term is used.

The claim language should be interpreted consistently throughout the claims of the '521 patent.  The meaning of "data storage means," "redundantly stored," and" as a function of detected prespecified parameters of the data transmission" should be the same as set forth above in Sections III.A,  III.E, and III.G addressing that claim language.  With respect to the phrase

"independent of an access of the computer unit," the specification explains, for example, that "data storage means copy redundantly stored data in the system among each other" (Exh. B col. 2 ll. 42-46) and "data storage means process the stored data independently from the computer unit" (Exh. B col. 2 ll. 54-56). The plain meaning of data storage means copies data … "independent of an access of the computer unit" is that the copying occurs at the data storage means without considering access by a computer unit.

Accordingly, to the extent that the Court deems construction to be necessary, the Court should adopt Plaintiff's proposal, which is consistent with the ordinary meaning of the claim language and the intrinsic record.

**L.**   **Shifting redundantly stored data independent of an access of the computer unit to the data as a function of the determined prespecified parameters of data transmissions between the data storage means (Claims 30, 31, 33, 40, 44)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No construction necessary

Alternative construction: Plain and Ordinary Meaning – "moving from a first location to a second different location data which is stored more than once without considering access by the computer unit and with the shifting function being affected by the determined, found, identified, discovered, measured, or otherwise detected prespecified values, variables, characteristics, or other parameters relating to data transmissions between the data storage means"

Intrinsic evidence: *See* Exh. A, pp. 8-9 | Indefinite |

The Defendants have not offered any proposed construction. The claim language is not indefinite. To the extent that the Court determines that this term should be construed, it should be accorded its plain, ordinary meaning consistent with the intrinsic evidence and how the term is used.

The claim language should be interpreted consistently throughout the claims of the '521 patent.  The meaning of "redundantly stored data," "independent of an access of a computer unit to the data," "as a function of the determined prespecified parameters," and "storage means," should be the same as set forth above in Sections III.A, III.G, III.H, and III.K  addressing that claim language.  Additionally, the term "shifting" is discussed in III.O below, and its meaning should be the same.  For the same reasons explained in those sections, Plaintiff's proposal, in contrast with the Defendants', is consistent with the ordinary meaning of the claim language and the intrinsic record.

### M.      Process[ing]/process[ed] (Claims 4, 11, 33, 40)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No construction necessary<br><br>Alternative construction: Plain and Ordinary Meaning --<br>"manipulate/manipulating/manipulated"<br><br>Intrinsic evidence: *See* Exh. A, p. 9 | to modify using computer instructions |

The claim term "process[ing]/process[ed]" is used in the context of a device, such as a data storage device or a computer unit, or a user, manipulating data, orders, requests and code. *See, e.g.,* Exh. B, claims 4, 11, 23, 29, 33, 40, 48, 54; col. 2, ll. 38-41, 54-59; col. 3, ll. 21-32; col. 4, ll. 11-15, 34-41, 57-60; col. 5, ll. 13-23, 44-50; col. 6, ll. 10-17; col. 8, ll. 5-10; col. 9, ll. 19-24, 51-62; col. 10, ll. 24-34, 48-51; col. 13, ll. 5-49; col. 19, ll. 61-65; col. 22, ll. 10-15; col. 24, ll. 40-43.  In this context, the term is unambiguous and needs no construction.

To the extent that the Court determines that this term should be construed, it should be accorded its plain, ordinary meaning consistent with the intrinsic evidence and how the term is used.  Defendants' proposed construction is inconsistent with the claim language and how the term is used in the specification.  By their proposed construction, Defendants attempt to

impermissibly limit the interpretation of process, processing and processed to "to modify using computer instructions."

While "processing" may result in "modifying" and may be caused by or the result of "using computer instructions," there is no evidence that warrants limiting the term in this way. Defendants' limited construction is not supported by the intrinsic evidence.  The claim language used is "process," "processing" and "processed."  *Id*.  What is recited as being processed in the claims and specification is data, orders, requests and code.  *Id.*  While the specification describes using computer instructions, there is no evidence that supports limiting the interpretation of process, processing and processed to "to modify using computer instructions."

Accordingly, to the extent that the Court deems construction to be necessary, the Court should adopt Plaintiff's proposal, which is consistent with the ordinary meaning of the claim language and the intrinsic record.

**N.**   **With prespecified parameters of the data transmission between the data storage means and the computer unit being determined (Claims 30, 31, 33, 40, 44)**

| Plaintiff's Construction | Defendants' Construction |
| --- | --- |
| No construction necessary<br><br>Alternative construction: Plain and Ordinary Meaning – "with prespecified values, variables, characteristics or other parameters relating to data transmission between the at least one data storage means and the computer unit being determined, found, identified, discovered, measured or otherwise detected"<br>Intrinsic evidence: *See* Exh. A, p. 10 | discovering or measuring at least two performance characteristics of the data transmission between the at least two data storage means and the computer unit |

Defendants' proposed construction is inconsistent with the plain and ordinary meaning of the term and the intrinsic record.  The claim language should be interpreted consistently throughout the claims of the '521 patent.  The meaning of "prespecified parameters of the data transmission" and "determined" should be the same as set forth above in Sections III.E and III.H

addressing that claim language.  For the reasons explained in those sections, Plaintiff's proposal, in contrast with the Defendants, is consistent with the ordinary meaning of the claim language and the intrinsic record.

Additionally, Defendants impermissibly narrow the term to include "at least two data storage means."  The plain language of the term states that prespecified parameters of the data transmission are determined "between the data storage means and the computer unit."  There is nothing in the intrinsic record to indicate that this phrase requires at least two data storage means.  *See* Sec. III.A, above.  Instead, the term should be afforded its plain and ordinary meaning, namely, that there is at least *one* data storage means.

O.       **Shifting (Claims 30, 31, 33, 40, 44)**

| Plaintiff's Construction | Defendants' Construction |
| --- | --- |
| No construction necessary<br><br>Alternative construction: Plain and Ordinary Meaning -- "moving from a first location to a second different location"<br><br>Intrinsic evidence: *See* Exh. A, pp. 10-11 | copying data to a new location and deleting it from the prior location |

The claim term "shifting" is used in the context of moving data between locations, such as, cells Z, clusters C and mirrors SP, and between devices, such as data storage devices.  *See, e.g.,* Exh. B, claim 30; col. 2, ll. 48-53; col. 9, ll. 25-37; col. 20, ll. 15-17; col. 26, ll. 12-51.  In this context, the term is unambiguous and needs no construction.

To the extent that the Court determines that this term should be construed, it should be accorded its plain, ordinary meaning consistent with the intrinsic evidence and how the term is used.  Defendants' proposed construction is inconsistent with the claim language and how the term is used in the specification.  By their proposed construction, Defendants attempt to impermissibly limit the interpretation of shifting to "copying data to a new location and deleting

it from the prior location."

While "copying" data to a "new location" and "deleting" that data from the "prior location" may be one way to shift data from a first location to a second different location, there is no evidence that warrants limiting the term "shifting" in this way. Defendants' limited construction is not supported by the intrinsic evidence. The claim language used is "shifting." *Id.*, claim 30. When limited to "copying" and "deleting," the claim language used is "copying" and "deleting." *Id.,* claim 32. While the specification describes that data "can thus be shifted in the inventive system from one data storage means to other data storage means" by "the data storage means copy[ing] redundantly stored data in the system among each other as a function of the determined parameters of data transmissions between the individual data storage means and the computer unit and delet[ing] the data in the data storage means in which it had been stored beforehand," there is no evidence that supports any intent to limit the term to "copying" and "deleting." *Id.,* col. 2, ll. 42-53.

Accordingly, to the extent that the Court deems construction to be necessary, "shifting" should be construed to mean "moving from a first location to a second location." Plaintiff's proposal, in contrast with the Defendants, is consistent with the ordinary meaning of the claim language and the intrinsic record.

**IV.**   **<u>Conclusion</u>**

For the foregoing reasons, the Court should adopt Plaintiff Via Vadis' proposed constructions of the various terms set forth herein.

October 26, 2012                    Respectfully submitted,


                                   */s/Martin M. Zoltick*_____
                                   Martin M. Zoltick (*admitted pro hac*)
                                   ROTHWELL, FIGG, ERNST &
                                   MANBECK, P.C.
                                   607 14th Street, NW
                                   Suite 800
                                   Washington, DC 20005
                                   (202) 783-6040
                                   mzoltick@rothwellfigg.com

                                   Daniel A. Griffith (DE# 4209)
                                   Whiteford, Taylor & Preston LLC
                                   1220 North Market Street
                                   Suite 608
                                   Wilmington, Delaware 19801
                                   (302) 353-4144
                                   dgriffith@wtplaw.com

                                   Edward M. Buxbaum (*admitted pro hac*)
                                   Steven E. Tiller (*admitted pro hac*)
                                   Whiteford, Taylor & Preston L.L.P.
                                   Seven Saint Paul Street
                                   Baltimore, Maryland 21202-1636
                                   (410) 347-8700
                                   ebuxbaum@wtplaw.com
                                   stiller@wtplaw.com


                                   Robert J. Weltchek (*admitted pro hac*)
                                   WELTCHEK MALLAHAN & WELTCHEK
                                   2330 West Joppa Road, Suite 203
                                   Lutherville, Maryland 21093
                                   410-825-5287
                                   rweltcheck@wmwlawfirm.com

                                   ***Attorneys for Plaintiff, Via Vadis, LLC***

21

## <u>CERTIFICATE OF SERVICE</u>

I, Martin M. Zoltick, Esquire, hereby certify that on October 26, 2012, I caused a true and

correct copy of PLAINTIFF VIA VADIS, LLC'S OPENING BRIEF ON CLAIM

CONSTRUCTION to be served, via electronic and U.S. First Class Mail, postage prepaid, on the

following counsel of record:

Jack B. Blumenfeld
Rodger Dallery Smith, II
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE  19899

Douglas E. Lumish
Michael B. Eisenberg
Parker C. Ankrum
Stefan R. Stoyanov
Kasowitz, Benson, Torres & Friedman LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA 94065

*/s/ Martin M. Zoltick*

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| VIA VADIS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.11-507-RGA |
| v. | ) | |
| | ) | |
| SKYPE, INC.; SKYPE | ) | **JURY TRIAL DEMANDED** |
| COMMUNICATIONS SARL; | ) | |
| SKYPE GLOBAL SARL; SKYPE | ) | |
| SOFTWARE SARL; | ) | |
| AND SKYPE TECHNOLOGIES, SA., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## *JOINT CLAIM CONSTRUCTION STATEMENT*

The Parties, by their undersigned counsel, and pursuant to ¶7 of the Court's Scheduling Order entered on April 12, 2012, have conferred regarding the construction of the patent claims asserted in this case and submit this Joint Claim Construction Statement identifying the claim language from U.S. Patent Nos. RE40,521 ("the '521 patent") and 7,904,680 ("the '680 patent") that the parties believe require construction by the Court, along with the parties' proposed constructions. True and complete copies of these patents, as well as the cited portions of the prosecution history are attached hereto as Exhibits A though I.

### A. Identification of Asserted Patents

Based on public information available to it at the time it filed its original and amended complaints in this matter, Plaintiff asserted that Defendants infringe two United States Patents owned by it, U.S. Pat. Nos. RE40,521 ("the '521 patent") and 7,904,680 ("the '680 patent"). Having had the opportunity to review Defendants' source code and core technical documents

related to the asserted products, methods and systems during discovery in this matter, Plaintiffs intend to dismiss with prejudice all claims against the Defendants related to the '680 patent (Count II).[1]  Plaintiff reserves the right to assert the '680 patent against the Defendants if evidence comes to light indicating that Defendants have modified or altered the products, methods or systems such that they fall within the scope of the '680 patent.

### B.  Joint Claim Construction Chart[2]

| '521 Patent Claim Terms to be Construed | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| storage means<br><br>(Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44) | Plain and Ordinary Meaning to be construed in accordance with 35 U.S.C. §112, para. 6[3]<br><br>2:24-26<br>2:35-38<br>2:59-65<br>2:66-67<br>6:33-35<br>7:26-42<br>10:8-10<br>10:29-34<br>Figs. 1-4 | Subject to 112, 6<br><br>function: storing<br><br>structure: 7:26-35(describing clusters, cells and fields) and 10:29-34 (describing non-volatile memories and random access memories)<br><br>7:26-35<br>10:29-34 |
| data transmission means<br><br>(Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44) | Plain and Ordinary Meaning to be construed in accordance with 35 U.S.C. §112, para. 6<br><br>3: 48-56<br>8: 5-13 | Subject to 112, 6<br><br>function: transmitting data<br><br>structure: 3:48-55 (describing conductive connections, bus systems, network) |

[1] As the '680 patent has not yet been dismissed from this matter, Defendants include proposed constructions for the'680 patent with their identification of supporting intrinsic evidence as Schedule 1 attached hereto.

[2] All references to column/line numbers will be to the '521 patent unless otherwise indicated.

[3] In its August 28, 2012 identification of claim terms and proposed construction, Via Vadis made no disclosures to Skype and stated only that it did "not believe that any of the claim terms/phrases of either of the patents at issue require construction by the Court."  *See Exhibit J.*  In an email dated September 4, 2012, Skype sought clarification that Via Vadis would not seek to provide any claim constructions.  *See Exhibit K.*  Here, however, for the first time, Via Vadis states that it is seeking to have a number of claim terms "construed in accordance with 35 U.S.C. §112, para. 6."  This disclosure is untimely and prejudicial and, for that reason, Skype objects to all of Via Vadis's proposed constructions that include this language.

| | 10: 4-8<br>Fig. 1<br>Fig. 3<br>Fig. 4 | 3:48-55 |
|---|---|---|
| detecting<br><br>(Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44) | Plain and Ordinary Meaning<br><br>2:24-30<br>2:42-48<br>4:15-20<br>4:25-30<br>4:42-56<br>5:66-6:3<br>18:32-37<br>18:57-65<br><br><br>'084 patent file history<br><br>• December 9, 2004 Non-Final Rejection<br>• April 8, 2005 Response to Office Action<br>• June 29, 2005 Notice of Allowance<br><br>'521 patent file history<br><br>• June 9, 2008 Notice of Allowance | discovering or measuring<br><br>4:42-48<br>18:27-65<br>22:60-24:67<br>26:30-67<br>29:29-32:15<br><br>'680 patent at 25:63-30:26.<br><br>'680 prosecution history: May 20, 2010 Reply to OA at 3. |
| parameters of the data transmission<br><br>(Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44) | Plain and Ordinary Meaning<br><br>3:3-9<br>3:39-47<br>4:15-24<br>5:28-33<br>5:57-65<br>9:6-11<br>20:37-64<br>23:51-25:31<br>26:15-19<br>26:30-67<br>Claim 25<br>Claim 50 | at least two performance characteristics describing the transmission<br><br>Abstract<br>1:24-67<br>2:1-12<br>2:23-34<br>3:39-47<br>3:63-4: 48<br>5:28-35<br>5:52-57<br>6:28-32<br>9:6-11<br>9:25-38 |

| | '084 patent file history<br><br>• December 9, 2004 Non-Final Rejection<br>• April 8, 2005 Response to Office Action<br>• June 29, 2005 Notice of Allowance<br><br>'521 patent file history<br><br>• June 9, 2008 Notice of Allowance | 16:24-19:10<br>22:60-24:67<br>26:29-67<br>27:19-32:15<br><br>'680 patent prosecution history: May 20, 2010 Reply to OA at 3; Oct. 4, 2010 Interview Summary; Nov. 4, 2010 Amendment and Reply to Final Office Action at 10 |
|---|---|---|
| detecting prespecified parameters of the [for] data transmission<br><br>(Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44) | Plain and Ordinary Meaning<br><br>3:3-9<br>3:39-47<br>4:15-24<br>5:28-35<br>5:57-65<br>9:6-38<br>9:63-10:4<br>12: ("Pseudocode for Sending a Pseudoreliable Message PSM")<br>13:6-20<br>18:32-37<br>18:55-65<br>19:11-22<br>20:37-64<br>21:24-22:59<br>23:51-26:51<br><br>'084 patent file history<br><br>• December 9, 2004 Non-Final Rejection<br>• April 8, 2005 Response to Office Action<br>• June 29, 2005 Notice of Allowance<br><br>'521 patent file history<br><br>• June 9, 2008 Notice of Allowance | discovering or measuring at least two performance characteristics of the data transmission between the at least two data storage means and the computer unit<br><br>Abstract<br>1:24-67<br>2:1-12<br>2:23-34<br>3:39-47<br>3:63-4: 48<br>5:28-35<br>5:52-57<br>6:28-32<br>9:6-11<br>9:25-38<br>16:24-19:10<br>22:60-24:67<br>26:29-67<br>27:19-32:15.<br><br>'680 patent prosecution history: May 20, 2010 Reply to OA at 3; Oct. 4, 2010 Interview Summary; Nov. 4, 2010 Amendment and Reply to Final Office Action at 10 |

| | | |
|---|---|---|
| means for detecting prespecified parameters of the data transmission between the data storage means and the computer unit<br><br>(Claims 1, 2, 4, 11, 16, 17) | Plain and Ordinary Meaning to be construed in accordance with 35 U.S.C. §112, para. 6<br><br>3:3-9<br>3:39-47<br>4:15-24<br>5:28-35<br>5:57-65<br>9:6-38<br>9:63-10:4<br>12: ("Pseudocode for Sending a Pseudoreliable Message PSM")<br>13:6-20<br>18:32-37<br>18:55-65<br>19:11-22<br>20:37-64<br>21:24-22:59<br>23:51-25:31<br>26:11-51 | Subject to 112, 6.<br><br>function: "detecting prespecified parameters of the data transmission between the data storage means and the computer unit"<br><br>structure: 26:30-39 (describing a counter or timer)<br><br>26:30-39 |
| with data being preferably stored in a redundant manner in the data storage means as a function of said detected prespecified parameters<br><br>(Claims 1, 2, 4, 11, 16, 17) | Plain and Ordinary Meaning<br><br>2:42-53<br>2:59-65<br>3:3-9<br>3:39-47<br>4:15-24<br>4:61-67<br>5:1-6<br>5:28-35<br>5:57-65<br>8:63-9:5<br>9:6-38<br>9:63-10:4<br>12: ("Pseudocode for Sending a Pseudoreliable Message PSM")<br>13:6-20<br>18:32-37<br>18:55-65<br>19:11-22<br>20:37-64<br>21:24-22:59<br>23:51-25:31 | Indefinite |

| | | |
|---|---|---|
| | 26:11-51<br><br>'084 patent file history<br><br>• December 9, 2004 Non-Final Rejection<br>• April 8, 2005 Response to Office Action<br>• June 29, 2005 Notice of Allowance<br><br>'521 patent file history<br><br>• June 9, 2008 Notice of Allowance | |
| accessing one of the data storage means as a function of said detected prespecified parameters<br><br>the access to the data being effected as a function of the determined prespecified parameters of the data transmission<br><br>(Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44) | Plain and Ordinary Meaning<br><br>2:24-30<br>4:41-48<br>19:11-20:64<br>21:24-26:10<br>Figs. 1-4<br><br>'084 patent file history<br><br>• December 9, 2004 Non-Final Rejection<br>• April 8, 2005 Response to Office Action<br>• June 29, 2005 Notice of Allowance<br><br>'521 patent file history<br><br>• June 9, 2008 Notice of Allowance | accessing an optimal data storage means as a function of the detected prespecified parameters<br><br>Abstract;<br>1:24-67<br>2:1-12<br>2:23-34<br>3:39-47<br>3:63-4:48<br>5:28-35<br>5:52-57<br>6:28-32<br>9:26-38<br>16:24-19:10<br>22:60-24:67<br>26:29-67<br>27:19-32:15<br><br>'680 patent prosecution history: May 20, 2010 Reply to OA at 3; Oct. 4, 2010 Interview Summary; Nov. 4, 2010 Amendment and Reply to Final Office Action at 10 |
| detecting prespecified parameters for data transmissions between said [the] data storage means | Plain and Ordinary Meaning<br><br>3:3-9<br>3:39-47 | discovering or measuring at least two performance characteristics of the data transmission between the at |

| | | |
|---|---|---|
| (Claims 1, 2, 4, 11, 16, 17, 30, 31, 33, 40, 44) | 4:15-24<br>5:28-35<br>5:57-65<br>9:6-38<br>9:63-10:4<br>12: ("Pseudocode for Sending a Pseudoreliable Message PSM")<br>13:6-20<br>18:32-37<br>18:55-65<br>19:11-22<br>20:37-64<br>21:24-22:59<br>23:51-25:31<br>26:11-51<br><br><br>'084 patent file history<br><br>• December 9, 2004 Non-Final Rejection<br>• April 8, 2005 Response to Office Action<br>• June 29, 2005 Notice of Allowance<br><br>'521 patent file history<br><br>• June 9, 2008 Notice of Allowance | least two data storage means<br>Abstract<br>1:24-67<br>2:1-12<br>2:23-34<br>3:39-47<br>3:63-4:48<br>5:28-35<br>5:52-57<br>6:28-32<br>9:6-11<br>9:25-38<br>16:24-19:10<br>22:60-24:67<br>26:29-67<br>27:19-32:15.<br>'680 patent prosecution history: May 20, 2010 Reply to OA at 3; Oct. 4, 2010 Interview Summary; Nov. 4, 2010 Amendment and Reply to Final Office Action at 10 |
| second means for detecting prespecified parameters of the data transmission between said data storage means<br><br>(Claims 1, 2, 4, 11, 16, 17) | Plain and Ordinary Meaning to be construed in accordance with 35 U.S.C. §112, para. 6<br><br>3:3-9<br>3:39-47<br>4:15-24<br>5:28-35<br>5:57-65<br>9:6-38<br>9:63-10:4<br>12: ("Pseudocode for Sending a Pseudoreliable Message PSM")<br>13:6-20<br>18:32-37 | Subject to 112, 6.<br><br>function: "detecting prespecified parameters of the data transmission between said data storage means"<br><br>structure: indefinite for lack of structure |

7

| | | |
|---|---|---|
| | 18:55-65<br>19:11-22<br>20:37-64<br>21:24-22:59<br>23:51-25:31<br>26:11-51<br>27:8-12 | |
| wherein [t]he data storage means copies data which is redundantly stored in the system independent of an access of the computer unit as a function of the detected prespecified parameters of data transmission between the data storage means<br><br>(Claims 1, 2, 4, 11, 16, 17) | Plain and Ordinary Meaning<br><br>2:42-46<br>2:54-56<br>4:51-55<br>4:57-60<br>19:11-20:64<br>21:24-26:10<br><br>'084 patent file history<br><br>• December 9, 2004 Non-Final Rejection<br>• April 8, 2005 Response to Office Action<br>• June 29, 2005 Notice of Allowance<br><br>'521 patent file history<br><br>• June 9, 2008 Notice of Allowance | Indefinite |
| shifting redundantly stored data independent of an access of the computer unit to the data as a function of the determined prespecified parameters of data transmissions between the data storage means<br><br>(Claims 30, 31, 33, 40, 44) | Plain and Ordinary Meaning<br><br>2:42-53<br>2:54-56<br>4:51-56<br>4:57-60<br>9:25-37<br>19:11-20:64<br>21:24-26:51<br><br>'084 patent file history<br><br>• December 9, 2004 Non-Final Rejection<br>• April 8, 2005 Response | Indefinite |

| | | |
|---|---|---|
| | to Office Action<br>• June 29, 2005 Notice of Allowance<br><br>'521 patent file history<br><br>• June 9, 2008 Notice of Allowance | |
| process[ing] / process[ed]<br><br>(Claims 4, 11, 33, 40) | Plain and Ordinary Meaning<br><br>2:38-41<br>2:54-59<br>3:21-32<br>3:39-44<br>4:11-15<br>4:34-41<br>4:57-60<br>5:13-23<br>5:45-51<br>6:10-17<br>8:5-10<br>9:19-24<br>9:51-62<br>10:24-34<br>10:48-51<br>12:11-18<br>13:5-49<br>19:61-65<br>22:10-15<br>24:40-43<br><br>'084 patent file history<br><br>• December 9, 2004 Non-Final Rejection<br>• April 8, 2005 Response to Office Action<br>• June 29, 2005 Notice of Allowance<br><br>'521 patent file history<br><br>• June 9, 2008 Notice of Allowance | to modify using computer instructions<br><br>1:26-29<br>2:35-41<br>3:26-32<br>4:11-14<br>4:30-40<br>5:45-50<br>8:5-8 |

| | | |
|---|---|---|
| with prespecified parameters of the data transmission between the data storage means and the computer unit being determined<br><br>(Claims 30, 31, 33, 40, 44) | Plain and Ordinary Meaning<br><br>3:3-9<br>3:39-47<br>4:15-24<br>5:28-35<br>5:57-65<br>9:6-24<br>9:63-10:4<br>12: ("Pseudocode for Sending a Pseudoreliable Message PSM")<br>13:6-20<br>18:32-37<br>18:55-65<br>19:11-22<br>20:37-64<br>21:24-22:59<br>23:51-26:10<br><br><br>'084 patent file history<br><br>• December 9, 2004 Non-Final Rejection<br>• April 8, 2005 Response to Office Action<br>• June 29, 2005 Notice of Allowance<br><br>'521 patent file history<br><br>• June 9, 2008 Notice of Allowance | discovering or measuring at least two performance characteristics of the data transmission between the at least two data storage means and the computer unit<br><br>Abstract<br>1:24-67<br>2:1-12<br>2:23-34<br>3:39-47<br>3:63-4:48<br>5:28-35<br>5:52-57<br>6:28-32<br>9:6-11<br>9:25-38<br>16:24-19:10<br>22:60-24:67<br>26:29-67<br>27:19-32:15<br><br>'680 patent prosecution history: May 20, 2010 Reply to OA at 3; Oct. 4, 2010 Interview Summary; Nov. 4, 2010 Amendment and Reply to Final Office Action at 10 |
| shifting<br><br>(Claims 30, 31, 33, 40, 44) | Plain and Ordinary Meaning<br><br>2:42-53<br>2:54-56<br>4:51-56<br>4:57-60<br>9:25-37<br>19:11-20:64<br>21:24-26:51<br><br><br>'084 patent file history | copying data to a new location and deleting it from the prior location<br><br>Abstract<br>2:42-54<br>4:51-56<br>9:25-37<br>18:17-21<br>20:11-38<br>26:11-27:12<br>27:20-32:15 |

| | | Fig. 2 |
|---|---|---|
| | • December 9, 2004 Non-Final Rejection<br>• April 8, 2005 Response to Office Action<br>• June 29, 2005 Notice of Allowance<br><br>'521 patent file history<br><br>• June 9, 2008 Notice of Allowance | |

Respectfully submitted,

/s/ Daniel A. Griffith
Daniel A. Griffith (DE# 4209)
Whiteford, Taylor & Preston LLC
1220 North Market Street
Suite 608
Wilmington, Delaware 19801
(302) 353-4144
dgriffith@wtplaw.com


Edward M. Buxbaum (*admitted pro hac*)
Steven E. Tiller (*admitted pro hac*)
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1636
(410) 347-8700
ebuxbaum@wtplaw.com
stiller@wtplaw.com


Martin M. Zoltick (*admitted pro hac*)
ROTHWELL, FIGG, ERNST &
MANBECK, P.C.
607 14th Street, NW
Suite 800
Washington, DC 20005

(202) 783-6040
mzoltick@rothwellfigg.com

Robert J. Weltchek (*admitted pro hac*)
WELTCHEK MALLAHAN & WELTCHEK
2330 West Joppa Road, Suite 203
Lutherville, Maryland 21093
410-825-5287
rweltcheck@wmwlawfirm.com

***Attorneys for Plaintiff***

      /s/ Jack B. Blumenfeld
Jack B. Blumenfeld
Morris Nichols Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
jblumenfeld@mnat.com

***Attorneys for Defendants***

2020662

13

| '680 Patent Claim Terms to be Construed | Skype's Proposed Construction | Skype's Citation of Intrinsic Support |
|---|---|---|
| at least one computer unit that stores at least one complete file, each file including a plurality of individual pieces, the pieces containing parts of the files / store at least one complete file of data, each file including a plurality of individual pieces of data, the pieces containing parts of the file<br><br>(Claims 1, 3, 5, 7, 8) | Indefinite | |
| the data storage units copy pieces that are redundantly stored in the system from one of the data storage units to another of the data storage units independently of an access of the computer unit based on the data transmission performance measured between the data storage units / the second data storage means copy pieces that are redundantly stored in the system from one of the second data storage means to another of the second data storage means independently of an access of the first data storage means based on the measured data transmission performance between the second data storage means / sending from the at least one data storage device to the another data storage device a copy of the received piece of data for redundant storage independently of an access of the computer unit as a function | Indefinite | |

| '680 Patent Claim Terms to be Construed | Skype's Proposed Construction | Skype's Citation of Intrinsic Support |
|---|---|---|
| of the measured data transmission performance between the data storage devices / sending from the at least one data storage device to the another data storage device a copy of the received second piece of data for redundant storage independently of an access of the computer unit as a function of the measured data transmission performance between the data storage devices<br><br>(Claims 1, 3, 5, 7, 8) | | |
| at least two data storage units that need not store the complete file stored in the at least one computer unit at a given point in time<br><br>(Claims 3 and 5) | Indefinite | |
| first means for storing<br><br>(Claim 5) | Subject to 112, 6<br>function: storing<br>structure: 7:10-17(describing clusters, cells and fields) and 10:5-11 (describing non-volatile memories and random access memories) | '680 patent at 7:10-17, 10:5-11. |
| second data storage means for storing data<br><br>(Claim 5) | Subject to 112, 6<br>function: storing<br>structure: 7:10-17(describing clusters, cells and fields) and 10:5-11 (describing non-volatile memories and random access memories) | '680 patent at 7:10-17, 10:5-11. |

| '680 Patent Claim Terms to be Construed | Skype's Proposed Construction | Skype's Citation of Intrinsic Support |
|---|---|---|
| control means for enabling data transmission between the second data storage means and the first means<br><br>(Claim 5) | Subject to 112, 6<br><br>function:  enabling data transmission<br><br>structure:  indefinite for lack of structure | |

**Exhibit A**

**to**

**Joint Claim Construction Statement**

(19) **United States**

(12) **Reissued Patent**
Binzinger

(10) Patent Number: **US RE40,521 E**
(45) Date of Reissued Patent: **Sep. 23, 2008**

(54) **DATA ACCESS AND MANAGEMENT SYSTEM AS WELL AS A METHOD FOR DATA ACCESS AND DATA MANAGEMENT FOR A COMPUTER SYSTEM**

(75) Inventor: **Thomas Binzinger**, Baldham (DE)

(73) Assignee: **AC Technologies S.A.**, Leithum (LU)

(21) Appl. No.: **11/515,507**

(22) Filed: **Sep. 5, 2006**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **7,000,084**
Issued: **Feb. 14, 2006**
Appl. No.: **09/903,431**
Filed: **Jul. 10, 2001**

U.S. Applications:
(63) Continuation of application No. PCT/EP2000/00141, filed on Jan. 11, 2000.

(30) **Foreign Application Priority Data**

Jan. 11, 1999 (DE) ........................................ 199 00 636

(51) **Int. Cl.**
*G06F 12/14* (2006.01)
*G06F 13/28* (2006.01)

(52) **U.S. Cl.** ...................................... **711/162**; 711/165

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,459,837 A | 10/1995 | Caccavale | .................... | 709/226 |
| 5,515,500 A | 5/1996 | Mizuno et al. | ................ | 714/7 |
| 5,841,962 A | 11/1998 | Nakamura et al. | .............. | 714/6 |
| 6,081,907 A | 6/2000 | Witty et al. | ................ | 714/6 |
| 6,085,251 A | 7/2000 | Fabozzi, II | .................. | 709/230 |
| 6,339,785 B1 | 1/2002 | Feigenbaum | ................ | 709/213 |
| 2005/0273504 A1 | 12/2005 | Gailer et al. | ................ | 709/219 |

FOREIGN PATENT DOCUMENTS

| EP | 0 767 585 A2 | 4/1997 |
|---|---|---|
| EP | WO 98/18076 | 4/1998 |
| EP | WO 98/26559 | 6/1998 |
| EP | 0 884 870 A2 | 12/1998 |

OTHER PUBLICATIONS

Abbasov, "Optimizing the Location of Databases With Copies in Computer Networks", Avomatika i Vychislitlel'naya Tekhnika, vol. 22, No. 4, pp. 58–62, 1988.
Search Report for PCT/EP00/00141 dated Jun. 30, 2000.
International Preliminary Examination Report for PCT/EP00/00141 dated Apr. 27, 2001.
BitTorrent Source Code, Circa Jul. 1, 2001, 96 pages.
Search Report of PCT/EP00/00141 Dated Jun. 30, 2000 in co-pending PCT filing of U.S. application filed herewith.
International Preliminary Examination Report for PCT/EP00/00141 Dated Apr. 27, 2001 in parent PCT filing of U.S. application filed herewith.

*Primary Examiner*—Gary Portka
(74) *Attorney, Agent, or Firm*—Oblon, Spivak, McClelland, Maier & Neustadt, P.C.

(57) **ABSTRACT**

The present invention permits improved data access and improved data management in a computer system. To this end, data are divided into individual partial data (F) and stored in cells (Z) of storage devices (C) in such a way that the partial data (F) being accessed and managed are present in the computer system in a redundant manner. Computer units (CL) are able to access the redundantly stored data. The fact that they are stored in the storage devices (C) ensures that the computer units (CL) accessing said data are supplied more rapidly. This is achieved in particular owing to the fact that the redundantly stored data are accessed in accordance with parameters of data transmissions between the computer units (CL) and the data storage devices (C) and that, in accordance with said data transmission parameters, the redundantly stored data are moved to and from the data storage devices (C) by corresponding copy and delete operations.

**55 Claims, 3 Drawing Sheets**



Fig. 1



Case 1:11-cv-00050-RGA Document 182-2 Filed 10/07/12 Page 64 of 203 PageID #: 9832

Fig. 2



Fig. 3



Fig. 4



US RE40,521 E

1

# DATA ACCESS AND MANAGEMENT SYSTEM AS WELL AS A METHOD FOR DATA ACCESS AND DATA MANAGEMENT FOR A COMPUTER SYSTEM

**Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.**

## CROSS REFERENCE TO RELATED APPLICATIONS

This application *is a continuation of international application PCT/EP2000/00141, filed Jan. 11, 2000, which* claims priority to [our previously-filed] German patent application number 199 00 636.9, filed on Jan. 11, 1999 and entitled "DATA ACCESS AND MANAGEMENT SYSTEM AS WELL AS A METHOD FOR DATA ACCESS AND DATA MANAGEMENT FOR A COMPUTER SYSTEM".

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The invention generally relates to a data access and management system as well as to a method for data access and data management for a computer system. In particular, the present invention relates to a system and a method for optimising the access to data and their processing in distributed and networked computer structures.

### 2. Description of the Prior Art

The ever increasing use of distributed and networked computer structures and arrangements has the consequence that data and functionalities for data management purposes are no longer provided or utilised, respectively, by consistent computer systems, but by various distributes computer systems which are. In conventional distributed and net-worked computer structures and arrangements data and functionalities are generally provided by a central computer system, a so-called server, or an accumulation of central computer systems, so-called server clusters. Other computer systems, so-called clients, such as for example, personal computers are connected e.g. via networks or busses with the central computer system in order to access data and functionalities. In this context, various problems occur which limit the supply of clients with data and/or functionalities, in particular, if the access to a central computer system is done by several clients in a short period of time or even simultaneously. An example for this is computer games, which are supplied to several players via the Internet.

Due to the fact that only one central computer system (server) is used, its failure results in that the clients can no longer access provided data and functionalities. The failure of network areas, too, which connect the server with the clients, also leads to a total failure of the entire computer structure.

Moreover, the transmission times from the server to individual clients differ greatly in part because the connection quality to the clients varies e.g. due to various distances between the server and the clients as well as different transmission performances in various areas of the network. In particular, with interactive operations of several clients in connection with the server, such an inadequate transmission characteristic often leads to an unsatisfactory supply of individual clients with data/functionalities. In this context, the so-called "lags" must be mentioned which affect the communication between the server and the clients.

2

## SUMMARY OF THE INVENTION

It is an object of the present invention to eliminate the above mentioned problems of the known state of the art. In particular, it is an object of the invention to optimise the transmission quality between clients and means of a networked distributed computer structure which provide data in such a manner that each client is provided with the respectively requested data in a desired application-specific manner. Preferably, the invention is to enable an as rapid as possible supply with data/functionalities, whereby it is additionally to be ensured that the transmissions are effected as fault-tolerantly as possible.

In addition, the present invention secures the operability of a distributed networked computer system in the case of the failure of data providing means of the computer structure. The invention is also able to secure the operability of a distributed networked computer system in the case of the failure of individual areas of the networks via which the data providing means and clients are connected with each other.

Furthermore, the invention is to enable that clients are only provided with current data. The invention also intends to reduce the required transmission capacities of a networked distributed computer system.

In the inventive system according to the present invention, the data provided in a computer system is stored in a redundant manner in the data storage means, depending on prespecified parameters of the data transmission between data storage means and computer units, and the computer units access one of the data storage means as a function of the determined prespecified parameters. In this manner it is made possible to optimise data transmissions between the data storage means and the computer units in the desired application-specific manner in order to be carried out more rapidly and in a manner involving fewer faults.

In addition, the data storage means comprise control unit for controlling the data access and the data management in order to work independent of other means of the computer system. This reduces the quantity of the data to be transmitted in the inventive system and increases the fault tolerance of the inventive system because the data are not processed centrally.

For achieving an additional optimisation it is to be preferred that the data storage means copy redundantly stored data in the system among each other as a function of the determined parameters of data transmissions between the individual data storage means and the computer unit and delete the data in the data storage means in which it had been stored beforehand. Data can thus be shifted in the inventive system from one data storage means to other data storage means, whose parameters of the data transmission enable a higher degree of optimisation of the data access and the data management for the respective application case of the invention.

Moreover, it is to be preferred that the data storage means process the stored data independently from the computer unit. In this manner data can be processed in a decentralised way whereby increased data integrity and an increased fault tolerance as well as a relief of individual system components is achieved. In another embodiment the data in the system is divided into data subsets, and the data storage means are divided into cells in such a manner that each of the data subsets to be stored in a redundant manner is stored in one of the cells each of the corresponding data storage means in order to only store that data in a redundant manner which is currently required.

In addition, it is advantageous that the data storage means are divided into cells depending on data transmission param-

3

eters in order to further optimise the data transmissions within the inventive system.

In order to carry out the data access and the data management in a more efficient manner each cell may comprise additional data which relates to parameters of data transmissions between the individual data storage means and the computer unit, and/or neighbouring cells, and/or cells which comprise data which is stored in the system in a redundant manner.

In addition, it is possible to use cells which can interchange additional data which is used for the data access and the data management. Thus, the information for data access and data management to be transmitted in the inventive system is reduced further.

The cells in special data storage means can be designed in such a manner that the parameters of data transmission between the individual data storage means and the computer unit are identical for the cells of a data storage means in order to achieve a consistent data access for the individual data storage means.

It is also possible to use computer units which output data for storage in the data storage means and/or process data stored in the data storage means in order to relieve the data storage means.

For processing the data independent of the inventive system, the computer units can also be connected with one or several users in order to transmit the data from the data storage means and/or to be controlled by the user. Such a user is preferably a personal computer, and/or a central processing unit of a computer and/or another data storage means.

In this manner, the computer unit can also be a system which provides Internet services such as e.g. data base access operation and computer games. The computer unit can also be suited to immediately access individual cells of the data storage means, which relieves the individual data storage means of data access and data management tasks.

In particular, the prespecified parameters of data transmissions between the individual data storage means and the computer unit can comprise the duration of the transmission, and/or the fault rate, and/or the duration of data processing operations of the individual data storage means prior to the transmission of the data. In this manner, data can be accessed more rapidly and data is provided which is less faulty.

The individual components of the inventive system according to an embodiment of the present invention are connected with each other via data transmission means, which can comprise electrically conductive connections, and/or bus systems, and/or computer networks, and/or wired or wireless (mobile) telephone networks, and/or the Internet. The present invention is thus suited for each computer structure and arrangement as well as for each computer system which utilises distributed and networked means.

When using the present invention, it is therefore possible to build a database system or a computer structure for data access and data management with an inventive database system or an inventive computer structure being able to be built from components which are arranged locally in a neighbouring relation.

Moreover, the present invention can be used in a system for a computer game which is provided via the Internet. In this case, it is to be preferred that at least one computer unit is an Internet service provider in order to integrate the present invention into existing computer structures of the

4

Internet and in order to enable Internet users an inventive access to the data.

In particular, the invention is suited for interactive computer games for use by at least two users in order to ensure an optimised supply of the individual user with data required for the computer game, whereby each user can be connected with one computer unit.

Preferably, data for executing the computer game is transmitted from the computer units to the users so that the computer game can also be carried out—at least partially—independent of the computer units. Another relief of the computer units and the data storage means can be obtained if the users process the received data for executing the computer game and transmit it back to the corresponding computer units.

Moreover, the inventive system for a computer game can comprise additional means for the detection of prespecified parameters of the data transmission between the computer units and the respectively connected users in order to additionally optimise the data access and the data management. Preferably, these prespecified parameters comprise the duration of the transmission, and/or the fault rate, and/or the duration of data processing operations of the individual computer units and/or the individual users prior to the transmission of the data.

It is thus possible to store the data for executing the computer game in a redundant manner also as a function of the determined prespecified parameters of the data transmission between the computer units and the users which are connected therewith.

Furthermore, the computer units can receive control data for executing the computer game from the respective users in order to enable improved interactions of the individual users.

This control data or equivalent data can then be output by the computer units to the data storage means. In this manner it becomes possible that the computer units process data for executing the computer game, depending on the control data, and/or the data storage means process data for executing the computer game, depending on the control data or on data equivalent to the control data, whereby a more efficient data access and a more efficient data management is achieved.

Similarly, a method of the present invention, data is stored in a redundant manner in at least two of at least two data storage means depending on determined parameters of the data transmission between the data storage means and computer units, with the access to the stored data by the computer units being effected as a function of the determined parameters of the data transmission.

The data access and the data management are preferably controlled by the data storage means.

In an embodiment of the inventive method the redundantly stored data are copied among each other by the data storage means as a function of the determined parameters of data transmissions between the individual data storage means and the computer unit and deleted in the data storage means in which the copied data has been stored beforehand.

In addition, it is possible to process the stored data by the data storage means independent of the computer unit in order to relieve individual means and to achieve a higher reliability of the inventive method.

In order to achieve an application-specific and thus optimised storage of the data can be divided into data subsets, with the data subsets to be stored in a redundant manner being stored in cells of the individual data storage means. Preferably, the division into data subsets and the storage in cells is carried out as a function of the data transmission parameters.

5

A further optimisation can be obtained if additional data for data access and data management is stored in the cells, which relate to the parameters of data transmissions between the individual data storage means and the computer unit, and/or neighbouring cells, and/or cells which comprise the data redundantly stored in the system.

Moreover, additional data for data access and data management can be exchanged between the cells of the data storage means. Preferably, the access to data of cells of a data storage means has identical data transmission parameters in order to ensure a consistent data access for the individual data storage means.

For the relief of the entire system it is also possible that the computer unit outputs data for storage in the data storage means and/or the data stored in the data storage means is processed by the computer unit.

The data is preferably transmitted by the computer unit to a user and/or the computer unit is controlled by the user in order to process data independent of the execution of the inventive method and to additionally control the sequence of the inventive method. The inventive method is thus capable of providing Internet services.

In order to achieve a more efficient data access and a more efficient data management, the access can also be made directly to the data of individual cells of the data storage means.

Further it is to be preferred that the determination of the prespecified parameters of data transmissions between the individual data storage means and the computer unit comprises the determination of the duration of the transmission, and/or the fault rate, and/or the duration of data processing operations of the individual data storage means prior to the transmission of the data in order to access data more rapidly and/or reliably.

In this manner it is possible to provide a method for a database system or a computer structure as well as a method for an Internet computer game wherein in the latter case the access to data in the data storage means preferably comprises the employment of an Internet service provider.

Moreover, the method can enable at least two users to access the computer game, with the computer game being an interactive computer game.

The data for executing the computer game from the computer units can be transmitted to the respective users. Preferably, the data received by the users are processed by the users and transmitted back to the corresponding computer units in order to relieve the computer units and the data storage means and to optimise the execution of the computer game.

In another embodiment, prespecified parameters of the data transmission between the computer units and the respective users connected therewith are determined in addition, in order to carry out the data access and the data management with the inventive method also under consideration of these parameters.

It is further to be preferred, that the determination of the prespecified parameters of data transmission between the computer units and the users which are connected therewith comprises the determination of the duration of the transmission, and/or the fault rate, and/or the duration of data processing operations of the individual computer units and/or the individual users prior to the transmission of the data.

In this manner the redundant storage of the data for the execution of the computer game can also be carried out as a

6

function of the determined prespecified parameters of the data transmission between the computer units and the respective users connected therewith.

A more efficient execution of interactive operations of the computer game can be achieved if control data for the execution of the computer game is additionally transmitted by the users of the corresponding computer units. Preferably, the control data or equivalent data from the computer units is also transmitted to the data storage means.

Finally, it is possible to process the data for executing the computer game as a function of the control data from the computer units and/or to process the data for executing the computer game as a function of the control data or the data equivalent to the control data from the data storage means. In this manner, the individual users are relieved and the redundantly stored data is processed by the data storage means which ensure a desired data transmission.

By an inventive replacement of individual failed cells it is possible to compensate for connection errors and in the case of a failure of individual areas of a distributed networked computer structure to utilise areas which retain the functionality of the entire computer structure, in that data is present in the computer system in a redundant manner. Due to the fact that the invention allows for monitoring the used data, the consistency of the available data is also ensured in this manner.

Furthermore, the use of the present invention automatically optimises the connection quality between clients and data providing means of a computer structure so that poor transmission qualities (e.g. low transmission rate, lags, . . . ) are automatically compensated.

For this purpose, individual area of a distributed networked computer system, e.g. individual memory areas, are scaled without interruption of the operation. This means that such individual area of the inventive system can be added or removed at any time.

The present invention also enables to replace individual failed areas of a distributed networked computer system by other areas without interruption of the operation. This is possible because the invention does not require a central connection between individual areas of the computer system, which prevents limitations of the functionality of the inventive system due to failures (e.g. technical defects). In addition, the invention ensures a higher data integrity because the data is not stored centrally.

It is also possible to reduce the quantity of the data to be managed by individual areas of a networked distributed computer system in this manner. The consequence of this is that the required transmission capacities between individual areas of the inventive system can be reduced, too.

Moreover, further components can be added to the inventive system without having to modify its principal structure.

The inventive approach did in fact originate in particular in the solution of the above mentioned problems in the realisation of (interactive) computer games for the Internet. However, it must explicitly be emphasised that the present invention is not limited to such applications, but can be employed for any computer system and any computer structure utilising distributed networked means which provide data.

## IN THE DRAWINGS

FIG. **1** is a schematic representation of a preferred embodiment of a computer structure according to the present invention;

7

FIG. **2** shows a schematic representation of a data structure as well as its division and assignment to cells according to the present invention;

FIG. **3** is a schematic representation of another preferred embodiment of a computer structure according to the present invention; and

FIG. **4** is a schematic representation of a section of the preferred embodiment of FIG. **1** for the explanation of operations, which are used for executing the invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The terms used in the following text will now be explained with reference to FIGS. **1** and **2**.

The entire data quantity GD which is used in the context of the invention is divided into individual data subsets which are referred to as field F.

The position of each field F in the entire data quantity GD is described by a unique field position or identification FeldIF (fieldID), with the entire data quantity GD being capable of being divided one or multi-dimensionally. If, for example, the entire data quantity GD is divided three-dimensionally, each field position FeldID can be described by x, y, z.

A cell Z is the smallest unit for data storage which stores exactly one field F. A cell Z also contains other information which will be covered in detail later.

A cluster C comprises one cell Z or is an accumulation of several cells Z. A cluster C can, for example, be formed by an individual computer or an integrated circuit which manages individual or several cells Z. Moreover, a cluster C can operate as a higher-level control unit for the cells Z contained in it.

All clusters C which are combined for the representation of the entire data stock GD form a cluster pool or a cluster compound CV. The individual clusters C are connected via a network N, with each cluster C having a unique address. A cluster compound CV can thus be formed by networking individual computers forming clusters and/or by connecting individual integrated circuits forming clusters.

Within the cluster compound each cluster is identified by a unique identification ClusterID which can be a single number or a tuple. Individual clusters in the compound contain a table of their neighbours (neighbour table) in order to be able to relay certain messages to certain clusters. In this context, a neighbour is another cluster with a next higher or lower identification ClusterID. The number of cells Z which belong to a cluster can vary between 0 and an upper limit maxcc, where maxcc can be different for each cluster C in the cluster compound CV. The number of cells Z which are actually included in a cluster C is indicated as ncc. In addition, each cell Z has a unique identification ZellID (cellID) within a cluster C.

Moreover, each cell Z of a cluster C can exchange information among each other without sending messages via the network N, which enables a reliable message transmission within a cluster C. In addition, it is to be preferred that all cells Z of a cluster C are provided with the same connection quality, i.e. through the connection to the network N can be different between the individual clusters C, it is the same for all cells Z of a cluster C.

As described, a cluster C comprises between 0 and maxcc cells Z. Each memory location of a cluster C which can store a cell Z is referred to as slot S. A slot S can be full, i.e. it stores the data of a cell Z, or empty, i.e. it represents no cell

8

Z. Therefore, the clusters C from FIG. **2** comprise only one full slot S each. The identification SlotID of each slot S corresponds to the identification ZellID which a cell Z would be assigned in this memory location.

A client CL (e.g. Internet provider, personal computer, network computer, and the like) is a unit communicating via the network N which requests data, processes data and/or orders to store the modified data. In the present invention, no assumption whatsoever concerning the actual realisation of the network N is made. As network N any means which transmit data can be employed, such as e.g. proprietary busses, local networks, or the Internet. The invention does also not assume that the network N ensures the transmission of all data, so that acknowledgements concerning a data transmission to the respective sender are not required, and that the network N transmits data according to its sending time.

As will be presented in the following and is shown in FIG. **2**, the invention is based, among other things, on a distribution of the entire data GD or the fields F, respectively, to several cells Z of identical contents, i.e. a single field F is stored in several cells Z in a redundant manner. The Number of cells Z which store and manage a certain field F is specified as nm and is the same throughout the entire cluster compound CV, with each of the nm cells Z being referred to as mirror SP for the field F which is stored in the nm cells Z. In the following explanation of the invention nm=3 is assumed, with this value serving only for illustrating the invention and to be specifically selected for each application case.

A response AK is the response to a request RQ. The contents and function of the individual requests RQ and responses AK depends on the transmitted data.

A message MSG is a data quantity which is exchanged between cells Z, clusters C and clients CL. It is the task of the network N to transmit the messages MSG. Due to the fact that the sender of a message MSG does not receive an acknowledgement of a successful transmission, messages MSG can get lost. It is also possible that two messages MSG arrive at a destination after different times. Now the principal procedure with the present invention and individual actions or operations, respectively, for carrying out the invention will be described.

The entire data quantity is divided into individual fields F. Such a division can, for example, be effected two-dimensionally or three-dimensionally. For example, a chess-board could be divided into 8*8 fields F, with each field F containing the information on the respective chessboard square, e.g. which chess piece is located there. Analogously, a three-dimensional space, too, can be represented by fields F. It is also possible, however, to divide an image into individual image areas or a text into individual words or character(s) (strings) which are assigned to individual fields F. The contents of the fields F is application-specific and is not relevant in the present invention. The individual fields F are then stored in nm cells Z, with each cell Z storing a corresponding field F, i.e. the actual data, as well as further information which preferably relates to references to neighbouring fields F. This information permits a data reduction because in this manner, "empty" fields F need not be stored and not each field F must be assigned a cell Z.

Several cells Z are then combined to a cluster C, and all clusters C in turn are combined to a cluster compound CV. An essential characteristic of the invention is that each cell in the cluster compound CV is available in a redundant manner, i.e. nm times in nm clusters C. Thus, each field F is nm times

US RE40,521 E

9

stored in these cells Z, and each of these cells Z is referred to as mirror SP with respect to the field F stored therein. In addition, each cell Z contains information in which clusters C and/or in which cells Z of the corresponding clusters C the other nm−1 cells Z are located.

In addition, each cell Z contains further information which preferably comprises indications on the data transmission quality in the cluster compound CV and with respect to the clients CL, e.g. transmission quality, transmission rate, and the like. This information is updated when the cells Z are accessed.

In order to receive the contents of a field F, a client CL sends a request via the network N to all cells Z and/or clusters C, which include the desired field F, i.e. to all cells Z which are mirrors SP of the desired field F. It depends on the parameters of the data transmissions to the individual cells Z and/or clusters C as well as back to the clients CL, from which cell Z or which cluster C the requesting client CL will receive a response. Preferably, the requesting client CL receives a response from the cell Z and/or the cluster C, which realise the fastest data transmission at the respective time and/or which are capable of carrying out a processing of the data more rapidly prior to its sending to the requesting client CL.

All cells Z and/or clusters C and/or clients CL periodically check their applicable parameters for data transmissions. In periodic intervals or subsequently to specified actions, all cells Z and/or clusters C and/or clients CL check the parameters for data transmissions, which are applicable to the used cells Z. If the checked parameters do not meet specified limits, or if other cells Z and/or clusters C comprise better data transmission parameters, the checking cells Z will try to shift its data to these other cells Z and/or clusters C in order to improve the data transmission parameters applicable for this data. In this manner, the inventive cluster compound CV optimises itself automatically during operation with respect to data transmissions.

Certain requests of a client CL, such as e.g. a write request WriteRQ as described below are synchronised between all mirrors SP of the respective field F. In this manner, failed mirrors SP are identified. In addition, extra checks are carried out at periodic intervals and/or by clients CL after the receipt of responses AK. This, too, identifies failed mirrors SP and/or mirrors which are no longer relevant. These mirrors SP are either replaced by other mirrors SP, or a cell Z or a cluster C or a client CL substitutionally generates new mirrors SP, or the present defects are remedied by means of methods described below. In this manner, the cluster compound CV is fault tolerant against the failure of individual cells Z and/or whole clusters C.

In addition, requesting clients CL can assign individual cells Z and/or clusters C special processing functions which are executed independent of the mode of operation of the clients CL. A client CL, for example, can instruct a cell Z or a cluster C to change the data of a field F in certain intervals. This characteristic is of particular importance if the present invention is employed in connection with computer games which are executed under real-time conditions via a network, e.g. the Internet, in order to reduce the data quantities to be transmitted and to optimise the interactive operations in the execution of a computer game.

Data between the individual clients CL, clusters C, and cells Z are transmitted by using a certain protocol. This means that in addition to the transmitted data, further pre-specified data are sent and received by the individual clients CL, clusters C, and cells Z in order to initiate desired opera-

10

tions or to react in a desired manner as described below. All clients CL, clusters C, and cells Z carry out the necessary operations in order to achieve the desired functionality of the corresponding cluster compound CV. If the invention is employed as shown in FIG. 1 for providing computer games via the Internet, then the network N is the Internet and the client CL is the computer system which operates as Internet provider. The individual clusters C comprise memory units of the client CL and storage means of other computer systems which are distributed over the computer system. Due to the fact that generally only one connection exists between a client CL (Internet service provider) and a corresponding user B, usually via a telephone line, the user B and the client CL (Internet provider) form a system to be regarded as consistent at that time. For this reason, the user B from FIG. 1 is not shown in FIG. 4. An inventive optimisation of the data transmission to the users B were possible only if the user B had a simultaneous access to different Internet providers. With the current state of the art, the present invention permits an optimisation of the data management and transmission for clients CL operating as Internet providers if these access e.g. the data required for an interactive computer game, with several players via the Internet in accessing other computer systems operating as clusters. As shown in FIG. 3, the invention can also be employed in a consistent computer structure such as in a personal computer PC. In this case, the central processing unit CPU operates as client and the various data managing means MEM1, MEM2, MEM3 operate as clusters. The data managing means MEM1, MEM2, MEM3 can be conventional storage means, e.g. non-volatile memories or random access memories, but also special means which e.g. do not only store but also process data and which can therefore not provide the central processing unit CPU with data without restrictions and at any time.

A cell Z can assume five states, with each status being always possible because the cells Z are not fault tolerant and the network N does not ensure and check data transmissions.

Active Status (Active): The contents of the cell Z are valid and the cell Z is ready for operation.

Invalid Status (Invalid): The cell Z is ready for operation but its contents are no longer current and valid. This can occur, for example, if the cell Z has not carried out data operations because of a technical defect or because of not received information.

Inactive Status (Inactive): The cell Z is not available, e.g. because data transmissions to it are permanently lost or because the cell Z has permanently failed.

Blocked Status (Blocked): The cell Z processes only certain data transmissions, such as e.g. the write requests WriteRQ or read requests ReadRQ described below.

Idle Status (Idle): The cell Z is ready for operation, but is currently not used in the cluster compound CV.

A cell Z contains a certain field F, i.e. a field F with a certain field position FeldID (fieldID) and has a unique position ZellID (cellID) within the corresponding cluster C. The cluter c in turn is identified by a unique identification with the form ClusterID:ZellID. Each cluster C and each client CL is uniquely identified in the cluster compound CV by an identification ClusterID, ClientID, respectively. No particular requirement are placed on these identifications, they only have to provide for a unique identification of the cluster C and the clients CL.

In the following, a number of algorithms will be described in more detail which are utilised by the functional operations described further below which serve for the execution of the invention. This explanation is supplemented by correspond-

US RE40,521 E

11

ing pseudocodes which are used in the currently preferred embodiment of the invention.

In order to be able to assign messages MSG, i.e. data transmissions in a unique manner to individual operations, each message MSG is given a ticket number TNr which is generated upon sending. As long as the respective operation is not completed, all clients CL, cells Z, and clusters C involved can associate the message MSG with the corresponding operation by the ticket number TNr in a unique manner. For obtaining unique ticket numbers TNr, a ticket number TNr can, for example, be combined by the sending time of the message (or from a continuous counter generated in the cell) and the sender's identification. Due to the fact that the sender's identification is unique and the sending times of two messages MSG are different, each message MSG can be assigned the respective operation in a unique manner. Unique ticket numbers TNr, however, can be generated depending on the most different applications of the invention in other ways.

Pseudocode for the generation of a ticket number TNr:

```
function makeNewTicket:longword;
begin
    a:=laufender__zachler; (continuous counter)
    inc(laufender__zachler); (continuous counter)
    b:=own__adress;
    makeNewTicket:=<combination from a and b, e.g. by shifting>
end;
```

If a cluster C receives a message MSG which is destined for another cluster C, i.e. the ClusterID of the destination address of the message MSG does not correspond to the address of the receiving cluster C, then the receiving cluster C relays the message MSG to the cluster C for which the message MSG is intended. The way in which the message MSG is relayed depends on the actual realisation of the network N, and/or the clusters C, and/or the clients CL, and/or the data transmission protocol, and/or corresponding data

12

included in the message MSG. A message MSG is also relayed if a cell Z receives the message MSG which is intended for another cell Z.

Each cell Z contains information on neighbouring cells Z and, on the basis of this information, checks whether a desired cell Z is located within the current cluster C. If this is not the case, preferably the cell Z is selected from all neighbouring cells Z of the current cluster C which is the most neighbouring cell with respect to the cell Z. If several cells Z meet this requirement, a cell Z can be selected at random.

Optionally, with each relay of a message MSG a step counter may be incremented by one step. With each step, the respective cluster C sends a holding response HalteAK (holdingAK) to the sender of the message MSG in order to inform same that his request RQ is still being processed. If the sender does not receive such a holding response HalteAK in this case, then the sender can assume that its message MSG has been lost. The sender can then direct its message MSG e.g. to the last cluster C which has sent the last received holding response HalteAK.

There is no reliable method for transmitting messages MSG and for ensuring that the messages MSG have been received because the network N need not guarantee data transmissions so that messages MSG (e.g. requests RQ and responses AK) can get lost any time.

In order to ensure a higher degree of reliability of the transmission of certain data, a pseudoreliable message PSM can be used. In this case, the pseudoreliable message PSM is sent repeatedly until a loss of the message is improbable. Only then it is assumed that the transmission has failed.

If one assumes a probability of $1/n$ with which any message MSG can get lost, then a psuedoreliable message PSM must be sent x times so that the probability $p=(2/n)^x$ with which the message has been lost is sufficiently small. With a missing response AK it can then be assumed that the recipient has failed.

Pseudocode for Sending a Pseudoreliable Message PSM:

```
procedure psm__send(message:TCellMsg; d1,d2,d3:Tndr; next__status:TCellStatus);
var i:byte;
begin
    //the psm__ variables are temporary variables of the
    // respective cell
    psm__timeout:=false;
    psm__next__status:=next__status;
    psm__ticket:=message.ticket;
    psm__num:=num;
    psm__dest[1]:=d1;
    psm__dest[2]:=d2;
    psm__dest[3]:=d3;
    for <all present i> do begin
        psm__received[i]:=false;
        psm__sendtime[i]:=curr__time;
        psm__arSended[i]:=0;
    end;
    <complete further fields of the message, if applicable>
    psm__m:=message;
    message.dest:=d1; send(message);
    message.dest:=d2; send(message);
    message.dest:=d3; send(message);
    status:=cs_psm__waiting;
end;
```

US RE40,521 E

<table>
<tr><td>13</td><td>14</td></tr>
</table>

In order to check whether a cell is waiting for the acknowledgement of a pseudoreliable message PSM, the following pseudocode is used:

```
<process if cell waits for PSM input>
begin
    if (status=cs_psm_waiting) and (message is Acknowledge)
    then begin
    if message.ticket<>psm_ticket then exit;
    sender:=psm_destination(message);
    // check if ak_hold
    if (sender<>0) and (message.command=ak_hold) then begin
            <extend waiting time>
            exit;
    end;
    if sender<>0 then begin
        // note message in psm_MsgIn[sender]
        psm_msgIn[sender]:=message;
        psm_received[sender]:=true;
        exit;
    end; //status=cs_psm_waiting
end;
```

The corresponding cell Z must check whether all responses AK have been received when it executes its update procedure. The corresponding status (cs_psm_waiting) must be processed there. It must then be decided whether all responses AK have been received and, if not, if waiting is to be continued:

```
procedure update;
    . . .
    case status of:
    <process of other status values>
    cs_psm_waiting:
        begin
            if 
            begin
                status:=psm_next_status;
                exit;
            end;
            <check here for timeout, and if required, resend
            one or several PSM requests>
            // check for timeout of all cells
            if <waiting time for addresses elapsed> then
            begin
                status:=psm_next_status;
                psm_timeout:=true;
            end;
        end;
    . . .
    end:
```

The self check is the central operation in order to ensure the consistency of all mirrors SP of a compound for a field F. A self check is initiated by a requesting third party, e.g. a client CL or a cluster C. A mirror SP which carries out a self check causes that the other mirrors SP of the compound also carry out a self check. A self check by a mirror SP can result in a fault correction by this mirror or another mirror SP. Depending on how unreliable the network actually is (loss of messages, lags), it may be impractical to make the PMS virtually reliable. The individual operations (such as adding a new mirror, etc.) should be fault tolerant to a certain degree. The case that a message, though classified as not delivered, is delivered nevertheless is very improbable with PMS but not impossible. Therefore corresponding fault corrections must be provided.

If a mirrors SP receives a self check request SelbsttestRQ (self checkRQ), it begins a self check under the same ticket

number TNr, provided it is not just carrying out a self check which has been initialised by another self check request SelbsttestRQ and if the ticket number TNr of the currently received self check request SelbsttestRQ differs from the last received self check request SelbsttestRQ.

If a requesting third part sends a read request LeseRQ (readRQ) described below, the execution of a self check is necessary only if the requesting third party receives inconsistent responses AK from the corresponding mirrors SP of a field F which the requesting third party intends to read.

The requesting third party compares the responses AK received from the mirrors SP and—under the assumption of the above described three mirrors SP for one field F—with three responses AK accepts the result. With two responses AK it initiates a self check and accepts the result. With only one response AK it initiates a self check and rejects the result.

If a self check request SelbsttestRQ has been received or a self check has been initiated by other system-related default, e.g. timeout, the corresponding mirror SP must check its own validity and is either responsible for the fault correction itself or instructs another mirror SP to perform the fault correction. In the selection of a mirror SP for the fault correction it is to be attempted that always only one mirror SP carries out the fault correction, even if several mirrors SP perform a self check quasi simultaneously, in order to avoid inconsistent conditions.

In this context, the mirror SP sends a validation request ValidierRQ (validationRQ) to all other mirrors SP. The exchange of the corresponding data is done by using pseudoreliable messages PSM. If no response AK is received, the destination is declared unavailable. The failed mirror SP is then replaced by a new one.

Pseudocode for Carrying Out a Self Check SelbsttestRQ:

A mirror starts a self check if it receives a corresponding message:

```
rq_start_selfCheck_
    begin
        if not used then exit;
        if (status<>cs_idle) then begin
            return_msg(m,ak_busy);
            exit;
        end;
        start_selfcheck;
        exit;
    end;
```

Alternatively or supplementary the self check can also be carried out automatically at certain intervals. For this purpose, the checking mirror SP sends a corresponding request to all other mirrors SP:

```
procedure start_selfCheck;
var m:TCellMsg;
begin
    <Optional: last_intervall_selfcheck:=current_time>
    m.cmd:=rq_validate;
    m.lifecount:=lifeCount;
    m.data:=data;
    m.ticket:=makeNewTicket;
    psm_send(m,mirror[1..nm-1],cs_selfTest_check);
end;
```

US RE40,521 E

<table>
<tr><td>15</td><td>16</td></tr>
</table>

Each cell Z must be capable of responding to validation requests:

```
rq_validate:
    begin
        if not used then
            if <cell just becomes mirror> and
                <request from future mirror> then
                    return_msg(m,ak_valid);
                    exit;
                end;
            return_msg(m,ak_noMirror);
            exit;
        end;
        if message_is_from_mirror(m) then
        begin
            <enter own mirrors in message>
            if message.lifeCount=lifeCount
                then return_msg(m,ak_valid)
                else if m.lifeCount>lifeCount then
                begin
                    lifeCount:=m.lifeCount;
                    <take data from message>
                    return_msg(m,ak_valid);
                end
                else return_msg(m,ak_invalidLC);
        end
        else return_msg(m,ak_noMirror);
        exit;
    end;
```

After the checking cell Z has either received all responses AK or the time has elapsed, it reviews the result of the self check:

```
procedure do_final_selfCheck;
var i:integer;
        m:cellmsg;
        s:string;
begin
    sc_res:=' ';
    for i:=1 to nm-1 do begin
        if (not psm_received[i]) then begin
            sc_res[i]' ';
            psm_msgIn[i].cmd:=rq_none;
        end else psm_msgIn[i].cmd of
            case psm_msgIn[i].cmd of
                ak_valid: sc_res[i]:='V';
                ak_invalidLC: sc_res[i]:='D';
                ak_noMirror: sc_res[i]:='I';
            end;
        end;
    end;
    // review result now:
    if sc_res='VV' then begin
        status:=cs_idle;
        <further initialisations after completed self check>
        exit;
    end;
    if (sc_res='VD') or (sc_res='DV') then begin
        <take over data from D sender>
        status:=cs_idle;
        <further initialisations after completed self check>
        exit;
    end;
    if (sc_res='DD') then begin
        <take over data from D sender>
        status:=cs_idle;
        exit;
    end;
    if (sc_res='VI') or (sc_res='IV') or
        (sc_res='DI') or (sc_res='ID') or
        (sc_res='V') or (sc_res='V') or
        (sc_res='D') or (sc_res='D') or
```

-continued

```
then begin
    <further checks, if required>
    if (sc_res[1]='D') or (sc_res[2]='D')
        then <take over data from D sender>
    <Set: no response='D'>
    if <this mirror is responsible> then
        <find a new mirror>
    else
        <send order to find a new mirror to responsible mirror>
    exit;
end;
if (sc_res='II') then begin
    <initialise cell>
    used:=false;
    exit;
end;
if (sc_res='I') or (sc_res='I') then begin
    status:=cs_idle;
    exit;
end;
if (sc_res=' ') then begin
    <optional: find nm-1 new mirrors>
    status:=cs_idle;
    exit;
end;
end;
```

Assuming a mirror compound of three mirrors SP, the following cases can be distinguished for the receipt of no, one, or two responses AK at the mirror SP which sends the validation requests ValidierRQ (validateRQ) to the two other mirrors SP of the compound, which are listed in the table below, with the incoming responses AK being classified as follows:

"V" (Valid): The sending mirror SP accepts the receiving cell Z as mirror SP, and the life counters of the sender and the recipient have the same value.

"D" (Delayed): The sending mirror SP accepts the receiving cell Z as mirror SP, but the life counter of the sender has a lower value than the life counter of the recipient.

"I" (Invalid): The sending mirror SP does not accept the receiving cell Z as mirror SP.

| Case | Incoming responses AK | Status of mirror compound |
|---|---|---|
| 1) | V V | Both receiving mirrors SP are valid: The mirrors of the compound have consistent and current data so that no further operations become necessary. |
| 2) | V D | The requested mirror SP sending a "V" is valid and the requested mirror SP sending a "D" has a higher life counter value. The requesting mirror SP must take over the data of the requested mirror SP sending a "D". |
| 3) | D D | Both receiving mirrors SP have life counters with higher values: The requesting mirror SP is invalid and must take over the data of the mirror SP sending a "D". |
| 4) | V I | a) The requested mirror SP sending a "V" receives an "I" from the requested mirror SP sending an "I": The requesting mirror SP and the requested mirror SP sending a "I" are valid, the requested mirror sending an "I" is invalid and is to be removed from the compound. The mirror SP with the lowest index must find a new mirror SP. b) The requested mirror SP sending a "V" receives a "V" from the requested mirror SP sending an "I": The requested mirror SP sending an "I" is inconsistent and must be removed from the group (see detailed explanation in the following). The mirror SP with the lowest index must find a new mirror SP. |

US RE40,521 E

17

-continued

| ase | Incoming responses AK | Status of mirror compound |
|---|---|---|
| 5) | D I | The requesting mirror SP takes over the data of the mirror SP sending a "D". Otherwise the procedure corresponds to case (4). |
| 6) | I I | The requesting mirror SP is in the minority and is declared invalid. |
| 7) | V- | A requested mirror cannot transmit data: The mirror Sp of the two working mirrors SP with the lower index must find a new mirror SP. The failed mirror SP is treated like to mirror SP sending an "I" in cases (4) and (5). |
| 8) | D- | One requested mirror cannot transmit data and the other requested mirror SP has a higher value: The requesting mirror SP takes over the data from the working mirror SP with the lower index must find a new mirror SP, and the minor SP with the lower index must find a new mirror SP. The failed mirror SP is treated like to mirror SP sending an "I" in cases (4) and (5). |
| 9) | I- | One requested mirror SP is invalid and the other requested mirror SP has failed: The requesting mirror SP is in the minority, remains active, but does not find new mirrors SP. |
| 10) | — | Both requested mirrors SP do not transmit data or the network connection of the requesting mirror has failed: Alternative 1: The requesting mirror SP remains active, but does not find new mirrors SP. Alternative 2: The requesting mirror ensures by additional checks that its connection functions properly and replaces the two mirrors. The two requested mirrors SP do not receive any information to this effect and will later exclude the requesting mirror SP. This case must be compensated by the operation DoubleFieldCheck described below |

In those cases in which a new mirror SP is to be found, a new mirror SP is found by one of the remaining mirrors SP, with only one mirror being allowed to do this task. A mirror must be selected, e.g. the one with the lower index. The other mirror SP with the higher index does not execute any operations, but will receive messages MSG after some time which indicate the integration of a new mirror SP into the compound.

If a mirror SP has physically failed, it is either possible that no requests RQ were made to the mirror compound in the meantime, i.e. that its failure has not been noticed and has not brought about any impacts, or that the two other mirrors SP have declared it invalid in the meantime and found a replacement mirror. If a restart operation is carried out, such a condition can be determined. For this purpose, the starting mirror SP carries out a self check as previously described.

In the present invention the life counter is a counter which is incremented by integer values. In order to prevent an overflow of the life counter the life counter of all clients CL, cells Z, and clusters C is periodically adjusted, i.e. set to a lower common value.

For this purpose, the adjustment is initiated from any mirror SP, e.g. from the mirror SP with the lowest life counter value. All nm mirrors SP of a field F wait for the receipt of all nm−1 responses AK (PSM). Only if all nm−1 responses AK are received, the respective mirror SP carries out an adjustment of the life counter.

When adjusting the life counter, attention has to paid that the interval between two adjustments is selected in such a manner that mirrors SP which have been replaced in the meantime do not become valid again upon a restart. Preferably an additional memory is used for this purpose in which

18

the value of the last life counter is stored where a mirror SP has been replaced.

In the case of pseudoreliable messages PSM, too, faults can occur. It is true that the parameters for pseudoreliable messages PSM can be selected in such a manner that faults are improbable to such an extent that they virtually do not occur in the selected application. This can, however, lead to the result that the application is actually no longer practicable. With respect to the parameters for pseudoreliable messages PSM it might be necessary to make compromises so that faults occur due to faulty pseudoreliable messages PSM, which must be corrected.

For this reason, the communication of the cells Z or the mirrors SP, respectively, among each other must be designed in such a manner that these faults remain without consequences or are corrected. This is done, e.g. by the use of a self check SelfCheck.

The operation DoubleFieldCheck described in this section serves to correct faults which have been caused by communication errors with pseudoreliable messages PSM. Such faults cause mirror compounds to duplicate, i.e. that more than nm mirrors exist for one field.

The operation DoubleFieldCheck can be carried by one or more mirrors SP in an interval t_DoubleFieldCheck. Each client CL can initiate an operation DoubleFieldCheck if it receives responses AK from mirrors SP whose references to other mirrors SP are not consistent.

The operation DoubleFieldCheck removes additionally generated mirror compounds in order to restore the desired condition of nm mirrors SP per one field F. For this purpose, a manager for the operation DoubleFieldCheck is selected. This can be any cell Z (also of the mirror compound) or a client CL (e.g. the client which detected the error situation). Optionally, the manager sends a request RQ to the network to which all cells Z respond which are responsible for a certain field F, whereby also additional mirror compounds are detected. The manager then decides which cells Z belong to the valid mirror compound and sends a delete request DeleteRQ to all other cells Z. Optionally, the manager sends a request rq_updateTable to all remaining mirrors SP for updating their mirror tables.

If individual cells Z do not receive the delete request DeleteRQ, they will be deactivated upon the next self check SelfCheck and/or the next operation DoubleFieldCheck.

In order to decide which cells Z belong to the valid mirror compound various algorithms can be employed. In the following, examples for this are shown which can also be combined.

One possibility is to introduce a generation counter which is incremented each time a new mirror SP is added to the compound. In the case of mirrors SP with a doubly existing index, the mirror SP with the higher/lower generation counter will be removed. It is also possible to declare the mirror compound valid which was last write-accessed. Furthermore, the validity of a mirror compound can also be decided as a function of any other properties (e.g. geographic position of mirrors SP). If only one single mirror SP is detected as working properly, e.g. by a client CL, it is possible that the error is with this mirror SP and not with the nm−1 other mirrors SP. In order to exclude this possibility, an additional safety check should be carried out for ensuring the correct function of the single mirror SP before same replaces the other mirrors SP. It is thereby prevented that the single operating mirror SP erroneously activates additional mirrors SP.

With actually only one mirror SP still working, nm−1 new mirrors SP are to be added. First, the working mirror SP

US RE40,521 E

19

must check or ensure, respectively, the function of its own data transmissions. Then nm−1 new mirrors SP are requested by a request rq_needNewCells. All nm−1 new mirrors SP are sent a request to become mirrors. It is thereby not necessary to evaluate the responses AK immediately, because any faults will be corrected by later self checks SelfChecks (this sequence approximately corresponds to the addition of a new field F, with the difference that only nm−1 cells Z are found and that the mirror manager in this case is identical with a mirror SP).

In the following sections the data exchange between clients CL, cells Z, and clusters C is described which is preferred for providing the inventive "active" cells. In particular, the following operations are employed with reference now being made to FIG. 4:

Find operation (find): Finding of a cell Z which defines a desired field F.

Read operation (read): A client CL reads the contents of a field F from a mirror SP.

Write operation (write): A client modifies the contents of a field F in all associated mirrors SP.

Add operation (add): Adding of fields F which previously have not been in the cluster compound CV.

Delete operation (delete): Deletion of a field F in the cluster compound CV.

By sending a find request FindRQ a client CL determines the position of the cells Z which include a desired field F and are thus mirrors SP for the desired field F. The addresses of these cells Z include both the identifications ClusterID of the corresponding clusters C as well as the identifications ZellID of the cells Z themselves.

For obtaining the addresses of the cells Z which are mirrors SP for the desired field F (e.g. field F$\mathbf{8}$ from FIG. $\mathbf{2}$), the client CL requests any cluster C, e.g. cluster C$\mathbf{6}$, whether one of its cells Z includes the desired field F$\mathbf{8}$. If this is the case than the cluster C$\mathbf{6}$ sends the corresponding cell identification ZellID as well as the cluster identification ClusterID of all nm−1 cluster C which include mirrors SP of the desired field F$\mathbf{8}$. As shown in FIG. $\mathbf{4}$, in this case these are the cell C$\mathbf{4}$ in cluster C$\mathbf{1}$ and the cell Z$\mathbf{6}$ in cluster C$\mathbf{3}$, i.e. in total the cells with the identifications ZellID C$\mathbf{1}$Z$\mathbf{4}$, C$\mathbf{3}$Z$\mathbf{6}$, and C$\mathbf{6}$Z$\mathbf{2}$.

If the requested cluster C, e.g. cluster C$\mathbf{4}$, does not contain the desired field F$\mathbf{8}$, the requested cluster C$\mathbf{4}$ finds the cell Z among the cells Z included therein whose field position FeldID comes closest to the field position FeldID of the desired field F$\mathbf{8}$. For this purpose, the cluster C can, for example, determine the sum of the absolute values of the difference between the cell position ZellID and all other neighbouring cell positions ZellID in order to select the cell Z where the absolute value of a difference is minimal.

Due to the fact that cells Z contain information on neighbouring cells a cluster C can be found in this manner which comprises a cell Z with the desired field F$\mathbf{8}$. The cluster C$\mathbf{4}$ requested by the client CL relays the find request FindRQ to the cluster C found in this manner, e.g. to cluster C$\mathbf{6}$. This operation is repeated until a desired cell Z has been found or until cells Z are no longer found which are neighbouring cells of the desired cell Z. Preferably, a step counter is incremented upon the relay of a find request FindRQ. With each increase of the step counter, the respective current cluster C sends a holding response HalteAK (holdingAK) to the client CL in order to inform same that his request FindRQ is still being processed. If the requesting client CL does not receive such a holding response HalteAK in this case, then it is to be assumed that its request FindRQ has been lost. In this case it

20

is to be preferred that the requesting client CL directs the request FindRQ to the cluster C again from which it has received the latest holding response HalteAK.

The find request FindRQ is successfully completed if the requesting client CL receives a destination identification ZielID (destinationID) for nm mirrors SP of the field F$\mathbf{8}$. In the example shown in FIG. $\mathbf{4}$, the destination identification ZielID would comprise the cells C$\mathbf{1}$Z$\mathbf{4}$, C$\mathbf{3}$Z$\mathbf{6}$, and C$\mathbf{6}$Z$\mathbf{2}$. If the client CL does not receive a response AK, the find operation has failed.

In the following, the sequence is described which is executed for read requests ReadRQ and write request WriteRQ. With the read and write requests ReadRQ, WriteRQ, shown below it is necessary that the respective client CL knows the identifications of the mirrors SP which include the field F whose data the client CL wants to access. This is critical insofar as the identifications of the desired mirrors SP can change any time due to shifting of the mirrors SP. To prevent this, it would be basically possible to link each find request FindRQ with an operation LockRQ which prevents changes of the respective compound of the desired mirrors SP before the actual read and write requests ReadRQ, WriteRQ have been received by the desired mirrors SP. This would, however, significantly reduce the efficiency of data transmissions between clients CL and clusters C.

For this reason the approach with the preferred embodiment of the present invention is as follows. A client CL executes a find operation and notices the received positions of the mirrors SP which include the desired field F.

If a find request includes read and write requests ReadRQ, WriteRQ with a field position FeldID for the desired field F, which does not correspond to the field position FeldID for the desired field F in the mirror SP, it informs the client CL accordingly. Furthermore, each mirror SP always or alternatively on request returns the positions of the other nm−1 mirrors SP to the requesting client CL. In this manner, a mirror SP can correct the identifications ID stored in it and, if required, send a new find request FindRQ.

Pseudocode for carrying out a find request FindRQ:

```
rq_read:
    begin
        if not used then
        begin
            <Optional: Return fault message to client>
            exit;
        end;
        message.data:=data;
        // Write own mirrors into the message
        for i:=1 to nm-1 do
            message.mirror[i]:=mirror[i];
        <complete further field>
        <storage of specifications for performance measurement>
        return _mag(m,ak_read);
    end;
```

The request of a client CL is always directed to all nm mirrors SP:

```
message.command:=rq_read;
for i:=1 to not do begin
    message.destination:=spiegel[i];
    <informationen für performance measurement in message, if req'd.>
    send(message);
end;
```

Ideally the client CL buffers its own requests in order to be able to execute further actions (e.g. other requests) in the

US RE40,521 E

21

meantime, until the 1..nm corresponding responses ak__read or a timeout arrives. After the expiration of the waiting time TWLese (TWRead) the client CL must check how many responses have been received and whether the mirror tables of the responses are consistent:

```
if nr__al>nm then begin
        <send request for DoubleFieldCheck to all senders>
    exit;
end;
if nr__ak=nm then begin
        if <Mirror tables consistent>
            then <use result from any response message[i] >
            else <send request for SelfCheck to all senders>
        exit;
end;
if nr__ak=nm div 2 then begin
            if <Mirror tables consistent> then <use result from any response
        message[i] >
            <send request for SelfCheck to all senders>
            exit;
end;
if nr__ak>0 then send <send request for SelfCheck to all senders>
```

Preferably, the read requests ReadRQ and the write requests WriteRQ are sent via the network N to all clusters C in parallel, but depending on the network N used any other type of sending is possible.

Each mirror SP, e.g. the cell $C1Z4$, optionally relays a read request ReadRQ from a client CL to all other mirrors SP, i.e. to the cells $C3Z6$ and $C6Z2$ in this case, and each mirror SP then sends a response AK to the client CL. In this case, a mirror SP receives a further read request ReadRQ and because this has the same ticket number TNr as the previously received read request ReadRQ it will be ignored because this mirror SP has already sent a response AK to the requesting client CL.

When a read operation is executed the client CL requires the data of a certain field F, e.g. F$8$. For receiving this data the client CL must know the positions of the mirrors SP which are responsible for this field F$8$. This can be enabled by a previously executed find operation in order to determine the cells $C1Z4$, $C3Z6$, and $C6Z2$ operating as mirrors SP.

The client CL sends a corresponding read request ReadRQ with a unique ticket number TNr to all 3 clusters C1, C3, and C6 which include the mirrors SP which are responsible for the desired field F$8$.

The client CL waits for a predetermined application-specific time interval TWLese (TWRead) for responses AK of the requested mirrors SP which include the desired data. Each mirror SP acknowledges the read request ReadRQ with a response AK so that nm (i.e. 3 in this case) responses AK arrive at the requesting client CL.

The client CL responds as a function of the type and/or number of the incoming responses AK. With three mirrors SP assumed which are responsible for the field F of the desired data the following different states result. If the client CL receives two or three identical responses AK, the result is used. If it receives two different responses AK or only one response AK the client CL sends a request for a self check to the corresponding mirrors SP. If the client CL receives different responses AK that response AK is used whose life counter has the highest value.

A read request ReadRQ is successful if the client CL receives at least one response AK and cannot be completed successfully if the client CL does not receive a response AK within the predetermined time interval TWLese or if one or

22

several clusters C signal that they did not find the desired cell Z. In order to avoid the above problems in sending a read request ReadRQ it is to be preferred to execute find requests FindRQ and read requests ReadRQ in a combined manner. In this case the client CL directs and find/read request Find/ReadRQ to any cluster C and receives a response AK from same as in the execution of an individual find request FindRQ. Here, the response AK does not include the address ID of the desired field F but the data of the desired field F.

It is to be considered, however, that a combined find/read request Find/ReadRQ compared to an initial find request FindRQ for finding the desired mirrors SP and a subsequent read request RearRQ to the desired mirrors requires more time, because now all clusters C must process the combined and thus more extensive find/read request Find/ReadRQ.

In order to change the data of a field F, e.g. field F$8$, the client CL sends a write request WriteRQ. As in the case of a read request ReadRQ, the client CL must know the positions of the 3 mirrors SP which are responsible for the desired field F$8$.

The client CL sends a write request WriteRQ to all 3 mirrors SP of the desired field F$8$. Thereupon the data of the desired field F$8$ or of the associated cells $C1Z4$, $C3Z6$, and $C6Z2$ operating as mirrors SP is modified in that all mirrors SP update their data correspondingly. Then each of the mirrors SP returns a response AK to the requesting client CL. As soon as all responses AK of the mirrors SP have arrived at the client CL the write operation is successfully completed.

If at the time at which the client CL sends it write request WriteRQ another write request WriteRQ to the desired cells $C1Z4$, $C3C6$, and $C6Z2$ is already being executed the client CL receives a corresponding response AK which indicates that the write request WriteRQ has failed and the desired cells $C1Z4$, $C3C6$, and $C6Z2$ are in a locked state. A write request WriteRQ has also not been completely successfully if the requesting client CL receives less than nm responses AK, i.e. in the present case less than 3 responses AK.

The synchronisation which is required for a write request WriteRQ is carried out by the involved mirrors SP in order to ensure that all nm mirrors SP are updated with the same data. If a mirror SP receives a write request WriteRQ, it sends this write request WriteRQ to all other nm−1 mirrors SP. Only if the sending mirror SP receives a response AK from all other nm−1 mirrors SP the write request WriteRQ is executed. Thereby the write request WriteRQ received by the mirror SP can be sent either from a client CL or from another mirror SP of the same compound.

If a mirror SP receives another write request WriteRQ from a mirror SP with a lower index, previously arrived write requests WriteRQ are overwritten in all mirrors. Moreover, a mirror SP does not accept further write requests WriteRQ from a client CL if already a not fully executed write request WriteRQ has arrived from another mirror SP or client CL.

It is possible to execute find requests FindRQ and write request WriteRQ in a combined manner as find/write requests Find/WriteRQ, but it is to be checked whether the additional time requirement is reasonable.

An add request AddRQ serves to integrate a field F which is not yet included in the cluster compound CV into the cluster compound CV. Such an add request AddRQ can be sent from a cluster C or a client CL.

An individual cell, e.g. the cell $C2Z6$ from FIG. 4, receives an add request AddRQ from the client CL to work as a mirror manager and to integrate nm−1 (i.e. 2) new mirrors SP into the cluster compound CV. In the currently pre-

US RE40,521 E

23

ferred embodiment of the invention, one cell Z is always selected a mirror manager which itself is no mirror SP. However, embodiments of the invention are possible where the mirror manager itself is also a mirror. The cell C2Z6 working as the mirror manager sends an add request AddRQ for 2 mirrors into the network N. The add request AddRQ is relayed from cluster C to cluster C in the cluster compound CV, e.g. from cluster C2 to cluter C3, with the number of the mirrors SP to be added being decremented upon relay of the add request AddRQ, when the last requested cluster C has provided a cell Z.

The last requested cluster C sends the identifications Zel-lID of the cells Z which are considered as mirrors SP to the cell C2Z6 working as the mirror manager. The cell C2Z6 working as the mirror manager then sends a corresponding response AK to all cells C3Z1 and C1Z2 which are possible as mirrors SP, preferably a pseudoreliable message PSM which instructs them to become mirrors SP. Then the cell C2Z6 working as the mirror manager returns a corresponding response AK to the requesting client CL. An add request AddRQ is not completed successfully if no response AK or a negative response AK is returned from the cell C2Z6 working as the mirror manager.

Pseudocode for the execution of an add request AddRQ:

```
rq__addField
        begin
        if (status<>cs__idle) or (used) then exit;
            message.command:=ak__addField;
        <store additional values for request,
        e.g. data, field position, etc. for later
        relay to the mirrors SP>
        fieldpos:=message.dataFieldPos;
        data:=message.data;
        mirManClient:=message.sender
        repeat__rq__emptycells:=c__repeat__rq__emptycells;
        psm__send(message,message.sender,cs__mirrorManager1);
        exit;
        end;
```

The execution of an add request AddRQ does not guarantee that nm mirrors SP are available for a desired field F, but that either nm mirrors SP are available or after the elapse of a predetermined time t no mirrors SP at all are available for the desired field F.

If less than nm new mirrors SP exist after the execution of an add request AddRQ this can only occur if the pseudoreliable messages PMSM used in the add request AddRQ provide wrong results. Such faults are corrected by later self checks of the mirrors SP.

A mirror request SpiegelRQ (MirrorRQ) is a special case of an add request AddRQ, wherein a cell Z which will be referred to a manager in the following requests a single mirror SP. The manager sends the request to the cells Z which are possible as mirrors SP to become new mirrors SP.

If the manager sends a mirror request SpiegelRQ into the network N, a waiting time WT is recorded from this moment on until responses AK of the cells Z possible as mirrors SP arrive at the manager. Each cluster C which receives the mirror request SpiegelRQ and can provide storage space sends a corresponding response AK to the manager and provides storage space which is kept free to be integrated into the cluster compound CV in the form of a cell Z or a mirror SP, respectively. If a cluster C cannot provide a mirror SP, it relays the mirror request SpiegelRQ to other clusters C. When the manager has received a corresponding response AK of a new mirror SP it will enter this in a mirror table. If a

24

cell Z which is possible as a mirror SP received a message MSG from the manager prior to the elapse of the time interval wt that no more mirrors SP are required, it is released again and the mirror request SpiegelRQ is rejected.

If a timeout occurs in one of the requested cells Z, i.e. the time interval wt of the mirror request SpiegelRQ for this cell Z has elapsed, then a new cell Z which is possible as a mirror is found. This operation is repeated several times or until cells Z possible as mirrors have responded. Cells Z which have made themselves available as possible mirrors SP and whose responses AK arrive at the manager after the assigned time interval wt will be ignored by same.

Pseudocode for carrying out a mirror request SpiegelRQ:

```
cs__getOneNewMirror0:
    begin
        message.command:=rq__needEmptyCells;
        <select destination cluster>
        message.ticket:=makeNewTicket;
        psm__send(r,r.dest,cs__getOneNewMirror1);
        exit;
    end;
```

Either the mirror SP receives a response AK or the mirror request SpiegelRQ becomes invalid:

```
cs__getOneNewMirror1:
    begin
        if psm__timeout then begin
            status:=cs__idle;
            exit;
        end;
        possibleMirror:=<received address>
        message.command:=rq__singlebecomeMirror:
        <write own address and addr. of the other valid mirror into the
        message>
        psm__send(r,possibleMirror[1],cs__getOneNewMirror2);
        exit;
    end;
```

The still not used mirror SP receives the mirror request SpiegelRQ to become a mirror which it processes with the following pseudocode:

```
rq__singlebecomeMirror:
    begin
        if <request from same mirror1> and <ticket in agreement>
        then begin
            <return acknowledgment>
            exit;
        end;
        if used then exit;
        <return acknowledgment>
            <notice MirrorManager and ticket>
        <Send rq__addMirror to all old mirrors>
        exit;
end;
```

Now this mirror candidate sends a request to all nm−1 old mirrors SP to be accepted as a mirror (rq__addMirror). Because the old mirrors SP must certify this mutually the cell might have to wait longer than normal for a response to the message. A mirror SP which has received this request enquires all other nm−2 mirrors SP whether these have received this request, too (rq__certify). Only if this is the case, the mirror SP replies with a corresponding response ak__addmirror and updates its own mirror table:

US RE40,521 E

25

26

```
rq_addMirror:
    begin
        <set flags, if req'd to accept messages>
        if <request is from mirror 1>then begin
            <update message with data corr. to LifeCount>
            <send acknowledgment ak_akkMirror>
            exit;
        end;
        if <message is from mirror candidate (anew)>
            then exit;
        if <Status is not correct>then exit;
        if not <mirror to be replaced is known>then exit;
        <further plausibility checks, if req'd.>
        <Send request to all nm-2 mirrors whether message received, too>
end;
```

Finally, the mirror candidate updates its data:

```
cs_becomeSingleNewMirror1:
    begin
        if not <all nm-1 old mirrors have sent ak_addMirror> then begin
            status:=cs_idle;
            exit;
        end;
        <take over mirror data>
        <take over data (field value etc.)>
        <establish own index>
        used:=true;
        status:=cs_idle;
        exit;
end;
```

In order to remove a field F from the cluster compound CV, a client CL or a cluster C, for example, sends a request DeleteRQ to all nm mirrors SP associated with the field F. A delete request DeleteRQ ensures that either all nm mirrors SP are removed or, in the case of a not successful execution of the delete request DeleteRQ, that no mirror SP is removed in order to ensure consistent data in the cluster compound CV.

Optionally, each mirror SP which receives a delete request DeleteRQ relays it to the other nm−1 mirrors SP. A mirror which receives a delete request DeleteRQ "deletes" itself, i.e. the respective cell Z changes into an idle state and informs the sender of the delete request DeleteRQ about this with a corresponding response AK.

A delete request DeleteRQ is executed successfully if the sender receives nm responses AK according to the which nm mirrors SP of the field F have deleted themselves. If the sender does not receive a response AK after the elapse of a predetermined time interval, according to which the nm mirrors SP of the field F have deleted themselves, the delete request DeleteRQ has failed.

Pseudocode for the execution of a delete request DeleteRQ:

```
rq_delete:
begin
    if status<>cs_idle then exit;
    if used and (message.ticket=1mtticket) and
        (message.sender=1mAdr) then
    begin
        return_msg(message,ak_delete);
        exit;
    end;
```

-continued

```
    return_msg(m,ak_delete);
    1mTicket:=message.ticket;
    1mAdr:=message.sender;
    <Initialise cell in the initial state>
    used:=false;
    status:=cs_idle
    exit;
end;
```

Shift operations are used for assigning individual mirrors SP of a mirror compound to other cells Z which replace the previous mirrors SP accordingly. There are various reasons which necessitate shift operations:

Failure of a cluster C or individual cells Z

Removal of a cluster C from a cluster compound

Inadequate data transmission performance of a cluster C

Application-specific causes/reasons.

The shifting of mirrors SP upon the request of new mirrors SP has already been described above. If a cluster C is to be removed from the cluster compound CV, for example, when a cluster C is to be shut down or to be used for other tasks in the network N, the data of its active cells Z, i.e. of the cells Z which operate as mirrors SP, must be shifted to other clusters C. In this case the cluster C to be removed initiates the shifting of the data or of the mirrors SP, respectively, of the individual mirror compounds (as described above).

For initiating shift operations due to an inadequate data transmission performance, the data transmission performance of the clusters C and/or the cells Z is checked during operation. For this purpose, the preferred embodiment of the present invention uses a counter for each mirror SP and/or each cell Z which determines the transmission duration with pseudoreliable messages PSM. Optionally, a timer is implemented which determines the average data transmission duration, with a common time basis being required in this case. Preferably, each cluster C determines the data transmission performances of its cells Z. Mirrors SP or cells Z, respectively, whose data transmission durations exceed certain limits are shifted.

The evaluation of the data transmission performance with respect to the data transmission duration, however, is to be understood as an example only, and any desired parameter of data transmission performances which is suitable for the application of the invention can be checked for an initiation of shift operations by means of known methods. For example, the computing performance of individual cells Z and/or clusters C, or the performance of individual areas of the network N could be checked.

If such an inadequate data transmission performance has been determined for a mirror SP, e.g. cell $C6Z2$ from FIG. 2, a single mirror SP from the corresponding compound becomes the manager, e.g. cell $C1Z4$. The manager $C1Z4$ sends a request RQ, preferably with a pseudoreliable message PSM, to all other two cells $C3Z6$ and $C6Z2$ of the compound operating as mirrors SP to remove the corresponding mirror SP ($C6Z2$). This makes itself invalid or is declared invalid by the corresponding cluster $C6$.

Thereupon the manager $C1Z4$ requests a new mirror SP in the cluster compound CV, whereby contrary to the above described replacement for a mirror SP additional requirements can be placed on the new mirror SP, preferably requirements with respect to the data transmission performance. The new mirror SP is integrated into the mirror compound in the above described manner.

US RE40,521 E

27

In order to ensure that all mirrors SP have received information on the shift operation the manager sends a request RQ (preferably with a pseudoreliable message PSM) for cancelling the shift operation if it has not received a corresponding response AK from all nm−1 mirrors SP. In this case, the shift operation could not be completed successfully.

The operations described above in conjunction with cells Z and mirrors SP are also applicable to operations with respect to the inventive clusters C. For this reason, a detailed description of the operations for adding, removing, shifting, and deactivating of individual clusters C is dispensed with.

Although the present invention has been described in terms of specific embodiments, it is anticipated that alterations and modifications thereof will no doubt become apparent to those skilled in the art. It is therefore intended that the following claims be interpreted as covering all such alterations and modification as fall within the true spirit and scope of the invention.

What is claimed is:

1. A data access and management system for a computer system, comprising:

at least two data storage means;

at least one computer unit which accesses the data of the data storage means;

data transmission means for a data transmission between the data storage means and the computer unit, with the data being stored in a redundant manner in at least two of the at least two data storage means; and

means for detecting prespecified parameters of the data transmission between the data storage means and the computer unit, with data being preferably stored in a redundant manner in the data storage means as a function of said detected prespecified parameters, and with the computer unit accessing one of the data storage means as a function of said detected prespecified parameters, the data storage means comprising a second means for detecting prespecified parameters for data transmissions between said data storage means; and

wherein the data storage means copies data which is redundantly stored in the system independent of an access of the computer unit as a function of the detected prespecified parameters of data transmission between the data storage means.

2. A data access and management system as recited in claim 1 wherein each of said data storage means comprise control units for controlling the data access and the data management.

3. A data access and management system as recited in claim 1 wherein the data storage means copy redundantly stored data in the system among each other as a function of the detected prespecified parameters of data transmissions between the individual data storage means and the computer unit and delete the data in the data storage means in which it had been stored beforehand.

4. A data access and management system as recited in claim 1 wherein the data storage means process the stored data independent from the computer unit.

5. A data access and management system as recited in claim 1 wherein the data in the system is divided into data subsets, and the data storage means are divided into cells in such a manner tat data subsets to be stored in a redundant manner are stored in one each of the cells of the corresponding data storage means.

6. A data access and management system as recited in claim 5 wherein the data storage means are divided into cells depending on data transmission parameters.

28

7. A data access and management system as recited in claim 5 wherein each cell comprises additional data for data access and data management which relates to the parameters of data transmissions between at least one of the individual data storage means, the computer unit, neighbouring cells, and cells which comprise data which is stored in the system in a redundant manner.

8. A data access and management system as recited in claim 5 wherein the cells interchange data among each other which is used for the data access and the data management.

9. A data access and management system as recited in claim 5 wherein the parameters of data transmission between the individual data storage means and the computer unit are identical for the cells of a data storage means.

10. A data access and management system as recited in claim 5 wherein the computer unit immediately accesses individual cells of the data storage means.

11. A data access and management system as recited in claim 1 wherein the computer unit operates to perform at least one of outputting data for storage in the data storage means and processing data stored in the data storage means.

12. A data access and management system as recited in claim 1 wherein the computer unit is connected with a user for at least one of transmitting the received data and control by the user.

13. A data access and management system as recited in claim 12 wherein the user is at least one of a personal computer, a central processing unit of a computer, and an additional data storage means.

14. A data access and management system as recited in claim 1 wherein the computer unit is a system which provides Internet services.

15. A data access and management system as recited in claim 1 wherein the detected prespecified parameters of data transmissions between the individual data storage means and the computer unit comprise at least one of the duration of the transmission, the fault rate, and the duration of data processing operations of the individual data storage means prior to the transmission of the data.

16. A data access and management system as recited in claim 1 wherein the data transmission means comprise at least one of electrically conductive connections, bus systems, computer networks, wired telephone networks, wireless telephone networks, and the Internet.

17. A data access and management system as recited in claim 1 for use with a database system or a computer structure which manages data by means of the data access and management system.

18. A data access and management system as recited in claim 1 for use in a system for a computer game which is provided via the Internet.

19. A data access and management system as recited in claim 18 wherein at least one computer unit is an Internet service provider.

20. A data access and management system as recited in claim 18 wherein the computer game is an interactive computer game to be used by at least two users.

21. A data access and management system as recited in claim 20 wherein each user is connected with one computer unit each.

22. A data access and management system as recited in claim 20 wherein the computer units transmit data for the execution of the computer game to the respective users.

23. A data access and management system as recited in claim 22 wherein the users process the received data for executing the computer game and transmit said processed received data back to the corresponding computer units.

29

30

24. A data access and management system as recited in claim 18 wherein additional means are provided for detecting prespecified parameters of the data transmission between the computer units and the respectively connected users.

25. A data access and management system as recited in claim 24 wherein the detected prespecified parameters of data transmissions between the computer units and the respectively connected users comprise at least one of the duration of the transmission, the fault rate, the duration of data processing operations of the individual computer units, and the individual users prior to the transmission of the data.

26. A data access and management system as recited in claim 24 wherein the data for executing the computer game is stored in a redundant manner as a function of the detected prespecified parameters of the data transmission between the computer units and the respectively connected users.

27. A data access and management system as recited in claim 18 wherein the computer units receive control for the execution of the computer game from the respective users.

28. A data access and management system as recited in claim 27 wherein the computer units output the control data or equivalent data to the data storage means.

29. A data access and management system as recited in claim 27 wherein the computer units process data for executing the computer game depending on at least one of the control data, and the data storage means process data for executing the computer game, depending on the control data or on data equivalent to the control data.

30. A method for data access and data management for a computer system, comprising:

storing data in at least two data storage means;

accessing the stored data by at least one computer unit via data transmission means, with prespecified parameters of the data transmission between the data storage means and the computer unit being determined, the data being stored in a redundant manner in at least two of the at least two data storage means as a function of the determined prespecified parameters of the data transmission, the access to the data being effected as a function of the determined prespecified parameters of the data transmission;

detecting prespecified parameters for data transmissions between the data storage means; and

shifting redundantly stored data independent of an access of the computer unit to the data as a function of the determined prespecified parameters of data transmissions between the data storage means.

31. A method for data access and data management as recited in claim 30 wherein the data access and the data management are controlled by the data storage means.

32. A method for data access and data management as recited in claim 30 further including the steps of copying redundantly stored data among each other by the data storage means as a function of the determined prespecified parameters of data transmissions between the individual data storage means and the computer unit and deleting in the data storage means in which the copied data had been previously stored.

33. A method for data access and data management as recited in claim 30 further including the step of processing the data by the data storage means independently of the computer unit.

34. A method for data access and data management as recited in claim 30 further including the step of dividing the data into data subsets, with the data subsets to be stored in a redundant manner being stored in cells of the individual data storage means.

35. A method for data access and data management as recited in claim 34 wherein additional data for data access and data management are exchanged between the cells of the data storage means.

36. A method for data access and data management as recited in claim 34 wherein the access is made directly to the data of individual cells of the data storage means.

37. A method for data access and data management as recited in claim 30 wherein the division into data subsets and the storage in the cells are carried out as a function of the data transmission parameters.

38. A method for data access and data management as recited in claim 30 wherein additional data for data access and data management is stored in the cells, which relate to at least one of the parameters of data transmissions between the individual data storage means, the computer unit, neighbouring cells, and cells which comprise the data redundantly stored in the system.

39. A method for data access and data management as recited in claim 30 wherein the access to data of cells of a data storage means has identical data transmission parameters.

40. A method for data access and data management as recited in claim 30 wherein data is at least one of output by the computer unit for storage in the data storage means and the data stored in the data storage means is processed by the computer unit.

41. A method for data access and data management as recited in claim 30 wherein the user either receives data transmitted by the computer unit, or controls the computer unit, or both.

42. A method for data access and data management as recited in claim 30 wherein the method provides Internet services.

43. A method for data access and data management as recited in claim 30 wherein the determination of the prespecified parameters of data transmissions between the individual data storage means and the computer unit comprises at least one of the determination of the duration of the transmission, the fault rate, and the duration of data processing operations of the individual data storage means prior to the transmission of the data.

44. A method for data access and data management as recited in claim 30 for use with a database system or a computer structure which manages data by means of said method for data access and data management.

45. A method for data access and data management as recited in claim 30 for use with a computer game which is provided via the Internet and in accordance with said method for data access and data management.

46. A method for data access and data management as recited in claim 45 wherein at least two users access the computer game, the computer game being an interactive computer game.

47. A method for data access and data management as recited in claim 46 wherein the data for executing the computer game is transmitted from the computer units to the respective users.

48. A method for data access and data management as recited in claim 47 wherein the data received by the users are processed by the users and transmitted back to the corresponding computer units.

49. A method for data access and data management as recited in claim 45 further comprising the step of determining prespecified parameters of the data transmission between the computer units and the respected users connected therewith.

US RE40,521 E

31

**50**. A method for data access and data management as recited in claim **49** wherein the determination of the prespecified parameters of data transmissions between the computer units and the respective users connected therewith comprises at least one of the determination of the duration of the transmission, the fault rate, the duration of data processing operations of the individual computer units, and the individual users prior to the transmission of the data.

**51**. A method for data access and data management, as recited in claim **49** wherein the redundant storage of the data for the execution of the computer game is carried out as a function of the determined prespecified parameters of the data transmission between the computer units and the respective users connected therewith.

**52**. A method for data access and data management as recited in claim **45** wherein control data for the execution of the computer game is additionally transmitted by the users to the corresponding computer units.

32

**53**. A method for data access and data management as recited in claim **52** wherein the control data or equivalent data is transmitted from the computer units to the data storage means.

**54**. A method for data access and data management as recited in claim **52** wherein the data for executing the computer game is processed by at least one of the computer units as a function of the control data and the data storage means as a function of the control data or of data equivalent to the control data.

**55**. A method for data access and data management as recited in claim **30** wherein the access to data in the data storage means comprises the employment of an Internet service provider which operates as a computer unit.

\* \* \* \* \*

**Exhibit B**

**to**

**Joint Claim Construction Statement**

US007904680B2

(12) **United States Patent** (10) **Patent No.:** **US 7,904,680 B2**

Binzinger (45) **Date of Patent:** *****Mar. 8, 2011**

(54) **DATA ACCESS MANAGEMENT SYSTEM AS WELL AS A METHOD FOR DATA ACCESS AND DATA MANAGEMENT FOR A COMPUTER SYSTEM**

(75) Inventor: **Thomas Binzinger**, Baldham (DE)

(73) Assignee: **AC Technologies S.A.**, Leithum (LU)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 909 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/188,025**

(22) Filed: **Jul. 23, 2005**

(65) **Prior Publication Data**

US 2005/0273504 A1    Dec. 8, 2005
US 2007/0244992 A9    Oct. 18, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 09/903,431, filed on Jul. 10, 2001, now Pat. No. 7,000,084, which is a continuation of application No. PCT/EP2000/000141, filed on Jan. 11, 2000.

(51) **Int. Cl.**
*G06F 12/14* (2006.01)

(52) **U.S. Cl.** .......................... **711/162**; 707/634; 709/214

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,459,837 A | | 10/1995 | Caccavale |
| 5,515,500 A | | 5/1996 | Mizuno et al. |

| | | | | |
|---|---|---|---|---|
| 5,634,125 A | * | 5/1997 | Li | ................................. 707/203 |
| 5,668,986 A | * | 9/1997 | Nilsen et al. | ..................... 707/10 |
| 5,841,962 A | | 11/1998 | Nakamura et al. | |
| 6,081,907 A | | 6/2000 | Witty et al. | |
| 6,085,251 A | | 7/2000 | Fabozzi, II | |
| 6,339,785 B1 | | 1/2002 | Feigenbaum | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP    0 767 585 A2    4/1997

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 11/515,507, filed Sep. 5, 2006, Binzinger.

(Continued)

*Primary Examiner* — Gary J Portka
(74) *Attorney, Agent, or Firm* — Rothwell, Figg, Ernst & Manbeck, P.C.

(57) **ABSTRACT**

The present invention permits improved data access and improved data management in a computer system. To this end, data are divided into individual partial data (F) and stored in cells (Z) of storage devices (C) in such a way that the partial data (F) being accessed and managed are present in the computer system in a redundant manner. Computer units (CL) are able to access the redundantly stored data. The fact that they are stored in the storage devices (C) ensures that the computer units (CL) accessing said data are supplied more rapidly. This is achieved in particular owing to the fact that the redundantly stored data are accessed in accordance with parameters of data transmissions between the computer units (CL) and the data storage devices (C) and that, in accordance with said data transmission parameters, the redundantly stored data are moved to and from the data storage devices (C) by corresponding copy and delete operations.

**15 Claims, 3 Drawing Sheets**



## US 7,904,680 B2
Page 2

### U.S. PATENT DOCUMENTS

7,000,084 B2    2/2006  Binzinger

### FOREIGN PATENT DOCUMENTS

| EP | 0 884 870 A2 | 12/1998 |
| WO | WO 98/18076 | 4/1998 |
| WO | WO 98/26559 | 6/1998 |

### OTHER PUBLICATIONS

Abbasov, "Optimizing the Location of Databases with Copies in Computer Networks," Avtomatika I Vychislitel'naya Tekhnika, vol. 22, No. 4, pp. 58-62, 1988.

BitTorrent Source Code, Circa Jul. 1, 2001, 96 pp.

* cited by examiner

Fig. 1

Fig. 2



Fig. 3



Fig. 4



US 7,904,680 B2

**DATA ACCESS MANAGEMENT SYSTEM AS WELL AS A METHOD FOR DATA ACCESS AND DATA MANAGEMENT FOR A COMPUTER SYSTEM**

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 09/903,431, filed Jul. 10, 2001, now U.S. Pat. No. 7,000,084, which was a continuation of international application PCT/EP2000/000141, filed Jan. 11, 2000, which claims priority to German patent application number 199 00 636.9, filed on Jan. 11, 1999 and entitled "DATA ACCESS AND MANAGEMENT SYSTEM AS WELL AS A METHOD FOR DATA ACCESS AND DATA MANAGEMENT FOR A COMPUTER SYSTEM".

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention generally relates to a data access and management system as well as to a method for data access and data management for a computer system. In particular, the present invention relates to a system and a method for optimising the access to data and their processing in distributed and networked computer structures.

2. Description of the Prior Art

The ever increasing use of distributed and networked computer structures and arrangements has the consequence that data and functionalities for data management purposes are no longer provided or utilised, respectively, by consistent computer systems, but by various distributes computer systems which are internetworked. In conventional distributed and networked computer structures and arrangements data and functionalities are generally provided by a central computer system, a so-called server, or an accumulation of central computer systems, so-called server clusters. Other computer systems, so-called clients, such as for example, personal computers are connected e.g. via networks or busses with the central computer system in order to access data and functionalities. In this context, various problems occur which limit the supply of clients with data and/or functionalities, in particular, if the access to a central computer system is done by several clients in a short period of time or even simultaneously. An example for this is computer games, which are supplied to several players via the Internet.

Due to the fact that only one central computer system (server) is used, its failure results in that the clients can no longer access provided data and functionalities. The failure of network areas, too, which connect the server with the clients, also leads to a total failure of the entire computer structure.

Moreover, the transmission times from the server to individual clients differ greatly in part because the connection quality to the clients varies e.g. due to various distances between the server and the clients as well as different transmission performances in various areas of the network. In particular, with interactive operations of several clients in connection with the server, such an inadequate transmission characteristic often leads to an unsatisfactory supply of individual clients with data/functionalities. In this context, the so-called "lags" must be mentioned which affect the communication between the server and the clients.

### SUMMARY OF THE INVENTION

It is an object of the present invention to eliminate the above mentioned problems of the known state of the art. In particular, it is an object of the invention to optimise the transmission quality between clients and means of a networked distributed computer structure which provide data in such a manner that each client is provided with the respectively requested data in a desired application-specific manner. Preferably, the invention is to enable an as rapid as possible supply with data/functionalities, whereby it is additionally to be ensured that the transmissions are effected as fault-tolerantly as possible.

In addition, the present invention secures the operability of a distributed networked computer system in the case of the failure of data providing means of the computer structure. The invention is also to secure the operability of a distributed networked computer system in the case of the failure of individual areas of the networks via which the data providing means and clients are connected with each other.

Furthermore, the invention is to enable that clients are only provided with current data. The invention also intends to reduce the required transmission capacities of a networked distributed computer system.

In the inventive system according to the present invention, the data provided in a computer system is stored in a redundant manner in the data storage means, depending on prespecified parameters of the data transmission between data storage means and computer units, and the computer units access one of the data storage means as a function of the determined prespecified parameters. In this manner it is made possible to optimise data transmissions between the data storage means and the computer units in the desired application-specific manner in order to be carried out more rapidly and in a manner involving fewer faults.

In addition, the data storage means comprise control unit for controlling the data access and the data management in order to work independent of other means of the computer system. This reduces the quantity of the data to be transmitted in the inventive system and increases the fault tolerance of the inventive system because the data are not processed centrally.

For achieving an additional optimisation it is to be preferred that the data storage means copy redundantly stored data in the system among each other as a function of the determined parameters of data transmissions between the individual data storage means and the computer unit and delete the data in the data storage means in which it had been stored beforehand. Data can thus be shifted in the inventive system from one data storage means to other data storage means, whose parameters of the data transmission enable a higher degree of optimisation of the data access and the data management for the respective application case of the invention.

Moreover, it is to be preferred that the data storage means process the stored data independently from the computer unit. In this manner data can be processed in a decentralised way whereby increased data integrity and an increased fault tolerance as well as a relief of individual system components is achieved. In another embodiment the data in the system is divided into data subsets, and the data storage means are divided into cells in such a manner that each of the data subsets to be stored in a redundant manner is stored in one of the cells each of the corresponding data storage means in order to only store that data in a redundant manner which is currently required.

In addition, it is advantageous that the data storage means are divided into cells depending on data transmission parameters in order to further optimise the data transmissions within the inventive system.

In order to carry out the data access and the data management in a more efficient manner each cell may comprise

US 7,904,680 B2

3

additional data which relates to parameters of data transmissions between the individual data storage means and the computer unit, and/or neighbouring cells, and/or cells which comprise data which is stored in the system in a redundant manner.

In addition, it is possible to use cells which can interchange additional data which is used for the data access and the data management. Thus, the information for data access and data management to be transmitted in the inventive system is reduced further.

The cells in special data storage means can be designed in such a manner that the parameters of data transmission between the individual data storage means and the computer unit are identical for the cells of a data storage means in order to achieve a consistent data access for the individual data storage means.

It is also possible to use computer units which output data for storage in the data storage means and/or process data stored in the data storage means in order to relieve the data storage means.

For processing the data independent of the inventive system, the computer units can also be connected with one or several users in order to transmit the data from the data storage means and/or to be controlled by the user. Such a user is preferably a personal computer, and/or a central processing unit of a computer and/or another data storage means.

In this manner, the computer unit can also be a system which provides Internet services such as e.g. data base access operation and computer games. The computer unit can also be suited to immediately access individual cells of the data storage means, which relieves the individual data storage means of data access and data management tasks.

In particular, the prespecified parameters of data transmissions between the individual data storage means and the computer unit can comprise the duration of the transmission, and/or the fault rate, and/or the duration of data processing operations of the individual data storage means prior to the transmission of the data. In this manner, data can be accessed more rapidly and data is provided which is less faulty.

The individual components of the inventive system according to an embodiment of the present invention are connected with each other via data transmission means, which can comprise electrically conductive connections, and/or bus systems, and/or computer networks, and/or wired or wireless (mobile) telephone networks, and/or the Internet. The present invention is thus suited for each computer structure and arrangement as well as for each computer system which utilises distributed and networked means.

When using the present invention, it is therefore possible to build a database system or a computer structure for data access and data management with an inventive database system or an inventive computer structure being able to be built from components which are arranged locally in a neighbouring relation.

Moreover, the present invention can be used in a system for a computer game which is provided via the Internet. In this case, it is to be preferred that at least one computer unit is an Internet service provider in order to integrate the present invention into existing computer structures of the Internet and in order to enable Internet users an inventive access to the data.

In particular, the invention is suited for interactive computer games for use by at least two users in order to ensure an optimised supply of the individual user with data required for the computer game, whereby each user can be connected with one computer unit.

4

Preferably, data for executing the computer game is transmitted from the computer units to the users so that the computer game can also be carried out—at least partially—independent of the computer units. Another relief of the computer units and the data storage means can be obtained if the users process the received data for executing the computer game and transmit it back to the corresponding computer units.

Moreover, the inventive system for a computer game can comprise additional means for the detection of prespecified parameters of the data transmission between the computer units and the respectively connected users in order to additionally optimise the data access and the data management. Preferably, these prespecified parameters comprise the duration of the transmission, and/or the fault rate, and/or the duration of data processing operations of the individual computer units and/or the individual users prior to the transmission of the data.

It is thus possible to store the data for executing the computer game in a redundant manner also as a function of the determined prespecified parameters of the data transmission between the computer units and the users which are connected therewith.

Furthermore, the computer units can receive control data for executing the computer game from the respective users in order to enable improved interactions of the individual users.

This control data or equivalent data can then be output by the computer units to the data storage means. In this manner it becomes possible that the computer units process data for executing the computer game, depending on the control data, and/or the data storage means process data for executing the computer game, depending on the control data or on data equivalent to the control data, whereby a more efficient data access and a more efficient data management is achieved.

Similarly, with a method of the present invention, data is stored in a redundant manner in at least two of at least two data storage means depending on determined parameters of the data transmission between the data storage means and computer units, with the access to the stored data by the computer units being effected as a function of the determined parameters of the data transmission.

The data access and the data management are preferably controlled by the data storage means.

In an embodiment of the inventive method the redundantly stored data are copied among each other by the data storage means as a function of the determined parameters of data transmissions between the individual data storage means and the computer unit and deleted in the data storage means in which the copied data has been stored beforehand.

In addition, it is possible to process the stored data by the data storage means independent of the computer unit in order to relieve individual means and to achieve a higher reliability of the inventive method.

In order to achieve an application-specific and thus optimised storage of the data can be divided into data subsets, with the data subsets to be stored in a redundant manner being stored in cells of the individual data storage means. Preferably, the division into data subsets and the storage in cells is carried out as a function of the data transmission parameters.

A further optimisation can be obtained if additional data for data access and data management is stored in the cells, which relate to the parameters of data transmissions between the individual data storage means and the computer unit, and/or neighbouring cells, and/or cells which comprise the data redundantly stored in the system.

Moreover, additional data for data access and data management can be exchanged between the cells of the data storage means. Preferably, the access to data of cells of a data

US 7,904,680 B2

5

storage means has identical data transmission parameters in order to ensure a consistent data access for the individual data storage means.

For the relief of the entire system it is also possible that the computer unit outputs data for storage in the data storage means and/or the data stored in the data storage means is processed by the computer unit.

The data is preferably transmitted by the computer unit to a user and/or the computer unit is controlled by the user in order to process data independent of the execution of the inventive method and to additionally control the sequence of the inventive method. The inventive method is thus capable of providing Internet services.

In order to achieve a more efficient data access and a more efficient data management, the access can also be made directly to the data of individual cells of the data storage means.

Further it is to be preferred that the determination of the prespecified parameters of data transmissions between the individual data storage means and the computer unit comprises the determination of the duration of the transmission, and/or the fault rate, and/or the duration of data processing operations of the individual data storage means prior to the transmission of the data in order to access data more rapidly and/or reliably.

In this manner it is possible to provide a method for a database system or a computer structure as well as a method for an Internet computer game wherein in the latter case the access to data in the data storage means preferably comprises the employment of an Internet service provider.

Moreover, the method can enable at least two users to access the computer game, with the computer game being an interactive computer game.

The data for executing the computer game from the computer units can be transmitted to the respective users. Preferably, the data received by the users are processed by the users and transmitted back to the corresponding computer units in order to relieve the computer units and the data storage means and to optimise the execution of the computer game.

In another embodiment, prespecified parameters of the data transmission between the computer units and the respective users connected therewith are determined in addition, in order to carry out the data access and the data management with the inventive method also under consideration of these parameters.

It is further to be preferred, that the determination of the prespecified parameters of data transmissions between the computer units and the users which are connected therewith comprises the determination of the duration of the transmission, and/or the fault rate, and/or the duration of data processing operations of the individual computer units and/or the individual users prior to the transmission of the data.

In this manner the redundant storage of the data for the execution of the computer game can also be carried out as a function of the determined prespecified parameters of the data transmission between the computer units and the respective users connected therewith.

A more efficient execution of interactive operations of the computer game can be achieved if control data for the execution of the computer game is additionally transmitted by the users to the corresponding computer units. Preferably, the control data or equivalent data from the computer units is also transmitted to the data storage means.

Finally, it is possible to process the data for executing the computer game as a function of the control data from the computer units and/or to process the data for executing the computer game as a function of the control data or the data

6

equivalent to the control data from the data storage means. In this manner, the individual users are relieved and the redundantly stored data is processed by the data storage means which ensure a desired data transmission.

By an inventive replacement of individual failed cells it is possible to compensate for connection errors and in the case of a failure of individual areas of a distributed networked computer structure to utilise areas which retain the functionality of the entire computer structure, in that data is present in the computer system in a redundant manner. Due to the fact that the invention allows for monitoring the used data, the consistency of the available data is also ensured in this manner.

Furthermore, the use of the present invention automatically optimises the connection quality between clients and data providing means of a computer structure so that poor transmission qualities (e.g. low transmission rate, lags, . . . ) are automatically compensated.

For this purpose, individual area of a distributed networked computer system, e.g. individual memory areas, are scaled without interruption of the operation. This means that such individual area of the inventive system can be added or removed at any time.

The present invention also enables to replace individual failed cells of a distributed networked computer system by other areas without interruption of the operation. This is possible because the invention does not require a central connection between individual areas of the computer system, which prevents limitations of the functionality of the inventive system due to failures (e.g. technical defects). In addition, the invention ensures a higher data integrity because the data is not stored centrally.

It is also possible to reduce the quantity of the data to be managed by individual areas of a networked distributed computer system in this manner. The consequence of this is that the required transmission capacities between individual areas of the inventive system can be reduced, too.

Moreover, further components can be added to the inventive system without having to modify its principal structure.

The inventive approach did in fact originate in particular in the solution of the above mentioned problems in the realisation of (interactive) computer games for the Internet. However, it must explicitly be emphasised that the present invention is not limited to such applications, but can be employed for any computer system and any computer structure utilising distributed networked means which provide data.

IN THE DRAWINGS

FIG. 1 is a schematic representation of a preferred embodiment of a computer structure according to the present invention;

FIG. 2 shows a schematic representation of a data structure as well as its division and assignment to cells according to the present invention;

FIG. 3 is a schematic representation of another preferred embodiment of a computer structure according to the present invention; and

FIG. 4 is a schematic representation of a section of the preferred embodiment of FIG. 1 for the explanation of operations, which are used for executing the invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The terms used in the following text will now be explained with reference to FIGS. 1 and 2.

7

8

The entire data quantity GD which is used in the context of the invention is divided into individual data subsets which are referred to as field F.

The position of each field F in the entire data quantity GD is described by a unique field position or identification FeldIF (fieldID), with the entire data quantity GD being capable of being divided one or multi-dimensionally. If, for example, the entire data quantity GD is divided three-dimensionally, each field position FeldID can be described by x, y, z.

A cell Z is the smallest unit for data storage which stores exactly one field F. A cell Z also contains other information which will be covered in detail later.

A cluster C comprises one cell Z or is an accumulation of several cells Z. A cluster C can, for example, be formed by an individual computer or an integrated circuit which manages individual or several cells Z. Moreover, a cluster C can operate as a higher-level control unit for the cells Z contained in it.

All clusters C which are combined for the representation of the entire data stock GD form a cluster pool or a cluster compound CV. The individual clusters C are connected via a network N, with each cluster C having a unique address. A cluster compound CV can thus be formed by networking individual computers forming clusters and/or by connecting individual integrated circuits forming clusters.

Within the cluster compound each cluster is identified by a unique identification ClusterID which can be a single number or a tuple. Individual clusters in the compound contain a table of their neighbours (neighbour table) in order to be able to relay certain messages to certain clusters. In this context, a neighbour is another cluster with a next higher or lower identification ClusterID. The number of cells Z which belong to a cluster can vary between 0 and an upper limit maxcc, where maxcc can be different for each cluster C in the cluster compount CV. The number of cells Z which are actually included in a cluster C is indicated as ncc. In addition, each cell Z has a unique identification ZellID (cellID) within a cluster C.

Moreover, cells Z of a cluster C can exchange information among each other without sending messages via the network N, which enables a reliable message transmission within a cluster C. In addition, it is to be preferred that all cells Z of a cluster C are provided with the same connection quality, i.e. though the connection to the network N can be different between the individual clusters C, it is the same for all cells Z of a cluster C.

As described, a cluster C comprises between 0 and maxcc cells Z. Each memory location of a cluster C which can store a cell Z is referred to as slot S. A slot S can be full, i.e. it stores the data of a cell Z, or empty, i.e. it represents no cell Z. Therefore, the clusters C from FIG. 2 comprise only one full slot S each. The identification SlotID of each slot S corresponds to the identification ZellID which a cell Z would be assigned in this memory location.

A client CL (e.g. Internet provider, personal computer, network computer, and the like) is a unit communicating via the network N which requests data, processes data and/or orders to store the modified data. In the present invention, no assumption whatsoever concerning the actual realisation of the network N is made. As network N any means which transmit data can be employed, such as e.g. proprietary busses, local networks, or the Internet. The invention does also not assume that the network N ensures the transmission of all data, so that acknowledgements concerning a data transmission to the respective sender are not required, and that the network N transmits data according to its sending time.

As will be presented in the following and is shown in FIG. 2, the invention is based, among other things, on a distribution of the entire data GD or the fields F, respectively, to several

cells Z of identical contents, i.e. a single field F is stored in several cells Z in a redundant manner. The Number of cells Z which store and manage a certain field F is specified as nm and is the same throughout the entire cluster compound CV, with each of the nm cells Z being referred to as mirror SP for the field F which is stored in the nm cells Z. In the following explanation of the invention nm=3 is assumed, with this value serving only for illustrating the invention and to be specifically selected for each application case.

A response AK is the response to a request RQ. The contents and function of the individual requests RQ and responses AK depends on the transmitted data.

A message MSG is a data quantity which is exchanged between cells Z, clusters C and clients CL. It is the task of the network N to transmit the messages MSG. Due to the fact that the sender of a message MSG does not receive an acknowledgement of a successful transmission, messages MSG can get lost. It is also possible that two messages MSG arrive at a destination after different times. Now the principal procedure with the present invention and individual actions or operations, respectively, for carrying out the invention will be described.

The entire data quantity is divided into individual fields F. Such a division can, for example, be effected two-dimensionally or three-dimensionally. For example, a chessboard could be divided into 8*8 fields F, with each field F containing the information on the respective chessboard square, e.g. which chess piece is located there. Analogously, a three-dimensional space, too, can be represented by fields F. It is also possible, however, to divide an image into individual image areas or a text into individual words or character(s) (strings) which are assigned to individual fields F. The contents of the fields F is application-specific and is not relevant in the present invention. The individual fields F are then stored in nm cells Z, with each cell Z storing a corresponding field F, i.e. the actual data, as well as further information which preferably relates to references to neighbouring fields F. This information permits a data reduction because in this manner, "empty" fields F need not be stored and not each field F must be assigned a cell Z.

Several cells Z are then combined to a cluster C, and all clusters C in turn are combined to a cluster compound CV. An essential characteristic of the invention is that each cell in the cluster compound CV is available in a redundant manner, i.e. nm times in nm clusters C. Thus, each field F is nm times stored in these cells Z, and each of these cells Z is referred to as mirror SP with respect to the field F stored therein. In addition, each cell Z contains information in which clusters C and/or in which cells Z of the corresponding clusters C the other nm−1 cells Z are located.

In addition, each cell Z contains further information which preferably comprises indications on the data transmission quality in the cluster compound CV and with respect to the clients CL, e.g. transmission quality, transmission rate, and the like. This information is updated when the cells Z are accessed.

In order to receive the contents of a field F, a client CL sends a request via the network N to all cells Z and/or clusters C, which include the desired field F, i.e. to all cells Z which are mirrors SP of the desired field F. It depends on the parameters of the data transmissions to the individual cells Z and/or clusters C as well as back to the clients CL, from which cell Z or which cluster C the requesting client CL will receive a response. Preferably, the requesting client CL receives a response from the cell Z and/or the cluster C, which realise the fastest data transmission at the respective time and/or which

US 7,904,680 B2

9

are capable of carrying out a processing of the data more rapidly prior to its sending to the requesting client CL.

All cells Z and/or clusters C and/or clients CL periodically check their applicable parameters for data transmissions. In periodic intervals or subsequently to specified actions, all cells Z and/or clusters C and/or clients CL check the parameters for data transmissions, which are applicable to the used cells Z. If the checked parameters do not meet specified limits, or if other cells Z and/or clusters C comprise better data transmission parameters, the checking cells Z will try to shift its data to these other cells Z and/or clusters C in order to improve the data transmission parameters applicable for this data. In this manner, the inventive cluster compound CV optimises itself automatically during operation with respect to data transmissions.

Certain requests of a client CL, such as e.g. a write request WriteRQ as described below are synchronised between all mirrors SP of the respective field F. In this manner, failed mirrors SP are identified. In addition, extra checks are carried out at periodic intervals and by clients CL after the receipt of responses AK. This, too, identifies failed mirrors SP and/or mirrors which are no longer relevant. These mirrors SP are either replaced by other mirrors SP, or a cell Z or a cluster C or a client CL substitutionally generates new mirrors SP, or the present defects are remedied by means of methods described below. In this manner, the cluster compound CV is fault tolerant against the failure of individual cells Z and/or whole clusters C.

In addition, requesting clients CL can assign individual cells Z and/or clusters C special processing functions which are executed independent of the mode of operation of the clients CL. A client CL, for example, can instruct a cell Z or a cluster C to change the data of a field F in certain intervals. This characteristic is of particular importance if the present invention is employed in connection with computer games which are executed under real-time conditions via a network, e.g. the Internet, in order to reduce the data quantities to be transmitted and to optimise the interactive operations in the execution of a computer game.

Data between the individual clients CL, clusters C, and cells Z are transmitted by using a certain protocol. This means that in addition to the transmitted data, further prespecified data are sent and received by the individual clients CL, clusters C, and cells Z in order to initiate desired operations or to react in a desired manner as described below. AU clients CL, clusters C, and cells Z carry out the necessary operations in order to achieve the desired functionality of the corresponding cluster compound CV. If the invention is employed as shown in FIG. 1 for providing computer games via the Internet, then the network N is the Internet and the client CL is the computer system which operates as Internet provider. The individual clusters C comprise memory units of the client CL and storage means of other computer systems which are distributed over the computer system. Due to the fact that generally only one connection exists between a client CL (Internet service provider) and a corresponding user B, usually via a telephone line, the user B and the client CL (Internet provider) form a system to be regarded as consistent at that time. For this reason, the user B from FIG. 1 is not shown in FIG. 4. An inventive optimisation of the data transmission to the users B were possible only if the user B had a simultaneous access to different Internet providers. With the current state of the art, the present invention permits an optimisation of the data management and transmission for clients CL operating as Internet providers if these access e.g. the data required for an interactive computer game, with several players via the Internet in accessing other computer systems operating as

10

clusters. As shown in FIG. 3, the invention can also be employed in a consistent computer structure such as in a personal computer PC. In this case, the central processing unit CPU operates as client and the various data managing means MEM1, MEM2, MEM3 operate as clusters. The data managing means MEM1, MEM2, MEM3 can be conventional storage means, e.g. non-volatile memories or random access memories, but also special means which e.g. do not only store but also process data and which can therefore not provide the central processing unit CPU with data without restrictions and at any time.

A cell Z can assume five states, with each status being always possible because the cells Z are not fault tolerant and the network N does not ensure and check data transmissions.

Active status (active): The contents of the cell Z are valid and the cell Z is ready for operation.

Invalid status (invalid): The cell Z is ready for operation but its contents are no longer current and valid. This can occur, for example, if the cell Z has not carried out data operations because of a technical defect or because of not received information.

Inactive status (inactive): The cell Z is not available, e.g. because data transmissions to it are permanently lost or because the cell Z has permanently failed.

Blocked status (blocked): The cell Z processes only certain data transmissions, such as e.g. the write requests WriteRQ or read requests ReadRQ described below.

Idle status (idle): The cell Z is ready for operation, but is currently not used in the cluster compound CV.

A cell Z contains a certain field F, i.e. a field F with a certain field position FeldID (fieldID) and has a unique position ZellID (cellID) within the corresponding cluster C. The cluster in turn is identified by a unique identification with the form ClusterID:ZellID. Each cluster C and each client CL is uniquely identified in the cluster compound CV by an identification ClusterID, ClientID, respectively. No particular requirement are placed on these identifications, they only have to provide for a unique identification of the cluster C and the clients CL.

In the following, a number of algorithms will be described in more detail which are utilised by the functional operations described further below which serve for the execution of the invention. This explanation is supplemented by corresponding pseudocodes which are used in the currently preferred embodiment of the invention.

In order to be able to assign messages MSG, i.e. data transmissions in a unique manner to individual operations, each message MSG is given a ticket number TNr which is generated upon sending. As long as the respective operation is not completed, all clients CL, cells Z, and clusters C involved can associate the message MSG with the corresponding operation by the ticket number TNr in a unique manner. For obtaining unique ticket numbers TNr, a ticket number TNr can, for example, be combined by the sending time of the message (or from a continuous counter generated in the cell) and the sender's identification. Due to the fact that the sender's identification is unique and the sending times of two messages MSG are different, each message MSG can be assigned the respective operation in a unique manner. Unique ticket numbers TNr, however, can be generated depending on the most different applications of the invention in other ways.

Pseudocode for the Generation of a Ticket Number TNR:
function makeNewTicket:longword;
begin
a:=laufender_zaehler; (continuous counter)
inc(laufender_zaehler); (continuous counter)
b:=own_adress;

US 7,904,680 B2

11

makeNewTicket:=<combination from a and b, e.g. by shifting>
end;

If a cluster C receives a message MSG which is destined for another cluster C, i.e. the ClusterID of the destination address of the message MSG does not correspond to the address of the receiving cluster C, then the receiving cluster C relays the message MSG to the cluster C for which the message MSG is intended. The way in which the message MSG is relayed depends on the actual realisation of the network N, and/or the clusters C, and/or the clients CL, and/or the data transmission protocol, and/or corresponding data included in the message MSG. A message MSG is also relayed if a cell Z receives the message MSG which is intended for another cell Z.

Each cell Z contains information on neighbouring cells Z and, on the basis of this information, checks whether a desired cell Z is located within the current cluster C. If this is not the case, preferably the cell Z is selected from all neighbouring cells Z of the current cluster C which is the most neighbouring cell with respect to the cell Z. If several cells Z meet this requirement, a cell Z can be selected at random.

Optionally, with each relay of a message MSG a step counter may be incremented by one step. With each step, the respective cluster C sends a holding response HalteAK (holdingAK) to the sender of the message MSG in order to inform same that his request RQ is still being processed. If the sender does not receive such a holding response HalteAK in this case, then the sender can assume that its message MSG has been lost. The sender can then direct its message MSG e.g. to the last cluster C which has sent the last received holding response HalteAK.

There is no reliable method for transmitting messages MSG and for ensuring that the messages MSG have been received because the network N need not guarantee data transmissions so that messages MSG (e.g. requests RQ and responses AK) can get lost any time.

In order to ensure a higher degree of reliability of the transmission of certain data, a pseudoreliable message PSM can be used. In this case, the pseudoreliable message PSM is sent repeatedly until a loss of the message is improbable. Only then it is assumed that the transmission has failed.

If one assumes a probability of 1/n with which any message MSG can get lost, then a pseudoreliable message PSM must be sent x times so that the probability $p=(2/n)^x$ with which the message has been lost is sufficiently small. With a missing response AK it can then be assumed that the recipient has failed.

Pseudocode for Sending a Pseudoreliable Message PSM:
```
procedure psm_send(message:TCellMsg; d1,d2,d3:Tadr;
next_status:TCellStatus);
  var i:byte;
  begin
  //the psm_variables are temporary variables of the
  //respective cell
  psm_timeout:=false;
  psm_nextstatus:=nextstatus;
  psm_ticket:=message.ticket;
  psm_num:=num;
  psm_dest[1]:=d1;
  psm_dest[2]:=d2;
  psm_dest[3]:=d3;
  for <all present i> do begin
    psm_received[i]:=false;
    psm_sendtime[i]:=curr_time;
    psm_nrSended[i]:=0;
  end;
  <complete further fields of the message, if applicable>
```

12

```
  psm_m:=message;
  message.dest=d1; send(message);
  message.dest=d2; send(message);
  message.dest=d3; send(message);
  status:=cs_psm_waiting;
  end;
```
In order to check whether a cell is waiting for the acknowledgement of a pseudoreliable message PSM, the following pseudocode is used:
```
  <process if cell waits for PSM input>
  begin
  if (status=cs_psm_waiting) and (message is Aknowledge)
  then begin
    if message.ticket<>psm_ticket then exit;
    sender:=psm_destination(message);
    //check if ak_hold
    if (sender<>0) and (message.command=ak_hold) then
      begin
        <extend waiting time>
        exit;
    end;
  if sender<>0 then begin
    //note message in psm_MsgIn[sender]
    psm_msgIn[sender]:=message;
    psm_received[sender]:=true;
    exit;
  end; //status=cs_psm_waiting
  end;
```
The corresponding cell Z must check whether all responses AK have been received when it executes its update procedure. The corresponding status (cs_psm_waiting) must be processed there. It must then be decided whether all responses AK have been received and, if not, if waiting is to be continued:
```
  procedure update;
  . . .
  case status of:
  <processing of other status values>
  cs_psm_waiting:
    begin
      if 
      begin
        status:=psm_next_status;
        exit;
    end;
    <check here for timeout, and if required, resend
    one or several PSM requests>
    //check for timeout of all cells
    if <waiting time for addressees elapsed> then
    begin
      status:=psm_nextstatus;
      psm_timeout:=true;
    end;
  end;
  . . .
  end;
```
The self check is the central operation in order to ensure the consistency of all mirrors SP of a compound for a field F. A self check is initiated by a requesting third party, e.g. a client CL or a cluster C. A mirror SP which carries out a self check causes that the other mirrors SP of the compound also carry out a self check. A self check by a mirror SP can result in a fault correction by this mirror or another mirror SP. Depending on how unreliable the network actually is (loss of messages, lags), it may be impractical to make the PMS virtually reliable. The individual operations (such as adding a new mirror, etc.) should be fault tolerant to a certain degree. The

US 7,904,680 B2

13

case that a message, though classified as not delivered, is delivered nevertheless is very improbable with PMS but not impossible. Therefore corresponding fault corrections must be provided.

If a mirrors SP receives a self check request SelbsttestRQ (self checkRQ), it begins a self check under the same ticket number TNr, provided it is not just carrying out a self check which has been initialised by another self check request SelbsttestRQ and if the ticket number TNr of the currently received self check request SelbsttestRQ differs from the last received check request SelbsttestRQ.

If a requesting third part sends a read request LeseRQ (readRQ) described below, the execution of a self check is necessary only if the requesting third party receives inconsistent responses AK from the corresponding mirrors SP of a field F which the requesting third party intends to read.

The requesting third party compares the responses AK received from the mirrors SP and—under the assumption of the above described three mirrors SP for one field F—with three responses AK accepts the result. With two response AK it initiates a self check and accepts the result. With only one response AK it initiates a self check and rejects the result.

If a self check request SelbsttestRQ has been received or a self check has been initiated by other system-related default, e.g. timeout, the corresponding mirror SP must check its own validity and is either responsible for the fault correction itself or instructs another mirror SP to perform the fault correction. In the selection of a mirror SP for the fault correction it is to be attempted that always only one mirror SP carries out the fault correction, even if several mirrors SP perform a self check quasi simultaneously, in order to avoid inconsistent conditions.

In this context, the mirror SP sends a validation request ValidierRQ (validationRQ) to all other mirrors SP. The exchange of the corresponding data is done by using pseudoreliable messages PSM. If no response AK is received, the destination is declared unavailable. The failed mirror SP is then replaced by a new one.

Pseudocode for Carrying Out a Self Check SelbsttestRQ:

A mirror starts a self check if it receives a corresponding message:

```
rq_start_selfCheck:
  begin
    if not used then exit;
    if (status< >cs_idle) then begin
      return_msg(m,ak_busy);
      exit;
    end;
    start_selfcheck;
    exit;
  end;
```

Alternatively or supplementary the self check can also be carried out automatically at certain intervals. For this purpose, the checking mirror SP sends a corresponding request to all other mirrors SP:

```
procedure start_selfCheck;
var m:TCellMsg;
begin
  <Optional: last_intervall_selfcheck:=current_time>
  m.cmd:=rq_validate;
  m.lifecount:=lifeCount;
  m.data:=data;
  m.ticket:=makeNewTicket;
  psm_send(m,mirror[1 . . . nm−1],cs_selfCheck_check);
end;
```

Each cell Z must be capable of responding to validation requests:

14

```
rq_validate:
begin
  if not used then begin
    if <cell just becomes mirror> and
    <request from future mirror> then
      return_msg(m,ak_valid);
      exit;
    end;
    return_msg(m,ak_noMirror);
    exit;
  end;
if message_is_from_mirror(m) then
begin
  <enter own mirrors in message>
  if message.lifeCount=lifeCount
    then return_msg(m,ak_valid)
    else if m.lifeCount>lifeCount then
      begin
        lifeCount=m.lifeCount;
        <take data from mirror>
        return_msg(m,ak_valid);
      end
    else return_msg(m,ak_invalidLC);
  end
else return_msg(m,ak_noMirror);
  exit;
  end;
```

After the checking cell Z has either received all responses AK or the time has elapsed, it reviews the result of the self check:

```
procedure do_final_selfCheck;
var i:integer;
m:tcellmsg;
s:string;
begin
  sc_res:=' ';
  for i:=1 to nm−1 do begin
    if (not psm_received[i]) then begin
      sc_res[i]:=' ';
      psm_msgIn[i].cmd:=rq_none;
    end else begin
      case psm_msgIn[i].cmd of
      ak_valid: sc_res[i]:='V';
      ak_invalidLC: sc_res[i]:='D';
      ak_noMirror: sc_res[i]:='I';
      end;
    end;
  end;
  //review result now:
  if sc_res='VV' then begin
    status:=cs_idle;
    <further initialisations after completed self check>
    exit;
  end;
  if (sc_res='VD') or (sc_res='DV') then begin
    <take over data from D sender>
    status:=cs_idle;
    <further initialisations after completed self check>
    exit;
  end;
  if (sc_res='DD') then begin
    <take over data from D sender>
    status:=cs_idle;
    exit;
  end;
  if (sc_res='VI') or (sc_res='IV') or
    (sc_res='DI') or (sc_res='ID') or
```

**15**

```
(sc_res='V') or (sc_res='V') or
(sc_res='D') or (sc_res='D')
then begin
  <further checks, if required>
  if (sc_res[1]='D') or (sc_res[2]='D')
    then <take over data from D sender>
  <Set: no response='D'>
  if <this mirror is responsible> then
    <find a new mirror>
  else
    <send order to find a new mirror to responsible mir-
    ror>
  exit;
end;
if (sc_res='11') then begin
  <initialise cell>
  used:=false;
  exit;
end;
if (sc_res='I') or (sc_res='I') then begin
  status:=cs_idle;
  exit;
end;
if (sc_res=' ') then begin
  <optional: find nm−1 new mirrors>
  status:=cs_idle;
  exit;
end;
end;
```

Assuming a mirror compound of three mirrors SP, the following cases can be distinguished for the receipt of no, one, or two responses AK at the mirror SP which sends the validation requests ValidierRQ (validateRQ) to the two other mirrors SP of the compound, which are listed in the table below, with the incoming responses AK being classified as follows:

"V" (valid): The sending mirror SP accepts the receiving cell Z as mirror SP, and the life counters of the sender and the recipient have the same value.

"D" (delayed): The sending mirror SP accepts the receiving cell Z as mirror SP, but the life counter of the sender has a lower value than the life counter of the recipient.

"I" (invalid): The sending mirror SP does not accept the receiving cell Z as mirror SP.

| ase | Incoming responses AK | Status of mirror compound |
|---|---|---|
| 1) | VV | Both receiving mirrors SP are valid: The mirrors of the compound have consistent and current data so that no further operations become necessary. |
| 2) | VD | The requested mirror SP sending a "V" is valid and the requested mirror SP sending a "D" has a higher life counter value. The requesting mirrors SP must take over the data of the requested mirror SP sending a "D". |
| 3) | DD | Both receiving mirrors SP have life counters with higher values: The sending mirror SP is invalid and must take over the data of the mirror SP sending a "D". |
| 4) | VI | a) The requested mirror SP sending a "V" receives an "I" from the requested mirror SP sending an "I": The requesting mirror SP and the requested mirror SP sending a "V" are valid, the requested mirror sending an "I" is invalid and is to be removed from the compound. The mirror SP with the lowest index must find a new mirror SP. b) The requested mirror SP sending a "V" receives a "V" from the requested mirror SP sending an "I": |

**16**

-continued

| ase | Incoming responses AK | Status of mirror compound |
|---|---|---|
| | | The requested mirror SP sending an "I" is inconsistent and must be removed from the group (see detailed explanation in the following). The mirror SP with the lowest index must find a new mirror SP. |
| 5) | DI | The requesting mirror SP takes over the data of the mirror SP sending a "D". Otherwise the procedure corresponds to case (4). |
| 6) | II | The requesting mirror SP is in the minority and is declared invalid. |
| 7) | V- | A requested mirror cannot transmit data: The mirrors SP of the two working mirrors SP with the lower index must find a new mirror SP. The failed mirror SP is treated like to mirror SP sending an "I" in cases (4) and (5). |
| 8) | D- | One requested mirror cannot transmit data and the other requested mirror SP has a life counter with a higher value: The requesting mirror SP takes over the data from the working requested mirror SP, and the mirror SP with the lower index must find a new mirror SP. The failed mirror SP is treated like to mirror SP sending an "I" in cases (4) and (5). |
| 9) | I- | One requested mirror SP is invalid and the other requested mirror SP has failed: The requesting mirror SP is in the minority, remains active, but does not find new mirrors SP. |
| 10) | -- | Both requested mirrors SP do not transmit data or the network connection of the requesting mirror has failed: Alternative 1: The requesting mirror SP remains active, but does not find new mirrors SP. Alternative 2: The requesting mirror SP ensures by additional checks that its connection functions properly and replaces the two mirrors. The two requested mirrors SP do not receive any information to this effect and will later exclude the requesting mirror SP. This case must be compensated by the operation DoubleFieldCheck described below. |

In those cases in which a new mirror SP is to be found, a new mirror SP is found by one of the remaining mirrors SP, with only one mirror being allowed to do this task. A mirror must be selected, e.g. the one with the lower index. The other mirror SP with the higher index does not execute any operations, but will receive messages MSG after some time which indicate the integration of a new mirror SP into the compound.

If a mirror SP has physically failed, it is either possible that no requests RQ were made to the mirror compound in the meantime, i.e. that its failure has not been noticed and has not brought about any impacts, or that the two other mirrors SP have declared it invalid in the meantime and found a replacement mirror. If a restart operation is carried out, such a condition can be determined. For this purpose, the starting mirror SP carries out a self check as previously described.

In the present invention the life counter is a counter which is incremented by integer values. In order to prevent an overflow of the life counter the life counter of all clients CL, cells Z, and clusters C is periodically adjusted, i.e. set to a lower common value.

For this purpose, the adjustment is initiated from any mirror SP, e.g. from the mirror SP with the lowest life counter value. All mn mirrors SP of a field F wait for the receipt of all nm−1 responses AK (PSM). Only if all nm−1 responses AK are received, the respective mirror SP carries out an adjustment of the life counter.

When adjusting the life counter, attention has to paid that the interval between two adjustments is selected in such a manner that mirrors SP which have been replaced in the

17                                                                      18

meantime do not become valid again upon a restart. Preferably an additional memory is used for this purpose in which the value of the last life counter is stored where a mirror SP has been replaced.

In the case of pseudoreliable messages PSM, too, faults can occur. It is true that the parameters for pseudoreliable messages PSM can be selected in such a manner that faults are improbable to such an extent that they virtually do not occur in the selected application. This can, however, lead to the result that the application is actually no longer practicable. With respect to the parameters for pseudoreliable messages PSM it might be necessary to make compromises so that faults occur due to faulty pseudoreliable messages PSM, which must be corrected.

For this reason, the communication of the cells Z or the mirrors SP, respectively, among each other must be designed in such a manner that these faults remain without consequences or are corrected. This is done, e.g. by the use of a self check SelfCheck.

The operation DoubleFieldCheck described in this section serves to correct faults which have been caused by communication errors with pseudoreliable messages PSM. Such faults cause mirror compounds to duplicate, i.e. that more than nm mirrors exist for one field.

The operation DoubleFieldCheck can be carried by one or more mirrors SP in an interval t_DoubleFieldCheck. Each client CL can initiate an operation DoubleFieldCheck if it receives responses AK from mirrors SP whose references to other mirrors SP are not consistent.

The operation DoubleFieldCheck removes additionally generated mirror compounds in order to restore the desired condition of nm mirrors SP per one field F. For this purpose, a manager for the operation DoubleFieldCheck is selected. This can be any cell Z (also of the mirror compound) or a client CL (e.g. the client which detected the error situation). Optionally, the manager sends a request RQ to the network to which all cells Z respond which are responsible for a certain field F, whereby also additional mirror compounds are detected. The manager then decides which cells Z belong to the valid mirror compound and sends a delete request DeleteRQ to all other cells Z. Optionally, the manager sends a request rq_updateTable to all remaining mirrors SP for updating their mirror tables.

If individual cells Z do not receive the delete request DeleteRQ, they will be deactivated upon the next self check SelfCheck and/or the next operation DoubleFieldCheck.

In order to decide which cells Z belong to the valid mirror compound various algorithms can be employed. In the following, examples for this are shown which can also be combined.

One possibility is to introduce a generation counter which is incremented each time a new mirror SP is added to the compound. In the case of mirrors SP with a doubly existing index, the mirror SP with the higher/lower generation counter will be removed. It is also possible to declare the mirror compound valid which was last write-accessed. Furthermore, the validity of a mirror compound can also be decided as a function of any other properties (e.g. geographic position of mirrors SP). If only one single mirror SP is detected as working properly e.g. by a client CL, it is possible that the error is with this mirror SP and not with the nm−1 other mirrors SP. In order to exclude this possibility, an additional safety check should be carried out for ensuring the correct function of the single mirror SP before same replaces the other mirrors SP. It is thereby prevented that the single operating mirror SP erroneously activates additional mirrors SP.

With actually only one mirror SP still working, nm−1 new mirrors SP are to be added. First, the working mirror SP must check or ensure, respectively, the function of its own data transmissions. Then nm−1 new mirrors SP are requested by a request rq_needNewCells. All nm−1 new mirrors SP are sent a request to become mirrors. It is thereby not necessary to evaluate the responses AK immediately, because any faults will be corrected by later self checks SelfChecks (this sequence approximately corresponds to the addition of a new field F, with the difference that only nm−1 cells Z are found and that the mirror manager in this case is identical with a mirror SP).

In the following sections the data exchange between clients CL, cells Z, and clusters C is described which is preferred for providing the inventive "active" cells. In particular, the following operations are employed with reference now being made to FIG. 4:

Find operation (find): Finding of a cell Z which includes a desired field F.

Read operation (read): A client CL reads the contents of a field F from a mirror SP.

Write operation (write): A client modifies the contents of a field F in all associated mirrors SP.

Add operation (add): Adding of fields F which previously have not been in the cluster compound CV.

Delete operation (delete): Deletion of a field F in the cluster compound CV.

By sending a find request FindRQ a client CL determines the position of the cells Z which include a desired field F and are thus mirrors SP for the desired field F. The addresses of these cells Z include both the identifications ClusterID of the corresponding clusters C as well as the identifications ZellID of the cells Z themselves.

For obtaining the addresses of the cells Z which are mirrors SP for the desired field Z (e.g. field F8 from FIG. 2), the client CL requests any cluster C, e.g. cluster C6, whether one of its cells Z includes the desired field F8. If this is the case than the cluster C6 sends the corresponding cell identification ZellID as well as the cluster identifications ClusterID of all nm−1 cluster C which include mirrors SP of the desired field F8. As shown in FIG. 4, in this case these are the cell C4 in cluster C1 and the cell Z6 in cluster C3, i.e. in total the cells with the identifications ZellID C1Z4, C3Z6, and C6Z2.

If the requested cluster C, e.g. cluster C4, does not contain the desired field F8, the requested cluster C4 finds the cell Z among the cells Z included therein whose field position FeldID comes closest to the field position FeldID of the desired field F8. For this purpose, the cluster C can, for example, determine the sum of the absolute values of the difference between the cell position ZellID and all other neighbouring cell positions ZellID in order to select the cell Z where the absolute value of such a difference is minimal.

Due to the fact that cells Z contain information on neighbouring cells a cluster C can be found in this manner which comprises a cell Z with the desired field F8. The cluster C4 requested by the client CL relays the find request FindRQ to the cluster C found in this manner, e.g. to cluster C6. This operation is repeated until a desired cell Z has been found or until cells Z are not longer found which are neighbouring cells of the desired cell Z. Preferably, a step counter in incremented upon the relay of a find request FindRQ. With each increase of the step counter, the respective current cluster C sends a holding response HalteAK (holdingAK) to the client CL in order to inform same that his request FindRQ is still being processed. If the requesting client CL does not receive such a holding response HalteAK in this case, then it is to be assumed that its request FindRQ has been lost. In this case it

19

is to be preferred that the requesting client CL directs the request FindRQ to the cluster C again from which it has received the latest holding response HalteAK.

The find request FindRQ is successfully completed if the requesting client CL receives a destination identification ZielID (destinationID) for nm mirrors SP of the field F8. In the example shown in FIG. 4 the destination identification ZielID would comprise the cells C1Z4, C3Z6, and C6Z2. If the client CL does not receive a response AK, the find operation has failed.

In the following, the sequence is described which is executed for read requests ReadRQ and write request WriteRQ. With the read and write requests ReadRQ, WriteRQ, shown below it is necessary that the respective client CL knows the identifications of the mirrors SP which include the field F whose data the client CL wants to access. This is critical insofar as the identifications of the desired mirrors SP can change any time due to shifting of the mirrors SP. To prevent this, it would be basically possible to link each find request FindRQ with an operation LockRQ which prevents changes of the respective compound of the desired mirrors SP before the actual read and write reqeuests ReadRQ, WriteRQ have been received by the desired mirrors SP. This would, however, significantly reduce the efficiency of data transmissions between clusters CL and clusters C.

For this reason the approach with the preferred embodiment of the present invention is as follows. A client CL executes a find operation and notices the received positions of the mirrors SP which include the desired field F.

If a mirror SP includes read and write requests ReadRQ, WriteRQ with a field position FeldID for the desired field F, which does not correspond to the field position FeldID for the desired field F in the mirror SP, it informs the client CL accordingly. Furthermore, each mirror SP always or alternatively on request returns the positions of the other nm−1 mirrors SP to the requesting client CL. In this manner, a mirror SP can correct the identifications ID stored in it and, if required, can send a new find request FindRQ.

Pseudocode for carrying out a find request FindRQ:

```
rq_read:
begin
  if not used then
  begin
    <Optional: Return fault message to client>
    exit;
  end;
  message.data:=data;
  //Write own mirrors into the message
  for i:=1 to nm−1 do
    message.mirror[i]:=mirror[i];
  <complete further field>
  <storage of specifications for performance measurement>
  return_msg(m,ak_read);
end;
```

The request of a client CL is always directed to all nm mirrors SP:

```
message.command:=rq_read;
for i:=1 to nm do begin
message.destination:=spiegel[i];
<informationen für performance measurement in message,
  if req'd.>
send(message);
end;
```

Ideally the client CL buffers its own requests in order to be able to execute further actions (e.g. other requests) in the meantime, until the 1 . . . nm corresponding responses ak_read or a timeout arrives. After the elapse of the waiting

20

time TWLese (TWRead) the client CL must check how many responses have been received and whether the mirror tables of the responses are consistent:

```
if nr_al>nm then begin
<send request for DoubleFieldCheck to all senders>
exit;
end;
if nr_ak=nm then begin
if <Mirror tables consistent>
  then <use result from any response message[i]>
  else <send request for SelfCheck to all senders>
exit;
end;
if nr_ak>nm div 2 then begin
if <Mirror tables consistent> then <use result from any
  response message[i]>
<send request for SelfCheck to all senders>
exit;
end;
if nr_ak>0 then <send request for SelfCheck to all senders>
```

Preferably, the read requests ReadRQ and the write requests WriteRQ are sent via the network N to all clusters C in parallel, but depending on the network N used any other type of sending is possible.

Each mirror SP, e.g. the cell C1Z4, optionally relays a read request ReadRQ from a client CL to all other mirrors SP, i.e. to the cells C3Z6 and C6Z2 in this case, and each mirror SP then sends a response AK to the client CL. In this case, a mirror SP receives a further read request ReadRQ and because this has the same ticket number TNr as the previously received read request ReadRQ it will be ignored because this mirror SP has already sent a response AK to the requesting client CL.

When a read operation is executed the client CL requires the data of a certain field F, e.g. F8. For receiving this data the client CL must know the positions of the mirrors SP which are responsible for this field F8. This can be enabled by a previously executed find operation in order to determine the cells C1Z4, C3Z6, and C6Z2 operating as mirrors SP.

The client CL sends a corresponding read request ReadRQ with a unique ticket number TNr to all 3 clusters C1, C3, and C6 which include the mirrors SP which are responsible for the desired field F8.

The client CL waits for a predetermined application-specific time interval TWLese (TWRead) for responses AK of the requested mirrors SP which include the desired data. Each mirror SP acknowledges the read request ReadRQ with a response AK so that nm (i.e. 3 in this case) responses AK arrive at the requesting client CL.

The client CL responds as a function of the type and/or number of the incoming responses AK. With three mirrors SP assumed which are responsible for the field F of the desired data the following different states result. If the client CL receives two or three identical responses AK, the result is used. If it receives two different responses AK or only one response AK the client CL sends a request for a self check to the corresponding mirrors SP. If the client CL receives different responses AK that response AK is used whose life counter has the highest value.

A read request ReadRQ is successful if the client CL receives at least one response AK and cannot be completed successfully if the client CL does not receive a response AK within the predetermined time interval TWLese or if one or several clusters C signal that they did not find the desired cell Z. In order to avoid the above problems in sending a read request ReadRQ it is to be preferred to execute find requests FindRQ and read requests ReadRQ in a combined manner. In

21

this case the client CL directs and find/read request Find/ReadRQ to any cluster C and receives a response AK from same as in the execution of an individual find request FindRQ. Here, the response AK does not include the address ID of the desired field F but the data of the desired field F.

It is to be considered, however, that a combined find/read request Find/ReadRQ compared to an individual find request FindRQ for finding the desired mirrors SP and a subsequent read request RearRQ to the desired mirrors requires more time, because now all clusters C must process the combined and thus more extensive find/read request Find/ReadRQ.

In order to change the data of a field F, e.g. field F**8**, the client CL sends a write request WriteRQ. As in the case of a read request ReadRQ, the client CL must know the positions of the 3 mirrors SP which are responsible for the desired field F**8**.

The client CL sends a write request WriteRQ to all 3 mirrors SP of the desired field F**8**. Thereupon the data of the desired field F**8** or of the associated cells C1**Z4**, C3**C6**, and C6**Z2** operating as mirrors SP is modified in that all mirrors SP update their data correspondingly. Then each of the mirrors SP returns a response AK to the requesting client CL. As soon as all responses AK of the mirrors SP have arrived at the client CL the write operation is successfully completed.

If at the time at which the client CL sends it write request WriteRQ another write request WriteRQ to the desired cells C1**Z4**, C3**C6**, and C6**Z2** is already being executed the client CL receives a corresponding response AK which indicates that the write request WriteRQ has failed and the desired cells C1**Z4**, C3**C6**, and C6**Z2** are in a locked state. A write request WriteRQ has also not been completely successfully if the requesting client CL receives less than nm responses AK, i.e. in the present case less than 3 responses AK.

The synchronisation which is required for a write request WriteRQ is carried out by the involved mirrors SP in order to ensure that all nm mirrors SP are updated with the same data. If a mirror SP receives a write request WriteRQ, it sends this write request WriteRQ to all other nm−1 mirrors SP. Only if the sending mirror SP receives a response AK from all other nm−1 mirrors SP the write request WriteRQ is executed. Thereby the write request WriteRQ received by the mirror SP can be sent either from a client CL or from another mirror SP of the same compound.

If a mirror SP receives another write request WriteRQ from a mirror SP with a lower index, previously arrived write requests WriteRQ are overwritten in all mirrors. Moreover, a mirror SP does not accept further write requests WriteRQ from a client CL if already a not fully executed write request WriteRQ has arrived from another mirror SP or client CL.

It is possible to execute find requests FindRQ and write request WriteRQ in a combined manner as find/write requests Find/WriteRQ, but it is to be checked whether the additional time requirement is reasonable.

An add request AddRQ serves to integrate a field F which is not yet included in the cluster compound CV into the cluster compound CV. Such an add request AddRQ can be sent from a cluster C or a client CL.

An individual cell, e.g. the cell C2**Z6** from FIG. **4**, receives an add request AddRQ from the client CL to work as a mirror manager and to integrate nm−1 (i.e. 2) new mirrors SP into the cluster compound CV. In the currently preferred embodiment of the invention, one cell Z is always selected a mirror manager which itself is no mirror SP. However, embodiments of the invention are possible where the mirror manager itself is also a mirror. The cell C2**Z6** working as the mirror manager sends an add request AddRQ for 2 mirrors into the network N. The add request AddRQ is relayed from cluster C to cluster C

22

in the cluster compound CV, e.g. from cluster C**2** to cluster C**3**, with the number of the mirrors SP to be added being decremented upon relay of the add request AddRQ, when the last requested cluster C has provided a cell Z.

The last requested cluster C sends the identifications ZellID of the cells Z which are considered as mirrors SP to the cell C2**Z6** working as the mirror manager. The cell C2**Z6** working as the mirror manager then sends a corresponding response AK to all cells C3**Z1** and C1**Z2** which are possible as mirrors SP, preferably a pseudoreliable message PSM which instructs them to become mirrors SP. Then the cell C2**Z6** working as the mirror manager returns a corresponding response AK to the requesting client CL. An add request AddRQ is not completed successfully if no response AK or a negative response AK is returned from the cell C2**Z6** working as the mirror manager.

Pseudocode for the execution of an add request AddRQ:
rq_addField:
begin
if (status< >cs_idle) or (used) then exit;
    message.command:=ak_addField;
    <store additional values for request,
      e.g. data, field position, etc. for later
relay to the mirrors SP>
fieldpos:=message.dataFieldPos;
data:=message.data;
mirManClient:=message.sender;
repeat_rq_emptycells:=c_repeat_rq_emptycells;
psm_send(message,message.sender,cs_mirrorManager1);
exit;
end;

The execution of an add request AddRQ does not guarantee that nm mirrors SP are as available for a desired field F, but that either nm mirrors SP are available or after the elapse of a predetermined time t no mirrors SP at all are available for the desired field F.

If less than nm new mirrors SP exist after the execution of an add request AddRQ this can only occur if the pseudoreliable messages PMSM used in the add request AddRQ provide wrong results. Such faults are corrected by later self checks of the mirrors SP.

A mirror request SpiegelRQ (MirrorRQ) is a special case of an add request AddRQ, wherein a cell Z which will be referred to a manager in the following requests a single mirror SP. The manager sends the request to the cells Z which are possible as mirrors SP to become new mirrors SP.

If the manager sends a mirror request SpiegelRQ into the network N, a waiting time WT is recorded from this moment on until responses AK of the cells Z possible as mirrors SP arrive at the manager. Each cluster C which receives the mirror request SpiegelRQ and can provide storage space sends a corresponding response AK to the manager and provides storage space which is kept free to be integrated into the cluster compound CV in the form of a cell Z or a mirror SP, respectively. If a cluster C cannot provide a mirror SP it relays the mirror request SpiegelRQ to other clusters C. When the manager has received a corresponding response AK of a new mirror SP it will enter this in a mirror table. If a cell Z which is possible as a mirror SP received a message MSG from the manager prior to the elapse of the time interval wt that no more mirrors SP are required, it is released again and the mirror request SpiegelRQ is rejected.

If a timeout occurs in one of the requested cells Z, i.e. the time interval wt of the mirror request SpiegelRQ for this cell Z has elapsed, then a new cell Z which is possible as a mirror Z is found. This operation is repeated several times or until cells Z possible as mirrors have responded. Cells Z which have

23

made themselves available as possible mirrors SP and whose responses AK arrive at the manager after the assigned time interval wt will be ignored by same.

Pseudocode for carrying out a mirror request SpiegelRQ:

```
cs_getOneNewMirror0:
begin
  message.command:=rq_needEmptyCells;
  <select destination cluster>
  message.ticket:=makeNewTicket;
  psm_send(r,r.dest,cs_getOneNewMirror1);
  exit;
end;
```

Either the mirror SP receives a response AK or the mirror request SpiegelRQ becomes invalid:

```
cs_getOneNewMirror1:
begin
  if psm_timeout then begin
    status:=cs_idle;
    exit;
  end;
  possibleMirror:=<received address>
  message.command:=rq_singlebecomeMirror;
  <write own address and addr. of the other valid mirror into
    the message>
  psm_send(r,possibleMirror[1],cs_getOneNewMirror2);
  exit;
end;
```

The still not used mirror SP receives the mirror request SpiegelRQ to become a mirror which it processes with the following pseudocode:

```
rq_singlebecomeMirror:
begin
  if <request from same mirror1> and <ticket in agree-
    ment> then begin
    <return acknowledgement>
    exit;
  end;
  if used then exit;
  <return acknowledgement>
    <notice MirrorManager and ticket>
  <Send rq_addMirror to all old mirrors>
  exit;
end;
```

Now this mirror candidate sends a request to all nm−1 old mirrors SP to be accepted as a mirror (rq_addMirror). Because the old mirrors SP must certify this mutually the cell might have to wait longer than normal for a response to the message. A mirror SP which has received this request enquires all other nm−2 mirrors SP whether these have received this request, too (rq_certify). Only if this is the case, the mirror SP replies with a corresponding response ak_addmirror and updates its own mirror table:

```
rq_addMirror:
begin
  <set flags, if req'd to accept messages>
  if <request is from mirror 1> then begin
    <update message with data corr. to LifeCount>
    <send acknowledgement ak_akkMirror>
    exit;
  end;
  if <message is from mirror candidate (anew)>
    then exit;
  if <Status is not correct> then exit;
  if not <mirror to be replaced is known> then exit;
  <further plausibility checks, if req'd.>
  <Send request to all nm−2 mirrors whether message
    received, too>
```

24

```
end;
```

Finally, the mirror candidate updates its data:

```
cs_becomeSingleNewMirror1:
begin
  if not <all nm−1 old mirrors have sent ak_addMirror>
    then begin
    status:=cs_idle;
    exit;
  end;
  <take over mirror data>
  <take over data (field value etc.)>
  <establish own index>
  used:=true;
  status:=cs_idle;
  exit;
end;
```

In order to remove a field F from the cluster compound CV, a client CL or a cluster C, for example, sends a delete request DeleteRQ to all nm mirrors SP associated with the field F. A delete request DeleteRQ ensures that either all nm mirrors SP are removed or, in the case of a not successful execution of the delete request DeleteRQ, that no mirror SP is removed in order to ensure consistent data in the cluster compound CV.

Optionally, each mirror SP which receives a delete request DeleteRQ relays it to the other nm−1 mirrors SP. A mirror which receives a delete request DeleteRQ "deletes" itself, i.e. the respective cell Z changes into an idle state and informs the sender of the delete request DeleteRQ about this with a corresponding response AK.

A delete request DeleteRQ is executed successfully if the sender receives nm responses AK according to the which nm mirrors SP of the field F have deleted themselves. If the sender does not receive a response AK after the elapse of a predetermined time interval, according to which the nm mirrors SP of the field F have deleted themselves, the delete request DeleteRQ has failed.

Pseudocode for the execution of a delete request DeleteRQ:

```
rq_delete:
begin
  if status<>cs_idle then exit;
  if used and (message.ticket=lmticket) and
    (message.sender=lmAdr) then
  begin
    return_msg(message,ak_delete);
    exit;
  end;
  return_msg(m,ak_delete);
  lmTicket:=message.ticket;
  lmAdr:=message.sender;
  <Initialise cell in the initial state>
  used:=false;
  status:=cs_idle;
  exit;
end;
```

Shift operations are used for assigning individual mirrors SP of a mirror compound to other cells Z which then replace the previous mirrors SP accordingly. There are various reasons which necessitate shift operations:

Failure of a cluster C or individual cells Z

Removal of a cluster C from a cluster compound

Inadequate data transmission performance of a cluster C

Application-specific causes/reasons.

The shifting of mirrors SP upon the request of new mirrors SP has already been described above. If a cluster C is to be removed from the cluster compound CV, for example, when a cluster C is to be shut down or to be used for other tasks in the

US 7,904,680 B2

25

26

network N, the data of its active cells Z, i.e. of the cells Z which operate as mirrors SP, must be shifted to other clusters C. In this case the cluster C to be removed initiates the shifting of the data or of the mirrors SP, respectively, of the individual mirror compounds (as described above).

For initiating shift operations due to an inadequate data transmission performance, the data transmission performance of the clusters C and/or the cells Z is checked during operation. For this purpose, the preferred embodiment of the present invention uses a counter for each mirror SP and/or each cell Z which determines the transmission duration with pseudoreliable messages PSM. Optionally, a timer is implemented which determines the average data trans-mission duration, with a common time basis being required in this case. Preferably, each cluster C determines the data transmission performances of its cells Z. Mirrors SP or cells Z, respectively, whose data transmission durations exceed certain limits are shifted.

The evaluation of the data transmission performance with respect to the data transmission duration, however, is to be understood as an example only, and any desired parameter of data transmission performances which is suitable for the application of the invention can be checked for an initiation of shift operations by means of known methods. For example, the computing performance of individual cells Z and/or clusters C, or the performance of individual areas of the network N could be checked.

If such an inadequate data transmission performance has been determined for a mirror SP, e.g. cell C6Z2 from FIG. 2, a single mirror SP from the corresponding compound becomes the manager, e.g. cell C1Z4. The manager C1Z4 sends a request RQ, preferably with a pseudoreliable message PSM, to all other two cells C3Z6 and C6Z2 of the compound operating as mirrors SP to remove the corresponding mirror SP (C6Z2). This makes itself invalid or is declared invalid by the corresponding cluster C6.

Thereupon the manager C1Z4 requests a new mirror SP in the cluster compound CV, whereby contrary to the above described replacement for a mirror SP additional requirements can be placed on the new mirror SP, preferably requirements with respect to the data trans-mission performance. The new mirror SP is integrated into the mirror compound in the above described manner.

In order to ensure that all mirrors SP have received information on the shift operation the manager sends a request RQ (preferably with a pseudoreliable message PSM) for cancelling the shift operation if it has not received a corresponding response AK from all nm−1 mirrors SP. In this case, the shift operation could not be completed successfully.

The operations described above in conjunction with cells Z and mirrors SP are also applicable to operations with respect to the inventive clusters C. For this reason, a detailed description of the operations for adding, removing, shifting, and deactivating of individual clusters C is dispensed with.

Although the present invention has been described in terms of specific embodiments, it is anticipated that alterations and modifications thereof will no doubt become apparent to those skilled in the art. It is therefore intended that the following claims be interpreted as covering all such alterations and modification as fall within the true spirit and scope of the invention.

What is claimed is:

1. A data management system comprising:
at least two data storage units;
at least one computer unit that stores at least one complete file, each file including a plurality of individual pieces, the pieces containing parts of the files, wherein at least one piece is stored in a redundant manner in the at least two data storage units;
a controller to enable data transmission between the data storage units and the computer unit;
wherein at least one of the data storage units and computer unit measures a data transmission performance between at least one of the data storage units and the computer unit, the at least one piece being stored by the computer unit in a redundant manner in the data storage units as a function of the measured data transmission performance, and the computer unit accessing the at least one of the data storage units as a function of the measured data transmission performance;
wherein at least one of the at least two data storage units measures a data transmission performance between at least two of the at least two data storage units and the data storage units copy pieces that are redundantly stored in the system from one of the data storage units to another of the data storage units independently of an access of the computer unit based on the data transmission performance measured between the data storage units.

2. The data management system of claim 1, wherein the at least one computer unit and the at least two data storage units are connected over a wireless network.

3. A data management system comprising:
at least one computer unit that stores at least one complete file, each file including a plurality of individual pieces, the pieces containing parts of the files; and
at least two data storage units that need not store the complete file stored in the at least one computer unit at a given point in time, wherein at least one piece is stored in a redundant manner in the at least two data storage units;
a controller to enable data transmission between the data storage units and the computer unit;
wherein at least one of the data storage units and computer unit measures a data transmission performance between at least one of the data storage units and the computer unit, the at least one piece being stored by the computer unit in a redundant manner in data storage units as a function of the measured data transmission performance, and the computer unit accessing the at least one of the data storage units as a function of the measured data transmission performance; and
wherein at least one of the at least two data storage units measures a data transmission performance between at least two of the at least two data storage units and the data storage units copy pieces that are redundantly stored in the system from one of the data storage units to another of the data storage units independently of an access of the computer unit based on the data transmission performance measured between the data storage units.

4. The data management system of claim 3, wherein the at least one computer unit and the at least two data storage units are connected over a wireless network.

5. A data management system comprising:
at least one first means for storing at least one complete file, each file including a plurality of individual pieces, the pieces containing parts of the files; and
at least two second data storage means for storing data, that need not store the complete file stored in the first means at a given point in time, wherein at least one piece is stored in a redundant manner in the at least two second data storage means;

US 7,904,680 B2

27                                                          28

control means for enabling data transmission between the second data storage means and the first means;

wherein at least one of the first means for storing or second data storage means measures a data transmission performance between at least one of the second data storage means and the first means, the at least one piece being stored by the first means in a redundant manner in the second data storage means as a function of the measured data transmission performance, and the second data storage means accessing the at least one of the second data storage means as a function of the measured data transmission performance; and

wherein at least one of the at least two second data storage means measures a data transmission performance between at least two of the at least two second data storage units and the second data storage means copy pieces that are redundantly stored in the system from one of the second data storage means to another of the second data storage means independently of an access of the first data storage means based on the measured data transmission performance between the second data storage means.

**6**. The data management system of claim **5**, wherein the at least one first means and the at least two second data storage means are connected over a wireless network.

**7**. A method for a data storage device to copy data over a network by receiving data from or sending data to at least one of a plurality of data storage devices in which data is stored redundantly as a function of measured data transmission performance between computer units that store at least one complete file of data, each file including a plurality of individual pieces of data, the pieces containing parts of the file, and between the plurality of data storage devices, the method comprising the steps of:

receiving in the at least one data storage device at least one piece of data stored by a computer unit in a redundant manner in at least two data storage devices as a function of a measured data transmission performance between the at least one data storage device and the computer unit;

storing in the at least one data storage device the received piece of data;

measuring by the at least one data storage device a data transmission performance between the at least one data storage device and another one of the plurality of data storage devices; and

sending from the at least one data storage device to the another data storage device a copy of the received piece of data for redundant storage independently of an access of the computer unit as a function of the measured data transmission performance between the data storage devices.

**8**. A method for a data storage device to copy data over a network as recited in claim **7**, further comprising the steps of:

receiving in the at least one data storage device a second piece of data stored by a computer unit in a redundant manner in at least two data storage devices as a function of a measured data transmission performance between the at least one data storage device and the computer unit;

storing in the at least one data storage device the received second piece of data;

measuring by the at least one data storage device a data transmission performance between the at least one data storage device and another one of the plurality of data storage devices; and

sending from the at least one data storage device to the another data storage device a copy of the received second piece of data for redundant storage independently of an access of the computer unit as a function of the measured data transmission performance between the data storage devices.

**9**. A method for a data storage device to copy data over a network as recited in claim **8**, wherein pieces of data are received, stored and sent between the plurality of data storage devices until the complete file of data has been received.

**10**. A method of operating a network over which a plurality of data storage devices copy data which is redundantly stored as a function of measured data transmission performance between computer units that store at least one complete file of data, each file including a plurality of individual pieces of data, the pieces containing parts of the file, and between the plurality of data storage devices, the method comprising the steps of:

providing a transmission medium enabling transmission of the data between one or more of the plurality of data storage devices and the computer unit; and

providing access by a user of at least one data storage device to the transmission medium for:

(i) receiving in the at least one data storage device at least one piece of data stored by a computer unit in a redundant manner in at least two data storage devices as a function of a measured data transmission performance between the at least one data storage device and the computer unit;

(ii) storing in the at least one data storage device the received piece of data;

(iii) measuring by the at least one data storage device a data transmission performance between the at least one data storage device and another one of the plurality of data storage devices; and

(iv) sending from the at least one data storage device to the another data storage device a copy of the received piece of data for redundant storage independently of an access of the computer unit as a function of the measured data transmission performance between the data storage devices.

**11**. A method of operating a network over which a plurality of data storage devices copy data, as recited in claim **10**, further comprising the steps of:

providing access by the user of the at least one data storage device to the transmission medium for:

(i) receiving in the at least one data storage device a second piece of data stored by a computer unit in a redundant manner in at least two data storage devices as a function of a measured data transmission performance between the at least one data storage device and the computer unit;

(ii) storing in the at least one data storage device the received second piece of data;

(iii) measuring by the at least one data storage device a data transmission performance between the at least one data storage device and another one of the plurality of data storage devices; and

(iv) sending from the at least one data storage device to the another data storage device a copy of the received second piece of data for redundant storage independently of an access of the computer unit as a function of the measured data transmission performance between the data storage devices.

**12**. A method of operating a network over which a plurality of data storage devices copy data, as recited in claim **11**,

US 7,904,680 B2

29

wherein pieces of data are received, stored and sent between the plurality of data storage devices until the complete file of data has been received.

**13**. A data storage device for copying data over a network by receiving data from or sending data to at least one of a plurality of data storage devices in which data is stored redundantly as a function of measured data transmission performance between computer units that store at least one complete file of data, each file including a plurality of individual pieces of data, the pieces containing parts of the file, and between the plurality of data storage devices, comprising:

a memory configured to store data received by the data storage device; and

a processor, connected to said memory, configured to:

(i) receive at least one piece of data stored by a computer unit in a redundant manner in at least two data storage devices as a function of a measured data transmission performance between the data storage device and the computer unit;

(ii) store in said memory the received piece of data;

(iii) measure a data transmission performance between the data storage device and another one of the plurality of data storage devices; and

(iv) send from the data storage device to the another data storage device a copy of the received piece of data for redundant storage independently of an access of the

30

computer unit as a function of the measured data transmission performance between the data storage devices.

**14**. A data storage device for copying data over a network as recited in claim **13**, wherein the processor is further configured to:

(v) receive a second piece of data stored by a computer unit in a redundant manner in at least two data storage devices as a function of a measured data transmission performance between the data storage device and the computer unit;

(vi) store in said memory the received second piece of data;

(vii) measure a data transmission performance between the data storage device and another one of the plurality of data storage devices; and

(viii) send from the data storage device to the another data storage device a copy of the received second piece of data for redundant storage independently of an access of the computer unit as a function of the measured data transmission performance between the data storage devices.

**15**. A data storage device for copying data over a network as recited in claim **14**, wherein the processor is further configured to receive, store in said memory, and send between the plurality of data storage devices until the complete file of data has been received.

*   *   *   *   *

**Exhibit C**

**to**

**Joint Claim Construction Statement**

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Appl. No.        :   11/188,025
Applicant      :   Thomas Binzinger
Filed           :   July 23, 2005
TC/A.U.       :   2187
Examiner      :   Gary J. Portka

Docket No.     :   3743-102
Customer No.   :   06449
Confirmation No. :   7982

## REPLY UNDER 37 CFR §1.111

Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

Dear Sir:

This reply is being submitted in response to the non-final Office Action, mailed

February 23, 2010.  Consideration of the following remarks is respectfully requested.

**Remarks** begin on page **2** of this paper.

## REMARKS

Claims 18-53 are pending. The non-final Office Action dated February 23, 2010 has been received and carefully reviewed. The following remarks form a full and complete response thereto. Applicant respectfully requests reconsideration.

## Allowable Subject Matter

Applicant wishes to thank the Examiner for the indication of allowable subject matter with respect to pending claims 12-17.

## Rejection of Claims 18-53 under 35 U.S.C. § 102(b)

Claims 18-53 were rejected under 35 U.S.C. § 102(b) as being allegedly anticipated by U.S. Patent No. 5,634,125 to Li. Applicant respectfully traverses each of the rejections and submits that Li fails to disclose every element of the claims.

Li is directed to a method, system and program for redistributing data between the nodes in a parallel database system. Li discloses techniques used to redistribute data amongst a plurality of nodes based on the workload at each of the nodes. (Li, Abstract). The invention of Li is described in terms of "nodes" which are defined as "multiple computers" which make up the parallel database system. (Li, Col. 1, Lines 23-27). Li further describes that data records are partitioned into "buckets" and that all data records associated with a particular "bucket" should be stored on a single node. (Li, Col. 1, Lines 56-59). The process of redistributing data between the various nodes of Li involves performing calculations to determine the workload for <u>each</u> existing and

2

potential new node and then redistributing the data ("buckets") between the nodes. (Li, Col. 6, Lines 53-65).

Li fails to disclose several features required by independent claims 18, 22, 26, 30, 34, 38, 42, 46 and 50.

Specifically, Li fails to disclose, *inter alia,* that data is stored redundantly as a function of "prespecified parameters of the data transmission" between the data storage devices and computer units, as required by all of independent claims.  Furthermore, each of the independent claims requires the detection of the prespecified data transmission parameters between the data storage devices and the computer unit.  Li describes performing calculations for each node individually, but fails to disclose or suggest any prespecified data transmission parameters between the node and a computer unit.  (Li, Col. 7, Lines 9-10).  An ideal workload is calculated for the entire parallel database system and then various attributes of the data to be stored and the individual nodes are used to calculate the workload for each node.  (Li, Col. 7, Line 11 – Col. 8, Line 51).  Li makes no mention of measuring or considering data transmission parameters, much less storing data as a function of prespecified data transmission parameters.

Furthermore, there is no mention of *detecting* prespecified parameters of a data transmission between the nodes and a computer unit, as required by all the independent claims.  In fact, Li fails to disclose a computer unit at all.  In rejecting claims 18, 26, 30, 38, 42 and 50, the Office Action cites to the plurality of nodes of the parallel database as disclosing the data storage devices, and the transmission medium 69 of Li, Fig. 3, as disclosing the network of the claims.  However, there is no element of Li cited

3

as disclosing the computer unit. To the extent that a computer used to access the parallel database might be considered inherent or appreciated, this does not remedy the fact that Li does not disclose or suggest detecting prespecified parameters of a data transmission *between* the data storage devices and a computer unit, as required by the claims.

Accordingly, Li fails to disclose or suggest each and every element of independent claims 18, 22, 26, 30, 34, 38, 42, 46 and 50. Claims 19-21, 23-25, 27-29, 31-33, 35-37, 39-41, 43-45, 47-49 and 51-53 depend from claims 18, 22, 26, 30, 34, 38, 42, 46 and 50, respectively, and should, therefore, be allowed for the same reasons as claims 18, 22, 26, 30, 34, 38, 42, 46 and 50. Applicant respectfully requests that the rejections of claims 18-53 be withdrawn.

## Conclusion

All of the stated grounds of objection and rejection have been properly traversed, accommodated, or rendered moot. Applicant therefore respectfully requests that the Examiner reconsider all presently outstanding objections and rejections, and that they be withdrawn. Applicant believes that a full and complete reply has been made to the outstanding Office Action and, as such, the present application is in condition for allowance.

If the Examiner believes, for any reason, that personal communication will expedite prosecution of this application, the Examiner is invited to telephone the undersigned at the number provided.

In the event that this paper is not timely filed, Applicant respectfully petitions for an appropriate extension of time.  Any fees for such an extension together with any additional fees may be charged to Counsel's Deposit Account No. 02-2135.

| Customer No: 6449 | | | | | |
|---|---|---|---|---|---|
| NAME AND REG. NUMBER | Martin M. Zoltick<br>Reg. No. 35,745<br>Ryan P. Wallace<br>Reg. No. 60,212 | | | | |
| SIGNATURE | /Ryan P. Wallace/ | | DATE | 5/20/2010 | |
| *Address* | Rothwell, Figg, Ernst & Manbeck<br>1425 K Street, N.W., Suite 800 | | | | |
| *City* | Washington | *State* | D.C. | *Zip Code* | 20005 |
| *Country* | U.S.A. | *Telephone* | 202-783-6040 | *Fax* | 202-783-6031 |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 7654035 |
| **Application Number:** | 11188025 |
| **International Application Number:** | |
| **Confirmation Number:** | 7982 |
| **Title of Invention:** | Data access and management system as well as a method for data access and data management for a computer system |
| **First Named Inventor/Applicant Name:** | Peter  Gailer |
| **Customer Number:** | 06449 |
| **Filer:** | Ryan Patrick Wallace/Tamika Miles |
| **Filer Authorized By:** | Ryan Patrick Wallace |
| **Attorney Docket Number:** | 3743-102 |
| **Receipt Date:** | 20-MAY-2010 |
| **Filing Date:** | 23-JUL-2005 |
| **Time Stamp:** | 17:01:39 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | | amendment1.pdf | 105159<br><br>8734aff8b55fde4d49c37dccd61b6f531663a255 | yes | 5 |

**Multipart Description/PDF files in .zip description**

| Document Description | Start | End |
|---|---|---|
| Amendment/Req. Reconsideration-After Non-Final Reject | 1 | 1 |
| Applicant Arguments/Remarks Made in an Amendment | 2 | 5 |

| | |
|---|---|
| Warnings: | |
| Information: | |
| **Total Files Size (in bytes):** | 105159 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

**Exhibit D**

**to**

**Joint Claim Construction Statement**

RECEIVED
CENTRAL FAX CENTER

**OCT 0 1 2010**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Application No. | : | 11/188,025 |
| Applicant | : | Peter Gailer et al. |
| Filed | : | July 23, 2005 |
| TC/A.U. | : | 2187 |
| Examiner | : | Gary J. Portka |
| Confirmation No. | : | 7982 |
| Docket No. | : | 3743-102 |
| Customer No. | : | 6449 |

### AGENDA FOR INTERVIEW

Applicant proposes the following agenda for the telephone interview to be conducted at 2:00 PM on Monday, October 4, 2010:

- o  Applicant would like to discuss:
    - ▪  The purpose and function of the invention
    - ▪  The nature of the computer unit and data storage devices.
    - ▪  The nature of detecting prespecified data transmission parameters between the computer unit and the plurality of data storage devices
    - ▪  Allowable subject matter – claims 12-17
    - ▪  Rejection of claims over U.S. Patent No. 5,634,125 to Li
        - •  Li does not disclose a computer unit
        - •  Li does not disclose detecting prespecified data transmission parameters between a computer unit and a plurality of data storage devices
    - ▪  Possible claim amendments

RECEIVED

CENTRAL FAX CENTER

**OCT 0 1** 2010

@001

# ROTHWELL, FIGG, ERNST & MANBECK

1425 K Street, NW
Suite 800
Washington, D.C. 20005

Telephone: (202)783-6040
Telefax: (202)783-6031

FACSIMILE TRANSMITTAL SHEET

DATE: October 1, 2010

TO:     Examiner Gary J. Portka
        U.S. Patent and Trademark Office

        Fax. No.: 571-273-8300

RE:     U.S. Serial Number 11/188,025
        Our Ref.: 3743-102

FROM: Ryan P. Wallace

Number of Pages Including This Transmittal Sheet: 2

If any problems in connection with this facsimile, please contact: Tamika Miles 202-783-6040

THIS MESSAGE IS INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENCY RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICES. THANK YOU.

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/188,025 | 07/23/2005 | Peter Gailer | 3743-102 | 7982 |

6449        7590        10/15/2010
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
1425 K STREET, N.W.
SUITE 800
WASHINGTON, DC 20005

| EXAMINER |
|---|
| PORTKA, GARY J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2187 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 10/15/2010 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

PTO-PAT-Email@rfem.com

| **Interview Summary** | Application No. | Applicant(s) | |
|---|---|---|---|
| | 11/188,025 | GAILER ET AL. | |
| | Examiner | Art Unit | |
| | GARY J. PORTKA | 2187 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) *GARY J. PORTKA (PTO)*.          (3)_____.

(2) *RYAN WALLACE (Apps. Rep. Reg. No. 60,212)*.          (4)_____.

Date of Interview: <u>04 October 2010</u>.

Type:  a)☒ Telephonic     b)☐ Video Conference
      c)☐ Personal [copy given to: 1)☐ applicant    2)☐ applicant's representative]

Exhibit shown or demonstration conducted:    d)☐ Yes    e)☒ No.
    If Yes, brief description: _____.

Claim(s) discussed: <u>18</u>.

Identification of prior art discussed: <u>Li, US 5,634,125</u>.

Agreement with respect to the claims f)☐ was reached.   g)☒ was not reached.   h)☐ N/A.

Substance of Interview including description of the general nature of what was agreed to if an agreement was reached, or any other comments: <u>The parties discussed possible distinctions between the present claims and the prior art reference. Examiner stated that the claim terms "computer unit" and "parameters of data transmission" are more broad than argued, as it appears limitations from the specification are being drawn into the claims. Applicant's representative argued interpretations were in line with the limitations as defined, and differentiated from the art. No agreement was reached. Applicants will review for possible amendment in response to the office action</u>.

(A fuller description, if necessary, and a copy of the amendments which the examiner agreed would render the claims allowable, if available, must be attached. Also, where no copy of the amendments that would render the claims allowable is available, a summary thereof must be attached.)

THE FORMAL WRITTEN REPLY TO THE LAST OFFICE ACTION MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW. (See MPEP Section 713.04). If a reply to the last Office action has already been filed, APPLICANT IS GIVEN A NON-EXTENDABLE PERIOD OF THE LONGER OF ONE MONTH OR THIRTY DAYS FROM THIS INTERVIEW DATE, OR THE MAILING DATE OF THIS INTERVIEW SUMMARY FORM, WHICHEVER IS LATER, TO FILE A STATEMENT OF THE SUBSTANCE OF THE INTERVIEW. See Summary of Record of Interview requirements on reverse side or on attached sheet.

| /GARY J PORTKA/ | |
|---|---|
| Primary Examiner, Art Unit 2187 | |

## Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

### Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews
Paragraph (b)

In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

37 CFR §1.2 Business to be transacted in writing.
All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

_____

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
– An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable). Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
   (The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.
Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

### Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

**Exhibit E**

**to**

**Joint Claim Construction Statement**

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Appl. No. | : | 11/188,025 |
| Applicant | : | Thomas Binzinger |
| Filed | : | July 23, 2005 |
| TC/A.U. | : | 2187 |
| Examiner | : | Gary J. Portka |
| | | |
| Docket No. | : | 3743-102 |
| Customer No. | : | 06449 |
| Confirmation No. | : | 7982 |

## <u>AMENDMENT AND REPLY UNDER 37 CFR §1.116</u>

**MAIL STOP: AF**
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

Dear Sir:

In response to the Final Office Action, mailed August 4, 2010, please enter the

amendments and remarks contained on the following pages, which are summarized

below.

**Amendments to the Claims** begin on page **2** of this paper.

**Remarks** begin on page **9** of this paper.

**Amendments to the Claims**

The following listing of the claims replaces and supersedes all previous listings.

1-11. (Canceled).

12. (Previously Presented)  A data management system comprising:

at least two data storage units;

at least one computer unit that stores at least one complete file, each file including a plurality of individual pieces, the pieces containing parts of the files, wherein at least one piece is stored in a redundant manner in the at least two data storage units;

a controller to enable data transmission between the data storage units and the computer unit;

wherein at least one of the data storage units and computer unit measures a data transmission performance between at least one of the data storage units and the computer unit, the at least one piece being stored by the computer unit in a redundant manner in the data storage units as a function of the measured data transmission performance, and the computer unit accessing the at least one of the data storage units as a function of the measured data transmission performance; and

wherein at least one of the at least two data storage units measures a data transmission performance between at least two of the at least two data storage units and the data storage units copy pieces that are redundantly stored in the system from one of the data storage units to another of the data storage units independently of an access of the computer unit based on the data transmission performance measured between the data storage units.

13. (Previously Presented)  The data management system of claim 12, wherein the at least one computer unit and the at least two data storage units are connected over a wireless network.

14. (Previously Presented)  A data management system comprising:

at least one computer unit that stores at least one complete file, each file including a plurality of individual pieces, the pieces containing parts of the files; and

at least two data storage units that need not store the complete file stored in the at least one computer unit at a given point in time, wherein at least one piece is stored in a redundant manner in the at least two data storage units;

a controller to enable data transmission between the data storage units and the computer unit;

wherein at least one of the data storage units and computer unit measures a data transmission performance between at least one of the data storage units and the computer unit, the at least one piece being stored by the computer unit in a redundant manner in data storage units as a function of the measured data transmission performance, and the computer unit accessing the at least one of the data storage units as a function of the measured data transmission performance; and

wherein at least one of the at least two data storage units measures a data transmission performance between at least two of the at least two data storage units and the data storage units copy pieces that are redundantly stored in the system from one of the data storage units to another of the data storage units independently of an access of the computer unit based on the data transmission performance measured between the data storage units.


15. (Previously Presented)  The data management system of claim 14, wherein the at least one computer unit and the at least two data storage units are connected over a wireless network.


16. (Previously Presented)  A data management system comprising:

at least one first means for storing at least one complete file, each file including a plurality of individual pieces, the pieces containing parts of the files; and

at least two second data storage means for storing data, that need not store the complete file stored in the first means at a given point in time, wherein at least one piece is stored in a redundant manner in the at least two second data storage means;

control means for enabling data transmission between the second data storage means and the first means;

wherein at least one of the first means for storing or second data storage means measures a data transmission performance between at least one of the second data storage means and the first means, the at least one piece being stored by the first means in a redundant manner in the second data storage means as a function of the measured data transmission performance, and the second data storage means accessing the at least one of the second data storage means as a function of the measured data transmission performance; and

wherein at least one of the at least two second data storage means measures a data transmission performance between at least two of the at least two second data storage units and the second data storage means copy pieces that are redundantly stored in the system from one of the second data storage means to another of the second data storage means independently of an access of the first data storage means based on the measured data transmission performance between the second data storage means.


17. (Previously Presented)  The data management system of claim 16, wherein the at least one first means and the at least two second data storage means are connected over a wireless network.


18- 53.  Cancelled.


54.  (New)  A method for a data storage device to copy data over a network by receiving data from or sending data to at least one of a plurality of data storage devices in which data is stored redundantly as a function of measured data transmission performance between computer units that store at least one complete file of data, each file including a plurality of individual pieces of data, the pieces containing parts of the file, and between the plurality of data storage devices, the method comprising the steps of:

receiving in the at least one data storage device at least one piece of data stored by a computer unit in a redundant manner in at least two data storage devices as a

function of a measured data transmission performance between the at least one data storage device and the computer unit;

storing in the at least one data storage device the received piece of data;

measuring by the at least one data storage device a data transmission performance between the at least one data storage device and another one of the plurality of data storage devices; and

sending from the at least one data storage device to the another data storage device a copy of the received piece of data for redundant storage independently of an access of the computer unit as a function of the measured data transmission performance between the data storage devices.

55. (New)  A method for a data storage device to copy data over a network as recited in claim 54, further comprising the steps of:

receiving in the at least one data storage device a second piece of data stored by a computer unit in a redundant manner in at least two data storage devices as a function of a measured data transmission performance between the at least one data storage device and the computer unit;

storing in the at least one data storage device the received second piece of data;

measuring by the at least one data storage device a data transmission performance between the at least one data storage device and another one of the plurality of data storage devices; and

sending from the at least one data storage device to the another data storage device a copy of the received second piece of data for redundant storage independently of an access of the computer unit as a function of the measured data transmission performance between the data storage devices.

56. (New)  A method for a data storage device to copy data over a network as recited in claim 55, wherein pieces of data are received, stored and sent between the plurality of data storage devices until the complete file of data has been received.

57.  (New)  A method of operating a network over which a plurality of data storage devices copy data which is redundantly stored as a function of measured data transmission performance between computer units that store at least one complete file of data, each file including a plurality of individual pieces of data, the pieces containing parts of the file, and between the plurality of data storage devices, the method comprising the steps of:

providing a transmission medium enabling transmission of the data between one or more of the plurality of data storage devices and the computer unit; and

providing access by a user of at least one data storage device to the transmission medium for:

(i) receiving in the at least one data storage device at least one piece of data stored by a computer unit in a redundant manner in at least two data storage devices as a function of a measured data transmission performance between the at least one data storage device and the computer unit;

(ii) storing in the at least one data storage device the received piece of data;

(iii) measuring by the at least one data storage device a data transmission performance between the at least one data storage device and another one of the plurality of data storage devices; and

(iv) sending from the at least one data storage device to the another data storage device a copy of the received piece of data for redundant storage independently of an access of the computer unit as a function of the measured data transmission performance between the data storage devices.

58.  (New)  A method of operating a network over which a plurality of data storage devices copy data, as recited in claim 57, further comprising the steps of:

providing access by the user of the at least one data storage device to the transmission medium for:

(i) receiving in the at least one data storage device a second piece of data stored by a computer unit in a redundant manner in at least two data storage

devices as a function of a measured data transmission performance between the at least one data storage device and the computer unit;

(ii) storing in the at least one data storage device the received second piece of data;

(iii) measuring by the at least one data storage device a data transmission performance between the at least one data storage device and another one of the plurality of data storage devices; and

(iv) sending from the at least one data storage device to the another data storage device a copy of the received second piece of data for redundant storage independently of an access of the computer unit as a function of the measured data transmission performance between the data storage devices.

59. (New)  A method of operating a network over which a plurality of data storage devices copy data, as recited in claim 58, wherein pieces of data are received, stored and sent between the plurality of data storage devices until the complete file of data has been received.

60. (New)  A data storage device for copying data over a network by receiving data from or sending data to at least one of a plurality of data storage devices in which data is stored redundantly as a function of measured data transmission performance between computer units that store at least one complete file of data, each file including a plurality of individual pieces of data, the pieces containing parts of the file, and between the plurality of data storage devices, comprising:

a memory configured to store data received by the data storage device; and

a processor, connected to said memory, configured to:

(i) receive at least one piece of data stored by a computer unit in a redundant manner in at least two data storage devices as a function of a measured data transmission performance between the data storage device and the computer unit;

(ii) store in said memory the received piece of data;

Appl. No. 11/188,025
Reply to Final Office Action dated 8/4/2010

(iii) measure a data transmission performance between the data storage device and another one of the plurality of data storage devices; and

(iv) send from the data storage device to the another data storage device a copy of the received piece of data for redundant storage independently of an access of the computer unit as a function of the measured data transmission performance between the data storage devices.

61. (New)  A data storage device for copying data over a network as recited in claim 60, wherein the processor is further configured to:

(v) receive a second piece of data stored by a computer unit in a redundant manner in at least two data storage devices as a function of a measured data transmission performance between the data storage device and the computer unit;

(vi) store in said memory the received second piece of data;

(vii) measure a data transmission performance between the data storage device and another one of the plurality of data storage devices; and

(viii) send from the data storage device to the another data storage device a copy of the received second piece of data for redundant storage independently of an access of the computer unit as a function of the measured data transmission performance between the data storage devices.

62. (New)  A data storage device for copying data over a network as recited in claim 61, wherein the processor is further configured to receive, store in said memory, and send between the plurality of data storage devices until the complete file of data has been received.

## REMARKS

The Final Office Action dated August 4, 2010 has been received and carefully reviewed. The preceding claim amendments and the following remarks are submitted as a full and complete response. Upon entry of the foregoing amendments, claims 12-17 and 54-62 are pending. Claims 12-17 are allowed. Claims 18-53 are cancelled. Claims 54-62 are new. No new matter has been added. Support for new claims 54-62 can be found, inter alia, at page 3, lines 1-7, page 10, lines 18-22, page 12, lines 25-30, page 13, lines 1-2 and elsewhere throughout the specification. Reconsideration of the outstanding rejections is respectfully requested in view of the above amendments and the following remarks.

## Allowable Subject Matter

At the outset, Applicant wishes to thank the Examiner for the indication of allowable subject matter with respect to pending claims 12-17.

## Examiner Interview

Applicant and Applicant's representatives, Martin Zoltick and Ryan Wallace, wish to thank Examiner Portka for extending the courtesy of the telephone interviews held on October 4 and November 2, 2010, and for the helpful and courteous discussions. Applicant's representatives believe that prosecution of the present application was materially advanced based on the discussion of the pending claims, the Examiner's rejections set forth in the Office Action mailed August 4, 2010, and the prior art Li reference, U.S. Patent No. 5,634,125.

**Rejection of Claims 18-53 under 35 U.S.C. § 102(b)**

Claims 18-53 stand rejected under 35 U.S.C. § 102(b) as allegedly anticipated by U.S. Patent No. 5,634,125 to Li. The rejection of claims 18-53 is moot in view of the cancellation of those claims.

**New Claims**

New claims 54-62 have been added by this amendment. As indicated above, support for these new claims can be found, inter alia, at page 3, lines 1-7, page 10, lines 18-22, page 12, lines 25-30, page 13, lines 1-2 and elsewhere throughout the specification.

All of the newly added claims include the feature of redundant storage of data independently of an access of a computer unit as a function of the measured data transmission performance between data storage devices, which, as Applicant has previously discussed in connection with claims 12-17, indicated as allowable, distinguishes the subject matter of new claims 54-62 from the prior art, including Li and Nilsen. Applicant respectfully submits that claims 54-62 should be allowed.

**Conclusion**

All of the stated grounds of objection and rejection have been properly traversed, accommodated, or rendered moot. Applicant believes that a full and complete reply has been made to the outstanding Office Action and, as such, the present application is in condition for allowance.

If the Examiner believes, for any reason, that personal communication will expedite prosecution of this application, the Examiner is invited to telephone the undersigned at the number provided.

In the event that this paper is not timely filed, Applicant respectfully petitions for an appropriate extension of time. Any fees for such an extension together with any additional fees may be charged to Counsel's Deposit Account No. 02-2135.

| | | | | | |
|---|---|---|---|---|---|
| **Customer No: 6449** | | | | | |
| NAME AND REG. NUMBER | Martin M. Zoltick<br>Reg. No. 35,745 | | | | |
| SIGNATURE | /Martin M. Zoltick/ | | DATE | 11-04-2010 | |
| *Address* | Rothwell, Figg, Ernst & Manbeck<br>1425 K Street, N.W., Suite 800 | | | | |
| *City* | Washington | *State* | D.C. | *Zip Code* | 20005 |
| *Country* | U.S.A. | *Telephone* | 202-783-6040 | *Fax* | 202-783-6031 |

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 11188025 |
| **Filing Date:** | 23-Jul-2005 |
| **Title of Invention:** | Data access and management system as well as a method for data access and data management for a computer system |
| **First Named Inventor/Applicant Name:** | Peter Gailer |
| **Filer:** | Martin M. Zoltick/Keiko Shelton |
| **Attorney Docket Number:** | 3743-102 |
| Filed as Large Entity | |

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| Request for continued examination | 1801 | 1 | 810 | 810 |
| **Total in USD ($)** | | | | **810** |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 8771086 |
| **Application Number:** | 11188025 |
| **International Application Number:** | |
| **Confirmation Number:** | 7982 |
| **Title of Invention:** | Data access and management system as well as a method for data access and data management for a computer system |
| **First Named Inventor/Applicant Name:** | Peter Gailer |
| **Customer Number:** | 06449 |
| **Filer:** | Martin M. Zoltick/Keiko Shelton |
| **Filer Authorized By:** | Martin M. Zoltick |
| **Attorney Docket Number:** | 3743-102 |
| **Receipt Date:** | 04-NOV-2010 |
| **Filing Date:** | 23-JUL-2005 |
| **Time Stamp:** | 16:13:05 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Deposit Account |
| Payment was successfully received in RAM | $810 |
| RAM confirmation Number | 2876 |
| Deposit Account | 022135 |
| Authorized User | |

The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows:

Charge any Additional Fees required under 37 C.F.R. Section 1.17 (Patent application and reexamination processing fees)

**File Listing:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Request for Continued Examination (RCE) | RCE.pdf | 768854 <br> f9f02c127ac0568e1ce2be49b2c6e9eef0bc5 0649 | no | 3 |

**Warnings:**

**Information:**

| 2 | | Amendment.pdf | 113987 <br> 60e0db9bb42b169472d213e4b68f70e62e 09fa0d | yes | 11 |

| | **Multipart Description/PDF files in .zip description** | | | | |
|---|---|---|---|---|---|
| | **Document Description** | | **Start** | **End** | |
| | Amendment After Final | | 1 | 1 | |
| | Claims | | 2 | 8 | |
| | Applicant Arguments/Remarks Made in an Amendment | | 9 | 11 | |

**Warnings:**

**Information:**

| 3 | Fee Worksheet (PTO-875) | fee-info.pdf | 30080 <br> 38b05ec219d71907961a72f2of02f40df92a c025 | no | 2 |

**Warnings:**

**Information:**

| | | **Total Files Size (in bytes):** | 912921 | | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

PTO/SB/06 (07-06)
Approved for use through 1/31/2007. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD Substitute for Form PTO-875 | Application or Docket Number 11/188,025 | Filing Date 07/23/2005 | ☐ To be Mailed |
|---|---|---|---|

## APPLICATION AS FILED – PART I

|  | (Column 1) | (Column 2) | SMALL ENTITY ☒ | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) | RATE ($) | FEE ($) |
| ☐ BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A |  | N/A |  |
| ☐ SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A |  | N/A |  |
| ☐ EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A |  | N/A |  |
| TOTAL CLAIMS (37 CFR 1.16(i)) | minus 20 = | * |  | X $ = | OR | X $ = |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | minus 3 = | * |  | X $ = |  | X $ = |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | | TOTAL | |

## APPLICATION AS AMENDED – PART II

|  |  | (Column 1) | (Column 2) | (Column 3) | SMALL ENTITY | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|
|  |  | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) | RATE ($) | ADDITIONAL FEE ($) |
| **AMENDMENT** 11/04/2010 | Total (37 CFR 1.16(i)) | * 15 Minus | ** 42 | = 0 | X $26 = | 0 | OR X $ = | 0 |
|  | Independent (37 CFR 1.16(h)) | * 6 Minus | *** 12 | = 0 | X $110 = | 0 | OR X $ = | 0 |
|  | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | OR | |
|  | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | |
|  |  | | | | TOTAL ADD'L FEE | **0** | OR TOTAL ADD'L FEE | |

|  |  | (Column 1) | (Column 2) | (Column 3) |  |  |  | |
|---|---|---|---|---|---|---|---|---|
|  |  | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) | RATE ($) | ADDITIONAL FEE ($) |
| **AMENDMENT** | Total (37 CFR 1.16(i)) | * Minus | ** | = | X $ = |  | OR X $ = |  |
|  | Independent (37 CFR 1.16(h)) | * Minus | *** | = | X $ = |  | OR X $ = |  |
|  | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | OR | |
|  | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | |
|  |  | | | | TOTAL ADD'L FEE |  | OR TOTAL ADD'L FEE |  |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.

** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".

*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".

The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

Legal Instrument Examiner:
/Debra R. Wyatt/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*



U̲NITED S̲TATES P̲ATENT AND T̲RADEMARK O̲FFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

6449     7590     11/30/2010

ROTHWELL, FIGG, ERNST & MANBECK, P.C.
1425 K STREET, N.W.
SUITE 800
WASHINGTON, DC 20005

| EXAMINER |
| --- |
| PORTKA, GARY J |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 2187 | |

DATE MAILED: 11/30/2010

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 11/188,025 | 07/23/2005 | Peter Gailer | 3743-102 | 7982 |

TITLE OF INVENTION: DATA ACCESS AND MANAGEMENT SYSTEM AS WELL AS A METHOD FOR DATA ACCESS AND DATA MANAGEMENT FOR A COMPUTER SYSTEM

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | YES | $755 | $300 | $0 | $1055 | 02/28/2011 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT.
PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS.
THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON
PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE
MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS
STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES
NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS
PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM
WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW
DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current
SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown
above.

B. If the status above is to be removed, check box 5b on Part B -
Fee(s) Transmittal and pay the PUBLICATION FEE (if required)
and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now
claiming SMALL ENTITY status, check box 5a on Part B - Fee(s)
Transmittal and pay the PUBLICATION FEE (if required) and 1/2
the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office
(USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b"
of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a
request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing
the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to
Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of
maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 08/07) Approved for use through 08/31/2010.

PTO/SB/85 (04/04)
Approved for use through 04/30/2007. OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>

**Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**

or <u>Fax</u> **(571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

| 6449 | 7590 | 11/30/2010 |

ROTHWELL, FIGG, ERNST & MANBECK, P.C.
1425 K STREET, N.W.
SUITE 800
WASHINGTON, DC 20005

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/188,025 | 07/23/2005 | Peter Gailer | 3743-102 | 7982 |

TITLE OF INVENTION: DATA ACCESS AND MANAGEMENT SYSTEM AS WELL AS A METHOD FOR DATA ACCESS AND DATA MANAGEMENT FOR A COMPUTER SYSTEM

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | YES | $755 | $300 | $0 | $1055 | 02/28/2011 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| PORTKA, GARY J | 2187 | 711-114000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

**2. For printing on the patent front page, list**

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)**

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE | (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

**4a. The following fee(s) are submitted:**

☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

**4b. Payment of Fee(s): (Please first reapply any previously paid issue fee shown above)**

☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

**5. Change in Entity Status (from status indicated above)**

☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27. | ☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____ Date _____

Typed or printed name _____ Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

**Exhibit F**

**to**

**Joint Claim Construction Statement**



# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/903,431 | 07/10/2001 | Peter Gailer | W&W-001 | 8926 |

7590          12/09/2004

LAW OFFICES OF IMAM
Suite 1010
111 North Market Street
San Jose, CA  95113

| EXAMINER |
|---|
| VITAL, PIERRE M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2188 | |

DATE MAILED: 12/09/2004

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| | Application No. | Applicant(s) |
|---|---|---|
| **Office Action Summary** | 09/903,431 | GAILER ET AL. |
| | **Examiner** | **Art Unit** |
| | Pierre M. Vital | 2188 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM
THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed
  after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any
  earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>10 July 2001</u>.

2a)☐ This action is **FINAL**.       2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is
      closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>1-55</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>1-29</u> is/are rejected.

7)☒ Claim(s) <u>30-55</u> is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☒ The drawing(s) filed on <u>10 July 2001</u> is/are: a)☒ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☒ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some *  c)☒ None of:

       1.☒ Certified copies of the priority documents have been received.

       2.☐ Certified copies of the priority documents have been received in Application No. _____.

       3.☐ Copies of the certified copies of the priority documents have been received in this National Stage
          application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☐ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08)
    Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application (PTO-152)

6)☐ Other: _____.

Application/Control Number: 09/903,431                                            Page 2
Art Unit: 2188

## DETAILED ACTION

1.    This Office Action is in response to Application No. 09/903,431 filed July 10,

2001. Claims 1-55 are pending in this application.

2.    The specification and the claims have been examined with the results that follow.

### *Priority*

3.    Acknowledgment is made of applicant's claim for foreign priority based on an

application filed in Japan on January 11, 1999.  It is noted, however, that applicant has

not filed a certified copy of the 19900636.9 application as required by 35 U.S.C. 119(b).

### *Claim Objections*

4.    Claim 30 is objected to because of the following informalities:

In claim 30, line 9, after "transmission", please include --;--.

Claims 31-55 are objected as being directly or indirectly dependent on claim 30.

Appropriate correction is required.

### *Claim Rejections - 35 USC § 112*

5.    The following is a quotation of the second paragraph of 35 U.S.C. 112:

The specification shall conclude with one or more claims particularly pointing out and distinctly
claiming the subject matter which the applicant regards as his invention.

6.    Claims 1-29 are rejected under 35 U.S.C. 112, second paragraph, as being

indefinite for failing to particularly point out and distinctly claim the subject matter which

applicant regards as the invention.

Case 1:11-cv-00050-RGA Document 81-7 Filed 09/28/12 Page 140 of 203 PageID #: 5808

(a)     Claim 1 recites the limitation "the determined prespecified parameters" in lines

11, 12 and 17.  There is insufficient antecedent basis for this limitation in the claim.

There is no mention of determination of prespecified parameters in the claim.

(b)     Claim 3 recites the limitation "the determined prespecified parameters" in lines 5-

6.  There is insufficient antecedent basis for this limitation in the claim. There is no

mention of determination of prespecified parameters in the claim.

(c)     Claim 26 recites the limitation "the determined prespecified parameters" in lines

2-3.  There is insufficient antecedent basis for this limitation in the claim. There is no

mention of determination of prespecified parameters in the claim.

(d)     Claim 1 recites the limitation "the data storage means shift data" in line 15.

There is insufficient antecedent basis for this limitation in the claim. There is no mention

of data being shifted in the claim.

(e)     Claims 2-29 are rejected as being directly or indirectly dependent on claim 1.

        Appropriate correction is required.


### *Allowable Subject Matter*

7.     Claims 1-29 would be allowable if claims 1, 3 and 26 were rewritten or amended

to overcome the rejection(s) under 35 U.S.C. 112, 2nd paragraph, set forth in this Office

action.

8.     Claims 30-55 would be allowable if claim 30 was rewritten or amended to

overcome the objection(s), set forth in this Office action.

Application/Control Number: 09/903,431                                    Page 4
Art Unit: 2188

9.      The following is a statement of reasons for the indication of allowable subject

matter:

        The prior art of record does not teach or suggest "accessing the stored data by at

least one computer unit (CL) via data transmission means (N), with prespecified

parameters of the data transmission between the data storage means (C) and the

computer unit (CL) being determined, the data being stored in a redundant manner in at

least two of the at least two data storage means (C) as a function of the determined

parameters of the data transmission, the access to the data being effected as a function

of the determined parameters of the data transmission; detecting prespecified

parameters for data transmissions between the data storage means (C); and shifting

redundantly stored data independent of an access of the computer unit (CL) to the data

as a function of the determined parameters of data transmissions between the data

storage means" in combination with the other elements set forth in the claimed

invention.


                                    **Conclusion**

10.     The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure. Applicant is required under 37 C.F.R. § 1.111(c) to consider

these references fully when responding to this action. The documents cited therein

teach redundant data storage.

Application/Control Number: 09/903,431                                        Page 5
Art Unit: 2188

11.     The examiner requests, in response to this Office action, any reference(s) known

to qualify as prior art under 35 U.S.C. sections 102 or 103 with respect to the invention

as defined by the independent and dependent claims. That is, any prior art (including

any products for sale) similar to the claimed invention that could reasonably be used in

a 102 or 103 rejection. This request does not require applicant to perform a search. This

request is not intended to interfere with or go beyond that **required** under 37 C.F.R.

1.56 or 1.105.

        The request may be fulfilled by asking the attorney(s) of record handling

prosecution and the inventors)/assignee for references qualifying as prior art. A simple

statement that the query has been made and no prior art found is sufficient to fulfill the

request. Otherwise, the fee and certification requirements of 37 CFR section 1.97 are

waived for those documents submitted in reply to this request. This waiver extends only

to those documents within the scope of this request that are included in the application's

first complete communication responding to this requirement. Any supplemental replies

subsequent to the first communication responding to this request and any information

disclosures beyond the scope of this are subject to the fee and certification

requirements of 37 CFR section 1.97.

        In the event prior art documentation is submitted, a discussion of relevant

passages, figs., etc., with respect to the claims is requested. The examiner is looking for

specific references to 102/103 prior art that identify independent and dependent claim

limitations. Since applicant is most knowledgeable of the present invention and

Application/Control Number: 09/903,431                                        Page 6
Art Unit: 2188

submitted art, his/her discussion of the reference(s) with respect to the instant claims is

essential. **A response to this inquiry is greatly appreciated**.

12.    The examiner also requests, in response to this Office action, support be shown

for language added to any original claims on amendment and any new claims. That is,

indicate support for newly added claim language by specifically pointing to page(s) and

line no(s) in the specification and/or drawing figure(s). This will assist the examiner in

prosecuting the application.

13.    When responding to this office action, Applicant is advised to clearly point out the

patentable novelty which he or she thinks the claims present, in view of the state of the

art disclosed by the references cited or the objections made. He or she must also show

how the amendments avoid such references or objections See 37 CFR 1.111(c).

14.    Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Pierre M. Vital whose telephone number is (571) 272-

4215. The examiner can normally be reached on 8:30 am - 6:00 pm, alternate Fridays

off.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Mano Padmanabhan can be reached on (571) 272-4210. The fax phone

number for the organization where this application or proceeding is assigned is 703-

872-9306.

Application/Control Number: 09/903,431                                Page 7
Art Unit: 2188

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system. Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free).


December 6, 2004


Pierre M. Vital
Primary Examiner
Art Unit 2188

**Exhibit G**

**to**

**Joint Claim Construction Statement**

**PATENT**

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
## (Attorney Docket No. 681998-0001)

| | | |
|---|---|---|
| In the Application of: | § | Group Art Unit: 2188 |
| | § | |
| **Peter Gailer, et al.** | § | |
| | § | Examiner: Pierre M. Vital |
| | § | |
| Serial No.: 09/903,431 | § | |
| | § | |
| Filed: July 10, 2001 | § | Confirmation No. 8926 |
| | § | |

For: Data Access and Management System as Well as a Method for Data Access and Data Management for a Computer System

---

**CERTIFICATE OF MAILING/TRANSMISSION (37 CFR 1.10)**

I hereby certify that this correspondence is, on the date shown below, being:

☒ deposited with the United States Postal Service with sufficient postage as "Express Mail Post Office to Addressee" service under 37 C.F.R. 1.10 and addressed to Mail Stop: Amendment, Commissioner of Patents, P.O. Box 1450, Alexandria, VA 22313-1450 "Express Mail" Label No. EL843249389US

☐ transmitted by facsimile to the Patent and Trademark Office.

Signature

Date: 4/8/2005

Kelly Breeze
*(type or print name of person certifying)*

---

Dear Sir:

## RESPONSE TO OFFICE ACTION

In response to the Office Action mailed December 9, 2004 (Paper No./Mail Date: 12092004), Applicants respectfully submit the following amendments in the above-referenced application, and request entry thereof to place the application in condition for Allowability.

**Amendments to the Claims** are reflected in the listing of claims which begins on page 2 of this paper.

**Remarks/Arguments** begin on page 13 of this paper.

1

**Amendments to the Claims:**

This listing of claims will replace all prior versions, and listings, of claims in the application:

## CLAIMS

1.    **(Currently Amended)** A data access and management system for a computer system, comprising:

~~a.~~    at least two data storage means ~~(C1, C2, ..., Cn)~~;

~~b.~~    at least one computer unit ~~(CL)~~ which accesses the data of the data storage means ~~(C)~~;

~~c.~~    data transmission means ~~(N)~~ for a data transmission between the data storage means ~~(C)~~ and the computer unit ~~(CL)~~, with the data being stored in a redundant manner in at least two of the at least two data storage means ~~(C)~~; and

~~d.~~    means for ~~the detection of~~ **detecting** prespecified parameters of the data transmission between the data storage means ~~(C)~~ and the computer unit ~~(CL)~~, with data being preferably stored in a redundant manner in the data storage means ~~(C)~~ as a function of **said** ~~the determined~~ **detected** prespecified parameters, and with the computer unit ~~(CL)~~ accessing one of the data storage means ~~(C)~~ as a function of **said** ~~the determined~~ **detected** prespecified parameters, the data storage means ~~(C)~~ comprising **second** means for ~~the detection of~~ **detecting** prespecified parameters for data transmissions between **said** ~~the~~ data storage means ~~(C)~~ and ~~the~~ data storage means ~~(C)~~ ~~shift~~ **copy** data which is redundantly stored in the system independent of an access of the computer unit ~~(CL)~~ as a function of the ~~determined~~ **detected prespecified** parameters of data transmissions between the data storage means ~~(C)~~.

2

2.   **(Currently Amended)** A data access and management system as recited in claim 1 wherein **each of said** ~~the~~ data storage means ~~(C)~~ ~~each~~ comprise control units for controlling the data access and the data management.

3.   **(Currently Amended)** A data access and management system as recited in claim 1 wherein the data storage means ~~(C)~~ copy redundantly stored data in the system among each other as a function of the ~~determined~~ **detected prespecified** parameters of data transmissions between the individual data storage means ~~(C)~~ and the computer unit ~~(CL)~~ and delete the data in the data storage means ~~(C)~~ in which it had been stored beforehand.

4.   **(Currently Amended)** A data access and management system as recited in claim 1 wherein the data storage means ~~(C)~~ process the stored data independent from the computer unit ~~(CL)~~.

5.   **(Currently Amended)** A data access and management system as recited in claim 1 wherein the data in the system is divided into data subsets ~~(F)~~, and the data storage means ~~(C)~~ are divided into cells ~~(Z)~~ in such a manner that data subsets ~~(F)~~ to be stored in a redundant manner are stored in one each of the cells ~~(Z)~~ of the corresponding data storage means ~~(C)~~.

6.   **(Currently Amended)** A data access and management system as recited in claim 5 wherein the data storage means ~~(C)~~ are divided into cells ~~(Z)~~ depending on data transmission parameters.

7.   **(Currently Amended)** A data access and management system as recited in claim 5 wherein each cell ~~(Z)~~ comprises additional data for data access and data management which relates to the parameters of data transmissions between **at least one of** the individual data storage means**,** ~~(C) and~~ the computer unit ~~(CL)~~, ~~and/or~~ neighbouring cells

3

5 (Z), ~~and/or~~ **and** cells ~~(Z)~~ which comprise data which is stored in the system in a redundant manner.

8.    **(Currently Amended)** A data access and management system as recited in claim 5 wherein the cells ~~(C)~~ interchange data among each other which is used for the data access and the data management.

9.    **(Currently Amended)** A data access and management system as recited in claim 5 wherein the parameters of data transmission between the individual data storage means ~~(C)~~ and the computer unit ~~(CL)~~ are identical for the cells ~~(Z)~~ of a data storage means ~~(C)~~.

10.    **(Currently Amended)** A data access and management system as recited in claim 1 wherein the computer unit **operates to perform at least one of outputting** ~~(CL) outputs~~ data for storage in the data storage means ~~(C) and/or processes~~ **and processing** data stored in the data storage means ~~(C)~~.

11.    **(Currently Amended)** A data access and management system as recited in claim 1 wherein the computer unit ~~(CL)~~ is connected with a user ~~(B)~~ for **at least one of** transmitting the received data ~~and/or for~~ **and** control by the user ~~(B)~~.

12.    **(Currently Amended)** A data access and management system as recited in claim 11 wherein the user ~~(B)~~ is **at least one of** a personal computer, ~~and/or~~ a central processing unit of a computer, ~~and/or~~ **and** an additional data storage means.

13.    **(Currently Amended)** A data access and management system as recited in claim 1 wherein the computer unit ~~(CL)~~ is a system which provides Internet services.

14.    **(Currently Amended)** A data access and management system as recited in claim 5 wherein the computer unit ~~(CL)~~ immediately accesses individual cells ~~(Z)~~ of the data storage means ~~(C)~~.

4

15.   **(Currently Amended)** A data access and management system as recited in claim 1 wherein the **detected** prespecified parameters of data transmissions between the individual data storage means (C) and the computer unit (CL) comprise **at least one of** the duration of the transmission, and/or the fault rate, and/or **and** the duration of data processing operations of the individual data storage means (C) prior to the transmission of the data.

16.   **(Currently Amended)** A data access and management system as recited in claim 1 wherein the data transmission means (N) comprise **at least one of** electrically conductive connections, and/or bus systems, and/or computer networks, and/or wired or wireless (mobile) telephone networks, **wireless telephone networks,** and/or **and** the Internet.

17.   **(ORIGINAL)** A data access and management system as recited in claim 1 for use with a database system or a computer structure which manages data by means of the data access and management system.

18.   **(ORIGINAL)** A data access and management system as recited in claim 1 for use in a system for a computer game which is provided via the Internet.

19.   **(Currently Amended)** A data access and management system as recited in claim 18 wherein at least one computer unit (CL) is an Internet service provider.

20.   **(Currently Amended)** A data access and management system as recited in claim 18 wherein the computer game is an interactive computer game to be used by at least two users (B).

21.   **(Currently Amended)** A data access and management system as recited in claim 20 wherein each user (B) is connected with one computer unit (CL) each.

5

22. **(Currently Amended)** A data access and management system as recited in claim 20 wherein the computer units ~~(CL)~~ transmit data for the execution of the computer game to the respective users ~~(B)~~.

23. **(Currently Amended)** A data access and management system as recited in claim 22 wherein the users ~~(B)~~ process the received data for executing the computer game and transmit ~~it~~ **said processed received data** back to the corresponding computer units ~~(CL)~~.

24. **(Currently Amended)** A data access and management system as recited in claim 18 wherein additional means are provided for ~~the detection of~~ **detecting** prespecified parameters of the data transmission between the computer units ~~(CL)~~ and the respectively connected users ~~(B)~~.

25. **(Currently Amended)** A data access and management system as recited in claim 24 wherein the **detected** prespecified parameters of data transmissions between the computer units ~~(CL)~~ and the respectively connected users ~~(B)~~ comprise **at least one of** the duration of the transmission, ~~and/or~~ the fault rate, ~~and/or~~ the duration of data processing operations of the individual computer units**, and** ~~(CL) and/or~~ the individual users ~~(B)~~ prior to the transmission of the data.

26. **(Currently Amended)** A data access and management system as recited in claim 24 wherein the data for executing the computer game is ~~also~~ stored in a redundant manner as a function of the ~~determined~~ **detected** prespecified parameters of the data transmission between the computer units ~~(CL)~~ and the respectively connected users ~~(B)~~.

27. **(Currently Amended)** A data access and management system as recited in claim 18 wherein the computer units ~~(CL)~~ receive control for the execution of the computer game from the respective users ~~(B)~~.

6

28.     **(Currently Amended)** A data access and management system as recited in claim 27 wherein the computer units ~~(CL)~~ output the control data or equivalent data to the data storage means ~~(C)~~.

29.     **(Currently Amended)** A data access and management system as recited in claim 27 wherein the computer units ~~(CL)~~ process data for executing the computer game depending on **at least one of** the control data, ~~and/or~~ **and** the data storage means ~~(C)~~ process data for executing the computer game, depending on the control data or on data
5       equivalent to the control data.

30.     **(Currently Amended)** A method for data access and data management for a computer system, comprising:

        ~~a.~~      storing data in at least two data storage means ~~(C)~~;

        ~~b.~~      accessing the stored data by at least one computer unit ~~(CL)~~ via data transmission
5                means ~~(N)~~, with prespecified parameters of the data transmission between the data storage means ~~(C)~~ and the computer unit ~~(CL)~~ being determined, the data being stored in a redundant manner in at least two of the at least two data storage means ~~(C)~~ as a function of the determined **prespecified** parameters of the data transmission, the access to the data being effected as a function of the determined
10               **prespecified** parameters of the data transmission**;**

        ~~c.~~      detecting prespecified parameters for data transmissions between the data storage means**;** ~~(C),~~ and

        ~~d.~~      shifting redundantly stored data independent of an access of the computer unit
                 ~~(CL)~~ to the data as a function of the determined **prespecified** parameters of data
15               transmissions between the data storage means.

7

31. **(Currently Amended)** A method for data access and data management as recited in claim 30 wherein the data access and the data management are controlled by the data storage means (C).

32. **(Currently Amended)** A method for data access and data management as recited in claim 30 further including the steps of copying redundantly stored data among each other by the data storage means as a function of the determined **prespecified** parameters of data transmissions between the individual data storage means (C) and the computer unit and deleting in the data storage means in which the copied data had been previously stored.

5

33. **(Currently Amended)** A method for data access and data management as recited in claim 30 further including the step of processing the data by the data storage means (C) independently of the computer unit (CL).

34. **(Currently Amended)** A method for data access and data management as recited in claim 30 further including the step of dividing the data into data subsets (F), with the data subsets (F) to be stored in a redundant manner being stored in cells (Z) of the individual data storage means (C).

35. **(Currently Amended)** A method for data access and data management as recited in claim 30 wherein the division into data subsets (F) and the storage in the cells (Z) are carried out as a function of the data transmission parameters.

36. **(Currently Amended)** A method for data access and data management as recited in claim 30 wherein additional data for data access and data management is stored in the cells (Z), which relate to **at least one of** the parameters of data transmissions between the

8

individual data storage means, ~~(C) and~~ the computer unit ~~(CL)~~, ~~and/or~~ neighbouring cells

5        ~~(Z)~~, ~~and/or~~ **and** cells ~~(Z)~~ which comprise the data redundantly stored in the system.

37.    **(Currently Amended)** A method for data access and data management as recited in claim 34 wherein additional data for data access and data management are exchanged between the cells ~~(Z)~~ of the data storage means ~~(C)~~.

38.    **(Currently Amended)** A method for data access and data management as recited in claim 30 wherein the access to data of cells ~~(Z)~~ of a data storage means ~~(C)~~ has identical data transmission parameters.

39.    **(Currently Amended)** A method for data access and data management as recited in claim 30 wherein data is **at least one of** output by the computer unit ~~(CL)~~ for storage in the data storage means ~~(C) and/or~~ **and** the data stored in the data storage means ~~(C)~~ is processed by the computer unit ~~(CL)~~.

40.    **(Currently Amended)** A method for data access and data management as recited in claim 30 wherein **the user at least one of receives** data ~~is~~ transmitted by the computer unit ~~(CL) to a user (B) and/or~~ **and controls** the computer unit ~~(CL) is controlled by the user (B)~~.

41.    **(ORIGINAL)** A method for data access and data management as recited in claim 30 wherein the method provides Internet services.

42.    **(Currently Amended)** A method for data access and data management as recited in claim 34 wherein the access is made directly to the data of individual cells ~~(Z)~~ of the data storage means ~~(C)~~.

43.    **(Currently Amended)** A method for data access and data management as recited in claim 30 wherein the determination of the prespecified parameters of data transmissions

9

between the individual data storage means (C) and the computer unit (CL) comprises **at least one of** the determination of the duration of the transmission, ~~and/or~~ the fault rate, ~~and/or~~ **and** the duration of data processing operations of the individual data storage means (C) prior to the transmission of the data.

44. **(ORIGINAL)** A method for data access and data management as recited in claim 30 for use with a database system or a computer structure which manages data by means of said method for data access and data management.

45. **(ORIGINAL)** A method for data access and data management as recited in claim 30 for use with a computer game which is provided via the Internet and in accordance with said method for data access and data management.

46. **(Currently Amended)** A method for data access and data management as recited in claim 30 wherein the access to data in the data storage means (C) comprises the employment of an Internet service provider which operates as a computer unit (CL).

47. **(Currently Amended)** A method for data access and data management as recited in claim 45 wherein at least two users (B) access the computer game, the computer game being an interactive computer game.

48. **(Currently Amended)** A method for data access and data management as recited in claim 47 wherein the data for executing the computer game is transmitted from the computer units (CL) to the respective users (B).

49. **(Currently Amended)** A method for data access and data management as recited in claim 48 wherein the data received by the users (B) are processed by the users (B) and transmitted back to the corresponding computer units (CL).

10

50.    **(Currently Amended)** A method for data access and data management as recited in claim 45 **further comprising the step of determining** ~~wherein~~ prespecified parameters of the data transmission between the computer units ~~(CL)~~ and the respected users ~~(B)~~ connected therewith ~~are determined~~.

51.    **(Currently Amended)** A method for data access and data management as recited in claim 50 wherein the determination of the prespecified parameters of data transmissions between the computer units ~~(CL)~~ and the respective users ~~(B)~~ connected therewith comprises **at least one of** the determination of the duration of the transmission, ~~and/or~~ the fault rate, ~~and/or~~ the duration of data processing operations of the individual computer units**,** ~~(CL) and/or~~ **and** the individual users ~~(B)~~ prior to the transmission of the data.

52.    **(Currently Amended)** A method for data access and data management as recited in claim 50 wherein the redundant storage of the data for the execution of the computer game is ~~also be~~ carried out as a function of the determined prespecified parameters of the data transmission between the computer units ~~(CL)~~ and the respective users ~~(B)~~ connected therewith.

53.    **(Currently Amended)** A method for data access and data management as recited in claim 45 wherein control data for the execution of the computer game is additionally transmitted by the users ~~(B)~~ to the corresponding computer units ~~(CL)~~. ~~Preferably, the control data or equivalent data from the computer units are also transmitted to the data storage means~~.

54.    **(Currently Amended)** A method for data access and data management as recited in claim 53 wherein the control data or equivalent data is transmitted from the computer units ~~(CL)~~ to the data storage means ~~(C)~~.

11

55.  **(Currently Amended)** A method for data access and data management as recited in claim 53 wherein the data for executing the computer game is processed by **at least one of** the computer units ~~(CL)~~ as a function of the control data ~~and/or the data for executing the computer game is processed by~~ **and** the data storage means ~~(C)~~ as a function of the control data or of data equivalent to the control data.

## REMARKS/ARGUMENTS

Reconsideration of the present application, as amended, is respectfully requested. Applicants wish to thank the Examiner for the indication of allowability of claims 1-55 if rewritten to overcome the deficiencies of claims 1, 3, 26, and 30 as noted in the Office Action.

5    Claims 1-16, 19-40, 42, 43, and 46-55 have been amended to more fully claim that to which Applicants believe they are entitled. No claims have been canceled. Therefore, claims 1-55 remain pending in the present application.

As required by 35 U.S.C. 119(b), Applicants have contacted WIPO to request that a certified copy of German application 19900636.9 be forwarded to your offices.

10    Claim 30 stands objected to due to an informality. Claim 30 has been amended as suggested by the Examiner. As such, Applicants request that the objection to claim 30 be withdrawn.

Claims 1-29 stand rejected under 35 U.S.C. §112, second paragraph, as being indefinite. Claims 1, 3, and 26 have been amended to overcome the antecedent basis issues raised by the

15    Examiner. Applicants respectfully request that the 35 U.S.C. §112 rejection of claims 1, 3, 26, and those claims dependent therefrom, be withdrawn.

In addition, Applicants have amended claims 1-16, 19-40, 42, 43, and 46-55 to conform to common U.S. practice. Applicants submit that the amendments to the claims are not made in response to any prior art of record and no new matter has been added.

20    Applicants submit, attached hereto, a copy of an international search report and references cited therein for the Examiner's review. As shown in the search report, the references are all designated as "category A."

In view of the foregoing remarks and for various other reasons readily apparent, Applicants submit that all of the claims now present are allowable, and withdrawal of the

25    rejections and a Notice of Allowance are courteously solicited.

13

If any impediment to the allowance of the claims remains after consideration of this amendment, a telephone interview with the undersigned at (214) 969-2751 is hereby requested so that such impediments may be resolved as expeditiously as possible.

5        No additional fee is believed to be required with this response. However, please charge Deposit Account No. 010657 for any additional fees required in conjunction with the papers filed herewith.

Respectfully Submitted,

Stuart D. Dwork
Reg. No. 31,103
Ashley N. Moore
Reg. No. 51,667
ATTORNEY FOR APPLICANTS

Date: _____4/8/05_____

Akin, Gump, Strauss, Hauer & Feld, L.L.P.
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201-4675
Tel. No.: (214 ) 969-2800
Fax No.: (214) 969-4343

14

**Exhibit H**

**to**

**Joint Claim Construction Statement**

| | **Application No.** | **Applicant(s)** |
|---|---|---|
| **Notice of Allowability** | 09/903,431 | GAILER ET AL. |
| | **Examiner** | **Art Unit** |
| | Pierre M. Vital | 2188 |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to _Amdt filed 6/1/05_.

2. ☒ The allowed claim(s) is/are _1-9, 14, 10-34, 42, 35-45, 47-55 and 46 renumbered 1-55_.

3. ☒ The drawings filed on _10 July 2001_ are accepted by the Examiner.

4. ☒ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   a) ☐ All    b) ☐ Some*   c) ☒ None   of the:
   1. ☒ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
   * Certified copies not received: _____.

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

6. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.
   (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached
      1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____.
   (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of
      Paper No./Mail Date _____.

   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

7. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☒ Notice of References Cited (PTO-892)
2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3. ☒ Information Disclosure Statements (PTO-1449 or PTO/SB/08), Paper No./Mail Date _4/8/05_
4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material
5. ☐ Notice of Informal Patent Application (PTO-152)
6. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____.
7. ☒ Examiner's Amendment/Comment
8. ☒ Examiner's Statement of Reasons for Allowance
9. ☐ Other _____.

_Pierre M. Vital_
Pierre M. Vital
Primary Examiner
Art Unit 2188

Application/Control Number: 09/903,431                                    Page 2
Art Unit: 2188

## · DETAILED ACTION

### *Correction of Inventorship Under 37 CFR 1.48(a)*

1.      In view of the papers filed April 8, 2005, it has been found that this nonprovisional

application, as filed, through error and without deceptive intent, improperly set forth the

inventorship, and accordingly, this application has been corrected in compliance with 37

CFR 1.48(a). The inventorship of this application has been changed by deleting the

following previously named inventors, namely, Peter Gailer and Joachim Gunster.

The application will be forwarded to the Office of Initial Patent Examination

(OIPE) for issuance of a corrected filing receipt, and correction of Office records to

reflect the inventorship as corrected.

## REASONS FOR ALLOWANCE

2.      The following is an examiner's statement of reasons for allowance:

Although Dan et al teaches redundantly transmitting data based on response

characteristics (see page 2), the reference does not teach or suggest "a data storage

means copying data which is redundantly stored in a system independent of an access

of a computer unit as a function of the detected prespecified parameters of data

transmissions between the data storage means". As such, Dan et al, does not teach or

render obvious the invention as claimed in claims 1-55.

Application/Control Number: 09/903,431                                    Page 3
Art Unit: 2188

3.      Any comments considered necessary by applicant must be submitted no later

than the payment of the issue fee and, to avoid processing delays, should preferably

accompany the issue fee.  Such submissions should be clearly labeled "Comments on

Statement of Reasons for Allowance."


### *Conclusion*

4.      Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Pierre M. Vital whose telephone number is (571) 272-

4215.  The examiner can normally be reached on 8:30 am - 6:00 pm, alternate Fridays

off.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Mano Padmanabhan can be reached on (571) 272-4210.  The fax phone

number for the organization where this application or proceeding is assigned is 703-

872-9306.

Application/Control Number: 09/903,431                                    Page 4
Art Unit: 2188

     Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system. Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free).


June 24, 2005

*Pierre M. Vital*

Pierre M. Vital
Primary Examiner
Art Unit 2188

**Exhibit I**

**to**

**Joint Claim Construction Statement**

# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/515,507 | 09/05/2006 | Thomas Binzinger | 294184US2RE | 6505 |

22850        7590        06/09/2008
OBLON, SPIVAK, MCCLELLAND MAIER & NEUSTADT, P.C.
1940 DUKE STREET
ALEXANDRIA, VA 22314

| EXAMINER |
|---|
| PORTKA, GARY J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2188 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 06/09/2008 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@oblon.com
oblonpat@oblon.com
jgardner@oblon.com

PTOL-90A (Rev. 04/07)



| | Application No. | Applicant(s) |
|---|---|---|
| **Notice of Allowability** | 11/515,507 | BINZINGER, THOMAS |
| | Examiner | Art Unit | |
| | Gary J. Portka | 2188 | |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**
All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to _application filed September 5, 2006_.

2. ☒ The allowed claim(s) is/are _1-55_.

3. ☒ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☒ All    b) ☐ Some*   c) ☐ None   of the:

        1. ☒ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____.

        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.

4. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached

        1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____.

    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of
    Paper No./Mail Date _____.

    Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3. ☒ Information Disclosure Statements (PTO/SB/08),
   Paper No./Mail Date _09/05/2006_
4. ☐ Examiner's Comment Regarding Requirement for Deposit
   of Biological Material

5. ☐ Notice of Informal Patent Application
6. ☐ Interview Summary (PTO-413),
   Paper No./Mail Date _____ .
7. ☒ Examiner's Amendment/Comment
8. ☒ Examiner's Statement of Reasons for Allowance
9. ☐ Other _____.

## EXAMINER'S AMENDMENT

1.    An examiner's amendment to the record appears below. Should the changes

and/or additions be unacceptable to applicant, an amendment may be filed as provided

by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be

submitted no later than the payment of the issue fee.

The application has been amended as follows:


**In the specification:**


2.    The paragraph beginning at column 1, line 5, is replaced with the following:


CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of international application PCT/EP2000/00141,

filed Jan. 11, 2000, which claims priority to [our previously filed] German patent

application number 199 00 636.9, filed on Jan. 11, 1999 and entitled "DATA ACCESS

AND MANAGEMENT SYSTEM AS WELL AS A METHOD FOR DATA ACCESS AND

DATA MANAGEMENT FOR A COMPUTER SYSTEM".


## REMARKS

3.    The amendment to the specification did not conform with 37 CFR 1.173, in

particular 1.173(d)(1), which requires amendments to the specification and claims in

reissue applications to show omitted matter enclosed in brackets.  Since the omitted

matter was easily discerned by the examiner as being that shown as struck out, an

examiner's amendment is submitted herewith showing the amendment in the form

conforming to the rule.


## REASONS FOR ALLOWANCE

4.     The following is an examiner's statement of reasons for allowance:  The prior art

of record does not teach or suggest a data access and management system and

method where data is stored in at least two storage means, accessed by a computer

unit via data transmission means with determined prespecified parameters of the data

transmission between the storage means and the computer unit, the data stored in a

redundant manner in at least two of the storage means as a function of, and access

thereto being effected as a function of, the determined prespecified parameters, and

detecting the prespecified parameters, where redundantly stored data is copied or

shifted independent of access of the computer unit to the data as a function of the

determined prespecified parameters.


## Conclusion

5.     Any comments considered necessary by applicant must be submitted no later

than the payment of the issue fee and, to avoid processing delays, should preferably

accompany the issue fee.  Such submissions should be clearly labeled "Comments on

Statement of Reasons for Allowance.

Application/Control Number: 11/515,507                                        Page 4
Art Unit: 2188

       Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Gary J. Portka whose telephone number is (571) 272-

4211.  The examiner can normally be reached on M-F 9:30 AM - 6:00 PM.

       If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Hyung Sough can be reached on (571) 272-6799.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

       Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/Gary J Portka/
Primary Examiner, Art Unit 2188
August 17, 2007

**Exhibit J**

**to**

**Joint Claim Construction Statement**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

_____

VIA VADIS, LLC,              )
                               )
      Plaintiff,       )
                               )     Civil Action No.11-507-RGA
v.                        )
                               )
SKYPE, INC.; SKYPE         )     **JURY TRIAL DEMANDED**
COMMUNICATIONS SARL;    )
SKYPE GLOBAL SARL; SKYPE   )
SOFTWARE SARL;         )
AND SKYPE TECHNOLOGIES, SA., )
                               )
                               )
      Defendants.    )
_____)

### *PLAINTIFF'S IDENTIFICATION OF*
### *TERMS/PHRASES REQUIRING CONSTRUCTION BY THE COURT*

Plaintiff, Via Vadis, LLC ("Via Vadis"), by its undersigned counsel, pursuant to the Court's Scheduling Order entered April 12, 2012, hereby submits its identification of claim terms/phrases requiring construction by the Court. In this regard, Via Vadis does not believe that any of the claim terms/phrases of either of the patents at issue in this matter require construction by the Court. Via Vadis nonetheless reserves the right to propose constructions for any claim terms/phrases in response to Defendants' proposed constructions and for any claim terms/phrases that the Court finds require construction.

Respectfully submitted,

_____
/s/ Daniel A. Griffith

Daniel A. Griffith (DE# 4209)
Whiteford, Taylor & Preston LLC
1220 North Market Street
Suite 608
Wilmington, Delaware 19801
(302) 353-4144
dgriffith@wtplaw.com


Edward M. Buxbaum (*admitted pro hac*)
Steven E. Tiller (*admitted pro hac*)
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1636
(410) 347-8700
ebuxbaum@wtplaw.com
stiller@wtplaw.com

Martin M. Zoltick (*admitted pro hac*)
ROTHWELL, FIGG, ERNST &
MANBECK, P.C.
607 14th Street, NW
Suite 800
Washington, DC 20005
(202) 783-6040
mzoltick@rothwellfigg.com

Robert J. Weltchek (*admitted pro hac*)
WELTCHEK MALLAHAN & WELTCHEK
2330 West Joppa Road, Suite 203
Lutherville, Maryland 21093
410-825-5287
rweltcheck@wmwlawfirm.com

*Attorneys for Plaintiff,*
*VIA VADIS, LLC*

2

## CERTIFICATE OF SERVICE

     I, Daniel A. Griffith, Esquire, hereby certify that on August 28, 2012, a true and correct

copy of Plaintiff's Identification of Terms/Phrases to be Construed were served via electronic

and U.S. First Class Mail, postage prepaid, on the following counsel of record:

| | |
|---|---|
| Jack B. Blumenfeld | Douglas E. Lumish |
| Rodger Dallery Smith, II | Michael B. Eisenberg |
| Morris, Nichols, Arsht & Tunnell | Parker C. Ankrum |
| 1201 North Market Street | Stefan R. Stoyanov |
| PO Box 1347 | Kasowitz, Benson, Torres & Friedman LLP |
| Wilmington, DE  19899 | 333 Twin Dolphin Drive, Suite 200 |
| | Redwood Shores, CA 94065 |

                              /s/ Daniel A. Griffith

*2017270*

3

**Exhibit K**

**to**

**Joint Claim Construction Statement**

## Parker C. Ankrum

| | |
|---|---|
| **From:** | Parker C. Ankrum |
| **Sent:** | Tuesday, September 04, 2012 1:35 PM |
| **To:** | Steven Tiller (stiller@wtplaw.com) |
| **Cc:** | Martin M. Zoltick (mzoltick@rfem.com); Skype-Via Vadis |
| **Subject:** | Via Vadis, LLC v. Skype, Inc. |

Steven,

Pursuant to Paragraph 7 of the April 12, 2012 Scheduling Order, the Court mandated that the parties exchange "a list of those claim term(s)/phrase(s) that they believe need construction and their proposed claim constructions of those term(s)/phrase(s)" by last Tuesday, August 28. As part of an agreement between the parties, Skype served a list of terms/phrases and proposed constructions on August 28, 2012 at 6:00 pm Eastern. At the same time, Via Vadis served a pleading that <u>did not identify any terms or phrases for construction</u>. In pertinent part, Via Vadis's pleading stated only that "Via Vadis does not believe that any of the claim terms/phrases of either of the patents at issue in this matter require construction by the Court." Tellingly, Via Vadis failed to propose claim constructions for the means-plus-function terms recited in its asserted claims, where no reasonable argument can be made that a claim construction would be unnecessary. Via Vadis's failure to address these or any other phrases or terms in the asserted claims violates both the letter and spirit of the Court's Scheduling Order.

To the extent that Via Vadis asserts that its disclosure accurately reflects its position that all terms and phrases in the asserted claims should be accorded their plain and ordinary meaning, then the parties should proceed through claim construction briefing on that basis. If, however, Via Vadis seeks to adopt claim constructions other than plain and ordinary meaning, Skype hereby gives notice that it will object to any such change in position and will seek to strike any briefing submitted by Via Vadis that proposes alternative constructions.

Regards,
Parker

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel A. Griffith, Esquire, hereby certify that on September 28, 2012, a true and

correct copy of the Joint Claim Construction Statement were served via electronic and U.S. First

Class Mail, postage prepaid, on the following counsel of record:

Jack B. Blumenfeld
Rodger Dallery Smith, II
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE 19899

Douglas E. Lumish
Michael B. Eisenberg
Parker C. Ankrum
Stefan R. Stoyanov
Kasowitz, Benson, Torres & Friedman LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA 94065

/s/ Daniel A. Griffith

# EXHIBIT B

(19) **United States**

(12) **Reissued Patent**
　　Binzinger

(10) Patent Number: **US RE40,521 E**
(45) Date of Reissued Patent: **Sep. 23, 2008**

(54) **DATA ACCESS AND MANAGEMENT SYSTEM AS WELL AS A METHOD FOR DATA ACCESS AND DATA MANAGEMENT FOR A COMPUTER SYSTEM**

(75) Inventor: **Thomas Binzinger**, Baldham (DE)

(73) Assignee: **AC Technologies S.A.**, Leithum (LU)

(21) Appl. No.: **11/515,507**

(22) Filed: **Sep. 5, 2006**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **7,000,084**
　　 Issued: **Feb. 14, 2006**
　　 Appl. No.: **09/903,431**
　　 Filed: **Jul. 10, 2001**

U.S. Applications:
(63) Continuation of application No. PCT/EP2000/00141, filed on Jan. 11, 2000.

(30) **Foreign Application Priority Data**

　　 Jan. 11, 1999　(DE) ......................................... 199 00 636

(51) **Int. Cl.**
　　 *G06F 12/14*　　(2006.01)
　　 *G06F 13/28*　　(2006.01)

(52) **U.S. Cl.** ...................................... **711/162**; 711/165

(58) **Field of Classification Search** ........................ None
　　 See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,459,837 A | 10/1995 | Caccavale | ................... | 709/226 |
| 5,515,500 A | 5/1996 | Mizuno et al. | ............... | 714/7 |
| 5,841,962 A | 11/1998 | Nakamura et al. | ............. | 714/6 |
| 6,081,907 A | 6/2000 | Witty et al. | ................ | 714/6 |
| 6,085,251 A | 7/2000 | Fabozzi, II | ................. | 709/230 |
| 6,339,785 B1 | 1/2002 | Feigenbaum | ................ | 709/213 |
| 2005/0273504 A1 | 12/2005 | Gailer et al. | ............... | 709/219 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 767 585 A2 | 4/1997 |
| EP | WO 98/18076 | 4/1998 |
| EP | WO 98/26559 | 6/1998 |
| EP | 0 884 870 A2 | 12/1998 |

OTHER PUBLICATIONS

Abbasov, "Optimizing the Location of Databases With Copies in Computer Networks", Avomatika i Vychislitlel'naya Tekhnika, vol. 22, No. 4, pp. 58–62, 1988.
Search Report for PCT/EP00/00141 dated Jun. 30, 2000.
International Preliminary Examination Report for PCT/EP00/00141 dated Apr. 27, 2001.
BitTorrent Source Code, Circa Jul. 1, 2001, 96 pages.
Search Report of PCT/EP00/00141 Dated Jun. 30, 2000 in co–pending PCT filing of U.S. application filed herewith.
International Preliminary Examination Report for PCT/EP00/00141 Dated Apr. 27, 2001 in parent PCT filing of U.S. application filed herewith.

*Primary Examiner*—Gary Portka
(74) *Attorney, Agent, or Firm*—Oblon, Spivak, McClelland, Maier & Neustadt, P.C.

(57)　　　**ABSTRACT**

The present invention permits improved data access and improved data management in a computer system. To this end, data are divided into individual partial data (F) and stored in cells (Z) of storage devices (C) in such a way that the partial data (F) being accessed and managed are present in the computer system in a redundant manner. Computer units (CL) are able to access the redundantly stored data. The fact that they are stored in the storage devices (C) ensures that the computer units (CL) accessing said data are supplied more rapidly. This is achieved in particular owing to the fact that the redundantly stored data are accessed in accordance with parameters of data transmissions between the computer units (CL) and the data storage devices (C) and that, in accordance with said data transmission parameters, the redundantly stored data are moved to and from the data storage devices (C) by corresponding copy and delete operations.

**55 Claims, 3 Drawing Sheets**





Fig. 1

Fig. 2



Fig. 3



Fig. 4



US RE40,521 E

1

DATA ACCESS AND MANAGEMENT SYSTEM
AS WELL AS A METHOD FOR DATA ACCESS
AND DATA MANAGEMENT FOR A
COMPUTER SYSTEM

**Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.**

CROSS REFERENCE TO RELATED
APPLICATIONS

This application *is a continuation of international application PCT/EP2000/00141, filed Jan. 11, 2000, which* claims priority to [our previously-filed] German patent application number 199 00 636.9, filed on Jan. 11, 1999 and entitled "DATA ACCESS AND MANAGEMENT SYSTEM AS WELL AS A METHOD FOR DATA ACCESS AND DATA MANAGEMENT FOR A COMPUTER SYSTEM".

BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention generally relates to a data access and management system as well as to a method for data access and data management for a computer system. In particular, the present invention relates to a system and a method for optimising the access to data and their processing in distributed and networked computer structures.

2. Description of the Prior Art

The ever increasing use of distributed and networked computer structures and arrangements has the consequence that data and functionalities for data management purposes are no longer provided or utilised, respectively, by consistent computer systems, but by various distributes computer systems which are. In conventional distributed and net-worked computer structures and arrangements data and functionalities are generally provided by a central computer system, a so-called server, or an accumulation of central computer systems, so-called server clusters. Other computer systems, so-called clients, such as for example, personal computers are connected e.g. via networks or busses with the central computer system in order to access data and functionalities. In this context, various problems occur which limit the supply of clients with data and/or functionalities, in particular, if the access to a central computer system is done by several clients in a short period of time or even simultaneously. An example for this is computer games, which are supplied to several players via the Internet.

Due to the fact that only one central computer system (server) is used, its failure results in that the clients can no longer access provided data and functionalities. The failure of network areas, too, which connect the server with the clients, also leads to a total failure of the entire computer structure.

Moreover, the transmission times from the server to individual clients differ greatly in part because the connection quality to the clients varies e.g. due to various distances between the server and the clients as well as different transmission performances in various areas of the network. In particular, with interactive operations of several clients in connection with the server, such an inadequate transmission characteristic often leads to an unsatisfactory supply of individual clients with data/functionalities. In this context, the so-called "lags" must be mentioned which affect the communication between the server and the clients.

2

SUMMARY OF THE INVENTION

It is an object of the present invention to eliminate the above mentioned problems of the known state of the art. In particular, it is an object of the invention to optimise the transmission quality between clients and means of a networked distributed computer structure which provide data in such a manner that each client is provided with the respectively requested data in a desired application-specific manner. Preferably, the invention is to enable an as rapid as possible supply with data/functionalities, whereby it is additionally to be ensured that the transmissions are effected as fault-tolerantly as possible.

In addition, the present invention secures the operability of a distributed networked computer system in the case of the failure of data providing means of the computer structure. The invention is also able to secure the operability of a distributed networked computer system in the case of the failure of individual areas of the networks via which the data providing means and clients are connected with each other.

Furthermore, the invention is to enable that clients are only provided with current data. The invention also intends to reduce the required transmission capacities of a networked distributed computer system.

In the inventive system according to the present invention, the data provided in a computer system is stored in a redundant manner in the data storage means, depending on pre-specified parameters of the data transmission between data storage means and computer units, and the computer units access one of the data storage means as a function of the determined prespecified parameters. In this manner it is made possible to optimise data transmissions between the data storage means and the computer units in the desired application-specific manner in order to be carried out more rapidly and in a manner involving fewer faults.

In addition, the data storage means comprise control unit for controlling the data access and the data management in order to work independent of other means of the computer system. This reduces the quantity of the data to be transmitted in the inventive system and increases the fault tolerance of the inventive system because the data are not processed centrally.

For achieving an additional optimisation it is to be preferred that the data storage means copy redundantly stored data in the system among each other as a function of the determined parameters of data transmissions between the individual data storage means and the computer unit and delete the data in the data storage means in which it had been stored beforehand. Data can thus be shifted in the inventive system from one data storage means to other data storage means, whose parameters of the data transmission enable a higher degree of optimisation of the data access and the data management for the respective application case of the invention.

Moreover, it is to be preferred that the data storage means process the stored data independently from the computer unit. In this manner data can be processed in a decentralised way whereby increased data integrity and an increased fault tolerance as well as a relief of individual system components is achieved. In another embodiment the data in the system is divided into data subsets, and the data storage means are divided into cells in such a manner that each of the data subsets to be stored in a redundant manner is stored in one of the cells each of the corresponding data storage means in order to only store that data in a redundant manner which is currently required.

In addition, it is advantageous that the data storage means are divided into cells depending on data transmission param-

3

eters in order to further optimise the data transmissions within the inventive system.

In order to carry out the data access and the data management in a more efficient manner each cell may comprise additional data which relates to parameters of data transmissions between the individual data storage means and the computer unit, and/or neighbouring cells, and/or cells which comprise data which is stored in the system in a redundant manner.

In addition, it is possible to use cells which can interchange additional data which is used for the data access and the data management. Thus, the information for data access and data management to be transmitted in the inventive system is reduced further.

The cells in special data storage means can be designed in such a manner that the parameters of data transmission between the individual data storage means and the computer unit are identical for the cells of a data storage means in order to achieve a consistent data access for the individual data storage means.

It is also possible to use computer units which output data for storage in the data storage means and/or process data stored in the data storage means in order to relieve the data storage means.

For processing the data independent of the inventive system, the computer units can also be connected with one or several users in order to transmit the data from the data storage means and/or to be controlled by the user. Such a user is preferably a personal computer, and/or a central processing unit of a computer and/or another data storage means.

In this manner, the computer unit can also be a system which provides Internet services such as e.g. data base access operation and computer games. The computer unit can also be suited to immediately access individual cells of the data storage means, which relieves the individual data storage means of data access and data management tasks.

In particular, the prespecified parameters of data transmissions between the individual data storage means and the computer unit can comprise the duration of the transmission, and/or the fault rate, and/or the duration of data processing operations of the individual data storage means prior to the transmission of the data. In this manner, data can be accessed more rapidly and data is provided which is less faulty.

The individual components of the inventive system according to an embodiment of the present invention are connected with each other via data transmission means, which can comprise electrically conductive connections, and/or bus systems, and/or computer networks, and/or wired or wireless (mobile) telephone networks, and/or the Internet. The present invention is thus suited for each computer structure and arrangement as well as for each computer system which utilises distributed and networked means.

When using the present invention, it is therefore possible to build a database system or a computer structure for data access and data management with an inventive database system or an inventive computer structure being able to be built from components which are arranged locally in a neighbouring relation.

Moreover, the present invention can be used in a system for a computer game which is provided via the Internet. In this case, it is to be preferred that at least one computer unit is an Internet service provider in order to integrate the present invention into existing computer structures of the

4

Internet and in order to enable Internet users an inventive access to the data.

In particular, the invention is suited for interactive computer games for use by at least two users in order to ensure an optimised supply of the individual user with data required for the computer game, whereby each user can be connected with one computer unit.

Preferably, data for executing the computer game is transmitted from the computer units to the users so that the computer game can also be carried out—at least partially—independent of the computer units. Another relief of the computer units and the data storage means can be obtained if the users process the received data for executing the computer game and transmit it back to the corresponding computer units.

Moreover, the inventive system for a computer game can comprise additional means for the detection of prespecified parameters of the data transmission between the computer units and the respectively connected users in order to additionally optimise the data access and the data management. Preferably, these prespecified parameters comprise the duration of the transmission, and/or the fault rate, and/or the duration of data processing operations of the individual computer units and/or the individual users prior to the transmission of the data.

It is thus possible to store the data for executing the computer game in a redundant manner also as a function of the determined prespecified parameters of the data transmission between the computer units and the users which are connected therewith.

Furthermore, the computer units can receive control data for executing the computer game from the respective users in order to enable improved interactions of the individual users.

This control data or equivalent data can then be output by the computer units to the data storage means. In this manner it becomes possible that the computer units process data for executing the computer game, depending on the control data, and/or the data storage means process data for executing the computer game, depending on the control data or on data equivalent to the control data, whereby a more efficient data access and a more efficient data management is achieved.

Similarly, with a method of the present invention, data is stored in a redundant manner in at least two of at least two data storage means depending on determined parameters of the data transmission between the data storage means and computer units, with the access to the stored data by the computer units being effected as a function of the determined parameters of the data transmission.

The data access and the data management are preferably controlled by the data storage means.

In an embodiment of the inventive method the redundantly stored data are copied among each other by the data storage means as a function of the determined parameters of data transmissions between the individual data storage means and the computer unit and deleted in the data storage means in which the copied data has been stored beforehand.

In addition, it is possible to process the stored data by the data storage means independent of the computer unit in order to relieve individual means and to achieve a higher reliability of the inventive method.

In order to achieve an application-specific and thus optimised storage of the data can be divided into data subsets, with the data subsets to be stored in a redundant manner being stored in cells of the individual data storage means. Preferably, the division into data subsets and the storage in cells is carried out as a function of the data transmission parameters.

US RE40,521 E

5

A further optimisation can be obtained if additional data for data access and data management is stored in the cells, which relate to the parameters of data transmissions between the individual data storage means and the computer unit, and/or neighbouring cells, and/or cells which comprise the data redundantly stored in the system.

Moreover, additional data for data access and data management can be exchanged between the cells of the data storage means. Preferably, the access to data of cells of a data storage means has identical data transmission parameters in order to ensure a consistent data access for the individual data storage means.

For the relief of the entire system it is also possible that the computer unit outputs data for storage in the data storage means and/or the data stored in the data storage means is processed by the computer unit.

The data is preferably transmitted by the computer unit to a user and/or the computer unit is controlled by the user in order to process data independent of the execution of the inventive method and to additionally control the sequence of the inventive method. The inventive method is thus capable of providing Internet services.

In order to achieve a more efficient data access and a more efficient data management, the access can also be made directly to the data of individual cells of the data storage means.

Further it is to be preferred that the determination of the prespecified parameters of data transmissions between the individual data storage means and the computer unit comprises the determination of the duration of the transmission, and/or the fault rate, and/or the duration of data processing operations of the individual data storage means prior to the transmission of the data in order to access data more rapidly and/or reliably.

In this manner it is possible to provide a method for a database system or a computer structure as well as a method for an Internet computer game wherein in the latter case the access to data in the data storage means preferably comprises the employment of an Internet service provider.

Moreover, the method can enable at least two users to access the computer game, with the computer game being an interactive computer game.

The data for executing the computer game from the computer units can be transmitted to the respective users. Preferably, the data received by the users are processed by the users and transmitted back to the corresponding computer units in order to relieve the computer units and the data storage means and to optimise the execution of the computer game.

In another embodiment, prespecified parameters of the data transmission between the computer units and the respective users connected therewith are determined in addition, in order to carry out the data access and the data management with the inventive method also under consideration of these parameters.

It is further to be preferred, that the determination of the prespecified parameters of data transmission between the computer units and the users which are connected therewith comprises the determination of the duration of the transmission, and/or the fault rate, and/or the duration of data processing operations of the individual computer units and/or the individual users prior to the transmission of the data.

In this manner the redundant storage of the data for the execution of the computer game can also be carried out as a

6

function of the determined prespecified parameters of the data transmission between the computer units and the respective users connected therewith.

A more efficient execution of interactive operations of the computer game can be achieved if control data for the execution of the computer game is additionally transmitted by the users of the corresponding computer units. Preferably, the control data or equivalent data from the computer units is also transmitted to the data storage means.

Finally, it is possible to process the data for executing the computer game as a function of the control data from the computer units and/or to process the data for executing the computer game as a function of the control data or the data equivalent to the control data from the data storage means. In this manner, the individual users are relieved and the redundantly stored data is processed by the data storage means which ensure a desired data transmission.

By an inventive replacement of individual failed cells it is possible to compensate for connection errors and in the case of a failure of individual areas of a distributed networked computer structure to utilise areas which retain the functionality of the entire computer structure, in that data is present in the computer system in a redundant manner. Due to the fact that the invention allows for monitoring the used data, the consistency of the available data is also ensured in this manner.

Furthermore, the use of the present invention automatically optimises the connection quality between clients and data providing means of a computer structure so that poor transmission qualities (e.g. low transmission rate, lags, . . . ) are automatically compensated.

For this purpose, individual area of a distributed networked computer system, e.g. individual memory areas, are scaled without interruption of the operation. This means that such individual area of the inventive system can be added or removed at any time.

The present invention also enables to replace individual failed areas of a distributed networked computer system by other areas without interruption of the operation. This is possible because the invention does not require a central connection between individual areas of the computer system, which prevents limitations of the functionality of the inventive system due to failures (e.g. technical defects). In addition, the invention ensures a higher data integrity because the data is not stored centrally.

It is also possible to reduce the quantity of the data to be managed by individual areas of a networked distributed computer system in this manner. The consequence of this is that the required transmission capacities between individual areas of the inventive system can be reduced, too.

Moreover, further components can be added to the inventive system without having to modify its principal structure.

The inventive approach did in fact originate in particular in the solution of the above mentioned problems in the realisation of (interactive) computer games for the Internet. However, it must explicitly be emphasised that the present invention is not limited to such applications, but can be employed for any computer system and any computer structure utilising distributed networked means which provide data.

IN THE DRAWINGS

FIG. 1 is a schematic representation of a preferred embodiment of a computer structure according to the present invention;

7

FIG. **2** shows a schematic representation of a data structure as well as its division and assignment to cells according to the present invention;

FIG. **3** is a schematic representation of another preferred embodiment of a computer structure according to the present invention; and

FIG. **4** is a schematic representation of a section of the preferred embodiment of FIG. **1** for the explanation of operations, which are used for executing the invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The terms used in the following text will now be explained with reference to FIGS. **1** and **2**.

The entire data quantity GD which is used in the context of the invention is divided into individual data subsets which are referred to as field F.

The position of each field F in the entire data quantity GD is described by a unique field position or identification FeldIF (fieldID), with the entire data quantity GD being capable of being divided one or multi-dimensionally. If, for example, the entire data quantity GD is divided three-dimensionally, each field position FeldID can be described by x, y, z.

A cell Z is the smallest unit for data storage which stores exactly one field F. A cell Z also contains other information which will be covered in detail later.

A cluster C comprises one cell Z or is an accumulation of several cells Z. A cluster C can, for example, be formed by an individual computer or an integrated circuit which manages individual or several cells Z. Moreover, a cluster C can operate as a higher-level control unit for the cells Z contained in it.

All clusters C which are combined for the representation of the entire data stock GD form a cluster pool or a cluster compound CV. The individual clusters C are connected via a network N, with each cluster C having a unique address. A cluster compound CV can thus be formed by networking individual computers forming clusters and/or by connecting individual integrated circuits forming clusters.

Within the cluster compound each cluster is identified by a unique identification ClusterID which can be a single number or a tuple. Individual clusters in the compound contain a table of their neighbours (neighbour table) in order to be able to relay certain messages to certain clusters. In this context, a neighbour is another cluster with a next higher or lower identification ClusterID. The number of cells Z which belong to a cluster can vary between 0 and an upper limit maxcc, where maxcc can be different for each cluster C in the cluster compound CV. The number of cells Z which are actually included in a cluster C is indicated as ncc. In addition, each cell Z has a unique identification ZellID (cellID) within a cluster C.

Moreover, cells Z of a cluster C can exchange information among each other without sending messages via the network N, which enables a reliable message transmission within a cluster C. In addition, it is to be preferred that all cells Z of a cluster C are provided with the same connection quality, i.e. through the connection to the network N can be different between the individual clusters C, it is the same for all cells Z of a cluster C.

As described, a cluster C comprises between 0 and maxcc cells Z. Each memory location of a cluster C which can store a cell Z is referred to as slot S. A slot S can be full, i.e. it stores the data of a cell Z, or empty, i.e. it represents no cell

8

Z. Therefore, the clusters C from FIG. **2** comprise only one full slot S each. The identification SlotID of a slot S corresponds to the identification ZellID which a cell Z would be assigned in this memory location.

A client CL (e.g. Internet provider, personal computer, network computer, and the like) is a unit communicating via the network N which requests data, processes data and/or orders to store the modified data. In the present invention, no assumption whatsoever concerning the actual realisation of the network N is made. As network N any means which transmit data can be employed, such as e.g. proprietary busses, local networks, or the Internet. The invention does also not assume that the network N ensures the transmission of all data, so that acknowledgements concerning a data transmission to the respective sender are not required, and that the network N transmits data according to its sending time.

As will be presented in the following and is shown in FIG. **2**, the invention is based, among other things, on a distribution of the entire data GD or the fields F, respectively, to several cells Z of identical contents, i.e. a single field F is stored in several cells Z in a redundant manner. The Number of cells Z which store and manage a certain field F is specified as nm and is the same throughout the entire cluster compound CV, with each of the nm cells Z being referred to as mirror SP for the field F which is stored in the nm cells Z. In the following explanation of the invention nm=3 is assumed, with this value serving only for illustrating the invention and to be specifically selected for each application case.

A response AK is the response to a request RQ. The contents and function of the individual requests RQ and responses AK depends on the transmitted data.

A message MSG is a data quantity which is exchanged between cells Z, clusters C and clients CL. It is the task of the network N to transmit the messages MSG. Due to the fact that the sender of a message MSG does not receive an acknowledgement of a successful transmission, messages MSG can get lost. It is also possible that two messages MSG arrive at a destination after different times. Now the principal procedure with the present invention and individual actions or operations, respectively, for carrying out the invention will be described.

The entire data quantity is divided into individual fields F. Such a division can, for example, be effected two-dimensionally or three-dimensionally. For example, a chessboard could be divided into 8*8 fields F, with each field F containing the information on the respective chessboard square, e.g. which chess piece is located there. Analogously, a three-dimensional space, too, can be represented by fields F. It is also possible, however, to divide an image into individual image areas or a text into individual words or character(s) (strings) which are assigned to individual fields F. The contents of the fields F is application-specific and is not relevant in the present invention. The individual fields F are then stored in nm cells Z, with each cell Z storing a corresponding field F, i.e. the actual data, as well as further information which preferably relates to references to neighbouring fields F. This information permits a data reduction because in this manner, "empty" fields F need not be stored and not each field F must be assigned a cell Z.

Several cells Z are then combined to a cluster C, and all clusters C in turn are combined to a cluster compound CV. An essential characteristic of the invention is that each cell in the cluster compound CV is available in a redundant manner, i.e. nm times in nm clusters C. Thus, each field F is nm times

9

stored in these cells Z, and each of these cells Z is referred to as mirror SP with respect to the field F stored therein. In addition, each cell Z contains information in which clusters C and/or in which cells Z of the corresponding clusters C the other nm−1 cells Z are located.

In addition, each cell Z contains further information which preferably comprises indications on the data transmission quality in the cluster compound CV and with respect to the clients CL, e.g. transmission quality, transmission rate, and the like. This information is updated when the cells Z are accessed.

In order to receive the contents of a field F, a client CL sends a request via the network N to all cells Z and/or clusters C, which include the desired field F, i.e. to all cells Z which are mirrors SP of the desired field F. It depends on the parameters of the data transmissions to the individual cells Z and/or clusters C as well as back to the clients CL, from which cell Z or which cluster C the requesting client CL will receive a response. Preferably, the requesting client CL receives a response from the cell Z and/or the cluster C, which realise the fastest data transmission at the respective time and/or which are capable of carrying out a processing of the data more rapidly prior to its sending to the requesting client CL.

All cells Z and/or clusters C and/or clients CL periodically check their applicable parameters for data transmissions. In periodic intervals or subsequently to specified actions, all cells Z and/or clusters C and/or clients CL check the parameters for data transmissions, which are applicable to the used cells Z. If the checked parameters do not meet specified limits, or if other cells Z and/or clusters C comprise better data transmission parameters, the checking cells Z will try to shift its data to these other cells Z and/or clusters C in order to improve the data transmission parameters applicable for this data. In this manner, the inventive cluster compound CV optimises itself automatically during operation with respect to data transmissions.

Certain requests of a client CL, such as e.g. a write request WriteRQ as described below are synchronised between all mirrors SP of the respective field F. In this manner, failed mirrors SP are identified. In addition, extra checks are carried out at periodic intervals and/or by clients CL after the receipt of responses AK. This, too, identifies failed mirrors SP and/or mirrors which are no longer relevant. These mirrors SP are either replaced by other mirrors SP, or a cell Z or a cluster C or a client CL substitutionally generates new mirrors SP, or the present defects are remedied by means of methods described below. In this manner, the cluster compound CV is fault tolerant against the failure of individual cells Z and/or whole clusters C.

In addition, requesting clients CL can assign individual cells Z and/or clusters C special processing functions which are executed independent of the mode of operation of the clients CL. A client CL, for example, can instruct a cell Z or a cluster C to change the data of a field F in certain intervals. This characteristic is of particular importance if the present invention is employed in connection with computer games which are executed under real-time conditions via a network, e.g. the Internet, in order to reduce the data quantities to be transmitted and to optimise the interactive operations in the execution of a computer game.

Data between the individual clients CL, clusters C, and cells Z are transmitted by using a certain protocol. This means that in addition to the transmitted data, further pre-specified data are sent and received by the individual clients CL, clusters C, and cells Z in order to initiate desired opera-

10

tions or to react in a desired manner as described below. All clients CL, clusters C, and cells Z carry out the necessary operations in order to achieve the desired functionality of the corresponding cluster compound CV. If the invention is employed as shown in FIG. 1 for providing computer games via the Internet, then the network N is the Internet and the client CL is the computer system which operates as Internet provider. The individual clusters C comprise memory units of the client CL and storage means of other computer systems which are distributed over the computer system. Due to the fact that generally only one connection exists between a client CL (Internet service provider) and a corresponding user B, usually via a telephone line, the user B and the client CL (Internet provider) form a system to be regarded as consistent at that time. For this reason, the user B from FIG. 1 is not shown in FIG. 4. An inventive optimisation of the data transmission to the users B were possible only if the user B had a simultaneous access to different Internet providers. With the current state of the art, the present invention permits an optimisation of the data management and transmission for clients CL operating as Internet providers if these access e.g. the data required for an interactive computer game, with several players via the Internet in accessing other computer systems operating as clusters. As shown in FIG. 3, the invention can also be employed in a consistent computer structure such as in a personal computer PC. In this case, the central processing unit CPU operates as client and the various data managing means MEM1, MEM2, MEM3 operate as clusters. The data managing means MEM1, MEM2, MEM3 can be conventional storage means, e.g. non-volatile memories or random access memories, but also special means which e.g. do not only store but also process data and which can therefore not provide the central processing unit CPU with data without restrictions and at any time.

A cell Z can assume five states, with each status being always possible because the cells Z are not fault tolerant and the network N does not ensure and check data transmissions.

Active Status (Active): The contents of the cell Z are valid and the cell Z is ready for operation.

Invalid Status (Invalid): The cell Z is ready for operation but its contents are no longer current and valid. This can occur, for example, if the cell Z has not carried out data operations because of a technical defect or because of not received information.

Inactive Status (Inactive): The cell Z is not available, e.g. because data transmissions to it are permanently lost or because the cell Z has permanently failed.

Blocked Status (Blocked): The cell Z processes only certain data transmissions, such as e.g. the write requests WriteRQ or read requests ReadRQ described below.

Idle Status (Idle): The cell Z is ready for operation, but is currently not used in the cluster compound CV.

A cell Z contains a certain field F, i.e. a field F with a certain field position FeldID (fieldID) and has a unique position ZellID (cellID) within the corresponding cluster C. The cluter c in turn is identified by a unique identification with the form ClusterID:ZellID. Each cluster C and each client CL is uniquely identified in the cluster compound CV by an identification ClusterID, ClientID, respectively. No particular requirement are placed on these identifications, they only have to provide for a unique identification of the cluster C and the clients CL.

In the following, a number of algorithms will be described in more detail which are utilised by the functional operations described further below which serve for the execution of the invention. This explanation is supplemented by correspond-

US RE40,521 E

11

ing pseudocodes which are used in the currently preferred embodiment of the invention.

In order to be able to assign messages MSG, i.e. data transmissions in a unique manner to individual operations, each message MSG is given a ticket number TNr which is generated upon sending. As long as the respective operation is not completed, all clients CL, cells Z, and clusters C involved can associate the message MSG with the corresponding operation by the ticket number TNr in a unique manner. For obtaining unique ticket numbers TNr, a ticket number TNr can, for example, be combined by the sending time of the message (or from a continuous counter generated in the cell) and the sender's identification. Due to the fact that the sender's identification is unique and the sending times of two messages MSG are different, each message MSG can be assigned the respective operation in a unique manner. Unique ticket numbers TNr, however, can be generated depending on the most different applications of the invention in other ways.

Pseudocode for the generation of a ticket number TNr:

```
function makeNewTicket:longword;
begin
    a:=laufender__zachler; (continuous counter)
    inc(laufender__zachler); (continuous counter)
    b:=own__adress;
    makeNewTicket:=<combination from a and b, e.g. by shifting>
end;
```

If a cluster C receives a message MSG which is destined for another cluster C, i.e. the ClusterID of the destination address of the message MSG does not correspond to the address of the receiving cluster C, then the receiving cluster C relays the message MSG to the cluster C for which the message MSG is intended. The way in which the message MSG is relayed depends on the actual realisation of the network N, and/or the clusters C, and/or the clients CL, and/or the data transmission protocol, and/or corresponding data

12

included in the message MSG. A message MSG is also relayed if a cell Z receives the message MSG which is intended for another cell Z.

Each cell Z contains information on neighbouring cells Z and, on the basis of this information, checks whether a desired cell Z is located within the current cluster C. If this is not the case, preferably the cell Z is selected from all neighbouring cells Z of the current cluster C which is the most neighbouring cell with respect to the cell Z. If several cells Z meet this requirement, a cell Z can be selected at random.

Optionally, with each relay of a message MSG a step counter may be incremented by one step. With each step, the respective cluster C sends a holding response HalteAK (holdingAK) to the sender of the message MSG in order to inform same that his request RQ is still being processed. If the sender does not receive such a holding response HalteAK in this case, then the sender can assume that its message MSG has been lost. The sender can then direct its message MSG e.g. to the last cluster C which has sent the last received holding response HalteAK.

There is no reliable method for transmitting messages MSG and for ensuring that the messages MSG have been received because the network N need not guarantee data transmissions so that messages MSG (e.g. requests RQ and responses AK) can get lost any time.

In order to ensure a higher degree of reliability of the transmission of certain data, a pseudoreliable message PSM can be used. In this case, the pseudoreliable message PSM is sent repeatedly until a loss of the message is improbable. Only then it is assumed that the transmission has failed.

If one assumes a probability of $1/n$ with which any message MSG can get lost, then a psuedoreliable message PSM must be sent x times so that the probability $p=(2/n)^x$ with which the message has been lost is sufficiently small. With a missing response AK it can then be assumed that the recipient has failed.

Pseudocode for Sending a Pseudoreliable Message PSM:

```
procedure psm__send(message:TCellMsg; d1,d2,d3:Tndr; next__status:TCellStatus);
var i:byte;
begin
begin
    //the psm__ variables are temporary variables of the
    // respective cell
    psm__timeout:=false;
    psm__next__status:=next__status;
    psm__ticket:=message.ticket;
    psm__num:=num;
    psm__dest[1]:=d1;
    psm__dest[2]:=d2;
    psm__dest[3]:=d3;
    for <all present i> do begin
        psm__received[i]:=false;
        psm__sendtime[i]:=curr__time;
        psm__arSended[i]:=0;
    end;
    <complete further fields of the message, if applicable>
    psm__m:=message;
    message.dest:=d1; send(message);
    message.dest:=d2; send(message);
    message.dest:=d3; send(message);
    status:=cs__psm__waiting;
end;
```

13

In order to check whether a cell is waiting for the acknowledgement of a pseudoreliable message PSM, the following pseudocode is used:

```
<process if cell waits for PSM input>
begin
    if (status=cs__psm__waiting) and (message is Acknowledge)
    then begin
    if message.ticket<>psm_ticket then exit;
    sender:=psm__destination(message);
    // check if ak__hold
    if (sender<>0) and (message.command=ak__hold) then begin
        <extend waiting time>
        exit;
    end;
    if sender<>0 then begin
        // note message in psm__MsgIn[sender]
        psm_msgIn[sender]:=message;
        psm_received[sender]:=true;
        exit;
    end; //status=cs__psm__waiting
end;
```

The corresponding cell Z must check whether all responses AK have been received when it executes its update procedure. The corresponding status (cs__psm__waiting) must be processed there. It must then be decided whether all responses AK have been received and, if not, if waiting is to be continued:

```
procedure update;
. . .
    case status of:
    <process of other status values>
    cs__psm__waiting:
        begin
            if 
            begin
                status:=psm__next__status;
                exit;
            end;
            <check here for timeout, and if required, resend
            one or several PSM requests>
            // check for timeout of all cells
            if <waiting time for addresses elapsed> then
            begin
                status:=psm__next__status;
                psm__timeout:=true;
            end;
        end;
. . .
end:
```

The self check is the central operation in order to ensure the consistency of all mirrors SP of a compound for a field F. A self check is initiated by a requesting third party, e.g. a client CL or a cluster C. A mirror SP which carries out a self check causes that the other mirrors SP of the compound also carry out a self check. A self check by a mirror SP can result in a fault correction by this mirror or another mirror SP. Depending on how unreliable the network actually is (loss of messages, lags), it may be impractical to make the PMS virtually reliable. The individual operations (such as adding a new mirror, etc.) should be fault tolerant to a certain degree. The case that a message, though classified as not delivered, is delivered nevertheless is very improbable with PMS but not impossible. Therefore corresponding fault corrections must be provided.

If a mirrors SP receives a self check request SelbsttestRQ (self checkRQ), it begins a self check under the same ticket

14

number TNr, provided it is not just carrying out a self check which has been initialised by another self check request SelbsttestRQ and if the ticket number TNr of the currently received self check request SelbsttestRQ differs from the last received check request SelbsttestRQ.

If a requesting third part sends a read request LeseRQ (readRQ) described below, the execution of a self check is necessary only if the requesting third party receives inconsistent responses AK from the corresponding mirrors SP of a field F which the requesting third party intends to read.

The requesting third party compares the responses AK received from the mirrors SP and—under the assumption of the above described three mirrors SP for one field F—with three responses AK accepts the result. With two responses AK it initiates a self check and accepts the result. With only one response AK it initiates a self check and rejects the result.

If a self check request SelbsttestRQ has been received or a self check has been initiated by other system-related default, e.g. timeout, the corresponding mirror SP must check its own validity and is either responsible for the fault correction itself or instructs another mirror SP to perform the fault correction. In the selection of a mirror SP for the fault correction it is to be attempted that always only one mirror SP carries out the fault correction, even if several mirrors SP perform a self check quasi simultaneously, in order to avoid inconsistent conditions.

In this context, the mirror SP sends a validation request ValidierRQ (validationRQ) to all other mirrors SP. The exchange of the corresponding data is done by using pseudoreliable messages PSM. If no response AK is received, the destination is declared unavailable. The failed mirror SP is then replaced by a new one.

Pseudocode for Carrying Out a Self Check SelbsttestRQ:

A mirror starts a self check if it receives a corresponding message:

```
rq__start__selfCheck:
    begin
        if not used then exit;
        if (status<>cs__idle) then begin
            return__msg(m,ak__busy);
            exit;
        end;
        start__selfcheck;
        exit;
    end;
```

Alternatively or supplementary the self check can also be carried out automatically at certain intervals. For this purpose, the checking mirror SP sends a corresponding request to all other mirrors SP:

```
procedure start__selfCheck;
var m:TCellMsg;
begin
    <Optional: last__intervall__selfcheck:=current__time>
    m.cmd:=rq__validate;
    m.lifecount:=lifeCount;
    m.data:=data;
    m.ticket:=makeNewTicket;
    psm__send(m,mirror[1..nn-1],cs__selfCheck__check);
end;
```

US RE40,521 E

**15**

Each cell Z must be capable of responding to validation requests:

```
rq_validate:
      begin
           if not used then
                if <cell just becomes mirror> and
                      <request from future mirror> then
                           return_msg(m,ak_valid);
                           exit;
                      end;
                      return_msg(m,ak_noMirror);
                      exit;
      end;
      if message_is_from_mirror(m) then
      begin
           <enter own mirrors in message>
                if message.lifeCount=lifeCount
                      then return_msg(m,ak_valid)
                      else if m.lifeCount>lifeCount then
                           begin
                                lifeCount:=m.lifeCount;
                                <take data from message>
                                return_msg(m,ak_valid):
                           end
                      else return_msg(m,ak_invalidLC);
                end
           else return_msg(m,ak_noMirror);
           exit;

      end;
```

After the checking cell Z has either received all responses AK or the time has elapsed, it reviews the result of the self check:

```
procedure do_final_selfCheck;
var i:integer;
          m:cellmsg;
          s:string;
begin
      sc_res:=' ';
      for i:=1 to nm-1 do begin
           if (not psm_received[i]) then begin
                sc_res[i]:=' ';
                psm_msgIn[i].cmd:=rq_none;
           end else psm_msgIn[i].cmd of
                case psm_msgIn[i].cmd of
                      ak_valid: sc_res[i]:='V';
                      ak_invalidLC: sc_res[i]:='D';
                      ak_noMirror: sc_res[i]:='I';
                end;
           end;
      end;
// review result now:
if sc_res='VV' then begin
      status:=cs_idle;
      <further initialisations after completed self check>
      exit;
end;
if (sc_res='VD') or (sc_res='DV') then begin
      <take over data from D sender>
      status:=cs_idle;
      <further initialisations after completed self check>
      exit;
end;
if (sc_res='DD') then begin
      <take over data from D sender>
      status:=cs_idle;
      exit;
end;
if (sc_res='VI') or (sc_res='IV') or
      (sc_res='D1') or (sc_res='ID') or
      (sc_res='V') or (sc_res='V') or
      (sc_res='D') or (sc_res='D') or
```

**16**

-continued

```
then begin
           <further checks, if required>
                if (sc_res[1]='D') or (sc_res[2]='D')
                      then <take over data from D sender>
                <Set: no response='D'>
                if <this mirror is responsible> then
                      <find a new mirror>
                else
                      <send order to find a new mirror to responsible mirror>
           exit;
end;
if (sc_res='II') then begin
           <initialise cell>
           used:=false;
           exit;
      end;
if (sc_res='I') or (sc_res='I') then begin
           status:=cs_idle;
           exit;
      end;
if (sc_res=' ') then begin
           <optional: find nm-1 new mirrors>
           status:=cs_idle;
           exit;
      end;
end;
```

Assuming a mirror compound of three mirrors SP, the following cases can be distinguished for the receipt of no, one, or two responses AK at the mirror SP which sends the validation requests ValidierRQ (validateRQ) to the two other mirrors SP of the compound, which are listed in the table below, with the incoming responses AK being classified as follows:

"V" (Valid): The sending mirror SP accepts the receiving cell Z as mirror SP, and the life counters of the sender and the recipient have the same value.

"D" (Delayed): The sending mirror SP accepts the receiving cell Z as mirror SP, but the life counter of the sender has a lower value than the life counter of the recipient.

"I" (Invalid): The sending mirror SP does not accept the receiving cell Z as mirror SP.

| Case | Incoming responses AK | | Status of mirror compound |
|---|---|---|---|
| 1) | V | V | Both receiving mirrors SP are valid: The mirrors of the compound have consistent and current data so that no further operations become necessary. |
| 2) | V | D | The requested mirror SP sending a "V" is valid and the requested mirror SP sending a "D" has a higher life counter value. |
| | | | The requesting mirror SP must take over the data of the requested mirror SP sending a "D". |
| 3) | D | D | Both receiving mirrors SP have life counters with higher values: |
| | | | The requesting mirror SP is invalid and must take over the data of the mirror SP sending a "D". |
| 4) | V | I | a) The requested mirror SP sending a "V" receives an "I" from the requested mirror SP sending an "I": |
| | | | The requesting mirror SP and the requested mirror SP sending a "V" are valid, the requested mirror sending an "I" is invalid and is to be removed from the compound. The mirror SP with the lowest index must find a new mirror SP. |
| | | | b) The requested mirror SP sending a "V" receives a "V" from the requested mirror SP sending an "I": |
| | | | The requested mirror SP sending an "I" is inconsistent and must be removed from the group (see detailed explanation in the following). |
| | | | The mirror SP with the lowest index must find a new mirror SP. |

US RE40,521 E

17
18

-continued

| ase | Incoming responses AK | Status of mirror compound |
|---|---|---|
| 5) | D I | The requesting mirror SP takes over the data of the mirror SP sending a "D". Otherwise the procedure corresponds to case (4). |
| 6) | I I | The requesting mirror SP is in the minority and is declared invalid. |
| 7) | V- | A requested mirror cannot transmit data: The mirror Sp of the two working mirrors SP with the lower index must find a new mirror SP. The failed mirror SP is treated like to mirror SP sending an "I" in cases (4) and (5). |
| 8) | D- | One requested mirror cannot transmit data and the other requested mirror SP has a life counter with a higher value: The requesting mirror SP takes over the data from the working mirror SP, and the minor SP with the lower index must find a new mirror SP. The failed mirror SP is treated like to mirror SP sending an "I" in cases (4) and (5). |
| 9) | I- | One requested mirror SP is invalid and the other requested mirror SP has failed: The requesting mirror SP is in the minority, remains active, but does not find new mirrors SP. |
| 10) | — | Both requested mirrors SP do not transmit data or the network connection of the requesting mirror has failed: Alternative 1: The requesting mirror SP remains active, but does not find new mirrors SP. Alternative 2: The requesting mirror ensures by additional checks that its connection functions properly and replaces the two mirrors. The two requested mirrors SP do not receive any information to this effect and will later exclude the requesting mirror SP. This case must be compensated by the operation DoubleFieldCheck described below |

In those cases in which a new mirror SP is to be found, a new mirror SP is found by one of the remaining mirrors SP, with only one mirror being allowed to do this task. A mirror must be selected, e.g. the one with the lower index. The other mirror SP with the higher index does not execute any operations, but will receive messages MSG after some time which indicate the integration of a new mirror SP into the compound.

If a mirror SP has physically failed, it is either possible that no requests RQ were made to the mirror compound in the meantime, i.e. that its failure has not been noticed and has not brought about any impacts, or that the two other mirrors SP have declared it invalid in the meantime and found a replacement mirror. If a restart operation is carried out, such a condition can be determined. For this purpose, the starting mirror SP carries out a self check as previously described.

In the present invention the life counter is a counter which is incremented by integer values. In order to prevent an overflow of the counter the life counter of all clients CL, cells Z, and clusters C is periodically adjusted, i.e. set to a lower common value.

For this purpose, the adjustment is initiated from any mirror SP, e.g. from the mirror SP with the lowest life counter value. All nm mirrors SP of a field F wait for the receipt of all nm−1 responses AK (PSM). Only if all nm−1 responses AK are received, the respective mirror SP carries out an adjustment of the life counter.

When adjusting the life counter, attention has to paid that the interval between two adjustments is selected in such a manner that mirrors SP which have been replaced in the meantime do not become valid again upon a restart. Preferably an additional memory is used for this purpose in which the value of the last life counter is stored where a mirror SP has been replaced.

In the case of pseudoreliable messages PSM, too, faults can occur. It is true that the parameters for pseudoreliable messages PSM can be selected in such a manner that faults are improbable to such an extent that they virtually do not occur in the selected application. This can, however, lead to the result that the application is actually no longer practicable. With respect to the parameters for pseudoreliable messages PSM it might be necessary to make compromises so that faults occur due to faulty pseudoreliable messages PSM, which must be corrected.

For this reason, the communication of the cells Z or the mirrors SP, respectively, among each other must be designed in such a manner that these faults remain without consequences or are corrected. This is done, e.g. by the use of a self check SelfCheck.

The operation DoubleFieldCheck described in this section serves to correct faults which have been caused by communication errors with pseudoreliable messages PSM. Such faults cause mirror compounds to duplicate, i.e. that more than nm mirrors exist for one field.

The operation DoubleFieldCheck can be carried by one or more mirrors SP in an interval t_DoubleFieldCheck. Each client CL can initiate an operation DoubleFieldCheck if it receives responses AK from mirrors SP whose references to other mirrors SP are not consistent.

The operation DoubleFieldCheck removes additionally generated mirror compounds in order to restore the desired condition of nm mirrors SP per one field F. For this purpose, a manager for the operation DoubleFieldCheck is selected. This can be any cell Z (also of the mirror compound) or a client CL (e.g. the client which detected the error situation). Optionally, the manager sends a request RQ to the network to which all cells Z respond which are responsible for a certain field F, whereby also additional mirror compounds are detected. The manager then decides which cells Z belong to the valid mirror compound and sends a delete request DeleteRQ to all other cells Z. Optionally, the manager sends a request rq_updateTable to all remaining mirrors SP for updating their mirror tables.

If individual cells Z do not receive the delete request DeleteRQ, they will be deactivated upon the next self check SelfCheck and/or the next operation DoubleFieldCheck.

In order to decide which cells Z belong to the valid mirror compound various algorithms can be employed. In the following, examples for this are shown which can also be combined.

One possibility is to introduce a generation counter which is incremented each time a new mirror SP is added to the compound. In the case of mirrors SP with a doubly existing index, the mirror SP with the higher/lower generation counter will be removed. It is also possible to declare the mirror compound valid which was last write-accessed. Furthermore, the validity of a mirror compound can also be decided as a function of any other properties (e.g. geographic position of mirrors SP). If only one single mirror SP is detected as working properly, e.g. by a client CL, it is possible that the error is with this mirror SP and not with the nm−1 other mirrors SP. In order to exclude this possibility, an additional safety check should be carried out for ensuring the correct function of the single mirror SP before same replaces the other mirrors SP. It is thereby prevented that the single operating mirror SP erroneously activates additional mirrors SP.

With actually only one mirror SP still working, nm−1 new mirrors SP are to be added. First, the working mirror SP

19

must check or ensure, respectively, the function of its own data transmissions. Then nm−1 new mirrors SP are requested by a request rq_needNewCells. All nm−1 new mirrors SP are sent a request to become mirrors. It is thereby not necessary to evaluate the responses AK immediately, because any faults will be corrected by later self checks SelfChecks (this sequence approximately corresponds to the addition of a new field F, with the difference that only nm−1 cells Z are found and that the mirror manager in this case is identical with a mirror SP).

In the following sections the data exchange between clients CL, cells Z, and clusters C is described which is preferred for providing the inventive "active" cells. In particular, the following operations are employed with reference now being made to FIG. 4:

Find operation (find): Finding of a cell Z which defines a desired field F.

Read operation (read): A client CL reads the contents of a field F from a mirror SP.

Write operation (write): A client modifies the contents of a field F in all associated mirrors SP.

Add operation (add): Adding of fields F which previously have not been in the cluster compound CV.

Delete operation (delete): Deletion of a field F in the cluster compound CV.

By sending a find request FindRQ a client CL determines the position of the cells Z which include a desired field F and are thus mirrors SP for the desired field F. The addresses of these cells Z include both the identifications ClusterID of the corresponding clusters C as well as the identifications ZellID of the cells Z themselves.

For obtaining the addresses of the cells Z which are mirrors SP for the desired field F (e.g. field F$\mathbf{8}$ from FIG. 2), the client CL requests any cluster C, e.g. cluster C$\mathbf{6}$, whether one of its cells Z includes the desired field F$\mathbf{8}$. If this is the case than the cluster C$\mathbf{6}$ sends the corresponding cell identification ZellID as well as the cluster identification ClusterID of all nm−1 cells Z which include mirrors SP of the desired field F$\mathbf{8}$. As shown in FIG. 4, in this case these are the cell C$\mathbf{4}$ in cluster C$\mathbf{1}$ and the cell Z$\mathbf{6}$ in cluster C$\mathbf{3}$, i.e. in total the cells with the identifications ZellID C$\mathbf{1}$Z$\mathbf{4}$, C$\mathbf{3}$Z$\mathbf{6}$, and C$\mathbf{6}$Z$\mathbf{2}$.

If the requested cluster C, e.g. cluster C$\mathbf{4}$, does not contain the desired field F$\mathbf{8}$, the requested cluster C$\mathbf{4}$ finds the cell Z among the cells Z included therein whose field position FeldID comes closest to the field position FeldID of the desired field F$\mathbf{8}$. For this purpose, the cluster C can, for example, determine the sum of the absolute values of the difference between the cell position ZellID and all other neighbouring cell positions ZellID in order to select the cell Z where the absolute value of such a difference is minimal.

Due to the fact that cells Z contain information on neighbouring cells a cluster C can be found in this manner which comprises a cell Z with the desired field F$\mathbf{8}$. The cluster C$\mathbf{4}$ requested by the client CL relays the find request FindRQ to the cluster C found in this manner, e.g. to cluster C$\mathbf{6}$. This operation is repeated until a desired cell Z has been found or until cells Z are no longer found which are neighbouring cells of the desired cell Z. Preferably, a step counter in incremented upon the relay of a find request FindRQ. With each increase of the step counter, the respective current cluster C sends a holding response HalteAK (holdingAK) to the client CL in order to inform same that his request FindRQ is still being processed. If the requesting client CL does not receive such a holding response HalteAK in this case, then it is to be assumed that its request FindRQ has been lost. In this case it

20

is to be preferred that the requesting client CL directs the request FindRQ to the cluster C again from which it has received the latest holding response HalteAK.

The find request FindRQ is successfully completed if the requesting client CL receives a destination identification ZielID (destinationID) for nm mirrors SP of the field F$\mathbf{8}$. In the example shown in FIG. 4 the destination identification ZielID would comprise the cells C$\mathbf{1}$Z$\mathbf{4}$, C$\mathbf{3}$Z$\mathbf{6}$, and C$\mathbf{6}$Z$\mathbf{2}$. If the client CL does not receive a response AK, the find operation has failed.

In the following, the sequence is described which is executed for read requests ReadRQ and write request WriteRQ. With the read and write requests ReadRQ, WriteRQ, shown below it is necessary that the respective client CL knows the identifications of the mirrors SP which include the field F whose data the client CL wants to access. This is critical insofar as the identifications of the desired mirrors SP can change any time due to shifting of the mirrors SP. To prevent this, it would be basically possible to link each find request FindRQ with an operation LockRQ which prevents changes of the respective compound of the desired mirrors SP before the actual read and write requests ReadRQ, WriteRQ have been received by the desired mirrors SP. This would, however, significantly reduce the efficiency of data transmissions between clients CL and clusters C.

For this reason the approach with the preferred embodiment of the present invention is as follows. A client CL executes a find operation and notices the received positions of the mirrors SP which include the desired field F.

If a mirror SP includes read and write requests ReadRQ, WriteRQ with a field position FeldID for the desired field F, which does not correspond to the field position FeldID for the desired field F in the mirror SP, it informs the client CL accordingly. Furthermore, each mirror SP always or alternatively on request returns the positions of the other nm−1 mirrors SP to the requesting client CL. In this manner, a mirror SP can correct the identifications ID stored in it and, if required, send a new find request FindRQ.

Pseudocode for carrying out a find request FindRQ:

```
rq_read:
        begin
                if not used then
                begin
                        <Optional: Return fault message to client>
                        exit;
                end;
                message.data:=data;
                // Write own mirrors into the message
                for i:=1 to nm-1 do
                        message.mirror[i]:=mirror[i];
                <complete further field>
                <storage of specifications for performance measurement>
                return _mag(m,ak_read);
        end;
```

The request of a client CL is always directed to all nm mirrors SP:

```
message.command:=rq_read;
for i:=1 to not do begin
        message.destination:=spiegel[i];
        <informationen für performance measurement in message, if req'd.>
        send(message);
end;
```

Ideally the client CL buffers its own requests in order to be able to execute further actions (e.g. other requests) in the

US RE40,521 E

21                                                                    22

meantime, until the 1..nm corresponding responses ak__read or a timeout arrives. After the elapse of the waiting time TWLese (TWRead) the client CL must check how many responses have been received and whether the mirror tables of the responses are consistent:

```
if nr_al>nm then begin
        <send request for DoubleFieldCheck to all senders>
     exit;
end;
if nr_ak=nm then begin
        if <Mirror tables consistent>
           then <use result from any response message[i] >
           else <send request for SelfCheck to all senders>
        exit;
end;
if nr_ak<nm div 2 then begin
           if <Mirror tables consistent> then <use result from any response
message[i] >
           <send request for SelfCheck to all senders>
           exit;
end;
if nr_ak>0 then <send request for SelfCheck to all senders>
```

Preferably, the read requests ReadRQ and the write requests WriteRQ are sent via the network N to all clusters C in parallel, but depending on the network N used any other type of sending is possible.

Each mirror SP, e.g. the cell C1Z4, optionally relays a read request ReadRQ from a client CL to all other mirrors SP, i.e. to the cells C3Z6 and C6Z2 in this case, and each mirror SP then sends a response AK to the client CL. In this case, a mirror SP receives a further read request ReadRQ and because this has the same ticket number TNr as the previously received read request ReadRQ it will be ignored because this mirror SP has already sent a response AK to the requesting client CL.

When a read operation is executed the client CL requires the data of a certain field F, e.g. F8. For receiving this data the client CL must know the positions of the mirrors SP which are responsible for this field F8. This can be enabled by a previously executed find operation in order to determine the cells C1Z4, C3Z6, and C6Z2 operating as mirrors SP.

The client CL sends a corresponding read request ReadRQ with a unique ticket number TNr to all 3 clusters C1, C3, and C6 which include the mirrors SP which are responsible for the desired field F8.

The client CL waits for a predetermined application-specific time interval TWLese (TWRead) for responses AK of the requested mirrors SP which include the desired data. Each mirror SP acknowledges the read request ReadRQ with a response AK so that nm (i.e. 3 in this case) responses AK arrive at the requesting client CL.

The client CL responds as a function of the type and/or number of the incoming responses AK. With three mirrors SP assumed which are responsible for the field F of the desired data the following different states result. If the client CL receives two or three identical responses AK, the result is used. If it receives two different responses AK or only one response AK the client CL sends a request for a self check to the corresponding mirrors SP. If the client CL receives different responses AK that response AK is used whose life counter has the highest value.

A read request ReadRQ is successful if the client CL receives at least one response AK and cannot be completed successfully if the client CL does not receive a response AK within the predetermined time interval TWLese or if one or several clusters C signal that they did not find the desired cell Z. In order to avoid the above problems in sending a read request ReadRQ it is to be preferred to execute find requests FindRQ and read requests ReadRQ in a combined manner. In this case the client CL directs and find/read request Find/ReadRQ to any cluster C and receives a response AK from same as in the execution of an individual find request FindRQ. Here, the response AK does not include the address ID of the desired field F but the data of the desired field F.

It is to be considered, however, that a combined find/read request Find/ReadRQ compared to an initial find request FindRQ for finding the desired mirrors SP and a subsequent read request RearRQ to the desired mirrors requires more time, because now all clusters C must process the combined and thus more extensive find/read request Find/ReadRQ.

In order to change the data of a field F, e.g. field F8, the client CL sends a write request WriteRQ. As in the case of a read request ReadRQ, the client CL must know the positions of the 3 mirrors SP which are responsible for the desired field F8.

The client CL sends a write request WriteRQ to all 3 mirrors SP of the desired field F8. Thereupon the data of the desired field F8 or of the associated cells C1Z4, C3Z6, and C6Z2 operating as mirrors SP is modified in that all mirrors SP update their data correspondingly. Then each of the mirrors SP returns a response AK to the requesting client CL. As soon as all responses AK of the mirrors SP have arrived at the client CL the write operation is successfully completed.

If at the time at which the client CL sends it write request WriteRQ another write request WriteRQ to the desired cells C1Z4, C3C6, and C6Z2 is already being executed the client CL receives a corresponding response AK which indicates that the write request WriteRQ has failed and the desired cells C1Z4, C3C6, and C6Z2 are in a locked state. A write request WriteRQ has also not been completely successfully if the requesting client CL receives less than nm responses AK, i.e. in the present case less than 3 responses AK.

The synchronisation which is required for a write request WriteRQ is carried out by the involved mirrors SP in order to ensure that all nm mirrors SP are updated with the same data. If a mirror SP receives a write request WriteRQ, it sends this write request WriteRQ to all other nm−1 mirrors SP. Only if the sending mirror SP receives a response AK from all other nm−1 mirrors SP the write request WriteRQ is executed. Thereby the write request WriteRQ received by the mirror SP can be sent either from a client CL or from another mirror SP of the same compound.

If a mirror SP receives another write request WriteRQ from a mirror SP with a lower index, previously arrived write requests WriteRQ are overwritten in all mirrors. Moreover, a mirror SP does not accept further write requests WriteRQ from a client CL if already a not fully executed write request WriteRQ has arrived from another mirror SP or client CL.

It is possible to create find requests FindRQ and write request WriteRQ in a combined manner as find/write requests Find/WriteRQ, but it is to be checked whether the additional time requirement is reasonable.

An add request AddRQ serves to integrate a field F which is not yet included in the cluster compound CV into the cluster compound CV. Such an add request AddRQ can be sent from a cluster C or a client CL.

An individual cell, e.g. the cell C2Z6 from FIG. 4, receives an add request AddRQ from the client CL to work as a mirror manager and to integrate nm−1 (i.e. 2) new mirrors SP into the cluster compound CV. In the currently pre-

US RE40,521 E

23

ferred embodiment of the invention, one cell Z is always selected a mirror manager which itself is no mirror SP. However, embodiments of the invention are possible where the mirror manager itself is also a mirror. The cell C2Z6 working as the mirror manager sends an add request AddRQ for 2 mirrors into the network N. The add request AddRQ is relayed from cluster C to cluster C in the cluster compound CV, e.g. from cluster C2 to cluter C3, with the number of the mirrors SP to be added being decremented upon relay of the add request AddRQ, when the last requested cluster C has provided a cell Z.

The last requested cluster C sends the identifications Zel-lID of the cells Z which are considered as mirrors SP to the cell C2Z6 working as the mirror manager. The cell C2Z6 working as the mirror manager then sends a corresponding response AK to all cells C3Z1 and C1Z2 which are possible as mirrors SP, preferably a pseudoreliable message PSM which instructs them to become mirrors SP. Then the cell C2Z6 working as the mirror manager returns a corresponding response AK to the requesting client CL. An add request AddRQ is not completed successfully if no response AK or a negative response AK is returned from the cell C2Z6 working as the mirror manager.

Pseudocode for the execution of an add request AddRQ:

```
rq__addField
        begin
        if (status<>cs__idle) or (used) then exit;
            message.command:=ak__addField;
            <store additional values for request,
            e.g. data, field position, etc. for later
            relay to the mirrors SP>
            fieldpos:=message.dataFieldPos;
            data:=message.data;
            mirManClient:=message.sender
        repeat__rq__emptycells:=c__repeat__rq__emptycells;
        psm_send(message,message.sender,cs__mirrorManager1);
        exit;
        end;
```

The execution of an add request AddRQ does not guarantee that nm mirrors SP are available for a desired field F, but that either nm mirrors SP are available or after the elapse of a predetermined time t no mirrors SP at all are available for the desired field F.

If less than nm new mirrors SP exist after the execution of an add request AddRQ this can only occur if the pseudoreliable messages PMSM used in the add request AddRQ provide wrong results. Such faults are corrected by later self checks of the mirrors SP.

A mirror request SpiegelRQ (MirrorRQ) is a special case of an add request AddRQ, wherein a cell Z which will be referred to a manager in the following requests a single mirror SP. The manager sends the request to the cells Z which are possible as mirrors SP to become new mirrors SP.

If the manager sends a mirror request SpiegelRQ into the network N, a waiting time WT is recorded from this moment on until responses AK of the cells Z possible as mirrors SP arrive at the manager. Each cluster C which receives the mirror request SpiegelRQ and can provide storage space sends a corresponding response AK to the manager and provides storage space which is kept free to be integrated into the cluster compound CV in the form of a cell Z or a mirror SP, respectively. If a cluster C cannot provide a mirror SP, it relays the mirror request SpiegelRQ to other clusters C. When the manager has received a corresponding response AK of a new mirror SP it will enter this in a mirror table. If a

24

cell Z which is possible as a mirror SP received a message MSG from the manager prior to the elapse of the time interval wt that no more mirrors SP are required, it is released again and the mirror request SpiegelRQ is rejected.

If a timeout occurs in one of the requested cells Z, i.e. the time interval wt of the mirror request SpiegelRQ for this cell Z has elapsed, then a new cell Z which is possible as a mirror is found. This operation is repeated several times or until cells Z possible as mirrors have responded. Cells Z which have made themselves available as possible mirrors SP and whose responses AK arrive at the manager after the assigned time interval wt will be ignored by same.

Pseudocode for carrying out a mirror request SpiegelRQ:

```
cs__getOneNewMirror0:
begin
    message.command:=rq__needEmptyCells;
    <select destination cluster>
    message.ticket:=makeNewTicket;
    psm_send(r,r.dest,cs__getOneNewMirror1);
    exit;
end;
```

Either the mirror SP receives a response AK or the mirror request SpiegelRQ becomes invalid:

```
cs__getOneNewMirror1:
    begin
        if psm__timeout then begin
            status:=cs__idle;
            exit;
        end;
        possibleMirror:=<received address>
        message.command:=rq__singlebecomeMirror:
        <write own address and addr. of the other valid mirror into the
        message>
        psm_send(r,possibleMirror[1],cs__getOneNewMirror2);
        exit;
    end;
```

The still not used mirror SP receives the mirror request SpiegelRQ to become a mirror which it processes with the following pseudocode:

```
rq__singlebecomeMirror:
    begin
        if <request from same mirror1> and <ticket in agreement>
        then begin
            <return acknowledgment>
            exit;
        end;
        if used then exit;
        <return acknowledgment>
            <notice MirrorManager and ticket>
        <Send rq__addMirror to all old mirrors>
            exit;
end;
```

Now this mirror candidate sends a request to all nm−1 old mirrors SP to be accepted as a mirror (rq__addMirror). Because the old mirrors SP must certify this mutually the cell might have to wait longer than normal for a response to the message. A mirror SP which has received this request enquires all other nm−2 mirrors SP whether these have received this request, too (rq__certify). Only if this is the case, the mirror SP replies with a corresponding response ak__addmirror and updates its own mirror table:

```
rq__addMirror:
    begin
        <set flags, if req'd to accept messages>
        if <request is from mirror 1>then begin
            <update message with data corr. to LifeCount>
            <send acknowledgment ak__akkMirror>
            exit;
        end;
        if <message is from mirror candidate (anew)>
            then exit;
        if <Status is not correct>then exit;
        if not <mirror to be replaced is known>then exit;
        <further plausibility checks, if req'd.>
        <Send request to all nm-2 mirrors whether message received, too>
    end;
```

Finally, the mirror candidate updates its data:

```
cs__becomeSingleNewMirror1:
    begin
        if not <all nm-1 old mirrors have sent ak__addMirror> then begin
            status:=cs__idle;
            exit;
        end;
        <take over mirror data>
        <take over data (field value etc.)>
        <establish own index>
        used:=true;
        status:=cs__idle;
        exit;
    end;
```

In order to remove a field F from the cluster compound CV, a client CL or a cluster C, for example, sends a request DeleteRQ to all nm mirrors SP associated with the field F. A delete request DeleteRQ ensures that either all nm mirrors SP are removed or, in the case of a not successful execution of the delete request DeleteRQ, that no mirror SP is removed in order to ensure consistent data in the cluster compound CV.

Optionally, each mirror SP which receives a delete request DeleteRQ relays it to the other nm−1 mirrors SP. A mirror which receives a delete request DeleteRQ "deletes" itself, i.e. the respective cell Z changes into an idle state and informs the sender of the delete request DeleteRQ about this with a corresponding response AK.

A delete request DeleteRQ is executed successfully if the sender receives nm responses AK according to the which nm mirrors SP of the field F have deleted themselves. If the sender does not receive a response AK after the elapse of a predetermined time interval, according to which the nm mirrors SP of the field F have deleted themselves, the delete request DeleteRQ has failed.

Pseudocode for the execution of a delete request DeleteRQ:

```
rq__delete:
    begin
        if status<>cs__idle then exit;
        if used and (message.ticket=1mticket) and
            (message.sender=1mAdr) then
        begin
            return__msg(message,ak__delete);
            exit;
        end;
```

26

-continued

```
        return__msg(m,ak__delete);
        1mTicket:=message.ticket;
        1mAdr:=message.sender;
        <Initialise cell in the initial state>
        used:=false;
        status:=cs__idle
    end;
```

Shift operations are used for assigning individual mirrors SP of a mirror compound to other cells Z which replace the previous mirrors SP accordingly. There are various reasons which necessitate shift operations:

Failure of a cluster C or individual cells Z
Removal of a cluster C from a cluster compound
Inadequate data transmission performance of a cluster C
Application-specific causes/reasons.

The shifting of mirrors SP upon the request of new mirrors SP has already been described above. If a cluster C is to be removed from the cluster compound CV, for example, when a cluster C is to be shut down or to be used for other tasks in the network N, the data of its active cells Z, i.e. of the cells Z which operate as mirrors SP, must be shifted to other clusters C. In this case the cluster C to be removed initiates the shifting of the data or of the mirrors SP, respectively, of the individual mirror compounds (as described above).

For initiating shift operations due to an inadequate data transmission performance, the data transmission performance of the clusters C and/or the cells Z is checked during operation. For this purpose, the preferred embodiment of the present invention uses a counter for each mirror SP and/or each cell Z which determines the transmission duration with pseudoreliable messages PSM. Optionally, a timer is implemented which determines the average data transmission duration, with a common time basis being required in this case. Preferably, each cluster C determines the data transmission performances of its cells Z. Mirrors SP or cells Z, respectively, whose data transmission durations exceed certain limits are shifted.

The evaluation of the data transmission performance with respect to the data transmission duration, however, is to be understood as an example only, and any desired parameter of data transmission performances which is suitable for the application of the invention can be checked for an initiation of shift operations by means of known methods. For example, the computing performance of individual cells Z and/or clusters C, or the performance of individual areas of the network N could be checked.

If such an inadequate data transmission performance has been determined for a mirror SP, e.g. cell C6Z2 from FIG. 2, a single mirror SP from the corresponding compound becomes the manager, e.g. cell C1Z4. The manager C1Z4 sends a request RQ, preferably with a pseudoreliable message PSM, to all other two cells C3Z6 and C6Z2 of the compound operating as mirrors SP to remove the corresponding mirror SP (C6Z2). This makes itself invalid or is declared invalid by the corresponding cluster C6.

Thereupon the manager C1Z4 requests a new mirror SP in the cluster compound CV, whereby contrary to the above described replacement for a mirror SP additional requirements can be placed on the new mirror SP, preferably requirements with respect to the data transmission performance. The new mirror SP is integrated into the mirror compound in the above described manner.

US RE40,521 E

27

28

In order to ensure that all mirrors SP have received information on the shift operation the manager sends a request RQ (preferably with a pseudoreliable message PSM) for cancelling the shift operation if it has not received a corresponding response AK from all nm−1 mirrors SP. In this case, the shift operation could not be completed successfully.

The operations described above in conjunction with cells Z and mirrors SP are also applicable to operations with respect to the inventive clusters C. For this reason, a detailed description of the operations for adding, removing, shifting, and deactivating of individual clusters C is dispensed with.

Although the present invention has been described in terms of specific embodiments, it is anticipated that alterations and modifications thereof will no doubt become apparent to those skilled in the art. It is therefore intended that the following claims be interpreted as covering all such alterations and modification as fall within the true spirit and scope of the invention.

What is claimed is:

1. A data access and management system for a computer system, comprising:

at least two data storage means;

at least one computer unit which accesses the data of the data storage means;

data transmission means for a data transmission between the data storage means and the computer unit, with the data being stored in a redundant manner in at least two of the at least two data storage means; and

means for detecting prespecified parameters of the data transmission between the data storage means and the computer unit, with data being preferably stored in a redundant manner in the data storage means as a function of said detected prespecified parameters, and with the computer unit accessing one of the data storage means as a function of said detected prespecified parameters, the data storage means comprising a second means for detecting prespecified parameters for data transmissions between said data storage means; and

wherein the data storage means copies data which is redundantly stored in the system independent of an access of the computer unit as a function of the detected prespecified parameters of data transmission between the data storage means.

2. A data access and management system as recited in claim 1 wherein each of said data storage means comprise control units for controlling the data access and the data management.

3. A data access and management system as recited in claim 1 wherein the data storage means copy redundantly stored data in the system among each other as a function of the detected prespecified parameters of data transmissions between the individual data storage means and the computer unit and delete the data in the data storage means in which it had been stored beforehand.

4. A data access and management system as recited in claim 1 wherein the data storage means process the stored data independent from the computer unit.

5. A data access and management system as recited in claim 1 wherein the data in the system is divided into data subsets, and the data storage means are divided into cells in such a manner tat data subsets to be stored in a redundant manner is stored in one each of the cells of the corresponding data storage means.

6. A data access and management system as recited in claim 5 wherein the data storage means are divided into cells depending on data transmission parameters.

7. A data access and management system as recited in claim 5 wherein each cell comprises additional data for data access and data management which relates to the parameters of data transmissions between at least one of the individual data storage means, the computer unit, neighbouring cells, and cells which comprise data which is stored in the system in a redundant manner.

8. A data access and management system as recited in claim 5 wherein the cells interchange data among each other which is used for the data access and the data management.

9. A data access and management system as recited in claim 5 wherein the parameters of data transmission between the individual data storage means and the computer unit are identical for the cells of a data storage means.

10. A data access and management system as recited in claim 5 wherein the computer unit immediately accesses individual cells of the data storage means.

11. A data access and management system as recited in claim 1 wherein the computer unit operates to perform at least one of outputting data for storage in the data storage means and processing data stored in the data storage means.

12. A data access and management system as recited in claim 1 wherein the computer unit is connected with a user for at least one of transmitting the received data and control by the user.

13. A data access and management system as recited in claim 12 wherein the user is at least one of a personal computer, a central processing unit of a computer, and an additional data storage means.

14. A data access and management system as recited in claim 1 wherein the computer unit is a system which provides Internet services.

15. A data access and management system as recited in claim 1 wherein the detected prespecified parameters of data transmissions between the individual data storage means and the computer unit comprise at least one of the duration of the transmission, the fault rate, and the duration of data processing operations of the individual data storage means prior to the transmission of the data.

16. A data access and management system as recited in claim 1 wherein the data transmission means comprise at least one of electrically conductive connections, bus systems, computer networks, wired telephone networks, wireless telephone networks, and the Internet.

17. A data access and management system as recited in claim 1 for use with a database system or a computer structure which manages data by means of the data access and management system.

18. A data access and management system as recited in claim 1 for use in a system for a computer game which is provided via the Internet.

19. A data access and management system as recited in claim 18 wherein at least one computer unit is an Internet service provider.

20. A data access and management system as recited in claim 18 wherein the computer game is an interactive computer game to be used by at least two users.

21. A data access and management system as recited in claim 20 wherein each user is connected with one computer unit each.

22. A data access and management system as recited in claim 20 wherein the computer units transmit data for the execution of the computer game to the respective users.

23. A data access and management system as recited in claim 22 wherein the users process the received data for executing the computer game and transmit said processed received data back to the corresponding computer units.

US RE40,521 E

29

**24.** A data access and management system as recited in claim **18** wherein additional means are provided for detecting prespecified parameters of the data transmission between the computer units and the respectively connected users.

**25.** A data access and management system as recited in claim **24** wherein the detected prespecified parameters of data transmissions between the computer units and the respectively connected users comprise at least one of the duration of the transmission, the fault rate, the duration of data processing operations of the individual computer units, and the individual users prior to the transmission of the data.

**26.** A data access and management system as recited in claim **24** wherein the data for executing the computer game is stored in a redundant manner as a function of the detected prespecified parameters of the data transmission between the computer units and the respectively connected users.

**27.** A data access and management system as recited in claim **18** wherein the computer units receive control for the execution of the computer game from the respective users.

**28.** A data access and management system as recited in claim **27** wherein the computer units output the control data or equivalent data to the data storage means.

**29.** A data access and management system as recited in claim **27** wherein the computer units process data for executing the computer game depending on at least one of the control data, and the data storage means process data for executing the computer game, depending on the control data or on data equivalent to the control data.

**30.** A method for data access and data management for a computer system, comprising:

storing data in at least two data storage means;

accessing the stored data by at least one computer unit via data transmission means, with prespecified parameters of the data transmission between the data storage means and the computer unit being determined, the data being stored in a redundant manner in at least two of the at least two data storage means as a function of the determined prespecified parameters of the data transmission, the access to the data being effected as a function of the determined prespecified parameters of the data transmission;

detecting prespecified parameters for data transmissions between the data storage means; and

shifting redundantly stored data independent of an access of the computer unit to the data as a function of the determined prespecified parameters of data transmissions between the data storage means.

**31.** A method for data access and data management as recited in claim **30** wherein the data access and the data management are controlled by the data storage means.

**32.** A method for data access and data management as recited in claim **30** further including the steps of copying redundantly stored data among each other by the data storage means as a function of the determined prespecified parameters of data transmissions between the individual data storage means and the computer unit and deleting in the data storage means in which the copied data had been previously stored.

**33.** A method for data access and data management as recited in claim **30** further including the step of processing the data by the data storage means independently of the computer unit.

**34.** A method for data access and data management as recited in claim **30** further including the step of dividing the data into data subsets, with the data subsets to be stored in a redundant manner being stored in cells of the individual data storage means.

30

**35.** A method for data access and data management as recited in claim **34** wherein additional data for data access and data management are exchanged between the cells of the data storage means.

**36.** A method for data access and data management as recited in claim **34** wherein the access is made directly to the data of individual cells of the data storage means.

**37.** A method for data access and data management as recited in claim **30** wherein the division into data subsets and the storage in the cells are carried out as a function of the data transmission parameters.

**38.** A method for data access and data management as recited in claim **30** wherein additional data for data access and data management is stored in the cells, which relate to at least one of the parameters of data transmissions between the individual data storage means, the computer unit, neighbouring cells, and cells which comprise the data redundantly stored in the system.

**39.** A method for data access and data management as recited in claim **30** wherein the access to data of cells of a data storage means has identical data transmission parameters.

**40.** A method for data access and data management as recited in claim **30** wherein data is at least one of output by the computer unit for storage in the data storage means and the data stored in the data storage means is processed by the computer unit.

**41.** A method for data access and data management as recited in claim **30** wherein the user either receives data transmitted by the computer unit, or controls the computer unit, or both.

**42.** A method for data access and data management as recited in claim **30** wherein the method provides Internet services.

**43.** A method for data access and data management as recited in claim **30** wherein the determination of the prespecified parameters of data transmissions between the individual data storage means and the computer unit comprises at least one of the determination of the duration of the transmission, the fault rate, and the duration of data processing operations of the individual data storage means prior to the transmission of the data.

**44.** A method for data access and data management as recited in claim **30** for use with a database system or a computer structure which manages data by means of said method for data access and data management.

**45.** A method for data access and data management as recited in claim **30** for use with a computer game which is provided via the Internet and in accordance with said method for data access and data management.

**46.** A method for data access and data management as recited in claim **45** wherein at least two users access the computer game, the computer game being an interactive computer game.

**47.** A method for data access and data management as recited in claim **46** wherein the data for executing the computer game is transmitted from the computer units to the respective users.

**48.** A method for data access and data management as recited in claim **47** wherein the data received by the users are processed by the users and transmitted back to the corresponding computer units.

**49.** A method for data access and data management as recited in claim **45** further comprising the step of determining prespecified parameters of the data transmission between the computer units and the respected users connected therewith.

US RE40,521 E

31

32

**50**. A method for data access and data management as recited in claim **49** wherein the determination of the prespecified parameters of data transmissions between the computer units and the respective users connected therewith comprises at least one of the determination of the duration of the transmission, the fault rate, the duration of data processing operations of the individual computer units, and the individual users prior to the transmission of the data.

**51**. A method for data access and data management, as recited in claim **49** wherein the redundant storage of the data for the execution of the computer game is carried out as a function of the determined prespecified parameters of the data transmission between the computer units and the respective users connected therewith.

**52**. A method for data access and data management as recited in claim **45** wherein control data for the execution of the computer game is additionally transmitted by the users to the corresponding computer units.

**53**. A method for data access and data management as recited in claim **52** wherein the control data or equivalent data is transmitted from the computer units to the data storage means.

**54**. A method for data access and data management as recited in claim **52** wherein the data for executing the computer game is processed by at least one of the computer units as a function of the control data and the data storage means as a function of the control data or of data equivalent to the control data.

**55**. A method for data access and data management as recited in claim **30** wherein the access to data in the data storage means comprises the employment of an Internet service provider which operates as a computer unit.

\* \* \* \* \*

# EXHIBIT E

## TO

## DEFENDANTS' MOTION TO STRIKE VIA VADIS'S UNTIMELEY DISCLOSED PROPOSED CLAIM CONSTRUCTIONS

**From:**              Parker C. Ankrum
**Sent:**               Monday, October 29, 2012 4:32 PM
**To:**                  Tiller, Steven
**Cc:**                  Martin M. Zoltick (mzoltick@rfem.com); Skype-Via Vadis; 'Blumenfeld, Jack'; 'Smith, Rodger'
**Subject:**          Via Vadis, LLC v. Skype Inc. et al.

Steven,

Last Friday (October 26, 2012), Via Vadis served its opening claim construction brief.  In this brief, for the first time and in complete violation of the disclosure scheme set forth in Paragraph 7 of the Protective Order, Via Vadis offered proposed constructions for each and every disputed claim term identified by Skype.  To narrow disputes and facilitate good faith negotiations, the Court has provided a disclosure paradigm that allows for the identification of claim construction issues prior to the start of *Markman* briefing, including through a Joint Claim Construction Statement that "should identify for the Court the term(s)/phrase(s) of the claim(s) in issue, and **should include each party's proposed construction of the disputed claim language** . . . ."  *See* D.I. 48 at ¶ 7 (emphasis added).  After having more than two months to consider Skype's proposed claim terms and constructions, Via Vadis's identification of proposed constructions at this late hour is unfair, highly prejudicial, and in clear violation of the spirit of the disclosure exchange provided by this Court.  The result here has been unilateral disclosures by Skype (who, alone, has complied with the Court's disclosure requirements).  As such, these newly provided constructions from Via Vadis should be withdrawn.

The harm produced by Via Vadis's breach is compounded further by the fact that Skype tried to resolve this issue months ago.  Indeed, on September 4, 2012 (a week after the parties first exchanged proposed claim terms and constructions), Skype notified Via Vadis that its failure to identify any proposed claim terms or constructions, including for the means-plus-function terms recited in the asserted claims, were in violation of the letter and spirit of the Court's Scheduling Order.  We also noted that, to the extent that this bare disclosure accurately reflected Via Vadis's proposed constructions, Skype would object to any "change in position and will seek to strike any briefing submitted by Via Vadis that proposes alternative constructions."  *See* Sept. 4, 2012 email from P. Ankrum.  Via Vadis never responded to this email, opting instead to wait two months so that it could spring its constructions on Skype in the midst of claim construction briefing.  This is improper and Skype, again, objects to Via Vadis's untimely disclosure and breach of the Scheduling Order.

Please let us know by close of business on Wednesday if you will agree to withdraw your proposed constructions.

Regards,
Parker

# EXHIBIT F

## TO

## DEFENDANTS' MOTION TO STRIKE VIA VADIS'S UNTIMELEY DISCLOSED PROPOSED CLAIM CONSTRUCTIONS

| | |
|---|---|
| **From:** | Martin M. Zoltick [Mzoltick@rothwellfigg.com] |
| **Sent:** | Tuesday, October 30, 2012 2:31 PM |
| **To:** | Parker C. Ankrum; stiller |
| **Cc:** | Skype-Via Vadis; Jack B. Blumenfeld; Smith, Rodger |
| **Subject:** | Our Ref: 3743-105 - RE: Via Vadis, LLC v. Skype Inc. et al. |

Parker – Via Vadis will not withdraw its Opening Brief on Claim Construction.  Via Vadis' position on claim construction, which has been disclosed in accordance with the Court's Scheduling Order, has been consistent throughout the entire process.  As indicated in all of the claim construction papers served and filed by Via Vadis, it is Via Vadis' position that the claims terms should be accorded their plain and ordinary meaning.

I hope that you all made it through the storm safely.  We fortunately made it through OK here and things are getting back to normal.



ROTHWELL FIGG ERNST & MANBECK ℗
IP Professionals

**Martin M. Zoltick, Esq.**
**ROTHWELL, FIGG, ERNST & MANBECK, P.C.**
**607 14th St, N.W.**
**Suite 800**
**Washington, D.C. 20005**
**Main No:** (202) 783-6040
**Fax No:** (202) 783-6031
**Email:**   mzoltick@rfem.com
**Web:**     www.rfem.com

STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential and/or privileged information. If you are not the addressee, note that any disclosure, copy, distribution or use of the contents of this message is prohibited. If you are not the intended recipient, please notify Rothwell, Figg, Ernst & Manbeck, P.C. immediately at (202) 783-6040 or email us at mzoltick@rfem.com, and destroy all copies of this message and any attachments.

**From:** Parker C. Ankrum [mailto:pankrum@kasowitz.com]
**Sent:** Monday, October 29, 2012 7:32 PM
**To:** stiller
**Cc:** Martin M. Zoltick; Skype-Via Vadis; Jack B. Blumenfeld; Smith, Rodger
**Subject:** Via Vadis, LLC v. Skype Inc. et al.

Steven,

Last Friday (October 26, 2012), Via Vadis served its opening claim construction brief.  In this brief, for the first time and in complete violation of the disclosure scheme set forth in Paragraph 7 of the Protective Order, Via Vadis offered proposed constructions for each and every disputed claim term identified by Skype.  To narrow disputes and facilitate good faith negotiations, the Court has provided a disclosure paradigm that allows for the identification of claim construction issues prior to the start of *Markman* briefing, including through a Joint Claim Construction Statement that "should identify for the Court the term(s)/phrase(s) of the claim(s) in issue, and **should include each party's proposed construction of the disputed claim language**. . . ."  *See* D.I. 48 at ¶ 7 (emphasis added).  After having more than two months to consider Skype's proposed claim terms and constructions, Via Vadis's identification of proposed constructions at this late hour is unfair, highly prejudicial, and in clear violation of the spirit of the disclosure exchange provided by this Court.  The result here has been unilateral disclosures by Skype (who, alone, has complied with the Court's disclosure requirements).  As such, these newly provided constructions from Via Vadis should be withdrawn.

The harm produced by Via Vadis's breach is compounded further by the fact that Skype tried to resolve this issue months ago.  Indeed, on September 4, 2012 (a week after the parties first exchanged proposed claim terms and constructions), Skype notified Via Vadis that its failure to identify any proposed claim terms or constructions, including for the means-plus-function terms recited in the asserted claims, were in violation of the letter and spirit of the Court's Scheduling Order.  We also noted that, to the extent that this bare disclosure accurately reflected Via Vadis's proposed constructions, Skype would object to any "change in position and will seek to strike any briefing submitted by Via Vadis that proposes alternative constructions."  *See* Sept. 4, 2012 email from P. Ankrum.  Via Vadis never responded to this email, opting instead to wait two months so that it could spring its constructions on Skype in the midst of claim construction briefing.  This is improper and Skype, again, objects to Via Vadis's untimely disclosure and breach of the Scheduling Order.

Please let us know by close of business on Wednesday if you will agree to withdraw your proposed constructions.


Regards,
Parker

Parker C. Ankrum
Kasowitz, Benson, Torres & Friedman LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA 94065
Tel. (650) 453-5413
Fax (650) 362-2403
pankrum@kasowitz.com

This e-mail and any files transmitted with it are confidential and may be subject to the attorney-client privilege. Use or disclosure of this e-mail or any such files by anyone other than a designated addressee is unauthorized. If you are not an intended recipient, please notify the sender by e-mail and delete this e-mail without making a copy.