# Exhibit A

## To

# Reply In Support of Skype Defendants' Motion to Strike Via Vadis's Proposed Claim Constructions

1

```
1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                        - - -

4    INTEGRATED DISCRETE        )   Civil Action
     DEVICES, L.L.C.,           )
5                               )
               Plaintiff,       )
6                               )
         v.                     )
7                               )
8    DIODES INCORPORATED,       )
                                )
9              Defendant.       )   No. 08-888-GMS

10                       Wilmington, Delaware
11                  Wednesday, April 28, 2010
                          9:30 a.m.
12                       Markman Hearing

13

14   BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

15   APPEARANCES:

16           THOMAS L. HALKOWSKI, ESQ.
             Fish & Richardson, P.C.
17                   -and-
             LAURENCE KOLODNEY, ESQ.
18           Fish & Richardson, P.C.
             (Boston, MA)
19
                     Counsel for Plaintiff
20           JACK B. BLUMENFELD, ESQ.
             Morris, Nichols, Arsht & Tunnell
21                   -and-
             BENJAMIN W. HATTENBACH, ESQ.,
22           PETER GRATZINGER, ESQ., and
             JEREMIAH HELM, ESQ.
23           Irell & Manella LLP
             (Los Angeles, CA)
24
                     Counsel for Defendant
25
```

2

09:33:38   1        THE COURT: Good morning, counsel. Please be
09:33:38   2   seated. Let's begin with introductions, if we could,
09:33:42   3   beginning with plaintiff.
09:33:42   4        MR. HALKOWSKI: Yes, Your Honor. Tom Halkowski
09:33:44   5   with Fish & Richardson on behalf of the plaintiff IDD. With
09:33:50   6   me today is Mr. Kolodney from our Boston office.
09:33:52   7        THE COURT: Good morning.
09:33:54   8        MR. KOLODNEY: Good morning, Your Honor.
09:33:54   9        THE COURT: Mr. Blumenfeld.
09:33:58   10       MR. BLUMENFELD: Good morning, Your Honor. Jack
09:33:58   11   Blumenfeld from Morris Nichols for the defendant Diodes.
09:34:00   12   With me is Ben Hattenbach, Peter Gratzinger, and Jeremiah
09:34:06   13   Helm, from Irell & Manella.
09:34:08   14       With the Court's permission, they were going to
09:34:10   15   split up the terms for the defendants today and each present
09:34:14   16   some of them.
09:34:14   17       THE COURT: I am about to make a ruling that is
09:34:18   18   going to affect, probably, the split. But you will know in
09:34:22   19   a minute.
09:34:26   20       Before we proceed, counsel, with the Markman
09:34:30   21   presentations, I want to address an issue that has been
09:34:32   22   brought to my attention by both my law clerk and the
09:34:36   23   defendant's answering claim construction brief, namely, the
09:34:42   24   fact that IDD has changed most of the claim constructions it
09:34:42   25   has asserted in both the final joint claim chart and its

3

09:34:46   1   opening claim construction chart brief. Indeed, I think
09:34:50   2   plaintiff actually points it out in the reply itself.
09:34:52   3        The Court entered the scheduling order in this
09:34:56   4   action on September the 10th of 2009. Paragraph 4 of the
09:35:00   5   scheduling order sets forth the procedure for the Markman
09:35:02   6   hearing, including the filing of the final joint claim chart
09:35:06   7   and a briefing schedule. The Court uses this procedure for
09:35:10   8   claim construction in order to obtain a clear understanding
09:35:14   9   of the parties' positions prior to the Markman hearing.
09:35:18   10   Moreover, the Court uses the term "final joint claim chart"
09:35:24   11   because the claim chart is meant to convey to the Court the
09:35:26   12   parties' ultimate position on the issue with supporting
09:35:30   13   citation to the intrinsic record. In other words, a party
09:35:34   14   cannot revise the constructions it advocated for in the
09:35:38   15   final joint claim chart without leave of Court.
09:35:40   16       And that's not just a matter of the Court
09:35:46   17   exercising its prerogatives and discretion insofar as court
09:35:50   18   management is concerned. It is actually, interestingly
09:35:52   19   enough, a provision of the Federal Rules of Civil Procedure,
09:35:56   20   specifically 16(b)(4), which says, "A schedule may be
09:36:00   21   modified only for good cause and with the judge's consent."
09:36:04   22       Pursuant to the scheduling order, the parties
09:36:08   23   filed the final joint claim chart on February 12, 2010. The
09:36:10   24   final joint claim chart contained ten disputed claim terms,
09:36:16   25   along with each party's proposed construction and citation

4

09:36:18   1   to the intrinsic record. The parties filed their respective
09:36:22   2   opening claim construction briefs simultaneously on February
09:36:22   3   26, 2010.
09:36:26   4        The final joint claim chart and opening briefs
09:36:30   5   should, in the Court's view, shape the parties' arguments to
09:36:34   6   the Court and serve as a preview of their Markman
09:36:36   7   presentations. In both the final joint claim chart and its
09:36:40   8   opening brief, IDD set forth certain proposed constructions
09:36:44   9   for the ten claim terms at issue. Utilizing these proposed
09:36:48   10   constructions, as well as those proposed by Diodes, the
09:36:50   11   Court began the process of examining the intrinsic record.
09:36:54   12       On March 26, 2010, the parties simultaneously
09:36:58   13   filed their answering claim construction briefs. The Court
09:37:00   14   was nonplussed to discover that IDD had changed seven of its
09:37:06   15   proposed constructions without seeking leave of Court.
09:37:10   16   IDD's answering brief was the first notice that the Court
09:37:12   17   received IDD's change in position. IDD's answering brief
09:37:20   18   states that it revised the proposed constructions in order
09:37:24   19   to "eliminate some of the previously argued distinctions
09:37:28   20   from Diodes' position."
09:37:30   21       Now, a cursory review of IDD's revised
09:37:34   22   constructions belies this assertion, in my view. Indeed,
09:37:36   23   although it appears that IDD now agrees with Diodes'
09:37:40   24   position on two terms, namely, conductivity type and
09:37:46   25   electrically connecting, IDD's revised constructions of five

5

09:37:50 1  other terms -- pedestal, side regions, semiconductor
09:37:54 2  substrate of the first conductivity type, a varied layer of
09:37:58 3  a second conductivity type under and between the side
09:38:04 4  regions, and, finally, channel region in the substrate below
09:38:04 5  the first oxide layer under the side regions -- still
09:38:10 6  differs from Diodes' proposed constructions.
09:38:12 7       The Court will not allow or permit parties to
09:38:14 8  violate its rules without consequence.  If IDD wished to
09:38:18 9  revise its constructions, it should have sought leave of
09:38:22 10 Court to do so.  Permitting argument on IDD's revised
09:38:26 11 constructions at this stage of the process would be patently
09:38:28 12 unfair to Diodes, who relied, as it should have, on IDD's
09:38:34 13 original constructions set forth in the final joint claim
09:38:36 14 chart and opening brief.
09:38:36 15      As a result of IDD's gamesmanship, the Court
09:38:40 16 will adopt Diodes' proposed claim constructions for the
09:38:44 17 terms that IDD improperly revised.  The Court, however, will
09:38:48 18 permit argument on the three terms that IDD did not revise,
09:38:52 19 namely, diode contact, on [the first surface of] the
09:38:56 20 substrate, and finally, substrate between the side regions.
09:39:02 21      We can now proceed.  And I would appreciate
09:39:04 22 counsel's refraining from referring to matters of an
09:39:08 23 extrinsic nature, other than dictionaries, or extrinsic
09:39:12 24 evidence that doesn't help advance the Court's understanding
09:39:12 25 of the underlying technology.

6

09:39:20 1       You may proceed, counsel.
09:39:22 2       Start with plaintiff.
09:39:28 3       MR. KOLODNEY:  Thank you, Your Honor.
09:39:30 4       I have copies of our presentation, much of
09:39:34 5  which, of course, is now moot given your ruling, but if the
09:39:40 6  Court would like the copies...
09:39:42 7       THE COURT:  Fine.  You can pass it up to Ms.
09:39:44 8  Walker right there.
09:40:14 9       Are you clear on which terms remain?
09:40:18 10      On [the first surface of] the substrate.  We
09:40:24 11 have got that.  Right?
09:40:26 12      I think the parties agree on conductivity type
09:40:28 13 and electrically connecting.
09:40:32 14      And then we have diode contact, and the
09:40:36 15 substrate between the side regions.
09:40:40 16      MR. KOLODNEY:  Thank you, Your Honor.
09:40:42 17      Would the Court entertain a response to the
09:40:44 18 ruling we just heard?
09:40:46 19      THE COURT:  No.  Not at all.  And, counsel, this
09:40:52 20 is for the benefit of both parties, not necessarily
09:40:52 21 involving exactly this action.  No.  When the Court rules,
09:41:00 22 the Court rules.  It doesn't invite an ongoing dialogue
09:41:04 23 regarding its final judgments.  That would be akin, Mr.
09:41:10 24 Blumenfeld and company, to me being reversed by a panel,
09:41:16 25 let's say the Third Circuit, and then me sitting down and

7

09:41:18 1  writing a letter:  I want to engage you gentlemen and/or
09:41:22 2  ladies in a dialogue about why I think you are wrong.
09:41:26 3       No, I am not going to entertain that or engage
09:41:32 4  in that kind of nonsense with lawyers.
09:41:36 5       No, you may not.
09:41:38 6       MR. KOLODNEY:  Okay, Your Honor.  Thank you.
09:41:42 7       What I would propose to do, Your Honor, is first
09:41:46 8  have a brief technology background presentation to explain
09:41:50 9  the technology underlying the invention and generally what
09:41:56 10 the patent specification discloses, and then go on to the
09:42:00 11 specific claim terms that are in dispute, if that is okay
09:42:02 12 with the Court.
09:42:02 13      THE COURT:  That is fine.
09:42:04 14      MR. KOLODNEY:  As the Court is aware, this is a
09:42:16 15 case about diodes.  And just to talk generally about what
09:42:22 16 diodes are and what they were in the prior art, a diode is
09:42:26 17 basically a one-way valve for electricity.  It allows
09:42:30 18 electricity to flow in one direction from a terminal called
09:42:32 19 the anode to another terminal called the cathode, and blocks
09:42:36 20 that flow when the current tries to flow from the cathode to
09:42:40 21 the anode.
09:42:42 22      In the prior art, a traditional, conventional
09:42:46 23 diode was a very simple device that was made out of two
09:42:50 24 different types of material, p-type semiconductor and n-type
09:42:56 25 semiconductor.  You can see in the picture here, it is

8

09:42:58 1  basically just a sandwich of these two materials with
09:43:02 2  electrodes sticking out at the end.
09:43:04 3       Because of the physics of n-type and p-type
09:43:08 4  semiconductor, current can flow from a p-type region to an
09:43:12 5  n-type region from a positive to a negative side, but it
09:43:16 6  cannot flow when the polarity is reversed.  When there is a
09:43:20 7  positive voltage on the cathode and a negative voltage on
09:43:24 8  the anode, normally current would want to flow from positive
09:43:26 9  to negative, but the p-n junction blocks that flow.
09:43:34 10      Now, there is an inherent problem with this type
09:43:36 11 of what is called a p-n diode.  That is that there is a
09:43:42 12 relatively high voltage drop even when the current is
09:43:44 13 flowing forward from the anode to the cathode.
09:43:46 14      What that means is that as current flows through
09:43:50 15 the diode, some of the energy containing the current is lost
09:43:54 16 and given off as heat, and that creates, obviously,
09:43:56 17 inefficiency, and in certain types of devices can actually
09:44:00 18 cause overheating and make them infeasible to build.
09:44:06 19      Now, the prior art also in another type of
09:44:10 20 conventional diode addressed that voltage drop process,
09:44:14 21 that's called a Schottky diode.  A Schottky diode replaces
09:44:20 22 that p material, that red section in the p-n diode, with a
09:44:22 23 piece of metal.  So you have a piece of metal, then you have
09:44:26 24 n-type semiconductor material.  The result is a lower
09:44:30 25 voltage drop, so there is less energy given off when the

9

09:44:32 1 current is flowing forward in the diode. But that presents
09:44:36 2 a different problem, a different inherent problem in the
09:44:38 3 physics of this technology. That is what is called high
09:44:40 4 reverse leakage current.
09:44:42 5     Leakage current is when the diode is supposed to
09:44:46 6 be blocking current from flowing again from the cathode to
09:44:50 7 the anode, some current nonetheless gets through. And the
09:44:56 8 Schottky diode is less good at blocking that current than
09:45:00 9 the traditional p-n diode.
09:45:02 10     So you have this tradeoff in the prior art
09:45:02 11 between p-n diode, which is relatively good at blocking
09:45:06 12 reverse current but has a cost of heat and inefficiency in
09:45:12 13 the forward direction, then you have the Schottky diode,
09:45:16 14 which reduces the inefficiency but is less good at blocking
09:45:18 15 the reverse current.
09:45:22 16     Now, the diode that is disclosed in the patent
09:45:26 17 and is claimed in Claim 6 of the patent which is in suit
09:45:30 18 here operates on a fundamentally different principle. As
09:45:34 19 you can see from this figure here, it is a lot more
09:45:36 20 complicated structure than either the traditional p-n or
09:45:42 21 Schottky diode.
09:45:44 22     The fundamental concept in this architecture is
09:45:48 23 that there is a region called the channel, which you can see
09:45:52 24 pointed out in the figure there, that sits in between the
09:45:?4 25 anode, which is the gray metal layer at the top of the

10

09:45:58 1 diagram, and the cathode, which is the gray metal layer at
09:46:02 2 the bottom.
09:46:02 3     So like a traditional p-n diode, there is an
09:46:06 4 anode and a cathode from which current flows across from one
09:46:08 5 to the other, but the current has to pass through this
09:46:12 6 region called the channel in order to get from the anode to
09:46:14 7 the cathode. And because of the way the channel is
09:46:20 8 constructed and the entire structure that is shown in the
09:46:24 9 figure here, the channel can be made to be nonconductive or
09:46:30 10 conductive depending on a voltage that is applied to an
09:46:34 11 electrode that sits right above it called a gate, that is
09:46:38 12 those two green regions right above the channel.
09:46:42 13     Particularly -- actually, I should mention that
09:46:46 14 the green gates in this particular configuration are
09:46:48 15 connected to the anode, so the gates end up having the same
09:46:54 16 voltage as the anode. When the anode voltage is positive
09:46:58 17 and is trying to force current down, that makes the gate
09:47:00 18 voltage positive. When the anode voltage is negative
09:47:04 19 relative to the cathode, the gate voltage is negative as
09:47:08 20 well.
09:47:?0 21     The way this works is, when there is positive
09:47:12 22 voltage on the anode and therefore on the gates, the gates
09:47:18 23 affect the channels and make them conductive. As a result,
09:47:22 24 current can flow, as you can see, from the top metal to the
09:47:22 25 bottom metal of the diode. And because the physics of this

11

09:47:30 1 type of a diode are fundamentally different than the p-n or
09:47:34 2 Schottky diode, the voltage drop is significantly lower than
09:47:38 3 it is in the p-n diode, and in the reverse direction, when
09:47:44 4 the channel becomes nonconductive, the ability to block
09:47:50 5 reverse leakage current is higher than in the Schottky
09:47:56 6 diode.
09:47:56 7     Essentially, what this type of a diode gives you
09:47:58 8 is the best of both worlds. It gives you the low voltage
09:48:02 9 drop of the Schottky diode and the reverse voltage blocking
09:48:12 10 of the p-n diode.
09:48:14 11     Now, Diodes made a couple of assertions in its
09:48:20 12 briefing about sort of how the technology of this patent
09:48:24 13 works that I would like to take issue with.
09:48:26 14     They basically made two related statements.
09:48:30 15 This is from their reply brief, Pages 17 to 18. First they
09:48:36 16 said that the central idea of the '079 patent was to reduce
09:48:40 17 the forward voltage conduction drop of a diode by creating
09:48:44 18 channels that are just conducting at zero forward bias.
09:48:50 19 Then shortly afterwards, they said, This idea required that
09:48:54 20 the current have a clear path from the top metal to the
09:48:58 21 bottom metal through material of a single conductivity type.
09:49:02 22     So they made two related assertions. One is
09:49:06 23 that the central idea, essentially, the essence of the
09:49:08 24 invention was to have conduction at zero voltage, and,
09:49:12 25 second, that that required a physical configuration which

12

09:49:16 1 they described as a clear path from the top to the bottom of
09:49:20 2 a single conductivity type.
09:49:22 3     Going back to the image, the figure of the
09:49:26 4 patent, what they are basically saying is that the central
09:49:28 5 idea of the patent requires that essentially there be -- the
09:49:32 6 blue here is n-type material and the red is the p-type
09:49:38 7 material in the preferred embodiment. They are saying there
09:49:42 8 has to be a clear path of blue-type material from the top to
09:49:46 9 the bottom without any p-type material intervening.
09:49:50 10     Now, this is not a correct characterization of
09:49:54 11 what the patent teaches. The patent only mentions
09:49:58 12 conducting at zero forward bias in one sentence in the
09:50:02 13 entire patent. It is in the description of the preferred
09:50:06 14 embodiment, at Column 7, Lines 18 to 22. What the patent
09:50:12 15 says is that channel regions may be just conducting at
09:50:16 16 zero forward bias, and they may do so not by having a clear
09:50:22 17 path of material of a single conductivity type, which is
09:50:26 18 what Diodes contends, but by appropriate selection of
09:50:30 19 dopants and their concentrations and other materials and
09:50:32 20 dimensions of the device.
09:50:36 21     There is no teaching in this patent whatsoever
09:50:38 22 that says either that zero forward bias conduction is an
09:50:44 23 essential part of the invention or that accomplishing that
09:50:48 24 requires this clear path of a single conductivity type.
09:50:52 25     Now, after the briefing was closed, we

---

**13**

1 discovered that one of the prior art references that was
2 cited during the prosecution of this patent actually,
3 essentially, contradicts and shows that Diodes'
4 characterization of the technology is incorrect. With the
5 Court's permission, I would like to discuss that. It's in
6 the notebook that we gave you. The reference itself is
7 included.
8     So the reference is called Yee. What the Yee
9 reference says is that a semiconductor device, which is a
10 diode, which could start conducting at substantially zero
11 voltage, was already known in the prior art. And the Yee
12 patent actually is not about that particular device. But
13 the Yee patent describes yet an earlier piece of technology,
14 a Japanese patent to Sakai.
15     This Yee patent was of record before the Patent
16 Office, so the examiner considered it in allowing Claim 6 to
17 issue. What that clearly suggests, Your Honor, is that
18 whatever the important feature of the invention of Claim 6
19 was, it wasn't turning on at zero volts, because that was
20 already known in the prior art. And, of course, Claim 6
21 says nothing about turning on at zero volts. As I showed
22 you in the earlier slide, the patent itself only suggests
23 that as a possibility for the preferred embodiment you may
24 achieve zero voltage conduction but it's not required by the
25 invention.

---

**14**

1     If we actually take a look at what Sakai
2 discloses -- Sakai is also in your notebook there, Your
3 Honor -- Sakai actually shows a device which has a channel
4 in p material even though the substrate is n material. So
5 this is the very configuration that Diodes would want to
6 exclude from the claim because they say it can't turn on at
7 zero volts. Well, lo and behold, Sakai specifically says
8 that it starts conducting at zero volts. That is in the
9 excerpt at the bottom there. It says, Specifically, the
10 current will start to flow from voltage zero volts, and
11 moreover show a considerable increase, and therefore the
12 forward voltage will become smaller.
13     So the very premise of Diodes' characterization
14 of the '079 patent that it's got to be a continuous path of
15 n material from the top to the bottom because you can't turn
16 on at zero volts is wrong for two reasons: first, that it
17 is not required by the invention, the zero volt turn-on is
18 not required by the invention, number one, and number two,
19 the current can start to flow at zero volts even with that
20 type of a p barrier between the two n regions as shown in
21 this patent.
22     Now I am going to talk briefly about the
23 specific disclosure of the preferred embodiment in the '079
24 patent. Much of the '079 patent is focused on describing
25 how to make a preferred embodiment of the invention. The

---

**15**

1 patent says that the way you make the preferred embodiment
2 is that you begin with something called a substrate. That
3 is shown in Figure 3A.
4     A substrate is basically a silicon wafer. A
5 silicon wafer can have one of two conductivity types. It
6 can be n-type or p-type. This is the way they are purchased
7 by the company that makes the diodes or whatever
8 semiconductor device out of them. In the patent it says
9 that in the preferred embodiment the substrate is an n-type
10 substrate.
11     Then what's done with the substrate?
12     Well, the first thing that happens is that some
13 additional layers of material are deposited on top of the
14 substrate. And in particular, for the purposes of this
15 presentation, the layers that are important are these layers
16 50 and 52, which are shown in Figure 3I. These are
17 basically, you take additional material and you basically
18 layer it on top of the substrate, and that allows you to
19 create additional structures for the ultimate device.
20     What is then done is that these layers are then
21 etched. And etching is basically what it sounds like. It's
22 scraping away or dissolving away portions of material that
23 is either on top of the substrate or sometimes even in the
24 substrate.
25     In this particular case, these two layers 50 and

---

**16**

1 52 are etched according to a pattern. And this is just
2 showing one pedestal here that results. But in reality,
3 there could be thousands of these pedestals in the device.
4 And there is basically a pattern map that determines where
5 these pedestals will be etched in this overall substrate,
6 the overall layers.
7     Basically what you end up with is you etch away
8 portions of these layers 50 and 52 and you end up with a
9 bunch of these bumps, these pedestals, that are scattered
10 across the surface of the substrate.
11     Now, in the preferred embodiment, the pedestals
12 are created using an etching technique called plasma
13 etching. In plasma etching, the result is a very sharply
14 defined edge to the device. As we can see here, the
15 pedestals in the preferred embodiment have substantially
16 vertical side walls. But there are other types of etching
17 techniques, for example, wet etching, which is described in
18 the patent, which give you a less distinct edge to the
19 device. It can be more of a graded edge to the structure
20 that's being etched.
21     Now, after the pedestal is created, a layer is
22 implanted into the pedestal by -- I should say is created in
23 the substrate by implanting into the substrate what's called
24 a dopant, which is an impurity that can change the
25 conductivity type of the material in which it's found.

---

17

09:57:26   1   These dopants, it is a very small amount of
09:57:28   2   material, one in 10,000, one in a million parts relative to
09:57:32   3   the overall chemistry of the substrate.  And the dopant in
09:57:44   4   this case is boron.  So, for example, there may be one boron
09:57:44   5   atom for every 10,000 silicon atoms or hundred thousand
09:57:48   6   silicon atoms.  It is a very small amount of material.  That
09:57:52   7   small amount of material has the ability to affect the
09:57:56   8   electrical characteristics of the region in which those
09:57:58   9   particular atoms are found.
09:58:00   10   So in the preferred embodiment this boron is
09:58:06   11   implanted into a layer 56 as shown in Figure 3L.  And that
09:58:12   12   changes the conductivity type of that particular region of
09:58:14   13   the substrate from n-type to p-type.
09:58:20   14   Now, the buried layer can also extend upward,
09:58:26   15   and, in fact, must extend upward and reach the surface at
09:58:30   16   various locations in the device.  And that is necessary
09:58:32   17   because in order for the device to work properly, the buried
09:58:36   18   layer has to be electrically connected to the anode.
09:58:40   19   So as you can see in both the preferred
09:58:44   20   embodiment 3S and alternative embodiment 5C, the buried
09:58:50   21   layer comes up to the surface of the substrate and touches
09:58:52   22   the anode.
09:58:54   23   After the pedestal and the buried layer are
09:58:58   24   created, the next step in the manufacturing process is to
09:59:02   25   create these so-called side regions or gates.  Those are

18

09:59:06   1   created on the sides of the pedestal.  In this particular
09:59:12   2   manufacturing technique, it is done by depositing a layer
09:59:14   3   over and on the sides of the pedestal and then etching away
09:59:18   4   the layer on the top so only the pieces on the sides remain.
09:59:26   5   The result of this is that you end up with a
09:59:28   6   channel region -- remember, the channel region is the region
09:59:32   7   that needs to be affected by the gate electrode.  The
09:59:36   8   channel region is formed in a layer 46, which you can see in
09:59:40   9   this figure, which is also implanted with material, in this
09:59:44   10   case arsenic.  The implantation doesn't change the
09:59:48   11   conductivity type of that region in the substrate, although
09:59:52   12   it does change -- its relative conductivity becomes more
09:59:58   13   conductive than the rest of the substrate.  It becomes more
10:00:02   14   n-like than the rest of the substrate because of that
10:00:06   15   implantation.
10:00:06   16   The result is, here you basically have the
10:00:10   17   result, except the final step is to add the metal layers at
10:00:14   18   the top and the bottom which actually create the electrodes,
10:00:16   19   which are then connected to the outside world, so to speak.
10:00:22   20   So that's the basic overview of the patent and
10:00:22   21   its technology.
10:00:26   22   Now, because of the Court's ruling, I am going
10:00:28   23   to have to skip a number of these slides.  You will forgive
10:00:32   24   me while I page through this.
10:00:36   25   Let me first say, this is --

19

10:00:38   1   THE COURT:  You can skip the patent primer.
10:00:48   2   MR. KOLODNEY:  Okay.  I think this is the first
10:01:16   3   term that is still at issue then, Your Honor, on [the first
10:01:24   4   surface of] the substrate.
10:01:26   5   The basic dispute between the parties, Your
10:01:28   6   Honor, is whether the term "on" in this context requires
10:01:32   7   that the thing that is on something else has to be in
10:01:34   8   contact with it.  IDD's position is that "on" is an ordinary
10:01:40   9   English word with a well-understood meaning that jurors can
10:01:44   10   understand and that there is no need for further
10:01:46   11   construction.
10:01:46   12   But, in any event, to the extent the Court is
10:01:50   13   inclined to construe it, we think that the requirement for
10:01:54   14   contact is narrower than the ordinary meaning of "on," and
10:01:58   15   there is nothing in the specification that requires that
10:02:02   16   narrowing construction.  And therefore, it should be
10:02:04   17   rejected.
10:02:04   18   The ordinary meaning of "on" is a preposition
10:02:12   19   that connotes a relationship between physical objects in
10:02:14   20   which one object is either in contact with another object or
10:02:20   21   is vertically supported indirectly by that object.
10:02:24   22   For example, and we gave some of these in our
10:02:28   23   briefing, a plate can be on a table even if there is a table
10:02:30   24   cloth in between.  Books can be piled on a table even though
10:02:34   25   only the bottom book in the pile is actually touching the

20

10:02:38   1   table.  A picture can be hanging on a wall even though it is
10:02:42   2   actually connected to the wall by a nail.  Similarly, I am
10:02:46   3   standing on this floor right now even though there is a rug
10:02:48   4   between me and the actual floor.
10:02:50   5   Moreover, in the specification itself, the term
10:02:54   6   "on" is used in this broad sense to include indirect
10:02:58   7   support.  At Column 5, Lines 43 to 49, there is a
10:03:04   8   description of forming the pedestal by forming one or more
10:03:10   9   layers on the substrate.  And that is a description of
10:03:16   10   actually how the preferred embodiment is formed, as you can
10:03:18   11   see in Figure 3J which we produced.  One or more layers are
10:03:24   12   formed on the substrate, and yet only the bottom layer is
10:03:26   13   touching the substrate.  There is an additional layer, which
10:03:28   14   the patent is characterizing as being formed on the
10:03:32   15   substrate, yet it's not touching the substrate.
10:03:34   16   So clearly, the drafter of this patent did not
10:03:38   17   understand the term "on" to be limited to a physical
10:03:42   18   touching relationship, but understood it more generally to
10:03:46   19   mean a supporting relationship with possibly intermediate
10:03:50   20   material in between.
10:03:56   21   Next, the term "diode contact."  Your Honor, the
10:04:32   22   claim requires two diode contacts, a first diode contact and
10:04:36   23   a second diode contact.  We think it's clear from the
10:04:40   24   specification that what the claim is referring to are these
10:04:44   25   two metallic layers, the anode and the cathode layers, which

21

10:04:50 1 are called contact layer 60 and contact layer 62 in the
10:04:54 2 specification. We think that's just the common-sense
10:05:00 3 reading of the patent. And really I don't have much more to
10:05:0? 4 say about that. We will rest on our briefing for that.
10:05:08 5     The third term that you are permitting argument
10:05:20 6 on is the substrate between the side regions. Is that
10:05:24 7 correct?
10:05:24 8     THE COURT: That's correct.
10:05:26 9     MR. KOLODNEY: Well, frankly, Your Honor, that
10:05:32 10 term, the real issue in that term is whether the
10:05:36 11 semiconductor substrate has to be comprised of material of a
10:05:40 12 first conductivity type, which was part of the argument I
10:05:42 13 was going to make about the term semiconductor substrate of
10:05:48 14 the first conductivity type. So --
10:05:50 15     THE COURT: To the extent you need to go back to
10:05:52 16 that, go ahead and do it.
10:05:54 17     MR. KOLODNEY: Thank you, Your Honor.
10:06:20 18     THE COURT: What you are saying is these are
10:06:22 19 related, these issues.
10:06:24 20     MR. KOLODNEY: Yes.
10:06:24 21     THE COURT: I will not rule, substantively,
10:06:28 22 inconsistently in spite of my sanction.
10:06:30 23     MR. KOLODNEY: Yes, Your Honor.
10:06:32 24     The issue in this term and, frankly, in a number
?:?? 25 of the terms, is that wherever the word substrate appears in

22

10:06:42 1 the claim, Diodes has construed that to mean material of a
10:06:46 2 first conductivity type. And our view is that the term
10:06:52 3 substrate in the claim language refers to this, basically
10:06:56 4 this underlying material that was -- or this underlying
10:07:02 5 object in which the device was fabricated, this wafer that
10:07:08 6 ultimately gets chopped up into pieces and made into
10:07:10 7 separate devices.
10:07:12 8     But that's what we are talking about when we are
10:07:14 9 talking about the semiconductor substrate and that's what we
10:07:18 10 are talking about when we are talking about the type of
10:07:20 11 semiconductor substrate.
10:07:22 12     So the fundamental insight here, Your Honor, is
10:07:26 13 that the claim language uses the term substrate in a way
10:07:28 14 that is inconsistent with Diodes' position, which is that
10:07:34 15 the substrate always has to refer to n-type material.
10:07:38 16     Specifically, the claim includes a clause that
10:07:42 17 says, The substrate having a buried layer of the second
10:07:44 18 conductivity type under and between the side regions.
10:07:46 19 Clearly, if the entire substrate has to be n-type or
10:07:50 20 material of the first conductivity type, which in the
?:?? 21 preferred embodiment is n-type, then this clause would be
10:07:56 22 nonsensical. So in order to make sense of this clause and
10:08:00 23 to make sense of the references to substrate throughout the
10:08:08 24 claim, we have to understand the substrate as being
10:08:10 25 something different than particular material that happens to

23

10:08:14 1 have a particular conductivity type in the final product.
10:08:16 2 We have to be referring to that original substrate within
10:08:26 3 which the device is manufactured.
10:08:26 4     The specification supports this understanding of
10:08:28 5 what the substrate is, because it refers to these p regions
10:08:32 6 that extend to the surface, portions of the buried layer
10:08:36 7 that extend to the surface as extending to the surface of
10:08:40 8 the substrate. Since it's already said that the substrate
10:08:42 9 is an n-type substrate this must mean that even if you have
10:08:46 10 an n-type substrate, p material can exist within it, and, in
10:08:52 11 fact, can extend to the surface of it.
10:08:56 12     So the solution to the linguistic issue of how
10:08:58 13 do you understand what is the substrate of a first
10:09:02 14 conductivity type is to look to the overall conductivity
10:09:04 15 type of the substrate when it was first deployed in making
10:09:08 16 the device. So in the patent the substrate is said to be an
10:09:14 17 n-type substrate even though subsequently various regions of
10:09:16 18 it are implanted with others chemicals to change the
10:09:20 19 conductivity type of the specific region, the overall
10:09:24 20 conductivity type of a substrate remains n-type.
10:09:30 21     I think that is as far as I can go, subject to
10:09:32 22 Your Honor's ruling. I am happy to entertain any questions.
10:09:34 23     THE COURT: I have none at this time. Thank
10:09:36 24 you, counsel.
10:09:44 25     MR. HATTENBACH: Good morning, Your Honor.

24

10:09:46 1     THE COURT: Good morning.
10:09:48 2     MR. HATTENBACH: Ben Hattenbach representing
10:09:50 3 Diodes. I will try to keep this as short as humanly
10:09:54 4 possible.
10:09:54 5     THE COURT: All right. I guess you do need to
10:09:56 6 talk about the difference of view in how the technology
10:09:58 7 works.
10:10:00 8     MR. HATTENBACH: Yes. I was going to give you a
10:10:02 9 30-second overview of Diodes, since it's the first time we
10:10:08 10 have appeared before Your Honor in person. And we have some
10:10:12 11 hand-ups.
10:10:14 12     THE COURT: Mr. Blumenfeld.
10:10:18 13     Okay. Mr. Hattenbach.
10:10:20 14     MR. HATTENBACH: Your Honor, Diodes is a company
10:10:22 15 founded in California. It has 3000 employees. It was
10:10:24 16 founded in 1959, so last year they celebrated their golden
10:10:28 17 anniversary. But rather than get a gift of gold, which is
10:10:30 18 the traditional gift, we received this patent infringement
10:10:34 19 lawsuit. So here we are today.
10:10:38 20     We designed an end pack for semiconductor
10:10:42 21 devices of all sorts, it's a pretty wide variety, and last
10:10:46 22 year shipped 19 billion units, although only a small portion
10:10:50 23 of those are actually at issue here. You can see on this
10:10:54 24 Slide No. 4 a sampling of some of the different types of
10:10:58 25 semiconductor devices that Diodes has manufactured. The

25

10:11:00 1 only ones at issue here are a subset of a subset of the type
10:11:02 2 of diodes that Diodes makes, which are called SBR diodes.
10:11:10 3 That is what we are focusing on here in this case, but
10:11:14 4 obviously not here in the Markman hearing today.
10:11:14 5 Just a couple of points on the technology
10:11:18 6 background. As Your Honor understands, we are here to talk
10:11:22 7 about semiconductor diodes. The basics I think are agreed
10:11:26 8 between the parties. A semiconductor is what the term
10:11:30 9 sounds like, it's not conductive. It's not completely
10:11:34 10 insulated. It is somewhere in between. Exactly where in
10:11:38 11 between depends on things like the type of doping that is
10:11:42 12 given to the material.
10:11:44 13 What doping means is introducing impurities into
10:11:48 14 something which is otherwise pure, which changes its
10:11:50 15 electrical property. So here, just as an example, you have
10:11:54 16 a piece of, usually it's polycrystalline silicon these days.
10:12:00 17 And you introduce a material like arsenic, and you can
10:12:04 18 create an n-type material. And if you wanted a buried layer
10:12:08 19 inside of that somewhere, like a p-type material, you could
10:12:10 20 introduce subsequently a different type of dopant, like
10:12:14 21 boron, which has other chemical properties and will create a
10:12:16 22 region that might look something like that, which is p-type
10:12:20 23 material inside the n-type material.
10:12:22 24 As we saw earlier, a diode is something which
10:12:26 25 generally conducts much better in one direction than

26

10:12:28 1 another. If you want to think of it in really simplistic
10:12:30 2 terms, it is sort of like a one-way street for electricity.
10:12:34 3 We will skip a number of slides here.
10:12:40 4 I want to address an argument that was made
10:12:42 5 during the technology tutorial from IDD. They referred to a
10:12:48 6 statement we made about a central idea of the patent having
10:12:52 7 to do with a zero or low forward bias. What that means is
10:12:56 8 how much voltage is required to get the current to start
10:13:00 9 flowing across the diode. They say that there is no support
10:13:04 10 whatsoever in the patent specification for this idea of
10:13:06 11 their patent, their patent being directed to something with
10:13:10 12 a zero or low forward conductive voltage bias.
10:13:14 13 Let's take a quick look at the specification,
10:13:16 14 rather than take their word for it. This is what we see.
10:13:18 15 Again and again, it's not only in the title of the patent,
10:13:22 16 but it's in the abstract, the background, the summary of the
10:13:24 17 invention, and detailed description.
10:13:26 18 For now let's just, to save time, look at the
10:13:28 19 detailed description. They don't describe it as optional or
10:13:32 20 one possible way of doing it. They actually use the terms,
10:13:40 21 "The present invention is directed to diodes having low
10:13:40 22 diode forward conduction voltage drops."
10:13:44 23 I am sure Your Honor is familiar with the case
10:13:44 24 law that addresses what happens when a patentee describes
10:13:48 25 something not as a preferred way of doing something but as

27

10:13:50 1 "the present invention."
10:13:54 2 I am going to move on.
10:14:00 3 There was argument on semiconductor of a first
10:14:10 4 type. And I wanted to respond briefly to that before
10:14:12 5 sitting down. I am not going to talk about all of the
10:14:16 6 construction issues here, just the part about first
10:14:20 7 conductivity type. In particular, IDD's position is that
10:14:24 8 that part of the term means having that first conductivity
10:14:26 9 type prior to some implantation operation which may
10:14:34 10 subsequently be performed on it.
10:14:36 11 And so what they are really saying is if you
10:14:38 12 have a diode like we see on the upper half of the Slide 41,
10:14:42 13 which has an n-type substrate, and you go ahead and you
10:14:46 14 process it and turn that into a p-type substrate, they would
10:14:50 15 still refer to that p-type substrate as an n-type substrate,
10:14:54 16 and they say that is the ordinary meaning of that language.
10:14:56 17 We disagree, and we think anyone who knows the difference
10:15:00 18 between an orange wall and a blue wall probably would
10:15:02 19 understand that you don't call the blue wall an orange wall.
10:15:04 20 And yet that's what they are asking the Court to do.
10:15:08 21 An additional problem with this prior to
10:15:10 22 implantation proposal that they are making is, you have to
10:15:14 23 consider the process used to make that layer. But this
10:15:18 24 isn't a process claim. It is not a method claim. It is an
10:15:22 25 apparatus claim. The construction, like the claim language,

28

10:15:24 1 should focus on the structure, not the process used to make
10:15:26 2 that structure. The Federal Circuit has been clear that one
10:15:30 3 shouldn't start injecting method limitations into apparatus
10:15:32 4 claims. And all sorts of anomalous results can occur if one
10:15:40 5 goes down that path.
10:15:40 6 The other problem we have with this is, it's
10:15:42 7 really impossible to tell whether there is infringement
10:15:44 8 unless, I suppose unless you have a crystal ball or ESP,
10:15:48 9 because jurors wouldn't be asked to determine whether there
10:15:52 10 is currently a structure that meets the limitations in the
10:15:54 11 claim. They would be asked to determine whether in some
10:15:56 12 prior existence they had some structure that met that
10:16:02 13 requirement. That would certainly be an awkward situation.
10:16:06 14 The claim language, as you see on Slide 44, is
10:16:08 15 quite clear. It's written in the present tense. Comprising
10:16:10 16 is a present-tense word. The claim requires a substrate to,
10:16:14 17 in the present tense, have a substrate of a first
10:16:20 18 conductivity type. It's pretty straightforward.
10:16:20 19 The arguments about the buried layer being of a
10:16:24 20 second conductivity type, that is fine. We agree there can
10:16:26 21 be a buried layer of a second conductivity type in a
10:16:28 22 substrate of a first conductivity type. We simply wouldn't
10:16:32 23 call the substrate a substrate of a second conductivity type
10:16:32 24 just because you add a buried layer to it. And that is
10:16:38 25 consistent with the language of the claim. The claim

29

| | | |
|---|---|---|
| 10:16:40 | 1 | doesn't change how it refers to the substrate.  It refers to |
| 10:16:42 | 2 | it consistently as having a first conductivity type even |
| 10:16:46 | 3 | though a buried layer might have subsequently been added to |
| 10:16:54 | 4 | it.  Even when a buried layer has a second conductivity |
| 10:16:54 | 5 | type, it simply refers to it by a different term.  It is a |
| 10:16:58 | 6 | buried layer.  It is not part of the substrate.  It is in |
| 10:17:00 | 7 | the substrate. |
| 10:17:02 | 8 |         The same thing in the preferred embodiments. |
| 10:17:04 | 9 | They talk about junctions formed between the n-type |
| 10:17:06 | 10 | substrate and a buried p region.  They don't talk about the |
| 10:17:12 | 11 | p region once it's put into that substrate, changing the |
| 10:17:14 | 12 | substrate into a p-type substrate. |
| 10:17:18 | 13 |         This is something that even my three-year-old I |
| 10:17:20 | 14 | think could understand.  She is very familiar with these |
| 10:17:22 | 15 | evil confections here.  She knows that if you have a chunk |
| 10:17:26 | 16 | of chocolate and you insert some peanut butter into it, the |
| 10:17:30 | 17 | chocolate doesn't change into peanut butter.  It is simply a |
| 10:17:34 | 18 | buried layer of chocolate inside a peanut butter shell. |
| 10:17:38 | 19 |         That, Your Honor, is all I have for you today. |
| 10:17:42 | 20 |         My colleague, Jeremiah Helm, is going to address |
| 10:17:46 | 21 | a couple of additional terms, starting with Slide 64. |
| 10:17:50 | 22 |         For Your Honor's reference, I have a list of the |
| 10:17:54 | 23 | slides that we will be referring to today, if that would |
| 10:17:56 | 24 | help, so you don't have to read through them all.  That |
| ‘ 5 | 25 | would be Slides 1 through 10, 13 through 15, 39 through the |

30

| | | |
|---|---|---|
| 10:18:06 | 1 | peanut butter cup, that's 48, and then 64 through 77. |
| 10:18:14 | 2 |         THE COURT:  Thank you. |
| 10:18:16 | 3 |         MR. HATTENBACH:  Thank you, Your Honor. |
| 10:18:18 | 4 |         THE COURT:  All right, Mr. Helm. |
| 10:18:20 | 5 |         MR. HELM:  Good morning, Your Honor. |
| 10:18:40 | 6 |         THE COURT:  Good morning, counsel. |
| 10:18:42 | 7 |         MR. HELM:  I am Jeremiah Helm.  It gives me |
| 10:18:46 | 8 | great pleasure to be the junior attorney and the only one |
| 10:18:50 | 9 | really arguing any terms.  Thank you very much for that. |
| 10:18:52 | 10 |         The first term that I would like to talk to you |
| 10:18:54 | 11 | about is on [the first surface of] the substrate or on the |
| 10:18:58 | 12 | substrate.  They are two related terms that we are just |
| 10:19:02 | 13 | construing the same way. |
| 10:19:02 | 14 |         What we have here is a situation where maybe we |
| 10:19:06 | 15 | have some confusion about what the plain meaning of "on" is. |
| 10:19:10 | 16 | First of all, I want to point out that this term has two |
| 10:19:12 | 17 | parts, the on part and the substrate part.  So we have to |
| 10:19:16 | 18 | look at both of those issues. |
| 10:19:18 | 19 |         The first point I would like to make is that |
| 10:19:20 | 20 | when IDD came up here, they talked about a number of |
| ‘ 1 | 21 | different features.  They gave a number of examples.  They |
| 10:19:26 | 22 | talked about a plate on a table, books piled on a table, a |
| 10:19:30 | 23 | picture on a wall hanging on a nail, and standing on the |
| 10:19:32 | 24 | floor.  And they said that this does not require contact . |
| 10:19:36 | 25 |         Now, the fact is, we are not talking about books |

31

| | | |
|---|---|---|
| 10:19:40 | 1 | on a table.  We are talking about semiconductor |
| 10:19:42 | 2 | manufacturing.  So when we look at the plain meaning, we |
| 10:19:46 | 3 | have to look at it from the standpoint of a person of |
| 10:19:48 | 4 | ordinary skill in the art.  So books piled on a table may |
| 10:19:52 | 5 | have some relevance to what we are thinking about, but it |
| 10:19:54 | 6 | doesn't really give us any insight into what a person of |
| 10:19:58 | 7 | ordinary skill in the art would think about manufacturing a |
| 10:20:00 | 8 | semiconductor diode.  These devices are very small, and are |
| 10:20:04 | 9 | manufactured in a specific way. |
| 10:20:04 | 10 |         Now, counsel for IDD also mentioned putting down |
| 10:20:08 | 11 | different layers of material on a substrate and then |
| 10:20:12 | 12 | patterning it into a specific feature.  We agree, these |
| 10:20:14 | 13 | materials get patterned into a specific feature, for |
| 10:20:18 | 14 | example, a pedestal.  What happens is that the patent then |
| 10:20:22 | 15 | refers to these specific patent features, like the pedestal, |
| 10:20:26 | 16 | to be on the substrate.  It doesn't refer to the specific |
| 10:20:28 | 17 | layers in the claim methods, it doesn't talk about different |
| 10:20:30 | 18 | layers one on top of each other being on the substrate.  In |
| 10:20:34 | 19 | the claim it talks about the specific features being on the |
| 10:20:38 | 20 | substrate itself. |
| 10:20:38 | 21 |         I want to give a little example here of what |
| 10:20:42 | 22 | would happen if you have what IDD advanced in their |
| 10:20:46 | 23 | briefing, at least, is that there would be a general spatial |
| 10:20:48 | 24 | relationship to the word "on" and that you could have these |
| 10:20:50 | 25 | intermediate layers in between. |

32

| | | |
|---|---|---|
| 10:20:54 | 1 |         Here we have what I think most people would |
| 10:20:56 | 2 | think of as the owl on the roof of a house.  IDD takes it |
| 10:21:02 | 3 | one step further and says that here is this intermediate |
| 10:21:04 | 4 | layer of house, but yet that means that the owl can be on |
| 10:21:08 | 5 | the ground.  That is kind of a nonsensical result.  It is a |
| 10:21:12 | 6 | little bit extreme, but it does drive home the point that |
| 10:21:14 | 7 | "on" does not necessarily have the meaning, the plain |
| 10:21:16 | 8 | meaning that IDD is saying. |
| 10:21:18 | 9 |         We are happy with the plain meaning.  We think |
| 10:21:22 | 10 | the plain meaning of "on" is in contact with.  Indeed, when |
| 10:21:26 | 11 | we look at the claim, it pops up a lot:  pedestals on the |
| 10:21:30 | 12 | first surface of the substrate; an oxide layer on the |
| 10:21:34 | 13 | substrate; channel region on the first surface of the |
| 10:21:36 | 14 | substrate and side regions on the pedestal.  Even though |
| 10:21:40 | 15 | this last term is not being construed, but it does include |
| 10:21:42 | 16 | the word "on," and as we will see, it is used entirely |
| 10:21:44 | 17 | consistently with the other uses of "on." |
| 10:21:46 | 18 |         For example, if we take IDD's position that it |
| 10:21:50 | 19 | is some general relationship, a spatial relationship, we |
| 10:21:52 | 20 | have pedestals on the substrate surface, that is on the |
| 10:21:56 | 21 | surface.  We have side regions on the pedestals, just to the |
| 10:22:00 | 22 | left and the right of the pedestal.  We have an oxide layer |
| 10:22:00 | 23 | on the substrate surface.  Again, that is above.  And then |
| 10:22:02 | 24 | we have a channel region on the substrate surface, and that |
| 10:22:06 | 25 | is low, so it can be up, down, left, or right. |

33

10:22:10 1    In contrast with Diodes, again, I think this is

10:22:12 2    the plain meaning of the term, we have a side region in

10:22:14 3    contact with the pedestal here and here. You have the

10:22:— 4    pedestal in contact with the surface of the substrate here.

10:22:20 5    The channel region is in contact with the substrate surface

10:22:22 6    from below. And the oxide region is in contact with the

10:22:28 7    substrate surface right here.

10:22:30 8    I think that Diodes' construction is entirely

10:22:32 9    consistent with the claim. It's also entirely consistent

10:22:34 10    with the way the term is used by one of skill in the art.

10:22:38 11    Now, I mentioned before that there are two

10:22:40 12    parts: the "on" part which IDD focused on, but also the

10:22:44 13    substrate part. So as Mr. Hattenbach mentioned just a

10:22:48 14    couple seconds ago, the semiconductor substrate, the claim

10:22:52 15    starts out by telling us that there is a semiconductor

10:22:54 16    substrate. It's of a first conductivity type. Then it goes

10:22:58 17    through and lists different elements, for example, pedestals

10:23:02 18    that are on the first surface of the substrate. And this is

10:23:06 19    a pretty typical thing to do in patents. You have

10:23:08 20    something, and you tell someone what it is, and then you

10:23:12 21    refer back to it by saying, the substrate. This is not an

10:23:16 22    unusual concept, in fact, as named, the antecedent basis.

10:23:22 23    In fact, we are just saying you have to look at the claim

10:23:26 24    language and apply it in the way that one of ordinary skill

10:23:— 25    in the art would understand it.

34

10:23:30 1    So when you start out with a substrate and you

10:23:30 2    tell us it's of a first conductivity type, that means when

10:23:34 3    you talk about the substrate, we are talking about that same

10:23:36 4    substrate that we mentioned before, not some other substrate

10:23:40 5    or some different substrate.

10:23:42 6    The next term I would like to talk about is the

10:23:44 7    substrate between the side regions. And that same issue

10:23:46 8    rears its ugly head again, because in the Diodes

10:23:48 9    construction we point out that when we refer to the

10:23:52 10    substrate in the claim, that means that we are talking about

10:23:54 11    that same first mentioned semiconductor substrate of the

10:23:56 12    first conductivity type.

10:23:58 13    The second part of this claim is between the

10:24:00 14    side regions. And that is a point of clarification that I

10:24:06 15    would just like to make.

10:24:06 16    So as I mentioned just before, it starts out,

10:24:10 17    Substrate of a first conductivity type. Six lines down it

10:24:14 18    hasn't changed the substrate it's talking about and it

10:24:16 19    refers back to that same substrate. It's a straightforward

10:24:20 20    claim construction principle. We don't think there is much

10:24:— 21    that needs to be said about that.

10:24:26 22    When we are talking about the neighboring

10:24:28 23    pedestals, I think IDD concedes that the neighboring

10:24:34 24    pedestals are between -- when it says neighboring pedestals,

10:24:38 25    that means between the side regions of neighboring

35

10:24:40 1    pedestals. That means this area here is what it's talking

10:24:44 2    about when it says the substrate between the side regions,

10:24:46 3    it's talking about this portion of the substrate right here.

10:24:50 4    It's not talking about this portion of the substrate right

10:24:54 5    here. There is some ambiguity, which is why we would ask

10:24:56 6    for the construction, to emphasize that it is the side

10:25:00 7    region in between neighboring pedestals and not in between

10:25:04 8    the side regions of the same pedestal.

10:25:08 9    The final term that it is my pleasure to present

10:25:12 10    is diode contact. IDD's construction is flawed because they

10:25:16 11    refer to the diode contact as a conductive layer. They gave

10:25:20 12    some cites to the specification. But as Your Honor knows,

10:25:22 13    you really have to look at the claim language to understand

10:25:26 14    what's going on. And they start out by telling us, again,

10:25:30 15    this semiconductor substrate here forms the first diode

10:25:36 16    contact. It's hard for me to understand how, if it is a

10:25:40 17    semiconductor substrate, they can have a conductive layer as

10:25:44 18    in IDD's. So it seems like the claim language itself

10:25:50 19    excludes IDD's construction.

10:25:52 20    There is more, because the second diode contact

10:25:54 21    is listed expressly as a conductive layer. So IDD's

10:26:02 22    construction is in large part redundant because the claim

10:26:08 23    tells us that it's a conductive layer forming the second

10:26:10 24    diode contact.

10:26:10 25    I am going to emphasize also that they use the

36

10:26:14 1    word form, not the conductive layer that is the second diode

10:26:18 2    contact.

10:26:20 3    Diodes' construction is completely consistent

10:26:22 4    with both the claim language and the specification. The

10:26:24 5    construction is that it's the interface to the outermost

10:26:26 6    conductive layer of the diode. Here you can see, you have a

10:26:32 7    conductive layer on the top, an interface here, a conductive

10:26:36 8    layer on the bottom, and an interface here.

10:26:38 9    This is the semiconductor substrate that forms

10:26:42 10    the interface, that is the first diode contact, with this

10:26:44 11    bottom conductive layer, and you have the substrate up here

10:26:48 12    and you have the conductive layer up here. And this

10:26:50 13    conductive layer forms the second diode contact, the second

10:26:54 14    interface.

10:26:54 15    Thank you, Your Honor.

10:26:54 16    THE COURT: Thank you, counsel.

10:26:56 17    Your reply.

10:27:00 18    MR. KOLODNEY: Thank you, Your Honor.

10:27:04 19    I need to talk first about Mr. Hattenbach's

10:27:10 20    discussion of the issue of zero bias turn-on, or zero bias

10:27:18 21    conduction.

10:27:22 22    Mr. Hattenbach engaged in a little bit of a

10:27:22 23    sleight of hand, Your Honor. The contention that IDD made

10:27:28 24    was that conduction at zero volts is not the central idea of

10:27:36 25    the patent and is not claimed and is not discussed -- it's

37

10:27:44 1    only discussed once in the patent. Mr. Hattenbach turned
10:27:48 2    that into zero or low voltage turn-on, which is very
10:27:56 3    different.
4            We never said that low voltage turn-on was not
10:28:00 5    the central idea of the patent. In fact, as I said, as I
10:28:02 6    explained in my technical introduction, one of the
10:28:04 7    advantages of this technology is that it does turn on at low
10:28:08 8    voltage relative to the traditional p-n diode.
10:28:14 9            But Diodes made a much stronger claim in their
10:28:18 10   briefing, which is not that low voltage turn-on was
10:28:20 11   important, but that zero voltage turn-on was important.
10:28:22 12           If you look at these various excerpts on Slide
10:28:26 13   14 of their presentation, none of them mention zero voltage
10:28:34 14   turn-on. They only mention low voltage turn-on. That is
10:28:38 15   really a red herring, to say that, you know, he says that
10:28:40 16   the patent is replete with mentions of this concept. No,
10:28:44 17   it's not. There is only one mention of zero voltage turn-on
10:28:48 18   in the patent. It is described in optional language, as
10:28:52 19   something that may be done.
10:28:54 20           Now let me address the --
10:29:00 21           THE COURT: Counsel, would you mind if I get a
10:29:02 22   reaction from Mr. Hattenbach. Then I will get you back up
10:29:06 23   on that point.
10:29:06 24           MR. HATTENBACH: Sure, Your Honor.
10:29:06 25           First and foremost, when he refers to it as a

38

10:29:12 1    red herring, I should say the only reason I addressed it was
10:29:16 2    because he raised it today. It was not something that was
10:29:18 3    in their briefing. The prior art references that they put
10:29:20 4    up on the screen were not in the joint claim construction
10:29:24 5    statement or in their briefing. We actually didn't even
10:29:26 6    receive any notice about that until I think it was the day
10:29:28 7    before we got on the plane, yesterday, to come here.
10:29:32 8            So that's my first reaction.
10:29:34 9            My second reaction is, with regard to the red
10:29:36 10   herring characterization, this is not something that is
10:29:38 11   relevant, as I think Your Honor just saw, to any of the
10:29:40 12   claim constructions that are still in dispute, that haven't
10:29:44 13   already been ruled on.
10:29:46 14           And, thirdly -- well, he does say that the
10:29:52 15   patent talks about zero conduction voltage. I would say our
10:29:58 16   position is probably more accurately that what is described
10:30:02 17   in the patent as the present invention is a diode having a
10:30:06 18   low diode forward conductive voltage. Not necessarily zero.
10:30:10 19   It could be slightly greater than zero.
10:30:12 20           By the way, that's the same thing that is talked
10:30:18 21   about in this piece of prior art that they raised with us
10:30:18 22   the day before yesterday. It actually talks about a diode
10:30:22 23   that actually does have a threshold voltage. It describes
10:30:28 24   the threshold voltage as hopefully reaching approximately
10:30:30 25   zero volts, not being zero volts.

39

10:30:34 1            We are, after all, talking about very small
10:30:38 2    differences here. A traditional diode will have a forward
10:30:40 3    turn-on voltage of something like .5 volts, a half a volt.
10:30:44 4    We are operating in a region between zero volts and half a
10:30:48 5    volt. I think this patent here is talking about something
10:30:50 6    toward the lower end of that range, like zero volts or
10:30:54 7    slightly more than zero volts in most cases, except for that
10:30:58 8    one, to something like .2 volts. That's what I was
10:31:02 9    referring to.
10:31:02 10           THE COURT: Thank you, counsel.
10:31:02 11           You can react further, if you would like.
10:31:06 12           MR. KOLODNEY: Your Honor, there is an important
10:31:10 13   difference between zero and almost zero in this context
10:31:14 14   because, according to Diodes, if you want zero you have to
10:31:20 15   have this continuous path of a single conductivity type.
10:31:22 16   That is, first of all, not true, but second of all, not even
10:31:28 17   required, the underlying premise is not required by the
10:31:30 18   patent, which is that you need to have turn-on at zero
10:31:34 19   voltage.
10:31:36 20           I think there was an effort in their claim
10:31:38 21   construction briefing to suggest that this concept should be
10:31:42 22   read into the various limitations of this claim, that you
10:31:44 23   have to have the configuration that looks just like the
10:31:48 24   Figure 3R in the patent with this clear path of n material
10:31:52 25   all the way from the top to the bottom. That is what we are

40

10:31:54 1    reacting to, and things not supported by the intrinsic
10:31:58 2    evidence.
10:32:00 3            THE COURT: You have a look on your face.
10:32:02 4            This is a little non-traditional. But go ahead.
10:32:08 5            MR. HATTENBACH: Very briefly, Your Honor.
10:32:10 6            When he says that it is not what the -- I think
10:32:12 7    he said something like it's not what the patent teaches. I
10:32:14 8    didn't catch exactly what he said. That is the only thing
10:32:16 9    the patent teaches. There is not a single example in the
10:32:18 10   patent where there is not a path from anode to cathode which
10:32:22 11   is not purely n-type with no intervening p material. Not a
10:32:28 12   single example. Every single preferred embodiment has a
10:32:30 13   clear path of purely n-type material from top to bottom.
10:32:34 14           THE COURT: Further reaction?
10:32:36 15           MR. KOLODNEY: As Your Honor knows, merely the
10:32:38 16   fact that there is only one preferred embodiment and it
10:32:42 17   doesn't specifically discuss alternatives does not mean that
10:32:44 18   those alternatives are not within the scope of the claim.
10:32:48 19           Turning to the issue of the substrate of first
10:32:54 20   conductivity type, Mr. Hattenbach talked about this
10:33:00 21   chocolate confection that his three-year-old likes and
10:33:02 22   described it as having, it looks like a peanut butter cup, I
10:33:06 23   guess. Nobody would say that if the peanut butter -- that
10:33:10 24   the fact that there is peanut butter inside of the
10:33:14 25   confection means that it's no longer a chocolate confection.

41

1 Similarly, nobody would say that if there was
2 some peanut butter at the top surface of that confection,
3 that, if the claim said a confection having a chocolate
4 type, and then it said something on the surface, exists on
5 the surface of the confection, the fact that there was
6 peanut butter rising to the surface of the confection at a
7 particular point would not mean that that was not part of
8 the surface of the confection, even though the confection
9 overall had a chocolate type rather than a peanut butter
10 type.
11 I think the point here is really, in context,
12 the conductivity type of the substrate is what it starts
13 with. The fact that small portions of the substrate may be
14 modified by implanting material and changing the
15 conductivity type of that particular region doesn't mean
16 that that is no longer part of the substrate. There is only
17 one substrate. It only has one conductivity type. The fact
18 that there are impurities within the substrate that change
19 the characteristics of those regions of the substrate does
20 not mean those are no longer part of the substrate. That is
21 really what it comes down to: Do those become not part of
22 the substrate because they no longer have the n-type
23 material in them or the material has been changed to p-type
24 material?
25 The claim language refers to, introduces the

42

1 substrate, refers to conductivity type, and then I think
2 there is two or three other locations in the claim that talk
3 about the substrate. The question is, when it's talking
4 about the substrate, is it requiring that the thing that's
5 being referred to in that limitation has n-type material in
6 it only, or can it include p-type portions of this overall
7 n-type substrate?
8 Another analogy, if you had a wood-framed house,
9 and then you put aluminum siding on the outside of it, and
10 you said a wood-framed house and something being on the wall
11 of the house, you wouldn't say it wasn't on the wall of the
12 house because it wasn't on the wood framing even though it
13 may have a brick facade on the outside. The type of a house
14 is a wood-framed house because that is sort of the
15 fundamental way it was constructed.
16 Counsel for Diodes says, look, then we have to
17 do this historical research to understand what they did back
18 when they were building the house. No, we don't. Any
19 carpenter or contractor can look at a house and tell you
20 that it was built with a wood frame even though they weren't
21 around when it was built because you can look at it with a
22 professional eye, and you can look at a device and
23 understand how it was made by merely its final construction.
24 That is something that people do all the time.
25 And there is no particular reason in this case

43

1 why that couldn't be done and why an expert couldn't look at
2 these devices and say this has an n-type substrate even
3 though there is p regions imbedded within.
4 On the issue of "on," Mr. Helm gave an example
5 of the owl on the roof. Everyone in this room agrees that
6 the ordinary meaning of "on" would not encompass the owl on
7 the roof as being on the ground, because in that particular
8 context it's nonsensical to talk about the owl being on the
9 ground when it's on the roof.
10 But in the context of this patent, the term "on"
11 clearly does encompass support by an element of the device
12 in which there may be an intermediate layer intervening.
13 How do we know that? Because it's in the specification. As
14 I pointed out to Your Honor, the specification talks about
15 piling layers on the substrate. And inherently, those
16 layers cannot all be touching the substrate even though they
17 are on the substrate.
18 The fact that they later get called a pedestal
19 and the pedestal is on the substrate, that is really beside
20 the point. Their usage of "on" in that particular passage
21 was multiple layers, one on top of another, and all of them
22 being on the substrate. So the term "on" is clearly broader
23 than the sense in which Diodes wants to use it.
24 THE COURT: So it seems that both parties'
25 analogies really don't work.

44

1 MR. KOLODNEY: Analogies are always dangerous
2 when you are talking about technology.
3 THE COURT: It would seem that --
4 MR. KOLODNEY: Yes, Your Honor. I think
5 ultimately we look at the intrinsic evidence, and the term
6 "on" is being used more broadly than Diodes proposed.
7 Then finally, on the diode contact point, Mr.
8 Helm said, well, the diode contact can't be a conductive
9 layer because the claim says that the first diode contact is
10 semi-conductive or is formed by the semiconductor.
11 But under their construction, the diode contact
12 is not a semiconductor, either. They are saying that the
13 diode contact is some interface, which, frankly, it is not
14 even clear to us what that means, but it's something in
15 between the semiconductor and the metal layer. And to us,
16 that is a nonsensical understanding of something -- it's
17 referring to something that is never described or mentioned
18 in the patent specification.
19 And the straightforward reading of this is that
20 the diode contacts are exactly what the contacts are
21 described as in the specification, which is these two metal
22 layers.
23 The formed aspect of it is, you know, the bottom
24 metal layer, which is the one that is referred to in that
25 clause of the claim, is formed on the bottom surface of the

45

10:38:52 1 semiconductor. So in that sense, the semiconductor surface

10:38:56 2 forms, in the sense of shapes, the diode contact. We think

10:39:00 3 that is really the understanding of what "forms" means in

10:39:00 4 that claim limitation. And if you read the entire patent

10:39:12 5 and understand these terms in context, it is clear what the

10:39:16 6 claim is referring to is the anode and the cathode. It is

10:39:18 7 really the only contacts that exist in the patent

10:39:22 8 specification.

10:39:22 9          THE COURT: Thank you, counsel.

10:39:44 10         Let me try something on for both parties to

10:39:48 11 react to. This proposal refers to diode contact, if you

10:39:56 12 have it in front of you. A suggestion. I would like a

10:40:02 13 reaction. The term being construed to mean: a layer

10:40:06 14 providing an electrical connection to part of the diode.

10:40:12 15         In other words, remove the word conductive.

10:40:16 16         Counsel for plaintiff?

10:40:18 17         MR. KOLODNEY: I think we have no problem with

10:40:20 18 that, Your Honor.

10:40:20 19         THE COURT: Mr. Hattenbach.

10:40:22 20         MR. HATTENBACH: Your Honor, I think the term

10:40:26 21 contact is usually used to refer to that --

10:40:30 22         THE COURT: I am talking about conductive,

10:40:30 23 removing the word conductive.

10:40:32 24         MR. HATTENBACH: I understand Your Honor's

10:40:32 25 proposal. I think that contact is typically used to refer

46

10:40:38 1 to that, but only to the extent it connects to the outer

10:40:42 2 layer or outer surface or something like that of the diode.

10:40:46 3 Otherwise, things within the diode would also qualify as

10:40:52 4 contacts, if I am understanding the proposal.

10:40:56 5          THE COURT: I get you.

10:40:58 6          Did you want to react further, counsel?

10:41:00 7          MR. KOLODNEY: I haven't had a chance to think

10:41:04 8 through entirely that particular distinction. I am not sure

10:41:14 9 what he means by outermost. There may be additional

10:41:18 10 structure in the packaging of the diode that goes beyond

10:41:20 11 what's shown in the patent and they may say, well, that is

10:41:22 12 really the outermost contact. So that's why we refrain from

10:41:28 13 using that terminology.

10:41:28 14         THE COURT: Can we clarify, perhaps, and maybe

10:41:32 15 achieve an agreement?

10:41:34 16         MR. KOLODNEY: The claim says that these two

10:41:36 17 layers, these two contacts have to be, one of them has to be

10:41:50 18 formed by the semiconductor substrate and the other one has

10:41:54 19 to be formed, conductive layer forming the second diode

10:42:02 20 contact and electrically connecting the side regions on the

10:42:02 21 pedestals and the substrate.

10:42:08 22         So I think that language tells you where these

10:42:12 23 contacts are, and the outermost really doesn't add very

10:42:18 24 much.

10:42:20 25         MR. HATTENBACH: Your Honor, to resolve that,

47

10:42:20 1 Mr. Helm has suggested your definition, a layer providing an

10:42:24 2 electrical connection to part of the diode where the part of

10:42:28 3 the diode we are referring to is either the anode or the

10:42:30 4 cathode.

10:42:30 5          That would alleviate any kind of concern about

10:42:34 6 what part of the diode we are referring to.

10:42:36 7          THE COURT: Any reaction to that?

10:42:38 8          MR. KOLODNEY: Why don't we just say it's the

10:42:42 9 anode or the cathode? That's I think perhaps the common

10:42:48 10 understanding.

10:43:00 11         MR. HATTENBACH: I think it might be a little

10:43:02 12 bit difficult to reconcile that with the language of the

10:43:04 13 claim into which that construction has to fit, because the

10:43:08 14 claim refers to it as a layer. I think the construction

10:43:15 15 should be one which is amenable to substitution into the

10:43:16 16 claim for the term that is being defined. That would be

10:43:20 17 hard to do with that kind of a construction.

10:43:20 18         THE COURT: What do you think about that,

10:43:20 19 counsel for plaintiff?

10:43:24 20         I don't disagree with that point. It doesn't

10:43:30 21 seem to me that you are very far apart.

10:43:34 22         MR. KOLODNEY: A layer forming the anode or the

10:43:36 23 cathode.

10:43:38 24         THE COURT: Mr. Hattenbach, did you hear?

10:43:40 25         MR. KOLODNEY: Or forming at least part of the

48

10:43:42 1 anode or the cathode.

10:43:44 2          MR. HATTENBACH: Your Honor, I heard that. I am

10:43:46 3 processing. I will be just a moment.

10:43:48 4          THE COURT: I understand. This is a fluid

10:43:50 5 process. I don't expect you to react instantly.

10:43:54 6          (Pause.)

10:44:02 7          It's just that I recognize that you two know a

10:44:06 8 heck of a lot more about this technology than I do. It is

10:44:08 9 generally, I feel, philosophically, more helpful to courts,

10:44:14 10 both trial courts and later the Federal Circuit, if there is

10:44:18 11 the ability to achieve agreement.

10:44:22 12         Go ahead.

10:44:24 13         MR. HATTENBACH: We definitely agree with those

10:44:26 14 principles.

10:44:26 15         The part of his proposal that we have trouble

10:44:28 16 with is the "part of" part. We would be okay with a layer

10:44:32 17 forming the anode or the cathode. I think that would fit

10:44:38 18 into the claim language.

10:44:56 19         MR. KOLODNEY: So the construction would be a

10:44:58 20 diode contact is a layer that forms the anode or the cathode

10:45:00 21 of the device.

10:45:02 22         THE COURT: Yes. That's what he said.

10:45:06 23         MR. KOLODNEY: I think we are okay with that.

10:45:08 24         THE COURT: Why don't you memorialize that in a

10:45:10 25 stipulation, as well as the other two that you agree on that

| | | |
|---|---|---|
| 10:45:14 | 1 | I referenced in my earlier ruling. |
| 10:45:16 | 2 | Anything else, counsel? |
| 10:45:20 | 3 | MR. HATTENBACH:  Not from Diodes, Your Honor. |
| | 4 | Thank you. |
| 10:45:24 | 5 | MR. KOLODNEY:  No, Your Honor. |
| 10:45:24 | 6 | THE COURT:  I will take the other matters under |
| 10:45:26 | 7 | advisement. |
| 10:45:26 | 8 | Thank you, counsel. |
| 10:45:28 | 9 | (Hearing concluded at 10:45 a.m.) |
| 10:45:32 | 10 | |
| | 11 | - - - |
| | 12 | Reporter: Kevin Maurer |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

'

'079 [4] - 11:16, 14:14, 14:23, 14:24

**0**

08-888-GMS [1] - 1:9

**1**

1 [1] - 29:25
10 [1] - 29:25
10,000 [2] - 17:2, 17:5
10:45 [1] - 49:9
10th [1] - 3:4
12 [1] - 3:23
13 [1] - 29:25
14 [1] - 37:13
15 [1] - 29:25
16(b)(4 [1] - 3:20
17 [1] - 11:15
18 [2] - 11:15, 12:14
19 [1] - 24:22
1959 [1] - 24:16

**2**

2 [1] - 39:8
2009 [1] - 3:4
2010 [4] - 1:11, 3:23, 4:3, 4:12
22 [1] - 12:14
26 [2] - 4:3, 4:12
28 [1] - 1:11

**3**

30-second [1] - 24:9
3000 [1] - 24:15
39 [1] - 29:25
3A [1] - 15:3
3I [1] - 15:16
3J [1] - 20:11
3L [1] - 17:11
3R [1] - 39:24
3S [1] - 17:20

**4**

4 [2] - 3:4, 24:24
41 [1] - 27:12
43 [1] - 20:7
44 [1] - 28:14
46 [1] - 18:8

48 [1] - 30:1
49 [1] - 20:7

**5**

5 [2] - 20:7, 39:3
50 [3] - 15:16, 15:25, 16:8
52 [3] - 15:16, 16:1, 16:8
56 [1] - 17:11
5C [1] - 17:20

**6**

6 [4] - 9:17, 13:16, 13:18, 13:20
60 [1] - 21:1
62 [1] - 21:1
64 [2] - 29:21, 30:1

**7**

7 [1] - 12:14
77 [1] - 30:1

**9**

9:30 [1] - 1:11

**A**

a.m [2] - 1:11, 49:9
ability [3] - 11:4, 17:7, 48:11
abstract [1] - 26:16
accomplishing [1] - 12:23
according [2] - 16:1, 39:14
accurately [1] - 38:16
achieve [3] - 13:24, 46:15, 48:11
action [2] - 3:4, 6:21
Action [1] - 1:4
actual [1] - 20:4
add [3] - 18:17, 28:24, 46:23
added [1] - 29:3
additional [7] - 15:13, 15:17, 15:19, 20:13, 27:21, 29:21, 46:9
address [2] - 2:21, 26:4, 29:20, 37:20
addressed [2] - 8:20, 38:1

addresses [1] - 26:24
adopt [1] - 5:16
advance [1] - 5:24
advanced [1] - 31:22
advantages [1] - 37:7
advisement [1] - 49:7
advocated [1] - 3:14
affect [3] - 2:18, 10:23, 17:7
affected [1] - 18:7
afterwards [1] - 11:19
ago [1] - 33:14
agree [5] - 6:12, 28:20, 31:12, 48:13, 48:25
agreed [1] - 25:7
agreement [2] - 46:15, 48:11
agrees [2] - 4:23, 43:5
ahead [4] - 21:16, 27:13, 40:4, 48:12
akin [1] - 6:23
alleviate [1] - 47:5
allow [1] - 5:7
allowing [1] - 13:16
allows [2] - 7:17, 15:18
almost [1] - 39:13
alternative [1] - 17:20
alternatives [2] - 40:17, 40:18
aluminum [1] - 42:9
ambiguity [1] - 35:5
amenable [1] - 47:15
amount [3] - 17:1, 17:6, 17:7
analogies [2] - 43:25, 44:1
analogy [1] - 42:8
AND [1] - 1:2
Angeles [1] - 1:23
anniversary [1] - 24:17
anode [24] - 7:19, 7:21, 8:8, 8:13, 9:7, 9:25, 10:4, 10:6, 10:15, 10:16, 10:18, 10:22, 17:18, 17:22, 20:25, 40:10, 45:6, 47:3, 47:9, 47:22, 48:1, 48:17, 48:20
anomalous [1] - 28:4
answering [4] - 2:23, 4:13, 4:16, 4:17
antecedent [1] - 33:22
apart [1] - 47:21
apparatus [2] - 27:25, 28:3
APPEARANCES [1] - 1:14

appeared [1] - 24:10
applied [1] - 10:10
apply [1] - 33:24
appreciate [1] - 5:21
appropriate [1] - 12:18
April [1] - 1:11
architecture [1] - 9:22
area [1] - 35:1
argued [1] - 4:19
arguing [1] - 30:9
argument [6] - 5:10, 5:18, 21:5, 21:12, 26:4, 27:3
arguments [2] - 4:5, 28:19
arsenic [1] - 18:10, 25:17
Arsht [1] - 1:20
art [13] - 7:16, 7:22, 8:19, 9:10, 13:1, 13:11, 13:20, 31:4, 31:7, 33:10, 33:25, 38:3, 38:21
aspect [1] - 44:23
asserted [1] - 2:25
assertion [1] - 4:22
assertions [2] - 11:11, 11:22
atom [1] - 17:5
atoms [3] - 17:5, 17:6, 17:9
attention [1] - 2:22
attorney [1] - 30:8
aware [1] - 7:14
awkward [1] - 28:13

**B**

background [2] - 7:8, 25:6, 26:16
ball [1] - 28:8
barrier [1] - 14:20
basic [2] - 18:20, 19:5
basics [1] - 25:7
basis [1] - 33:22
become [2] - 14:12, 41:21
becomes [3] - 11:4, 18:12, 18:13
BEFORE [1] - 1:13
began [1] - 4:11
begin [2] - 2:2, 15:2
beginning [1] - 2:3
behalf [1] - 2:5
behold [1] - 14:7
belies [1] - 4:22
below [2] - 5:4, 33:6
Ben [2] - 2:12, 24:2

benefit [1] - 6:20
BENJAMIN [1] - 1:21
beside [1] - 43:19
best [1] - 11:8
better [1] - 25:25
between [29] - 5:3, 5:20, 6:15, 9:11, 9:24, 14:20, 19:5, 19:19, 19:24, 20:4, 20:20, 21:6, 22:18, 25:8, 25:10, 25:11, 27:18, 29:9, 31:25, 34:7, 34:13, 34:24, 34:25, 35:2, 35:7, 39:4, 39:13, 44:15
beyond [1] - 46:10
bias [8] - 11:18, 12:12, 12:16, 12:22, 26:7, 26:12, 36:20
billion [1] - 24:22
bit [3] - 32:6, 36:22, 47:12
block [1] - 11:4
blocking [5] - 9:6, 9:8, 9:11, 9:14, 11:9
blocks [2] - 7:19, 8:9
blue [1] - 12:6, 12:8, 27:18, 27:19
blue-type [1] - 12:8
BLUMENFELD [2] - 1:20, 2:10
Blumenfeld [4] - 2:9, 2:11, 6:24, 24:12
book [1] - 19:25
books [4] - 19:24, 30:22, 30:25, 31:4
boron [1] - 17:4, 17:10, 25:21
Boston [2] - 1:18, 2:6
bottom [16] - 10:2, 10:25, 11:21, 12:1, 12:9, 14:9, 14:15, 18:18, 19:25, 20:12, 36:8, 36:11, 39:25, 40:13, 44:23, 44:25
brick [1] - 42:13
brief [8] - 2:23, 3:1, 4:8, 4:16, 4:17, 5:14, 7:8, 11:15
briefing [10] - 3:7, 11:12, 12:19, 19:23, 21:4, 31:23, 37:10, 38:3, 38:5, 39:21
briefly [3] - 14:22, 27:4, 40:5
briefs [4] - 4:2, 4:4, 4:13
broad [1] - 20:6
broader [1] - 43:22
broadly [1] - 44:6

brought [1] - 2:22
build [1] - 8:18
building - 42:18
built [2] - 42:20, 42:21
bumps [1] - 16:9
bunch [1] - 16:9
buried [15] - 17:14,
17:17, 17:20, 17:23,
22:17, 23:6, 25:18,
28:19, 28:21, 28:24,
29:3, 29:4, 29:6,
29:10, 29:18
butter [10] - 29:16,
29:17, 29:18, 30:1,
40:22, 40:23, 40:24,
41:2, 41:6, 41:9

## C

CA [1] - 1:23
California [1] - 24:15
cannot [3] - 3:14, 8:6,
43:16
carpenter [1] - 42:19
case [7] - 7:15, 15:25,
17:4, 18:10, 25:3,
26:23, 42:25
cases [1] - 39:7
catch [1] - 40:8
cathode [18] - 7:19,
7:20, 8:7, 8:13, 9:6,
10:1, 10:4, 10:7,
10:19, 20:25, 40:10,
45:6, 47:4, 47:9,
47:23, 48:1, 48:17,
48:20
celebrated [1] - 24:16
central [6] - 11:16,
11:23, 12:4, 26:6,
36:24, 37:5
certain [4] - 4:8, 8:17
certainly [1] - 28:13
chance [1] - 46:7
change [8] - 4:17,
16:24, 18:10, 18:12,
23:18, 29:1, 29:17,
41:18
changed [4] - 2:24,
4:14, 34:18, 41:23
changes [2] - 17:12,
25:14
changing [1] - 29:11,
41:14
channel [15] - 5:4,
9:23, 10:6, 10:7,
10:9, 10:12, 11:4,
12:15, 14:3, 18:6,
18:8, 32:13, 32:24,
33:5

channels [2] - 10:23,
11:18
characteristics [2] -
17:8, 41:19
characterization [4] -
12:10, 13:4, 14:13,
38:10
characterizing [1] -
20:14
chart [11] - 2:25, 3:1,
3:6, 3:10, 3:11, 3:15,
3:23, 3:24, 4:4, 4:7,
5:14
chemical [1] - 25:21
chemicals [1] - 23:18
chemistry [1] - 17:3
Chief [1] - 1:13
chocolate [7] - 29:16,
29:17, 29:18, 40:21,
40:25, 41:3, 41:9
chopped [1] - 22:6
chunk [1] - 29:15
Circuit [3] - 6:25, 28:2,
48:10
citation [2] - 3:13,
3:25
cited [1] - 13:2
cites [1] - 35:12
Civil [2] - 1:4, 3:19
Claim [4] - 9:17,
13:16, 13:18, 13:20
claim [68] - 2:23, 2:24,
2:25, 3:1, 3:6, 3:8,
3:10, 3:11, 3:15,
3:23, 3:24, 4:2, 4:4,
4:7, 4:9, 4:13, 5:13,
5:16, 7:11, 14:6,
20:22, 20:24, 22:1,
22:3, 22:13, 22:16,
22:24, 27:24, 27:25,
28:11, 28:14, 28:16,
28:25, 31:17, 31:19,
32:11, 33:9, 33:14,
33:23, 34:10, 34:13,
34:20, 35:13, 35:18,
35:22, 36:4, 37:9,
38:4, 38:12, 39:20,
39:22, 40:18, 41:3,
41:25, 42:2, 44:9,
44:25, 45:4, 45:6,
46:16, 47:13, 47:14,
47:16, 48:18
claimed [2] - 9:17,
36:25
claims [1] - 28:4
clarification [1] -
34:14
clarify [1] - 46:14
clause [4] - 22:16,
22:21, 22:22, 44:25

clear [14] - 3:8, 6:9,
11:20, 12:1, 12:8,
12:16, 12:24, 20:23,
28:2, 28:15, 39:24,
40:13, 44:14, 45:5
clearly [5] - 13:17,
20:16, 22:19, 43:11,
43:22
clerk [1] - 2:22
closed [1] - 12:25
cloth [1] - 19:24
colleague [1] - 29:20
Column [2] - 12:14,
20:7
common [2] - 21:2,
47:9
common-sense [1] -
21:2
company [3] - 6:24,
15:7, 24:14
completely [2] - 25:9,
36:3
complicated [1] - 9:20
comprised [1] - 21:11
comprising [1] - 28:15
concedes [1] - 34:23
concentrations [1] -
12:19
concept [4] - 9:22,
33:22, 37:16, 39:21
concern [1] - 47:5
concerned [1] - 3:18
concluded [1] - 49:9
conducting [5] -
11:18, 12:12, 12:15,
13:10, 14:8
conduction [8] -
11:17, 11:24, 12:22,
13:24, 26:22, 36:21,
36:24, 38:15
conductive [23] -
10:10, 10:23, 18:13,
25:9, 26:12, 35:11,
35:17, 35:21, 35:23,
36:1, 36:6, 36:7,
36:11, 36:12, 36:13,
38:18, 44:8, 44:10,
45:15, 45:22, 45:23,
46:19
conductivity [42] -
4:24, 5:2, 5:3, 6:12,
11:21, 12:2, 12:17,
12:24, 15:5, 16:25,
17:12, 18:11, 18:12,
21:12, 21:14, 22:2,
22:18, 22:20, 23:1,
23:14, 23:19, 23:20,
27:7, 27:8, 28:18,
28:20, 28:21, 28:22,
28:23, 29:2, 29:4,

33:16, 34:2, 34:12,
34:17, 39:15, 40:20,
41:12, 41:15, 41:17,
42:1
conducts [1] - 25:25
confection [9] - 40:21,
40:25, 41:2, 41:3,
41:5, 41:6, 41:8
confections [1] -
29:15
configuration [4] -
10:14, 11:25, 14:5,
39:23
confusion [1] - 30:15
connected [4] - 10:15,
17:18, 18:19, 20:2
connecting [3] - 4:25,
6:13, 46:20
connection [2] -
45:14, 47:2
connects [1] - 46:1
connotes [1] - 19:19
consent [1] - 3:21
consequence [1] - 5:8
consider [1] - 27:23
considerable [1] -
14:11
considered [1] - 13:16
consistent [4] - 28:25,
33:9, 36:3
consistently [2] -
29:2, 32:17
constructed [2] -
10:8, 42:15
construction [27] -
2:23, 3:1, 3:8, 3:25,
4:2, 4:13, 19:11,
19:16, 27:6, 27:25,
33:8, 34:9, 34:20,
35:6, 35:10, 35:19,
35:22, 36:3, 36:5,
38:4, 39:21, 42:23,
44:11, 47:13, 47:14,
47:17, 48:19
constructions [14] -
2:24, 3:14, 4:8, 4:10,
4:15, 4:18, 4:22,
4:25, 5:6, 5:9, 5:11,
5:13, 5:16, 38:12
construe [1] - 19:13
construed [3] - 22:1,
32:15, 45:13
construing [1] - 30:13
contact [36] - 5:19,
6:14, 19:8, 19:14,
19:20, 20:21, 20:22,
20:23, 21:1, 30:24,
32:10, 33:3, 33:4,
33:5, 33:6, 35:10,
35:11, 35:16, 35:20,

35:24, 36:2, 36:10,
36:13, 44:7, 44:8,
44:9, 44:11, 44:13,
45:2, 45:11, 45:21,
45:25, 46:12, 46:20,
48:20
contacts [7] - 20:22,
44:20, 45:7, 46:4,
46:17, 46:23
contained [1] - 3:24
containing [8] - 8:15
contends [1] - 12:18
contention [1] - 36:23
context [6] - 19:6,
39:13, 41:11, 43:8,
43:10, 45:5
continuous [2] -
14:14, 39:15
contractor [1] - 42:19
contradicts [1] - 13:3
contrast [1] - 33:1
conventional [2] -
7:22, 8:20
convey [1] - 3:11
copies [1] - 6:4
copies.. [1] - 6:6
correct [3] - 12:10,
21:7, 21:8
cost [1] - 9:12
counsel [17] - 2:1,
2:20, 6:1, 6:19,
23:24, 30:6, 31:10,
36:16, 37:21, 39:10,
42:16, 45:9, 45:16,
46:6, 47:19, 49:2,
49:8
Counsel [2] - 1:19,
1:24
counsel's [1] - 5:22
couple [4] - 11:11,
25:5, 29:21, 33:14
course [2] - 6:5, 13:20
COURT [39] - 1:1, 2:1,
2:7, 2:9, 2:17, 6:7,
6:19, 7:13, 19:1,
21:8, 21:15, 21:18,
21:21, 23:23, 24:1,
24:5, 24:12, 30:2,
30:4, 30:6, 36:16,
37:21, 39:10, 40:3,
40:14, 43:24, 44:3,
45:9, 45:19, 45:22,
46:5, 46:14, 47:7,
47:18, 47:24, 48:4,
48:22, 48:24, 49:6
Court [23] - 3:3, 3:7,
3:10, 3:11, 3:15,
3:16, 4:6, 4:11, 4:13,
4:15, 4:16, 5:7, 5:10,
5:15, 5:17, 6:6, 6:17,

6:21, 6:22, 7:12, 7:14, 19:12, 27:20
**court** [1] - 3:17
**Court's** [5] - 2:14, 4:5, 5:24, 13:5, 18:22
**courts** [2] - 48:9, 48:10
**create** [5] - 15:19, 17:25, 18:18, 25:18, 25:21
**created** [5] - 16:12, 16:21, 16:22, 17:24, 18:1
**creates** [1] - 8:16
**creating** [1] - 11:17
**crystal** [1] - 28:8
**cup** [2] - 30:1, 40:22
**current** [23] - 7:20, 8:4, 8:8, 8:12, 8:14, 8:15, 9:1, 9:4, 9:5, 9:6, 9:7, 9:8, 9:12, 9:15, 10:4, 10:5, 10:17, 10:24, 11:5, 11:20, 14:10, 14:19, 26:8
**cursory** [1] - 4:21

### D

**dangerous** [1] - 44:1
**days** [1] - 25:16
**defendant** [1] - 2:11
**Defendant** [2] - 1:9, 1:24
**defendant's** [1] - 2:23
**defendants** [1] - 2:15
**defined** [2] - 16:14, 47:16
**definitely** [1] - 48:13
**definition** [1] - 47:1
**DELAWARE** [1] - 1:2
**Delaware** [1] - 1:10
**deployed** [1] - 23:15
**deposited** [1] - 15:13
**depositing** [1] - 18:2
**describe** [1] - 26:19
**described** [7] - 12:1, 16:17, 37:18, 38:16, 40:22, 44:17, 44:21
**describes** [3] - 13:13, 26:24, 38:23
**describing** [1] - 14:24
**description** [5] - 12:13, 20:8, 20:9, 26:17, 26:19
**designed** [1] - 24:20
**detailed** [2] - 26:17, 26:19
**determine** [2] - 28:9,

28:11
**determines** [1] - 16:4
**device** [18] - 7:23, 12:20, 13:9, 13:12, 14:3, 15:8, 15:19, 16:3, 16:14, 16:19, 17:16, 17:17, 22:5, 23:3, 23:16, 42:22, 43:11, 48:21
**DEVICES** [1] - 1:4
**devices** [6] - 8:17, 22:7, 24:21, 24:25, 31:8, 43:2
**diagram** [1] - 10:1
**dialogue** [2] - 6:22, 7:2
**dictionaries** [1] - 5:23
**difference** [3] - 24:6, 27:17, 39:13
**differences** [1] - 39:2
**different** [15] - 7:24, 9:2, 9:18, 11:1, 22:25, 24:24, 25:20, 29:5, 30:21, 31:11, 31:17, 33:17, 34:5, 37:3
**differs** [1] - 5:6
**difficult** [1] - 47:12
**dimensions** [1] - 12:20
**diode** [69] - 5:19, 6:14, 7:16, 7:23, 8:11, 8:15, 8:20, 8:21, 8:22, 9:1, 9:5, 9:8, 9:9, 9:11, 9:13, 9:16, 9:21, 10:3, 10:25, 11:1, 11:2, 11:3, 11:6, 11:7, 11:9, 11:10, 11:17, 13:10, 20:21, 20:22, 20:23, 25:24, 26:9, 26:22, 27:12, 31:8, 35:10, 35:11, 35:15, 35:20, 35:24, 36:1, 36:6, 36:10, 36:13, 37:8, 38:17, 38:18, 38:22, 39:2, 44:7, 44:8, 44:9, 44:11, 44:13, 44:20, 45:2, 45:11, 45:14, 46:2, 46:3, 46:10, 46:19, 47:2, 47:3, 47:6, 48:20
**Diodes** [13] - 2:11, 4:10, 5:12, 14:5, 22:1, 24:3, 24:9, 24:25, 25:2, 34:8, 39:14, 44:6, 49:3
**DIODES** [1] - 1:8
**diodes** [14] - 7:15, 7:16, 11:11, 12:18,

15:7, 24:14, 25:2, 25:7, 26:21, 33:1, 37:9, 42:16, 43:23
**diodes'** [1] - 36:3
**Diodes'** [8] - 4:20, 4:23, 5:6, 5:16, 13:3, 14:13, 22:14, 33:8
**directed** [2] - 26:11, 26:21
**direction** [4] - 7:18, 9:13, 11:3, 25:25
**disagree** [2] - 27:17, 47:20
**disclosed** [1] - 9:16
**discloses** [2] - 7:10, 14:2
**disclosure** [1] - 14:23
**discover** [1] - 4:14
**discovered** [1] - 13:1
**DISCRETE** [1] - 1:4
**discretion** [1] - 3:17
**discuss** [2] - 13:5, 40:17
**discussed** [2] - 36:25, 37:1
**discussion** [1] - 36:20
**dispute** [3] - 7:11, 19:5, 38:12
**disputed** [1] - 3:24
**dissolving** [1] - 15:22
**distinct** [1] - 16:18
**distinction** [1] - 46:8
**distinctions** [1] - 4:19
**DISTRICT** [2] - 1:1, 1:2
**done** [5] - 15:11, 15:20, 18:2, 37:19, 43:1
**dopant** [3] - 16:24, 17:3, 25:20
**dopants** [2] - 12:19, 17:1
**doping** [2] - 25:11, 25:13
**down** [8] - 6:25, 10:17, 27:5, 28:5, 31:10, 32:25, 34:17, 41:21
**drafter** [1] - 20:16
**drive** [1] - 32:6
**drop** [6] - 8:12, 8:20, 8:25, 11:2, 11:9, 11:17
**drops** [1] - 26:22
**during** [2] - 13:2, 26:5

### E

**edge** [3] - 16:14, 16:18, 16:19
**effort** [1] - 39:20

**either** [6] - 9:20, 12:22, 15:23, 19:20, 44:12, 47:3
**electrical** [4] - 17:8, 25:15, 45:14, 47:2
**electrically** [4] - 4:25, 6:13, 17:18, 46:20
**electricity** [3] - 7:17, 7:18, 26:2
**electrode** [2] - 10:11, 18:7
**electrodes** [2] - 8:2, 18:18
**element** [1] - 43:11
**elements** [1] - 33:17
**eliminate** [1] - 4:19
**embodiment** [16] - 12:7, 12:14, 13:23, 14:23, 14:25, 15:1, 15:9, 16:11, 16:15, 17:10, 17:20, 20:10, 22:21, 40:12, 40:16
**embodiments** [1] - 29:8
**emphasize** [2] - 35:6, 35:25
**employees** [1] - 24:15
**encompass** [2] - 43:6, 43:11
**end** [7] - 8:2, 10:15, 16:7, 16:8, 18:5, 24:20, 39:6
**energy** [2] - 8:15, 8:25
**engage** [2] - 7:1, 7:3
**engaged** [1] - 36:22
**English** [1] - 19:9
**entered** [1] - 3:3
**entertain** [3] - 6:17, 7:3, 23:22
**entire** [4] - 10:8, 12:13, 22:19, 45:4
**entirely** [4] - 32:16, 33:8, 33:9, 46:8
**ESP** [1] - 28:8
**ESQ** [6] - 1:15, 1:17, 1:20, 1:21, 1:22, 1:22
**essence** [1] - 11:23
**essential** [1] - 12:23
**essentially** [4] - 11:7, 11:23, 12:5, 13:3
**etch** [1] - 16:7
**etched** [4] - 15:21, 16:1, 16:5, 16:20
**etching** [7] - 15:21, 16:12, 16:13, 16:16, 16:17, 18:3
**event** [1] - 19:12
**evidence** [3] - 5:24, 40:2, 44:5

**evil** [1] - 29:15
**exactly** [4] - 6:21, 25:10, 40:8, 44:20
**examiner** [1] - 13:16
**examining** [1] - 4:11
**example** [11] - 16:17, 17:4, 19:22, 25:15, 31:14, 31:21, 32:18, 33:17, 40:9, 40:12, 43:4
**examples** [1] - 30:21
**except** [2] - 18:17, 39:7
**excerpt** [1] - 14:9
**excerpts** [1] - 37:12
**exclude** [1] - 14:6
**excludes** [1] - 35:19
**exercising** [1] - 3:17
**exist** [2] - 23:10, 45:7
**existence** [1] - 28:12
**exists** [1] - 41:4
**expect** [1] - 48:5
**expert** [1] - 43:1
**explain** [1] - 7:8
**explained** [1] - 37:6
**expressly** [1] - 35:21
**extend** [5] - 17:14, 17:15, 23:6, 23:7, 23:11
**extending** [1] - 23:7
**extent** [3] - 19:12, 21:15, 46:1
**extreme** [1] - 32:6
**extrinsic** [2] - 5:23
**eye** [1] - 42:22

### F

**fabricated** [1] - 22:5
**facade** [1] - 42:13
**face** [1] - 40:3
**fact** [13] - 2:24, 17:15, 23:11, 30:25, 33:22, 33:23, 37:5, 40:16, 40:24, 41:5, 41:13, 41:17, 43:18
**familiar** [2] - 26:23, 29:14
**far** [2] - 23:21, 47:21
**feature** [3] - 13:18, 31:12, 31:13
**features** [3] - 30:21, 31:15, 31:19
**February** [2] - 3:23, 4:2
**Federal** [3] - 3:19, 28:2, 48:10
**Figure** [5] - 15:3, 15:16, 17:11, 20:11,

39:24

**figure** [5] - 9:19, 9:24, 10:9, 12:3, 18:9

**filed** [3] - 3:23, 4:1, 4:13

**filing** [1] - 3:6

**final** [14] - 2:25, 3:6, 3:10, 3:15, 3:23, 3:24, 4:4, 4:7, 5:13, 6:23, 18:17, 23:1, 35:9, 42:23

**finally** [3] - 5:4, 5:20, 44:7

**fine** [3] - 6:7, 7:13, 28:20

**first** [46] - 4:16, 5:2, 5:5, 5:19, 6:10, 7:7, 11:15, 14:16, 15:12, 18:25, 19:2, 19:3, 20:22, 21:12, 21:14, 22:2, 22:20, 23:13, 23:15, 24:9, 27:3, 27:6, 27:8, 28:17, 28:22, 29:2, 30:10, 30:11, 30:16, 30:19, 32:12, 32:13, 33:16, 33:18, 34:2, 34:11, 34:12, 34:17, 35:15, 36:10, 36:19, 37:25, 38:8, 39:16, 40:19, 44:9

**Fish** [3] - 1:16, 1:17, 2:5

**fit** [2] - 47:13, 48:17

**five** [1] - 4:25

**flawed** [1] - 35:10

**floor** [2] - 20:3, 20:4, 30:24

**flow** [10] - 7:18, 7:20, 8:4, 8:6, 8:8, 8:9, 10:24, 14:10, 14:19

**flowing** [4] - 8:13, 9:1, 9:6, 26:9

**flows** [2] - 8:14, 10:4

**fluid** [1] - 48:4

**focus** [1] - 28:1

**focused** [2] - 14:24, 33:12

**focusing** [1] - 25:3

**FOR** [1] - 1:2

**force** [1] - 10:17

**foremost** [1] - 37:25

**forgive** [1] - 18:23

**form** [1] - 36:1

**formed** [10] - 18:8, 20:10, 20:12, 20:14, 29:9, 44:10, 44:23, 44:25, 46:18, 46:19

**forming** [7] - 20:8, 35:23, 46:19, 47:22,

47:25, 48:17

**forms** [6] - 35:15, 36:9, 36:13, 45:2, 45:3, 48:20

**forth** [3] - 3:5, 4:8, 5:13

**forward** [14] - 8:13, 9:1, 9:13, 11:17, 11:18, 12:12, 12:16, 12:22, 14:12, 26:7, 26:12, 26:22, 38:18, 39:2

**founded** [2] - 24:15, 24:16

**frame** [1] - 42:20

**framed** [3] - 42:8, 42:10, 42:14

**framing** [1] - 42:12

**frankly** [3] - 21:9, 21:24, 44:13

**front** [1] - 45:12

**fundamental** [3] - 9:22, 22:12, 42:15

**fundamentally** [2] - 9:18, 11:1

### G

**gamesmanship** [1] - 5:15

**gate** [4] - 10:11, 10:17, 10:19, 18:7

**gates** [5] - 10:14, 10:15, 10:22, 17:25

**general** [2] - 31:23, 32:19

**generally** [5] - 7:9, 7:15, 20:18, 25:25, 48:9

**gentlemen** [1] - 7:1

**gift** [2] - 24:17, 24:18

**given** [4] - 6:5, 8:16, 8:25, 25:12

**gold** [1] - 24:17

**golden** [1] - 24:16

**graded** [1] - 16:19

**Gratzinger** [1] - 2:12

**GRATZINGER** [1] - 1:22

**gray** [2] - 9:25, 10:1

**great** [1] - 30:8

**greater** [1] - 38:19

**green** [2] - 10:12, 10:14

**GREGORY** [1] - 1:13

**ground** [3] - 32:5, 43:7, 43:9

**guess** [2] - 24:5, 40:23

### H

**half** [3] - 27:12, 39:3, 39:4

**HALKOWSKI** [2] - 1:15, 2:4

**Halkowski** [1] - 2:4

**hand** [2] - 24:11, 36:23

**hand-ups** [1] - 24:11

**hanging** [2] - 20:1, 30:23

**happy** [2] - 23:22, 32:9

**hard** [2] - 35:16, 47:17

**Hattenbach** [10] - 2:12, 24:2, 24:13, 33:13, 36:22, 37:1, 37:22, 40:20, 45:19, 47:24

**HATTENBACH** [15] - 1:21, 23:25, 24:2, 24:8, 24:14, 30:3, 37:24, 40:5, 45:20, 45:24, 46:25, 47:11, 48:2, 48:13, 49:3

**Hattenbach's** [1] - 36:19

**head** [1] - 34:8

**hear** [1] - 47:24

**heard** [2] - 6:18, 48:2

**hearing** [4] - 3:6, 3:9, 25:4, 49:9

**Hearing** [1] - 1:12

**heat** [2] - 8:16, 9:12

**heck** [1] - 48:8

**HELM** [3] - 1:22, 30:5, 30:7

**Helm** [7] - 2:13, 29:20, 30:4, 30:7, 43:4, 44:8, 47:1

**help** [2] - 5:24, 29:24

**helpful** [1] - 48:9

**herring** [3] - 37:15, 38:1, 38:10

**high** [2] - 8:12, 9:3

**higher** [1] - 11:5

**historical** [1] - 42:17

**home** [1] - 32:6

**Honor** [41] - 2:4, 2:8, 2:10, 6:3, 6:16, 7:6, 7:7, 13:17, 14:3, 19:3, 19:6, 20:21, 21:9, 21:17, 21:23, 22:12, 23:25, 24:10, 24:14, 25:6, 26:23, 29:19, 30:3, 30:5, 35:12, 36:15, 36:18, 36:23, 37:24, 38:11, 39:12, 40:5, 40:15,

43:14, 44:4, 45:18, 45:20, 46:25, 48:2, 49:3, 49:5

**Honor's** [3] - 23:22, 29:22, 45:24

**HONORABLE** [1] - 1:13

**hopefully** [1] - 38:24

**house** [10] - 32:2, 32:4, 42:8, 42:10, 42:11, 42:12, 42:13, 42:14, 42:18, 42:19

**humanly** [1] - 24:3

**hundred** [1] - 17:5

### I

**IDD** [17] - 2:5, 2:24, 4:8, 4:14, 4:23, 5:8, 5:17, 5:18, 26:5, 30:20, 31:10, 31:22, 32:2, 32:8, 33:12, 34:23, 36:23

**IDD's** [15] - 4:16, 4:17, 4:21, 4:25, 5:10, 5:12, 5:15, 19:8, 27:7, 32:18, 35:10, 35:18, 35:19, 35:21

**idea** [8] - 11:16, 11:19, 11:23, 12:5, 26:6, 26:10, 36:24, 37:5

**image** [1] - 12:3

**imbedded** [1] - 43:3

**implantation** [4] - 18:10, 18:15, 27:9, 27:22

**implanted** [4] - 16:22, 17:11, 18:9, 23:18

**implanting** [2] - 16:23, 41:14

**important** [5] - 13:18, 15:15, 37:11, 39:12

**impossible** [1] - 28:7

**improperly** [1] - 5:17

**impurities** [2] - 25:13, 41:18

**impurity** [1] - 16:24

**IN** [2] - 1:1, 1:2

**inclined** [1] - 19:13

**include** [3] - 20:6, 32:15, 42:6

**included** [1] - 13:7

**includes** [1] - 22:16

**including** [1] - 3:6

**inconsistent** [1] - 22:14

**inconsistently** [1] - 21:22

**INCORPORATED** [1] -

1:8

**incorrect** [1] - 13:4

**increase** [1] - 14:11

**indeed** [3] - 3:1, 4:22, 32:10

**indirect** [1] - 20:6

**indirectly** [1] - 19:21

**inefficiency** [3] - 8:17, 9:12, 9:14

**infeasible** [1] - 8:18

**infringement** [2] - 24:18, 28:7

**inherent** [2] - 8:10, 9:2

**inherently** [1] - 43:15

**injecting** [1] - 28:3

**insert** [1] - 29:16

**inside** [4] - 25:19, 25:23, 29:18, 40:24

**insight** [2] - 22:12, 31:6

**insofar** [1] - 3:17

**instantly** [1] - 48:5

**insulated** [1] - 25:10

**INTEGRATED** [1] - 1:4

**interestingly** [1] - 3:18

**interface** [6] - 36:5, 36:7, 36:8, 36:10, 36:14, 44:13

**intermediate** [4] - 20:19, 31:25, 32:3, 43:12

**intervening** [3] - 12:9, 40:11, 43:12

**intrinsic** [5] - 3:13, 4:1, 4:11, 40:1, 44:5

**introduce** [2] - 25:17, 25:20

**introduces** [1] - 41:25

**introducing** [1] - 25:13

**introduction** [1] - 37:6

**introductions** [1] - 2:2

**invention** [12] - 7:9, 11:24, 12:23, 13:18, 13:25, 14:17, 14:18, 14:25, 26:17, 26:21, 27:1, 38:17

**invite** [1] - 6:22

**involving** [1] - 6:21

**Irell** [2] - 1:23, 2:13

**issue** [15] - 2:21, 3:12, 4:9, 11:13, 13:17, 19:3, 21:10, 21:24, 23:12, 24:23, 25:1, 34:7, 36:20, 40:19, 43:4

**issues** [3] - 21:19, 27:6, 30:18

**itself** [6] - 3:2, 13:6, 13:22, 20:5, 31:20,

35:18

**J**

Jack [1] - 2:10
JACK [1] - 1:20
Japanese [1] - 13:14
JEREMIAH [1] - 1:22
Jeremiah [3] - 2:12, 29:20, 30:7
joint [10] - 2:25, 3:6, 3:10, 3:15, 3:23, 3:24, 4:4, 4:7, 5:13, 38:4
Judge [1] - 1:13
judge's [1] - 3:21
judgments [1] - 6:23
junction [1] - 8:9
junctions [1] - 29:9
junior [1] - 30:8
jurors [2] - 19:9, 28:9

**K**

keep [1] - 24:3
Kevin [1] - 49:12
kind [4] - 7:4, 32:5, 47:5, 47:17
known [2] - 13:11, 13:20
knows [4] - 27:17, 29:15, 35:12, 40:15
KOLODNEY [25] - 1:17, 2:8, 6:3, 6:16, 7:6, 7:14, 19:2, 21:9, 21:17, 21:20, 21:23, 36:18, 39:12, 40:15, 44:1, 44:4, 45:17, 46:7, 46:16, 47:8, 47:22, 47:25, 48:19, 48:23, 49:5
Kolodney [1] - 2:6

**L**

L.L.C [1] - 1:4
ladies [1] - 7:2
language [15] - 22:3, 22:13, 27:16, 27:25, 28:14, 28:25, 33:24, 35:13, 35:18, 36:4, 37:18, 41:25, 46:22, 47:12, 48:18
large [1] - 35:22
last [3] - 24:16, 24:21, 32:15
IAURENCE [1] - 1:17
law [2] - 2:22, 26:24

lawsuit [1] - 24:19
lawyers [1] - 7:4
layer [55] - 5:2, 5:5, 9:25, 10:1, 15:18, 16:21, 17:11, 17:14, 17:18, 17:21, 17:23, 18:2, 18:4, 18:8, 20:12, 20:13, 21:1, 22:17, 23:6, 25:18, 27:23, 28:19, 28:21, 28:24, 29:3, 29:4, 29:6, 29:18, 32:4, 32:12, 32:22, 35:11, 35:17, 35:21, 35:23, 36:1, 36:6, 36:7, 36:8, 36:11, 36:12, 36:13, 43:12, 44:9, 44:15, 44:24, 45:13, 46:2, 46:19, 47:1, 47:14, 47:22, 48:16, 48:20
layers [21] - 15:13, 15:15, 15:20, 15:25, 16:6, 16:8, 18:17, 20:9, 20:11, 20:25, 31:11, 31:17, 31:18, 31:25, 43:15, 43:16, 43:21, 44:22, 46:17
leakage [3] - 9:4, 9:5, 11:5
least [2] - 31:23, 47:25
leave [3] - 3:15, 4:15, 5:9
left [2] - 32:22, 32:25
less [4] - 8:25, 9:8, 9:14, 16:18
letter [1] - 7:1
limitation [2] - 42:5, 45:4
limitations [3] - 28:3, 28:10, 39:22
limited [1] - 20:17
Lines [2] - 12:14, 20:7
lines [1] - 34:17
linguistic [1] - 23:12
list [1] - 29:22
listed [1] - 35:21
lists [1] - 33:17
LLP [1] - 1:23
lo [1] - 14:7
locations [2] - 17:16, 42:2
look [19] - 14:1, 23:14, 25:22, 26:13, 26:18, 30:18, 31:2, 31:3, 32:11, 33:23, 35:13, 37:12, 40:3, 42:16, 42:19, 42:21, 42:22, 43:1, 44:5
looks [2] - 39:23,

40:22
Los [1] - 1:23
lost [1] - 8:15
low [11] - 11:8, 26:7, 26:12, 26:21, 32:25, 37:2, 37:4, 37:7, 37:10, 37:14, 38:18
lower [3] - 8:24, 11:2, 39:6

**M**

MA [1] - 1:18
management [1] - 3:18
Manella [2] - 1:23, 2:13
manufactured [3] - 23:3, 24:25, 31:9
manufacturing [4] - 17:24, 18:2, 31:2, 31:7
map [1] - 16:4
March [1] - 4:12
Markman [6] - 1:12, 2:20, 3:5, 3:9, 4:6, 25:4
material [43] - 7:24, 8:22, 8:24, 11:21, 12:6, 12:7, 12:8, 12:9, 12:17, 14:4, 14:15, 15:13, 15:17, 15:22, 16:25, 17:2, 17:6, 17:7, 18:9, 20:20, 21:11, 22:1, 22:4, 22:15, 22:20, 22:25, 23:10, 25:12, 25:17, 25:18, 25:19, 25:23, 31:11, 39:24, 40:11, 40:13, 41:14, 41:23, 41:24, 42:5
materials [3] - 8:1, 12:19, 31:13
matter [1] - 3:16
matters [2] - 5:22, 49:6
Maurer [1] - 49:12
mean [8] - 20:19, 22:1, 23:9, 40:17, 41:7, 41:15, 41:20, 45:13
meaning [12] - 19:9, 19:14, 19:18, 27:16, 30:15, 31:2, 32:7, 32:8, 32:9, 32:10, 33:2, 43:6
means [13] - 8:14, 25:13, 26:7, 27:8, 32:4, 34:2, 34:10, 34:25, 35:1, 40:25,

44:14, 45:3, 46:9
meant [1] - 3:11
meets [1] - 28:10
memorialize [1] - 48:24
mention [4] - 10:13, 37:13, 37:14, 37:17
mentioned [7] - 31:10, 33:11, 33:13, 34:4, 34:11, 34:16, 44:17
mentions [2] - 12:11, 37:16
merely [2] - 40:15, 42:23
met [1] - 28:12
metal [12] - 8:23, 9:25, 10:1, 10:24, 10:25, 11:20, 11:21, 18:17, 44:15, 44:21, 44:24
metallic [1] - 20:25
method [2] - 27:24, 28:3
methods [1] - 31:17
might [3] - 25:22, 29:3, 47:11
million [1] - 37:21
mind [1] - 37:21
minute [1] - 2:19
modified [2] - 3:21, 41:14
moment [1] - 48:3
moot [1] - 6:5
moreover [3] - 3:10, 14:11, 20:5
morning [8] - 2:1, 2:7, 2:8, 2:10, 3:25, 24:1, 30:5, 30:6
Morris [1] - 1:20, 2:11
most [3] - 2:24, 32:1, 39:7
move [1] - 27:2
MR [42] - 2:4, 2:8, 2:10, 6:3, 6:16, 7:6, 7:14, 19:2, 21:9, 21:17, 21:20, 21:23, 23:25, 24:2, 24:8, 24:14, 30:3, 30:5, 30:7, 36:18, 37:24, 39:12, 40:5, 40:15, 44:1, 44:4, 45:17, 45:20, 45:24, 46:7, 46:16, 46:25, 47:8, 47:11, 47:22, 47:25, 48:2, 48:13, 48:19, 48:23, 49:3, 49:5
multiple [1] - 43:21
must [2] - 17:15, 23:9

**N**

n-like [1] - 18:14
n-type [26] - 7:24, 8:3, 8:5, 8:24, 12:6, 15:6, 15:9, 17:13, 22:15, 22:19, 22:21, 23:9, 23:10, 23:17, 23:20, 25:18, 25:23, 27:13, 27:15, 29:9, 40:11, 40:13, 41:22, 42:5, 42:7, 43:2
nail [2] - 20:2, 30:23
named [1] - 33:22
namely [3] - 2:23, 4:24, 5:19
narrower [1] - 19:14
narrowing [1] - 19:16
nature [1] - 5:23
necessarily [3] - 6:20, 32:7, 38:18
necessary [1] - 17:16
need [5] - 19:10, 21:15, 24:5, 36:19, 39:18
needs [2] - 18:7, 34:21
negative [5] - 8:5, 8:7, 8:9, 10:18, 10:19
neighboring [5] - 34:22, 34:23, 34:24, 34:25, 35:7
never [2] - 37:4, 44:17
next [3] - 17:24, 20:21, 34:6
Nichols [2] - 1:20, 2:11
nobody [2] - 40:23, 41:1
non [1] - 40:4
non-traditional [1] - 40:4
nonconductive [2] - 10:9, 11:4
none [2] - 23:23, 37:13
nonetheless [1] - 9:7
nonplussed [1] - 4:14
nonsense [1] - 7:4
nonsensical [4] - 22:22, 32:5, 43:8, 44:16
normally [1] - 8:8
notebook [2] - 13:6, 14:2
nothing [2] - 13:21, 19:15
notice [2] - 4:16, 38:6
number [7] - 14:18, 18:23, 21:24, 26:3,

30:20, 30:21

**O**

**object** [4] - 19:20, 19:21, 22:5
**objects** [1] - 19:19
**obtain** [1] - 3:8
**obviously** [2] - 8:16, 25:4
**occur** [1] - 28:4
**OF** [1] - 1:2
**Office** [1] - 13:16
**office** [1] - 2:6
**old** [2] - 29:13, 40:21
**once** [2] - 29:11, 37:1
**one** [36] - 7:17, 7:18, 10:4, 11:22, 12:12, 13:1, 14:18, 15:5, 16:2, 17:2, 17:4, 19:20, 20:8, 20:11, 25:25, 26:2, 26:20, 28:2, 28:4, 30:8, 31:18, 32:3, 33:10, 33:24, 37:6, 37:17, 39:8, 40:16, 41:17, 43:21, 44:24, 46:17, 46:18, 47:15
**one-way** [2] - 7:17, 26:2
**ones** [1] - 25:1
**ongoing** [1] - 6:22
**opening** [5] - 3:1, 4:2, 4:4, 4:8, 5:14
**operates** [1] - 9:18
**operating** [1] - 39:4
**operation** [1] - 27:9
**optional** [2] - 26:19, 37:18
**orange** [2] - 27:18, 27:19
**order** [8] - 3:3, 3:5, 3:8, 3:22, 4:18, 10:6, 17:17, 22:22
**ordinary** [8] - 19:8, 19:14, 19:18, 27:16, 31:4, 31:7, 33:24, 43:6
**original** [2] - 5:13, 23:2
**otherwise** [2] - 25:14, 46:3
**outer** [2] - 46:1, 46:2
**outermost** [4] - 36:5, 46:9, 46:12, 46:23
**outside** [3] - 18:19, 42:9, 42:13
**overall** [7] - 16:5, 16:6, 17:3, 23:14,

23:19, 41:9, 42:6
**overheating** [1] - 8:18
**overview** [2] - 18:20, 24:9
**owl** [1] - 32:2, 32:4, 43:5, 43:6, 43:8
**oxide** [4] - 5:5, 32:12, 32:22, 33:6

**P**

**p-type** [14] - 7:24, 8:3, 8:4, 12:6, 12:9, 15:6, 17:13, 25:19, 25:22, 27:14, 27:15, 29:12, 41:23, 42:6
**P.C** [2] - 1:16, 1:17
**pack** [1] - 24:20
**packaging** [1] - 46:10
**page** [1] - 18:24
**Pages** [1] - 11:15
**panel** [1] - 6:24
**Paragraph** [1] - 3:4
**part** [23] - 12:23, 21:12, 27:6, 27:8, 29:6, 30:17, 33:12, 33:13, 34:13, 35:22, 41:7, 41:16, 41:20, 41:21, 45:14, 47:2, 47:6, 47:25, 48:15, 48:16
**particular** [16] - 10:14, 13:12, 15:14, 15:25, 17:9, 17:12, 18:1, 22:25, 23:1, 27:7, 41:7, 41:15, 42:25, 43:7, 43:20, 46:8
**particularly** [1] - 10:13
**parties** [9] - 3:22, 4:1, 4:12, 5:7, 6:12, 6:20, 19:5, 25:8, 45:10
**parties'** [4] - 3:9, 3:12, 4:5, 43:24
**parts** [3] - 17:2, 30:17, 33:12
**party** [1] - 3:13
**party's** [1] - 3:25
**pass** [2] - 6:7, 10:5
**passage** [1] - 43:20
**patent** [57] - 7:10, 9:16, 9:17, 11:12, 11:16, 12:4, 12:5, 12:11, 12:13, 12:14, 12:21, 13:2, 13:12, 13:13, 13:14, 13:15, 13:22, 14:14, 14:21, 14:24, 15:1, 15:8, 16:18, 18:20, 19:1, 20:14, 20:16, 21:3,

23:16, 24:18, 26:6, 26:10, 26:11, 26:15, 31:14, 31:15, 36:25, 37:1, 37:5, 37:16, 37:18, 38:15, 38:17, 39:5, 39:18, 39:24, 40:7, 40:9, 40:10, 43:10, 44:18, 45:4, 45:7, 46:11
**Patent** [1] - 13:15
**patentee** [1] - 26:24
**patently** [1] - 5:11
**patents** [1] - 33:19
**path** [11] - 11:20, 12:1, 12:8, 12:17, 12:24, 14:14, 28:5, 39:15, 39:24, 40:10, 40:13
**pattern** [2] - 16:1, 16:4
**patterned** [1] - 31:13
**patterning** [1] - 31:12
**Pause** [1] - 48:6
**peanut** [10] - 29:16, 29:17, 29:18, 30:1, 40:22, 40:23, 40:24, 41:2, 41:6, 41:9
**pedestal** [17] - 5:1, 16:2, 16:21, 16:22, 17:23, 18:1, 18:3, 20:8, 31:14, 31:15, 32:14, 32:22, 33:3, 33:4, 35:8, 43:18, 43:19
**pedestals** [15] - 16:3, 16:5, 16:9, 16:11, 16:15, 32:11, 32:20, 32:21, 33:17, 34:23, 34:24, 35:1, 35:7, 46:21
**people** [2] - 32:1, 42:24
**performed** [1] - 27:10
**perhaps** [2] - 46:14, 47:9
**permission** [2] - 2:14, 13:5
**permit** [2] - 5:7, 5:18
**permitting** [2] - 5:10, 21:5
**person** [3] - 24:10, 31:3, 31:6
**pETER** [1] - 1:22
**Peter** [1] - 2:12
**philosophically** [1] - 48:9
**physical** [3] - 11:25, 19:19, 20:17
**physics** [3] - 8:3, 9:3, 10:25
**picture** [3] - 7:25, 20:1, 30:23

**piece** [5] - 8:23, 13:13, 25:16, 38:21
**pieces** [2] - 18:4, 22:6
**pile** [1] - 19:25
**piled** [3] - 19:24, 30:22, 31:4
**piling** [1] - 43:15
**plain** [6] - 30:15, 31:2, 32:7, 32:9, 32:10, 33:2
**plaintiff** [6] - 2:3, 2:5, 3:2, 6:2, 45:16, 47:19
**Plaintiff** [2] - 1:5, 1:19
**plane** [1] - 38:7
**plasma** [2] - 16:12, 16:13
**plate** [2] - 19:23, 30:22
**pleasure** [2] - 30:8, 35:9
**PN** [11] - 8:9, 8:11, 8:22, 9:9, 9:11, 9:20, 10:3, 11:1, 11:3, 11:10, 37:8
**point** [11] - 30:16, 30:19, 32:6, 34:9, 34:14, 37:23, 41:7, 41:11, 43:20, 44:7, 47:20
**pointed** [2] - 9:24, 43:14
**points** [2] - 3:2, 25:5
**polarity** [1] - 8:6
**polycrystalline** [1] - 25:16
**pops** [1] - 32:11
**portion** [3] - 24:22, 35:3, 35:4
**portions** [5] - 15:22, 16:8, 23:6, 41:13, 42:6
**position** [9] - 3:12, 4:17, 4:20, 4:24, 19:8, 22:14, 27:7, 32:18, 38:16
**positions** [1] - 3:9
**positive** [6] - 8:5, 8:7, 8:8, 10:16, 10:18, 10:21
**possibility** [1] - 13:23
**possible** [2] - 24:4, 26:20
**possibly** [1] - 20:19
**preferred** [17] - 12:7, 12:13, 13:23, 14:23, 14:25, 15:1, 15:9, 16:11, 16:15, 17:10, 17:19, 20:10, 22:21, 26:25, 29:8, 40:12, 40:16

**premise** [2] - 14:13, 39:17
**preposition** [1] - 19:18
**prerogatives** [1] - 3:17
**present** [8] - 2:15, 26:21, 27:1, 28:15, 28:16, 28:17, 35:9, 38:17
**present-tense** [1] - 28:16
**presentation** [4] - 6:4, 7:8, 15:15, 37:13
**presentations** [2] - 2:21, 4:7
**presents** [1] - 9:1
**pretty** [3] - 24:21, 28:18, 33:19
**preview** [1] - 4:6
**previously** [1] - 4:19
**primer** [1] - 19:1
**principle** [2] - 9:18, 34:20
**principles** [1] - 48:14
**problem** [6] - 8:10, 9:2, 27:21, 28:6, 45:17
**procedure** [2] - 3:5, 3:7
**Procedure** [1] - 3:19
**proceed** [3] - 2:20, 5:21, 6:1
**process** [9] - 4:11, 5:11, 8:20, 17:24, 27:14, 27:23, 27:24, 28:1, 48:5
**processing** [1] - 48:3
**produced** [1] - 20:11
**product** [1] - 23:1
**professional** [1] - 42:22
**properly** [1] - 17:17
**properties** [1] - 25:21
**property** [1] - 25:15
**proposal** [5] - 27:22, 45:11, 45:25, 46:4, 48:15
**propose** [1] - 7:7
**proposed** [9] - 3:25, 4:8, 4:9, 4:10, 4:15, 4:18, 5:6, 5:16, 44:6
**prosecution** [1] - 13:2
**providing** [2] - 45:14, 47:1
**provision** [1] - 3:19
**purchased** [1] - 15:6
**pure** [1] - 25:14
**purely** [2] - 40:11, 40:13
**purposes** [1] - 15:14

**pursuant** [1] - 3:22
**put** [3] - 29:11, 38:3, 42:9
**putting** [1] - 31:10

## Q

**qualify** [1] - 46:3
**questions** [1] - 23:22
**quick** [1] - 26:13
**quite** [1] - 28:15

## R

**raised** [2] - 38:2, 38:21
**range** [1] - 39:6
**rather** [3] - 24:17, 26:14, 41:9
**reach** [1] - 17:15
**reaching** [1] - 38:24
**react** [4] - 39:11, 45:11, 46:6, 48:5
**reacting** [1] - 40:1
**reaction** [6] - 37:22, 38:8, 38:9, 40:14, 45:13, 47:7
**read** [3] - 29:24, 39:22, 45:4
**reading** [2] - 21:3, 44:19
**real** [1] - 21:10
**reality** [1] - 16:2
**really** [16] - 21:3, 26:1, 27:11, 28:7, 30:9, 31:6, 35:13, 37:15, 41:11, 41:21, 43:19, 43:25, 45:3, 45:7, 46:12, 46:23
**rears** [1] - 34:8
**reason** [2] - 38:1, 42:25
**reasons** [1] - 14:16
**receive** [1] - 38:6
**received** [2] - 4:17, 24:18
**recognize** [1] - 48:7
**reconcile** [1] - 47:12
**record** [4] - 3:13, 4:1, 4:11, 13:15
**red** [5] - 8:22, 12:6, 37:15, 38:1, 38:9
**reduce** [1] - 11:16
**reduces** [1] - 9:14
**redundant** [1] - 35:22
**refer** [8] - 22:15, 27:15, 31:16, 33:21, 34:9, 35:11, 45:21,

45:25
**reference** [4] - 13:6, 13:8, 13:9, 29:22
**referenced** [1] - 49:1
**references** [3] - 13:1, 22:23, 38:3
**referred** [3] - 26:5, 42:5, 44:24
**referring** [9] - 5:22, 20:24, 23:2, 29:23, 39:9, 44:17, 45:6, 47:3, 47:6
**refers** [12] - 22:3, 23:5, 29:1, 29:5, 31:15, 34:19, 37:25, 41:25, 42:1, 45:11, 47:14
**refrain** [1] - 46:12
**refraining** [1] - 5:22
**regard** [1] - 38:9
**regarding** [1] - 6:23
**region** [24] - 5:4, 8:4, 8:5, 9:23, 10:6, 17:8, 17:12, 18:6, 18:8, 18:11, 23:19, 25:22, 29:10, 29:11, 32:13, 32:24, 33:2, 33:5, 33:6, 35:7, 39:4, 41:15
**regions** [23] - 5:1, 5:4, 5:5, 5:20, 6:15, 10:12, 12:15, 14:20, 17:25, 21:6, 22:18, 23:5, 23:17, 32:14, 32:21, 34:7, 34:14, 34:25, 35:2, 35:8, 41:19, 43:3, 46:20
**rejected** [1] - 4:24
**related** [4] - 11:14, 11:22, 21:19, 30:12
**relationship** [6] - 19:19, 20:18, 20:19, 31:24, 32:19
**relative** [4] - 10:19, 17:2, 18:12, 37:8
**relatively** [2] - 8:12, 9:11
**relevance** [1] - 31:5
**relevant** [1] - 38:11
**relied** [1] - 5:12
**remain** [2] - 6:9, 18:4
**remains** [1] - 23:20
**remember** [1] - 18:6
**remove** [1] - 45:15
**removing** [1] - 45:23
**replaces** [1] - 8:21
**replete** [1] - 37:16
**reply** [3] - 3:2, 11:15, 36:17
**Reporter** [1] - 49:12
**representing** [1] -

24:2
**require** [1] - 30:24
**required** [8] - 11:19, 11:25, 13:24, 14:17, 14:18, 26:8, 39:17
**requirement** [2] - 19:13, 28:13
**requires** [6] - 12:5, 12:24, 19:6, 19:15, 20:22, 28:16
**requiring** [1] - 42:4
**research** [1] - 42:17
**resolve** [1] - 46:25
**respective** [1] - 4:1
**respond** [1] - 27:4
**response** [1] - 6:17
**rest** [3] - 18:13, 18:14, 21:4
**result** [8] - 5:15, 8:24, 10:23, 16:13, 18:5, 18:16, 18:17, 32:5
**results** [1] - 16:2, 28:4
**reverse** [6] - 9:4, 9:12, 9:15, 11:3, 11:5, 11:9
**reversed** [2] - 6:24, 8:6
**review** [1] - 4:21
**revise** [3] - 3:14, 5:9, 5:18
**revised** [5] - 4:18, 4:21, 4:25, 5:10, 5:17
**Richardson** [3] - 1:16, 1:17, 2:5
**rising** [1] - 41:6
**roof** [4] - 32:2, 43:5, 43:7, 43:9
**room** [1] - 43:5
**rug** [1] - 20:3
**rule** [1] - 21:21
**ruled** [1] - 38:13
**rules** [3] - 5:8, 6:21, 6:22
**Rules** [1] - 3:19
**ruling** [6] - 2:17, 6:5, 6:18, 18:22, 23:22, 49:1

## S

**Sakai** [5] - 13:14, 14:1, 14:2, 14:3, 14:7
**sampling** [1] - 24:24
**sanction** [1] - 21:22
**sandwich** [1] - 8:1
**save** [1] - 37:16
**saw** [2] - 25:24, 38:11
**SBR** [1] - 25:2

**scattered** [1] - 16:9
**schedule** [2] - 3:7, 3:20
**scheduling** [3] - 3:3, 3:5, 3:22
**Schottky** [8] - 8:21, 9:8, 9:13, 9:21, 11:2, 11:5, 11:9
**scope** [1] - 40:18
**scraping** [1] - 15:22
**screen** [1] - 38:4
**seated** [1] - 2:2
**second** [17] - 5:3, 11:25, 20:23, 22:17, 28:20, 28:21, 28:23, 29:4, 34:13, 35:20, 35:23, 36:1, 36:13, 38:9, 39:16, 46:19
**seconds** [1] - 33:14
**section** [1] - 8:22
**see** [14] - 7:25, 9:19, 9:23, 10:24, 16:14, 17:19, 18:8, 20:11, 24:23, 26:14, 27:12, 28:14, 32:16, 36:6
**seeking** [1] - 4:15
**seem** [2] - 44:3, 47:21
**selection** [1] - 12:18
**semi** [1] - 44:10
**semi-conductive** [1] - 44:10
**semiconductor** [30] - 5:1, 7:24, 7:25, 8:4, 8:24, 13:9, 15:8, 21:11, 21:13, 22:9, 22:11, 24:20, 24:25, 25:7, 25:8, 27:3, 31:1, 31:8, 33:14, 33:15, 34:11, 35:15, 35:17, 36:9, 44:10, 44:12, 44:15, 45:1, 46:18
**sense** [7] - 20:6, 21:2, 22:22, 22:23, 43:23, 45:1, 45:2
**sentence** [1] - 12:12
**separate** [1] - 22:7
**September** [1] - 3:4
**serve** [1] - 4:6
**set** [2] - 4:8, 5:13
**sets** [1] - 3:5
**seven** [1] - 4:14
**shape** [1] - 4:5
**shapes** [1] - 45:2
**sharply** [1] - 16:13
**shell** [1] - 29:18
**shipped** [1] - 44:22
**short** [1] - 24:3
**shortly** [1] - 11:19
**show** [1] - 14:11

**showed** [1] - 13:21
**showing** [1] - 16:2
**shown** [6] - 10:8, 14:20, 15:3, 15:16, 17:11, 46:11
**shows** [1] - 13:3, 14:3
**side** [20] - 5:1, 5:3, 5:5, 5:20, 6:15, 8:5, 16:16, 17:25, 21:6, 22:18, 32:14, 32:21, 33:2, 34:7, 34:14, 34:25, 35:2, 35:6, 35:8, 46:20
**sides** [3] - 18:1, 18:3, 18:4
**siding** [1] - 42:9
**significantly** [1] - 11:2
**silicon** [5] - 15:4, 15:5, 17:5, 17:6, 25:16
**similarly** [2] - 20:2, 41:1
**simple** [1] - 7:23
**simplistic** [1] - 26:1
**simply** [3] - 28:22, 29:5, 29:17
**simultaneously** [2] - 4:2, 4:12
**single** [8] - 11:21, 12:2, 12:17, 12:24, 39:15, 40:9, 40:12
**sits** [2] - 9:24, 10:11
**sitting** [2] - 6:25, 27:5
**situation** [2] - 28:13, 30:14
**six** [1] - 34:17
**skill** [4] - 31:4, 31:7, 33:10, 33:24
**skip** [3] - 18:23, 19:1, 26:3
**SLEET** [1] - 1:13
**sleight** [1] - 36:23
**Slide** [3] - 28:14, 29:21, 37:12
**slide** [3] - 13:22, 24:24, 27:12
**slides** [4] - 18:23, 26:3, 29:23, 29:25
**slightly** [2] - 38:19, 39:7
**small** [7] - 17:1, 17:6, 17:7, 24:22, 31:8, 39:1, 41:13
**smaller** [1] - 14:12
**so-called** [1] - 17:25
**solution** [1] - 23:12
**someone** [1] - 33:20
**sometimes** [1] - 15:23
**somewhere** [2] - 25:10, 25:19
**sort** [3] - 11:12, 26:2,

42:14
**sorts** [2] - 24:21, 28:4
**sought** [1] - 5:9
**sounds** [2] - 15:21, 25:9
**spatial** [2] - 31:23, 32:19
**specific** [9] - 7:11, 14:23, 23:19, 31:9, 31:12, 31:13, 31:15, 31:16, 31:19
**specifically** [5] - 3:20, 14:7, 14:9, 22:16, 40:17
**specification** [15] - 7:10, 19:15, 20:5, 20:24, 21:2, 23:4, 26:10, 26:13, 35:12, 36:4, 43:13, 43:14, 44:18, 44:21, 45:8
**spite** [1] - 21:22
**split** [2] - 2:15, 2:18
**stage** [1] - 5:11
**standing** [2] - 20:3, 30:23
**standpoint** [1] - 31:3
**start** [6] - 6:2, 13:10, 14:10, 14:19, 26:8, 28:3, 34:1, 35:14
**starting** [1] - 29:21
**starts** [4] - 14:8, 33:15, 34:16, 41:12
**statement** [2] - 26:6, 38:5
**statements** [1] - 11:14
**states** [1] - 4:18
**STATES** [1] - 1:1
**step** [3] - 17:24, 18:17, 32:3
**sticking** [1] - 8:2
**still** [4] - 5:5, 19:3, 27:15, 38:12
**stipulation** [1] - 48:25
**straightforward** [3] - 28:18, 34:19, 44:19
**street** [1] - 26:2
**stronger** [1] - 37:9
**structure** [8] - 9:20, 10:8, 16:19, 28:1, 28:2, 28:10, 28:12, 46:10
**structures** [1] - 15:19
**subject** [1] - 23:21
**subsequently** [4] - 23:17, 25:20, 27:10, 29:3
**subset** [2] - 25:1
**substantially** [2] - 13:10, 16:15
**substantively** [1] -

21:21
**substitution** [1] - 47:15
**substrate** [132] - 5:2, 5:4, 5:20, 6:10, 6:15, 14:4, 15:2, 15:4, 15:9, 15:10, 15:11, 15:14, 15:18, 15:23, 15:24, 16:5, 16:10, 16:23, 17:3, 17:13, 17:21, 18:11, 18:13, 18:14, 19:4, 20:9, 20:12, 20:13, 20:15, 21:6, 21:11, 21:13, 21:25, 22:3, 22:9, 22:11, 22:13, 22:15, 22:17, 22:19, 22:23, 22:24, 23:2, 23:5, 23:8, 23:9, 23:10, 23:13, 23:15, 23:16, 23:17, 23:20, 27:13, 27:14, 27:15, 28:16, 28:17, 28:22, 28:23, 29:1, 29:6, 29:7, 29:10, 29:11, 29:12, 30:11, 30:12, 30:17, 31:11, 31:16, 31:18, 31:20, 32:12, 32:13, 32:14, 32:20, 32:23, 32:24, 33:4, 33:5, 33:7, 33:13, 33:14, 33:16, 33:18, 33:21, 34:1, 34:3, 34:4, 34:5, 34:7, 34:10, 34:11, 34:17, 34:18, 34:19, 35:2, 35:3, 35:4, 35:15, 35:17, 36:9, 36:11, 40:19, 41:12, 41:13, 41:16, 41:17, 41:18, 41:19, 41:20, 41:22, 42:1, 42:3, 42:4, 42:7, 43:2, 43:15, 43:16, 43:17, 43:19, 43:22, 46:18, 46:21
**suggest** [1] - 39:21
**suggested** [1] - 47:1
**suggestion** [1] - 45:12
**suggests** [2] - 13:17, 13:22
**suit** [1] - 9:17
**summary** [1] - 26:16
**support** [3] - 20:7, 26:9, 43:11
**supported** [2] - 19:21, 40:1
**supporting** [2] - 3:12, 20:19
**supports** [1] - 23:4
**suppose** [1] - 28:8

**supposed** [1] - 9:5
**surface** [29] - 5:19, 6:10, 6:10, 17:15, 17:21, 19:4, 23:6, 23:7, 23:11, 30:11, 32:12, 32:13, 32:20, 32:21, 32:23, 32:24, 33:4, 33:5, 33:7, 33:18, 41:2, 41:4, 41:5, 41:6, 41:8, 44:25, 45:1, 46:2

**T**

**table** [8] - 19:23, 19:24, 20:1, 30:22, 31:1, 31:4
**talks** [4] - 31:19, 38:15, 38:22, 43:14
**teaches** [3] - 12:11, 40:7, 40:9
**teaching** [1] - 12:21
**technical** [1] - 37:6
**technique** [2] - 16:12, 18:2
**techniques** [1] - 16:17
**technology** [14] - 5:25, 7:8, 7:9, 9:3, 11:12, 13:4, 13:13, 18:21, 24:6, 25:5, 26:5, 37:7, 44:2, 46:16
**ten** [2] - 3:24, 4:9
**tense** [3] - 28:15, 28:16, 28:17
**term** [29] - 3:10, 19:3, 19:6, 20:5, 20:17, 20:21, 21:5, 21:10, 21:13, 21:24, 22:2, 22:13, 25:8, 27:8, 29:5, 30:10, 30:16, 32:15, 33:2, 33:10, 34:6, 35:9, 43:10, 43:22, 44:5, 45:13, 45:20, 47:16
**terminal** [2] - 7:18, 7:19
**terminology** [1] - 46:13
**terms** [16] - 2:15, 3:24, 4:9, 4:24, 5:1, 5:17, 5:18, 6:9, 7:11, 21:25, 26:2, 26:20, 29:21, 30:9, 30:12, 45:5
**THE** [40] - 1:1, 1:2, 2:1, 2:7, 2:9, 2:17, 6:7, 6:19, 7:13, 19:1, 21:8, 21:15, 21:18,

21:21, 23:23, 24:1, 24:5, 24:12, 30:2, 30:4, 30:6, 36:16, 37:21, 39:10, 40:3, 40:14, 43:24, 44:3, 45:9, 45:19, 45:22, 46:5, 46:14, 47:7, 47:18, 47:24, 48:4, 48:22, 48:24, 49:6
**therefore** [2] - 10:22, 14:11, 19:16
**thinking** [1] - 31:5
**Third** [1] - 6:25
**third** [1] - 21:5
**thirdly** [1] - 38:14
**THOMAS** [1] - 1:15
**thousand** [1] - 17:5
**thousands** [1] - 16:3
**three** [4] - 5:18, 29:13, 40:21, 42:2
**three-year-old** [2] - 29:13, 40:21
**threshold** [2] - 38:23, 38:24
**throughout** [1] - 22:23
**title** [1] - 26:15
**today** [7] - 2:6, 2:15, 24:19, 25:4, 29:19, 29:23, 38:2
**Tom** [1] - 2:4
**top** [17] - 9:25, 10:24, 11:20, 12:1, 12:18, 14:15, 15:13, 15:18, 15:23, 18:4, 18:18, 31:18, 36:7, 39:25, 40:13, 41:2, 43:21
**touches** [1] - 17:21
**touching** [5] - 19:25, 20:13, 20:15, 20:18, 43:16
**toward** [1] - 39:6
**tradeoff** [1] - 9:10
**traditional** [8] - 7:22, 9:9, 9:20, 10:3, 24:18, 37:8, 39:2, 40:4
**trial** [1] - 48:10
**tries** [1] - 7:20
**trouble** [1] - 48:15
**true** [1] - 39:16
**try** [2] - 24:3, 45:10
**trying** [1] - 10:17
**Tunnell** [1] - 1:20
**turn** [15] - 14:6, 14:15, 14:17, 27:14, 36:20, 37:2, 37:4, 37:7, 37:10, 37:11, 37:14, 37:17, 39:3, 39:18
**turn-on** [11] - 14:17, 36:20, 37:2, 37:4,

37:10, 37:11, 37:14, 37:17, 39:3, 39:18
**turned** [1] - 37:1
**turning** [3] - 13:19, 13:21, 40:19
**tutorial** [1] - 26:5
**two** [22] - 4:24, 7:23, 8:1, 10:12, 11:14, 11:22, 14:16, 14:18, 14:20, 15:5, 15:25, 20:22, 20:25, 30:12, 30:16, 33:11, 42:2, 44:21, 46:16, 46:17, 48:7, 48:25
**type** [95] - 4:24, 5:2, 5:3, 6:12, 7:24, 8:3, 8:4, 8:5, 8:10, 8:19, 8:24, 11:1, 11:7, 11:21, 12:2, 12:6, 12:8, 12:9, 12:17, 12:24, 14:20, 15:6, 15:9, 16:25, 17:12, 17:13, 18:11, 21:12, 21:14, 22:2, 22:10, 22:15, 22:18, 22:19, 22:20, 22:21, 23:1, 23:9, 23:10, 23:14, 23:15, 23:17, 23:19, 23:20, 25:1, 25:11, 25:18, 25:19, 25:20, 25:22, 25:23, 27:4, 27:7, 27:9, 27:13, 27:14, 27:15, 28:18, 28:20, 28:21, 28:22, 28:23, 29:2, 29:5, 29:9, 29:12, 33:16, 34:2, 34:12, 34:17, 39:15, 40:11, 40:13, 40:20, 41:4, 41:9, 41:10, 41:12, 41:15, 41:17, 41:22, 41:23, 42:1, 42:5, 42:6, 42:7, 42:13, 43:2
**types** [5] - 7:24, 8:17, 15:5, 16:16, 24:24
**typical** [1] - 33:19
**typically** [1] - 45:25

**U**

**ugly** [1] - 34:8
**ultimate** [2] - 3:12, 15:19
**ultimately** [2] - 22:6, 44:5
**under** [5] - 5:3, 5:5, 22:18, 44:11, 49:6
**underlying** [5] - 5:25, 7:9, 22:4, 39:17
**understood** [2] - 19:9,

20:18
unfair [1] - 5:12
UNITED [1] - 1:1
units [1] - 24:22
unless [2] - 28:8
unusual [1] - 33:22
up [15] - 2:15, 6:7,
10:15, 16:7, 16:8,
17:21, 18:5, 22:6,
30:20, 32:11, 32:25,
36:11, 36:12, 37:22,
38:4
upper [1] - 27:12
ups [1] - 24:11
upward [2] - 17:14,
17:15
usage [1] - 43:20
uses [4] - 3:7, 3:10,
22:13, 32:17
utilizing [1] - 4:9

**V**

valve [1] - 7:17
varied [1] - 5:2
variety [1] - 24:21
various [4] - 17:16,
23:17, 37:12, 39:22
vertical [1] - 16:16
vertically [1] - 19:21
view [4] - 4:5, 4:22,
22:2, 24:6
violate [1] - 5:8
volt [3] - 14:17, 39:3,
39:5
voltage [38] - 8:7,
8:12, 8:20, 8:25,
10:10, 10:16, 10:18,
10:19, 10:22, 11:2,
11:8, 11:9, 11:17,
11:24, 13:11, 13:24,
14:10, 14:12, 26:8,
26:12, 26:22, 37:2,
37:4, 37:8, 37:10,
37:11, 37:13, 37:14,
37:17, 38:15, 38:18,
38:23, 38:24, 39:3,
39:19
volts [15] - 13:19,
13:21, 14:7, 14:8,
14:10, 14:16, 14:19,
36:24, 38:25, 39:3,
39:4, 39:6, 39:7,
39:8

**W**

wafer [3] - 15:4, 15:5,
22:5

Walker [1] - 6:8
wall [9] - 20:1, 20:2,
27:18, 27:19, 30:23,
42:10, 42:11
walls [1] - 16:16
wants [1] - 43:23
Wednesday [1] - 1:11
well-understood [1] -
19:9
wet [1] - 16:17
whatsoever [2] -
12:21, 26:10
wide [1] - 24:21
Wilmington [1] - 1:10
wished [1] - 5:8
wood [5] - 42:8, 42:10,
42:12, 42:14, 42:20
wood-framed [3] -
42:8, 42:10, 42:14
word [9] - 19:9, 21:25,
26:14, 28:16, 31:24,
32:16, 36:1, 45:15,
45:23
words [2] - 3:13,
45:15
works [3] - 10:21,
11:13, 24:7
world [1] - 18:19
worlds [1] - 11:8
writing [1] - 7:1
written [1] - 28:15

**Y**

year [4] - 24:16, 24:22,
29:13, 40:21
Yee [5] - 13:8, 13:11,
13:13, 13:15
yesterday [2] - 38:7,
38:22

**Z**

zero [36] - 11:18,
11:24, 12:12, 12:16,
12:22, 13:10, 13:19,
13:21, 13:24, 14:7,
14:8, 14:10, 14:16,
14:17, 14:19, 26:7,
26:12, 36:20, 36:24,
37:2, 37:11, 37:13,
37:17, 38:15, 38:18,
38:19, 38:25, 39:4,
39:6, 39:7, 39:13,
39:14, 39:18

**Exhibit B**

**To**

**Reply In Support of Skype Defendants'
Motion to Strike Via Vadis's Proposed
Claim Constructions**

# Patent Case Management Judicial Guide

## Second Edition (2012)

**Peter S. Menell**
*Robert L. Bridges Professor of Law*
*Berkeley Center for Law & Technology*
*University of California, Berkeley School of Law*

**Lynn H. Pasahow**
*Fenwick & West LLP*

**James Pooley**
*Deputy Director General, Innovation and Technology Sector*
*World Intellectual Property Organization*

**Matthew D. Powers**
*Tensegrity Law Group LLP*

**Steven C. Carlson**
*Fish & Richardson*

**Jeffrey G. Homrig**
*Kasowitz, Benson, Torres & Friedman LLP*

*in collaboration with*

| | |
|---|---|
| **David S. Bloch** | **Jeremy Bock** |
| *Winston & Strawn LLP* | *Berkeley Center for Law & Technology* |

| | | |
|---|---|---|
| **Carolyn Chang** | **Samuel F. Ernst** | **Rebecca Charnas Grant** |
| *Fenwick & West LLP* | *Covington & Burling LLP* | **Leeron G. Kalay** |
| | | *Fish & Richardson* |

| | | |
|---|---|---|
| **Marc David Peters** | **Clem Roberts** | **Patricia Young** |
| **Colette R. Verkuil** | *Durie Tangri* | *Kasowitz, Benson, Torres* |
| **Anita Choi** | | *& Friedman LLP* |
| **Kimberly N. Van Voorhis** | | |
| **Michael R. Ward** | | |
| *Morrison & Foerster LLP* | | |

## Federal Judicial Center

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to develop educational materials for the judicial branch. While the Center regards the content as responsible and valuable, it does not reflect policy or recommendations of the Board of the Federal Judicial Center.

with its own construction that does not square with either party's, or deprive litigants of enough time to settle the case before trial.

## 5.1.2  Pre-*Markman* Procedures

In order to promote efficient and effective *Markman* hearings, courts will want to address the procedures and ground rules for such proceedings at a relatively early stage in case management. As discussed in Chapter 2, Patent Local Rules place particular emphasis on timely and orderly identification of disputed claim terms. We begin this section with further discussion of best practices to bring those disputes and the parties' arguments to the surface prior to the *Markman* hearing. Depending on the complexity of the technology at issue, it is often useful to plan for technology tutorials in conjunction with the *Markman* proceeding. We discuss several practical issues relating to the timing, form, and conduct of such tutorials and the use of court-appointed experts to assist in claim construction.

### 5.1.2.1  Mandatory Disclosure of Positions

The primary goals of the procedures before a *Markman* hearing are to: (1) ensure that the parties' claim construction positions are squarely joined, reducing false and hidden disputes; and (2) resolve any disputes about how the *Markman* hearing should be conducted so the hearing itself is efficient, helpful to the court, and without procedural disarray.

The following steps have proven especially effective in accomplishing these objectives.

### 5.1.2.1.1  Early  Disclosure  of  Infringement  and Invalidity Contentions

Requiring disclosure of infringement contentions at the start of the case is a proven way to focus at least some of the disputes at issue for the *Markman* hearing. Early disclosure of infringement contentions is a feature of the Patent Local Rules discussed in Chapter 2. *See* Appendix D (listing jurisdictions with Patent Local Rules). In jurisdictions that have not adopted Patent Local Rules, courts are free to build these disclosure requirements into their scheduling orders. These infringement contentions require the patentee to specify, among other things, each claim of each patent in suit that is allegedly infringed; each instrumentality that allegedly infringes each asserted claim; and a claim chart detailing where each element of an asserted claim is found

in each accused instrumentality. *See, e.g.,* Northern District of California Patent Local Rule 3-1; Eastern District of Texas Patent Rule 3-1.

With its infringement contentions, the party must produce, among other things, all documents evidencing the conception and reduction to practice of each asserted claim, along with documents sufficient to show the disclosure of the claimed inventions to others prior to filing of the patent application. Similarly, the court can help focus *Markman* issues by requiring the alleged infringer to disclose invalidity contentions after receipt of the infringement contentions. This requires the alleged infringer to specify, among other things, the identity of each item of prior art that allegedly anticipates each asserted claim or renders it obvious, and any grounds for invalidity due to indefiniteness, enablement, or written description. *See* § 112. With its invalidity contentions, the accused infringer must produce all prior art not already of record, as well as documents sufficient to show the operation of the accused devices.

These disclosures force parties to crystallize their theories early in the case, and thereby to identify the matters that need to be resolved through the *Markman* hearing. They also help streamline discovery by mandating the disclosures that are core to patent cases, thus reducing the need for interrogatories, document requests, and contention depositions. Early infringement contentions can, however, lead to more discovery because they may occur before parties fully understand their own positions.

## 5.1.2.1.2 Disclosure of Claims to Construe and Proposed Constructions

A widespread problem in patent cases is that the parties' *Markman* briefing may not effectively join the issues to be litigated at the *Markman* hearing, or may not confront claim construction issues that will ultimately be litigated at trial. To avoid this problem, it is advisable that the court set a meet-and-confer schedule in its scheduling order to require parties to identify terms that need construction. These procedures help to ensure that the issues for the *Markman* hearing be specified in advance of the briefing cycle, as opposed to having issues disclosed for the first time in briefing. Ordering a meet-and-confer process also helps to ensure that the parties' briefing is not wastefully directed to false or merely hypothetical disputes. Ordering parties to disclose their claim construction positions also discourages "hidden" disputes that may otherwise arise at trial. This structured meet-and-confer process is part of the Patent Local Rules of the Northern District of California, the Eastern District of Texas, and growing number of district courts, and is required within ten days of service of the invalidity contentions. *See* Northern

*Patent Case Management Judicial Manual*

District of California Patent Local Rules 4-1 to 4-3; Eastern District of Texas Patent Rules 4-1 to 4-3.

As part of this process, the court's scheduling order should set a date for the parties to exchange proposed constructions of the identified terms. Setting this date approximately twenty days after exchanging lists of terms is appropriate. As part of this disclosure, some jurisdictions also require that the parties disclose their supporting evidence, including whether they will be relying on expert witnesses.

### 5.1.2.1.3 Mechanisms for Limiting the Number of Claim Terms to Construe

Cases commonly involve multiple patents, dozens or even hundreds of claims, and multitudes of claim terms that may need construction. If left unmanaged, the sheer complexity of this tangle of terms can overwhelm the merits of a lawsuit. Courts should exercise their inherent case-management authority to limit the number of claims and claim terms at issue, as appropriate.

At the *Markman* phase, courts have wide discretion to limit the number of claim terms at issue. Restricting the scope of the *Markman* hearing may have the benefit of focusing the court's attention on the key issues (which may dispose of the case), and of allowing a more prompt and well-reasoned ruling on the central matters in the case. Courts have experimented widely with various approaches to managing the scope of *Markman* hearings. By contrast, asking the parties to brief all the potential claim construction disputes invites false or inconsequential disputes, particularly because parties reflexively seek to avoid the risk of a waiver finding if they refrain from raising peripheral disputes.

As a means for focusing patent litigation on the most salient issues, the Northern District of California revised its Patent Local Rules to require the parties to jointly identify ten terms "likely to be most significant to resolving the parties' dispute, including those terms for which construction may be case or claim dispositive." *See* N.D. Cal. Patent L.R. 1.2; *see also* N.D. Ill. LPR 4.1(b) (requiring parties to limit terms submitted for construction to ten absent a showing of good cause). The ten-term limit is a default that can be adjusted upwards or downwards depending on the circumstances of the case.

There are several factors that may influence whether to increase the number of terms to be construed, such as the number of patents in dispute and the extent to which means-plus-function claims (§ 112 ¶ 6) are present. Ten can be high for single patent cases, but low for multi-patent cases. *See* N.D. Ill. LPR 4.1(b) (noting that the "assertion of multiple non-related patents